David B. Shemano, Esq.                    **AUCTION: December 1, 2015 at 11am (EST)**
**ROBINS KAPLAN LLP**
601 Lexington Avenue
Suite 3400
New York, NY 10022-4611
Tel:  (212) 980-7400
Fax: (212) 980-7499

- and -

Howard J. Weg, Esq.
Scott F. Gautier, Esq.
**ROBINS KAPLAN LLP**
2049 Century Park East
Suite 3400
Los Angeles, CA 90067-3208
Tel:  (310) 552-0130
Fax: (310) 229-5800

*Counsel for Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| 33 PECK SLIP ACQUISITION LLC, *et al.*, | Case No. 15-12479 (JLG) |
| Debtors.[1] | (Joint Administration Pending) |

**NOTICE OF BID AND AUCTION FOR HOTEL PROPERTY
LOCATED AT 33 PECK SLIP, NEW YORK, NEW YORK**

PLEASE TAKE NOTICE THAT 33 Peck Slip Acquisition LLC (the "Debtor"),

hereby gives notice (this "Notice") of the receipt of a written bid by the Howard

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: 33 Peck Slip Acquisition LLC (3412), 52 West 13th P, LLC (4970), 36 West 38th Street, LLC (6842), and Gemini 37 West 24th Street MT, LLC (4143).

Hughes Corporation ("HHC" or "Acceptable Bidder") in connection with the sale (the "Sale") of the real property located at 33 Peck Slip, New York, NY (the "Property").  A copy of the written bid (the "Acceptable Bid") received by the Debtor's counsel is attached to this Notice as Exhibit A and a copy of the letter transmitting the Acceptable Bid is attached hereto as Exhibit B.

PLEASE TAKE FURTHER NOTICE THAT, pursuant to the Order approving bidding procedures (the "Sale Procedures"), the bid is considered an "Acceptable Bid" submitted by 4pm (EST) on November 24, 2015 (the "Bid Deadline")[2] that meets each of the Sales Procedures requirements.

PLEASE TAKE FURTHER NOTICE THAT, pursuant to the Sales Procedures, the Acceptable Bid was reviewed by the Debtor with the assistance of counsel, the Real Estate Advisors, and counsel to the Lender and William T. Obeid, who made the determination that there was no basis to object to the Acceptable Bid being a "Qualified Bid" and the offeror a "Qualified Bidder."  Accordingly, the Debtors have not filed an objection to the Acceptable Bid becoming a Qualified Bid and the offeror a Qualified Bidder, and the Acceptable Bid shall be deemed a Qualified Bid with no further notice.

PLEASE TAKE FURTHER NOTICE THAT if any other party in interest objects to the Acceptable Bidder becoming a Qualified Bidder, then the objecting party shall, at any time prior to the Auction, file with the Court a notice of objection to the Acceptable

---

[2] The written bid was submitted via e-mail at 4:35pm on November 24, 2015.  HHC had notified the Debtor of its intent to submit a bid well in advance of the Bid Deadline.  Prior to the Bid Deadline, HHC was unable to reach Debtor's counsel because counsel was involved in a hearing before the Court.  The written bid was submitted immediately after counsel responded to HHC's question regarding bid submission.

75640847.1

Bid and Acceptable Bidder with a short summary of the reasons that the Acceptable Bid and Acceptable Bidder should not be considered a Qualified Bid and Qualified Bidder and the Court shall determine whether such Acceptable Bid and Acceptable Bidder shall be considered a Qualified Bid and Qualified Bidder immediately prior to the Auction.

PLEASE TAKE FURTHER NOTICE THAT the Auction shall be held on **December 1, 2015, at 11:00 a.m. (EST)** at the United States Bankruptcy Court for the Southern District of New York, Courtroom 601, One Bowling Green, New York, NY 10004. At the conclusion of the Auction, the Debtor shall request the Court to confirm the designation of the "Successful Bidder" as defined in the Sales Procedures**.**

Dated: November 25, 2015

**ROBINS KAPLAN LLP**

By:/s/  Scott F. Gautier
David B. Shemano, Esq.
601 Lexington Avenue
Suite 3400
New York, NY 10022-4611
Tel:  (212) 980-7400
Fax:  (212) 980-7499

-and-

Howard J. Weg, Esq.
Scott F. Gautier, Esq.
2049 Century Park East
Suite 3400
Los Angeles, CA 90067-3208
Tel:  (310) 552-0130
Fax:  (310) 229-5800

*Counsel for Debtors and Debtors in Possession*

75640847.1

# EXHIBIT A

75640847.1

PURCHASE AND SALE AGREEMENT

BY AND BETWEEN

**33 PECK SLIP ACQUISITION LLC**
a Delaware limited liability company

AS SELLER

AND

**THE HOWARD HUGHES CORPORATION**
A Delaware corporation

AS PURCHASER

Dated as of November 24, 2015

FOR THE

Best Western Seaport Inn

33 Peck Slip, New York, NY

# TABLE OF CONTENTS

PURCHASE AND SALE AGREEMENT ...........................................................................1

**ARTICLE I DEFINITIONS** ...............................................................................................1
1.1         Definitions. ..................................................................................................1

**ARTICLE II THE PROPERTY AND LIABILITIES** .......................................................8
2.1         Description of the Property. ..........................................................................8
2.2         Assumed Liabilities. ...................................................................................11
2.3         Retained Liabilities. ...................................................................................11

**ARTICLE III PURCHASE PRICE**..................................................................................11
3.1         Purchase Price. ...........................................................................................11
3.2         Earnest Money. ...........................................................................................11
3.3         Payment of Purchase Price. ........................................................................12
3.4         Allocation of Purchase Price. .....................................................................12
3.5         Like-Kind Exchange. .................................................................................12

**ARTICLE IV CONTINGENCIES** ...................................................................................12
4.1         Due Diligence. ............................................................................................12

**ARTICLE V TITLE TO THE PROPERTY** .....................................................................12
5.1         Title Commitment. ......................................................................................12
5.2         Survey. .......................................................................................................13
5.3         Exceptions to Title. ....................................................................................13
5.4         Title Policy. ................................................................................................13
5.5         Conveyance of the Property. .......................................................................14

**ARTICLE VI CONDITION OF THE PROPERTY** ........................................................14
6.1         PROPERTY SOLD "AS IS". .....................................................................14

**ARTICLE VII REPRESENTATIONS AND WARRANTIES** ........................................14
7.1         Seller's Representations and Warranties. .....................................................14
7.2         Purchaser's Representations and Warranties. ..............................................18

**ARTICLE VIII COVENANTS** .........................................................................................19
8.1         Confidentiality. ..........................................................................................19
8.2         Conduct of the Business. ............................................................................20
8.3         Licenses and Permits. .................................................................................20
8.4         Employees. .................................................................................................20
8.5         Assignment of Mortgage. ...........................................................................20
8.6         Tax Contests. ..............................................................................................20
8.7         Notices and Filings. ....................................................................................21
8.8         Further Assurances. ....................................................................................21

**ARTICLE IX CLOSING CONDITIONS** .........................................................................22
9.1         Mutual Closing Conditions. .......................................................................22
9.2         Purchaser Closing Conditions. ...................................................................22
9.3         Seller Closing Conditions. ..........................................................................23

**ARTICLE X CLOSING** ..............................................................**23**
    10.1    Closing Date. ...........................................23
    10.2    Closing Escrow. .......................................23
    10.3    Closing Deliveries. ...................................24
    10.4    Possession. ..............................................26

**ARTICLE XI PRORATIONS AND EXPENSES** ...............**26**
    11.1    Closing Statement. ...................................26
    11.2    Prorations. ...............................................26
    11.3    Accounts Receivable. ...............................28
    11.4    Transaction Costs. ....................................28

**ARTICLE XII TRANSITION PROCEDURES** ..................**29**
    12.1    Safe Deposit Boxes. .................................29
    12.2    Baggage. ..................................................29

**ARTICLE XIII DEFAULT AND REMEDIES** .....................**29**
    13.1    Seller's Default. .......................................29
    13.2    Purchaser's Default. .................................30
    13.3    LIQUIDATED DAMAGES. ....................30

**ARTICLE XIV RISK OF LOSS** .........................................**30**
    14.1    Casualty. ..................................................30
    14.2    Condemnation. ........................................31

**ARTICLE XV SURVIVAL, INDEMNIFICATION AND RELEASE** ........**31**
    15.1    Survival. ...................................................31
    15.2    Indemnification by Seller. .......................32
    15.3    Indemnification by Purchaser. ................32
    15.4    Limitations on Indemnification Obligations. ......32

**ARTICLE XVI MISCELLANEOUS PROVISIONS** ...........**33**
    16.1    Notices ....................................................33
    16.2    No Recordation. ......................................34
    16.3    Time is of the Essence. ............................34
    16.4    Assignment. .............................................34
    16.5    Successors and Assigns. ..........................34
    16.6    Third Party Beneficiaries. .......................34
    16.7    GOVERNING LAW. ..............................34
    16.8    Rules of Construction. .............................34
    16.9    Severability. ............................................35
    16.10   JURISDICTION AND VENUE. ............35
    16.11   WAIVER OF TRIAL BY JURY. ...........35
    16.12   Prevailing Party. .....................................35
    16.13   Incorporation of Recitals, Exhibits and Schedules. ....35
    16.14   Intentionally omitted. ..............................35
    16.15   Entire Agreement. ...................................37
    16.16   Amendments, Waivers and Termination of Agreement. .........36
    16.17   Not an Offer. ...........................................36
    16.18   Execution of Agreement. .........................36

## LIST OF EXHIBITS

| | |
|---|---|
| Exhibit A | Form of Earnest Money Escrow Agreement |
| Exhibit B | Intentionally Omitted |
| Exhibit C | Intentionally Omitted |
| Exhibit D | Form of Seller Closing Certificate |
| Exhibit E | Form of Deed |
| Exhibit F | Form of Bill of Sale |
| Exhibit G | Form of Assignment and Assumption of Contracts and Licenses and Permits |
| Exhibit H | Intentionally Omitted |
| Exhibit I | Form of Purchaser Closing Certificate |

# PURCHASE AND SALE AGREEMENT

**THIS PURCHASE AND SALE AGREEMENT** (this "Agreement") is made and entered into as of this 24th_ day of November, 2015 (the "Effective Date"), by and between 33 Peck Slip Acquisition LLC, a Delaware limited liability company ("Seller"), and The Howard Hughes Corporation, a Delaware corporation ("Purchaser"). Seller and Purchaser are sometimes referred to herein individually as a "Party", and collectively as the "Parties".

**WHEREAS**, Seller is the owner of good and marketable title to the hotel facility located at 33 Peck Slip, New York, NY, and commonly known as the Best Western Seaport Inn (the "Hotel"), and the Property (as defined below), as more specifically described in this Agreement.

**WHEREAS**, Seller has filed a petition under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court").

**WHEREAS**, Seller desires to sell the Property to Purchaser, and Purchaser desires to purchase the Property from Seller, on the terms set forth in this Agreement, in accordance with and pursuant to section 105, 363 and 365 of the Bankruptcy Code.

**NOW, THEREFORE**, in consideration of the mutual covenants set forth in this Agreement and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

## ARTICLE I
## DEFINITIONS

**1.1 Definitions.** In addition to the terms defined above in the introduction and recitals to this Agreement, the following terms when used in this Agreement shall have the meanings set forth in this Section 1.1.

"Accounts Receivable" means all amounts which Seller is entitled to receive from the Business which are not paid as of the Closing, but expressly excluding all (i) credit card charges, checks and other instruments which Seller has submitted for payment as of the Closing, and (ii) items of income otherwise prorated pursuant to Section 11.2 or 11.3.1.

"Accrued Vacation Pay" means, with respect to any Rehired Employee, the salary and wages which such Rehired Employee is entitled to receive for any sick or vacation days or other paid time off accrued but unused by such Rehired Employee as of the time in question, together with all employment taxes with respect thereto, including, without limitation, any withholding and employer contributions required under Applicable Law.

"Affiliate" means, with respect to the Person in question, any other Person that, directly or indirectly, (i) owns or controls fifty percent (50%) or more of the outstanding voting and/or equity interests of such Person, or (ii) controls, is controlled by or is under common control with, the Person in question. For the purposes of this definition, the term "control" and its derivations means having the power, directly or indirectly, to direct the management, policies or general conduct of business of the Person in question, whether by the ownership of voting securities, contract or otherwise.

"Anti-Terrorism Laws" means Executive Order 13224 issued by the President of the United States, the USA PATRIOT Act, and all other Applicable Law addressing or in any way relating to terrorist acts and acts of war.

"Applicable Law" means (i) all statutes, laws, common law, rules, regulations, ordinances, codes or other legal requirements of any Governmental Authority, stock exchange, board of fire underwriters and similar quasi governmental authority, and (ii) any judgment, injunction, order or other similar requirement of any court or other adjudicatory authority, in effect at the time in question and in each case to the extent the Person or property in question is subject to the same.

"Assigned Operating Agreements" has the meaning set forth in Section 2.1.10.

"Assumed Liabilities" has the meaning set forth in Section 2.2.

"Bankruptcy Case" has the meaning set forth in Section 7.1.20

"Bankruptcy Code" means Title 11 of the United States Code

"Bookings" has the meaning set forth in Section 2.1.17.

"Books and Records" has the meaning set forth in Section 2.1.14.

"Broker" means RobertDouglas.

"Business" means the lodging business and all business and activities related or ancillary thereto conducted at the Hotel.

"Business Day" means any day other than a Saturday, Sunday or federal legal holiday.

"Casualty" has the meaning set forth in Section 14.1.

"Closing" has the meaning set forth in Section 10.1.

"Closing Date" has the meaning set forth in Section 10.1.

"Closing Escrow" has the meaning set forth in Section 10.2.

"Closing Escrow Agreement" has the meaning set forth in Section 10.2.

"Closing Statement" has the meaning set forth in Section 11.1.

"Code" means the Internal Revenue Code of 1986, as amended from time to time, and any regulations, rulings and guidance issued by the Internal Revenue Service.

"Compensation" means, with respect to any Employee, all salary and wages which such Employee is entitled to receive at the time in question, together with all employment taxes with respect thereto, including, without limitation, any withholding and employer contributions required under Applicable Law, but expressly excluding all other compensation accrued or payable to such Employee, including, without limitation, any (i) bonus or incentive compensation; (ii) PTO/Accrued Vacation Pay, sick days and personal days; and (iii) health, welfare and other benefits provided to such Employee, and employer contributions to, and amounts paid or accrued under, any benefit plans for the benefit of such Employee.

"Condemnation" has the meaning set forth in Section 14.2.

"Confidential Information" has the meaning set forth in Section 8.1.1.

"Contracts" means, collectively, the Equipment Leases and the Assigned Operating Agreements.

"Cut-Off Time" has the meaning set forth in Section 11.2.

"Deed" has the meaning set forth in Section 10.3.1(b).

"Earnest Money" means, at the time in question, the amounts then deposited with Escrow Agent in respect of the Deposit, together with all interest and any other amounts earned thereon.

"Earnest Money Escrow Agreement" has the meaning set forth in Section 3.2.1.

"Employees" means, at the time in question, all persons employed full time or part time at the Hotel by Seller or any its Affiliates.

"Employer" means the employer of the Employees.

"Employment Agreements" has the meaning set forth in Section 7.1.8(b).

"Environmental Claims" means all claims for reimbursement, remediation, abatement, removal, clean up, contribution, personal injury, property damage or damage to natural resources made by any Governmental Authority or other Person arising from or in connection with the (i) presence or actual or potential spill, leak, emission, discharge or release of any Hazardous Substances over, on, in, under or from the Property, or (ii) violation of any Environmental Laws with respect to the Property.

"Environmental Laws" means any Applicable Laws which regulate the manufacture, generation, formulation, processing, use, treatment, handling, storage, disposal, distribution or transportation, or an actual or potential spill, leak, emission, discharge or release of any Hazardous Substances, pollution, contamination or radiation into any water, soil, sediment, air or other environmental media, including, without limitation, (i) the Comprehensive Environmental Response, Compensation and Liability Act, (ii) the Resource Conservation and Recovery Act, (iii) the Federal Water Pollution Control Act, (iv) the Toxic Substances Control Act, (v) the Clean Water Act, (vi) the Clean Air Act, and (vii) the Hazardous Materials Transportation Act, and similar state and local laws, as amended as of the time in question.

"Environmental Liabilities" means all liabilities and obligations under any Environmental Laws arising from or in connection with the Property, including, without limitation, any obligations to manage, control, contain, remove, remedy, respond to, clean up or abate any actual or potential spill, leak, emission, discharge or release of any Hazardous Substances, pollution, contamination or radiation into any water, soil, sediment, air or other environmental media.

"Environmental Reports" has the meaning set forth in Section 7.1.18.

"Equipment Leases" has the meaning set forth in Section 2.1.9.

"Escrow Agent" means Old Republic National Title Insurance Company

"Existing Survey" means that certain Survey entitled "ALTA/ACSM Land Title Survey", last updated on November 14, 2013 by Precision Surveys.

"F&B" has the meaning set forth in Section 2.1.6.

"FF&E" has the meaning set forth in Section 2.1.3.

3

"Franchise Agreement" means that certain Membership Application and Agreement dated February 24, 2014, between Seller and Franchisor permitting the operation of the Hotel under the Best Western brand.

"Franchisor" means Best Western International, Inc.

"Governmental Authority" means any federal, state or local government or other political subdivision thereof, including, without limitation, any Person exercising executive, legislative, judicial, regulatory or administrative governmental powers or functions, in each case to the extent the same has jurisdiction over the Person or property in question.

"Guest Ledger" means all charges accrued to the open accounts of any guests or customers at the Hotel as of the Cut-Off Time for the use or occupancy of any guest, conference or banquet rooms or other facilities at the Hotel, any restaurant, bar or banquet services, or any other goods or services provided by or on behalf of Seller at the Hotel.

"Hazardous Substances" means any hazardous or toxic substances, materials or waste, whether in solid, semisolid, liquid or gaseous form, including, without limitation, asbestos, petroleum or petroleum by products and polychlorinated biphenyls.

"Hotel Guest Data and Information" means all Hotel guest or customer profiles, contact information (e.g., addresses, phone numbers, facsimile numbers and email addresses), histories, preferences and any other guest or customer information.

"Improvements" has the meaning set forth in Section 2.1.2.

"Indemnification Deductible" has the meaning set forth in Section 15.4.2.

"Indemnification Loss" means, with respect to any Indemnitee, any liability, damage, loss, cost or expense, including, without limitation, reasonable attorneys' fees and expenses and court costs, incurred by such Indemnitee as a result of the act, omission or occurrence in question.

"Indemnitee" means a Seller Indemnitee or a Purchaser Indemnitee as the case may be.

"Indemnitor" means the Party required to provide defense or indemnification to an Indemnitee.

"Intellectual Property" has the meaning set forth in Section 2.1.13.

"Inventoried Baggage" has the meaning set forth in Section 12.2.

"Inventoried Safe Deposit Boxes" has the meaning set forth in Section 12.1.

"IT Systems" has the meaning set forth in Section 2.1.5.

"Land" has the meaning set forth in Section 2.1.1.

"Letter of Intent" means that certain letter of intent, dated March 3, 2015 between Seller and Purchaser or their respective Affiliates outlining the general terms of the transaction described in this Agreement.

"Liability" means any liability, obligation, damage, loss, diminution in value, cost or expense of any kind or nature whatsoever, whether accrued or unaccrued, actual or contingent, known or unknown, foreseen or unforeseen.

"Licenses and Permits" has the meaning set forth in Section 2.1.12.

"Liquor License" has the meaning set forth in Section 8.3.

"Lis Pendens" means that certain Notice of Pendency dated March 16, 2015 filed against the Property as Index No.: 152596/2015 by WILLIAM T. OBEID, directly and derivatively on behalf of GEMINI REAL ESTATE ADVISORS LLC, GEMINI EQUITY PARTNERS, LLC, GEMINI FUND 5, LLC, 36 WEST 38TH STREET HOLDING, LLC, 33 PECK SLIP HOLDING, LLC, GEMINI COLLEGE PLAZA H, LLC, GEMINI INDIAN CREEK, LLC, GEMINI PARKWAY PLAZA, LLC, GEMINI RIVER RIDGE, LLC, GEMINI YOUNGSVILLE CROSSING M, LLC, GEMINI TAMIAMI, LLC, 300 WEST 22ND STREET, LLC, GEMINI RIO NORTE H, LP, GEMINI REAL ESTATE INDIAN CREEK MEMBER, LLC, GEMINI REAL ESTATE PARTNERS, LP, GEMINI OPPORTUNITY FUND IV, LLC, GEMINI OPPORTUNITY FUND I, LLC, GEMINI DUBOIS MALL, LLC, GEMINI CENTERVILLE GALERIA, LLC, GEMINI ROWLETT PARTNERS LLC, GEMINI ROWLETT CROSSING LP, GEMINI 449 WEST 36TH STREET MT, LLC, GEMINI 442 WEST 36TH STREET MT, LLC, GEMINI 305 WEST 39TH STREET MT, LLC, GEMINI 135 EAST HOUSTON MT, LLC, 52 WEST 13TH P, LLC and GEMINI 37 WEST 24TH STREET MT, LLC, and any amendments, modifications or replacements thereof or additions thereto.

"Material Casualty" has the meaning set forth in Section 14.1.1.

"Material Condemnation" has the meaning set forth in Section 14.2.1.

"Material Contract" means any Contract which cannot be cancelled without penalty on no more than thirty (30) days' notice and which has a remaining payment obligation of at least $10,000.

"Mutual Closing Conditions" has the meaning set forth in Section 9.1.1.

"Non-Union Employees" means those Employees that are not Union Employees.

"Notice" has the meaning set forth in Section 16.1.1.

"Operating Agreements" means all maintenance, service and supply contracts, booking and reservation agreements, credit card service agreements, and all other agreements for goods or services in connection with the Business, other than the Equipment Leases, Union Contract, and Licenses and Permits, together with all deposits made or held by Seller thereunder.

"Ordinary Course of Business" means the ordinary course of business consistent with Seller's past custom and practice for the Business.

"Permitted Exceptions" has the meaning set forth in Section 5.3.2.

"Person" means any natural person, corporation, general or limited partnership, limited liability company, association, joint venture, trust, estate, Governmental Authority or other legal entity, in each case whether in its own or a representative capacity.

"Personal Property" means the Property other than the Real Property.

"Plans and Specifications" has the meaning set forth in Section 2.1.15.

"Property" has the meaning set forth in Section 2.1.

"Prorations" has the meaning set forth in Section 11.2.

"Purchase Price" has the meaning set forth in Section 3.1.

"Purchaser Closing Conditions" has the meaning set forth in Section 9.2.

"Purchaser Closing Deliveries" has the meaning set forth in Section 10.3.2.

"Purchaser Default" has the meaning set forth in Section 13.2.

"Purchaser Documents" has the meaning set forth in Section 7.2.2.

"Purchaser Indemnitees" means Purchaser and its Affiliates, and each of their respective shareholders, members, partners, trustees, beneficiaries, directors, officers and employees, and the successors, permitted assigns, legal representatives, heirs and devisees of each of the foregoing.

"Real Property" has the meaning set forth in Section 2.1.2.

"Rehired Employees" has the meaning set forth in Section 8.4.

"Retail Merchandise" has the meaning set forth in Section 2.1.7.

"Retained Liabilities" has the meaning set forth in Section 2.5.

"Sale Motion" is that motion brought on by the Seller before the Bankruptcy Court seeking approval of the "Sale Procedures Order" as hereinafter defined.

"Sale Order" shall mean the entry of an order of the Bankruptcy Court, in the form and substance acceptable to Purchaser, approving the sale of the Property as defined to Section 2.1 herein, free and clear of all liens, encumbrances and claims of any nature, which has not been stayed. Unless a separate order is sought by the Seller, the order confirming the Plan of Reorganization filed in the Bankruptcy Case shall be the Sale Order.

"Sale Procedures Order" shall mean the order of the Bankruptcy Court approving certain marketing and bid procedures with respect to the Property as defined to Section 2.1 herein.

"Seller Closing Conditions" has the meaning set forth in Section 9.3.

"Seller Closing Deliveries" has the meaning set forth in Section 10.3.1.

"Seller Default" has the meaning set forth in Section 13.1.

"Seller Documents" has the meaning set forth in Section 7.1.2.

"Seller Indemnitees" means Seller, Manager, Employer and their respective Affiliates, and each of their respective shareholders, members, partners, trustees, beneficiaries, directors, officers and

6

employees, and the successors, permitted assigns, legal representatives, heirs and devisees of each of the foregoing.

"Seller Litigation" shall mean those certain civil actions identified as items 1, 2 and 3 on Schedule 7.1.7 attached hereto, as same may be modified, amended, replaced, expanded, appealed or supplemented, and including any additional actions or claims or counterclaim brought by or on behalf of or against the Seller or any of its Affiliates, members, directors or officers, successors or assigns in any jurisdiction.

"Seller's Knowledge" means the actual knowledge of Christopher La Mack, who is the President of the entity ultimately responsible for the management of Seller, and/or ZB Moham, who is the current general manager of the Hotel and has held such position since the time of Seller's acquisition of the Property, in each case after reasonable inquiry.

"Successful Bidder" has the meaning set forth in the Sale Motion

"Supplies" has the meaning set forth in Section 2.1.4.

"Survey" has the meaning set forth in Section 5.2.

"Survey Defects" has the meaning set forth in Section 5.3.1.

"Survival Period" has the meaning set forth in Section 15.1.1.

"Taxes" means any federal, state, local or foreign, real property, personal property, sales, use, room, occupancy, ad valorem or similar taxes, assessments, levies, charges or fees imposed by any Governmental Authority on Seller with respect to the Property or the Business, including, without limitation, any interest, penalty or fine with respect thereto, but expressly excluding any (i) federal, state, local or foreign income, capital gain, gross receipts, capital stock, franchise, profits, estate, gift or generation skipping tax, or (ii) transfer, documentary stamp, recording or similar tax, levy, charge or fee incurred with respect to the transaction described in this Agreement.

"Title and Survey Side Letter" has the meaning set forth in Section 5.3.1.

"Title Commitment" has the meaning set forth in Section 5.1.

"Title Company" means a title insurance company chosen by the Purchaser, Chicago Title Insurance Company.

"Title Exceptions" has the meaning set forth in Section 5.3.1.

"Title Policy" has the meaning set forth in Section 5.4.

"Trade Payables" has the meaning set forth in Section 11.2.12.

"Union Contract" has the meaning set forth in Section 2.1.11.

"Union Employees" means any Employees whose employment is subject to the terms of the Union Contract.

"Unpermitted Exceptions" has the meaning set forth in Section 5.3.1.

"Updated Survey" means an updated Existing Survey (or any new survey).

"UST Guidelines" means the "Operating Guidelines and Reporting Requirements for Debtor's In Possession and Trustees (Revised 11/27/13)" promulgated by the Office of the United States Trustee for the Southern District of New York and applicable in the Bankruptcy Case.

"Warranties" has the meaning set forth in Section 2.1.16.

## ARTICLE II
## THE PROPERTY AND LIABILITIES

**2.1 Description of the Property.** Subject to the terms set forth in this Agreement, at the Closing, Seller shall sell, convey, transfer, assign and deliver to Purchaser, and Purchaser shall purchase and accept from Seller, all right, title and interest of Seller in and to the property and assets set forth in this Section 2.1 (collectively, the "Property"):

2.1.1. Land. The land described in Schedule 2.1.1, together with all appurtenant easements and any other rights and interests appurtenant thereto (the "Land");

2.1.2. Improvements. All buildings, structures and other improvements located on or affixed to the Land and all fixtures on the Land which constitute real property under Applicable Law (the "Improvements"; the Land and the Improvements are referred to collectively herein as the "Real Property");

2.1.3. FF&E. All fixtures (other than those which constitute Improvements), furniture, furnishings, equipment, machinery, tools, vehicles, appliances, art work, apparatus, finishes, trade fixtures, televisions, video and antennae equipment, carpets, window treatments, telephones and other communications equipment, safety equipment, intercom equipment and systems, advertising booklets and materials, brochures, signs and other items of tangible personal property which are located at the Hotel, or ordered for future use at the Hotel as of the Closing, other than the Supplies, IT Systems, F&B, Retail Merchandise, Books and Records and Plans and Specifications (the "FF&E");

2.1.4. Supplies. All china, glassware and silverware, bedding, towels, linens, uniforms, operating stock, engineering, maintenance, cleaning and housekeeping supplies, matches and ashtrays, soap and other toiletries, stationery, menus, directories and other printed materials, and all other similar supplies and materials, which are located at the Hotel or ordered for future use at the Hotel as of the Closing (the "Supplies");

2.1.5. IT Systems. All computer hardware, telecommunications and information technology systems located at the Hotel, and all computer software used at the Hotel (subject to the terms of the applicable license agreement), to the extent the same are transferable or the Parties obtain any consent necessary to effectuate such a transfer (the "IT Systems");

2.1.6. Food and Beverage. All food and beverages (alcoholic and non alcoholic) which are located at the Hotel (whether opened or unopened), or ordered or stored for future use at the Hotel as of the Closing, including, without limitation, all food and beverages located in the guest rooms, but expressly excluding any alcoholic beverages to the extent the sale or transfer of the same is not permitted under Applicable Law (the "F&B");

2.1.7.   Retail Merchandise. All merchandise located at the Hotel and held for sale to guests and customers of the Hotel, or ordered or stored for future sale at the Hotel as of the Closing, including, without limitation, the inventory held for sale in any gift shop, pro shop or newsstand at the Hotel, but expressly excluding the F&B (the "Retail Merchandise");

2.1.8.   Intentionally omitted;

2.1.9.   Equipment Leases. Subject to section 2.2., all leases and purchase money security agreements for any equipment, machinery, vehicles, furniture or other personal property located at the Hotel, together with all deposits made thereunder, to the extent the same and such deposits are transferable or the Parties obtain any consent necessary to effectuate such a transfer (the "Equipment Leases");

2.1.10.  Assigned Operating Agreements. Subject to section 2.2., all Operating Agreements, to the extent the same and the deposits held thereunder are transferable or the Parties obtain any consent necessary to effectuate such a transfer (the "Assigned Operating Agreements");

2.1.11.  Union Contract. Subject to section 2.2., that certain Agreement , executed June 11, 2011, between Best Western Seaport Inn and The International Brotherhood of Teamsters (the "Union Contract");

2.1.12.  Licenses and Permits. Subject to section 2.2., all licenses, permits, consents, authorizations, approvals, registrations and certificates issued by any Governmental Authority which are held by Seller or its Affiliate with respect to the Hotel, including, without limitation, the construction, use or occupancy of the Hotel or the Business, together with any deposits made by Seller or its Affiliate thereunder, to the extent the same and such deposits are transferable or the Parties obtain any consent necessary to effectuate such a transfer (the "Licenses and Permits");

2.1.13.  Intellectual Property. All trademarks, trade names, goodwill, trade dress, service marks and other intellectual property rights set forth in Schedule 2.1.13 (the "Intellectual Property");

2.1.14.  Books and Records. All books and records located at the Hotel which relate to the Hotel or the Business, including, without limitation, all Hotel Guest Data and Information, but excluding Employee personnel files (the "Books and Records");

2.1.15.  Plans and Specifications. All plans and specifications, blue prints, architectural plans, engineering diagrams and similar items which relate to the Hotel (the "Plans and Specifications");

2.1.16.  Warranties. The right, title and interest of Seller in and to all unexpired warranties and guarantees furnished by contractors, subcontractors and other third parties, whether presently outstanding or hereafter arising, including, without limitation, contractors' and manufacturers' warranties or guarantees, to the extent they relate to the Hotel, the Improvements or the Personal Property (the "Warranties");

2.1.17.  Bookings. All bookings and reservations for guest, conference and banquet rooms or other facilities at the Hotel as of the Closing, together with all deposits with respect thereto (the "Bookings");

2.1.18.  Accounts Receivable. Such Accounts Receivable (including the Guest Ledger) as set forth in Section 11.3; and

2.1.19. Miscellaneous Hotel Assets. All telephone and facsimile numbers and all keys, locks and safe combinations and codes for the Hotel.

## 2.2    Executory Contracts.

(a)    On or prior to the Bid Submission Deadline (as defined in the "Sale Procedures Order"), Purchaser shall have the right, in Purchaser's sole and absolute discretion, to designate any contract of Seller (a "Seller's Contract") as a Purchased Contract or an Excluded Contract (other than any Seller's Contract which Purchaser is required to assume pursuant to the terms hereof). Any Seller's Contract designated as a Purchased Contract shall be assumed by Sellers and assigned to Purchaser at the Closing and shall be deemed a Purchased Asset. Any Seller's Contract designated as an Excluded Contract may be assumed or rejected by Sellers in Sellers' sole discretion and shall be deemed an Excluded Asset. Any such designation may be made by Purchaser by giving notice on or prior to the Bid Submission Deadline. Any such designation shall be subject to change by Purchaser from time to time in Purchaser's sole discretion by giving written notice thereof to Sellers on or prior to the Bid Submission Deadline. At 5:00 p.m. Pacific time on the Bid Submission Deadline, all such designations made by Purchaser shall be become final and binding upon Purchaser and, except as otherwise set forth below, all Seller's Contracts as to which Purchaser has made no such designation shall be deemed Excluded Contracts. The entry of an order by the Bankruptcy Court authorizing the assumption or rejection of executory contracts in accordance with the terms and conditions of this Agreement ("Executory Contract Order"), which may be included in the Sale Order, at Closing shall be deemed to be part of the Seller Closing Deliveries under this contract.

(b)    Notwithstanding the foregoing,

(i)    so long as an Excluded Contract has not been rejected by the Sellers pursuant to Section 365 of the Bankruptcy Code, Sellers shall, upon written request by Purchaser, assume and assign such Excluded Contract to Purchaser or its designee for no additional consideration. and

(ii)    if at any time Sellers become aware, on or before the Closing Date, of any Seller's Contract that has not been included on the Schedules attached hereto, Sellers shall promptly thereafter advise Purchaser of the existence, and provide Purchaser with a copy, of such Contract and Purchaser thereupon shall have the right to request, by written notice to Sellers within five (5) days, that Sellers assume, assign and sell such Seller's Contract to Purchaser, in which case Sellers shall use commercially reasonable efforts to assume, assign and sell such Seller's Contract to Purchaser, as promptly as reasonably practicable, on the same terms and conditions as would be applicable under this Agreement to the Purchased Contracts.

(c)    As part of the Sale Motion to be filed by Seller, Seller shall seek approval by the Bankruptcy Court of the sale, assumption and assignment by Sellers to Purchaser of all Seller's Contracts identified on Schedules attached hereto. Sellers shall serve the Sale Motion on all counterparties to all such Seller's Contracts along with a notice specifically stating that Sellers are or may be seeking the sale, assumption and assignment of such Seller's Contracts and shall notify such parties of the deadline for objecting to the Cure Costs, which deadline shall be not less than three (3) Business Days prior to the Bid Submission Deadline. As part of the Sale

Motion, Sellers shall seek authority to file with the Bankruptcy Court the list identifying such Seller's Contracts and the amounts necessary to cure defaults under each of such Contract, so as to enable any such party to object to the proposed Cure Costs and the Bankruptcy Court to determine such Cure Costs as promptly as reasonably possible. In cases in which Sellers are unable to establish that a default exists, the relevant Cure Cost shall be set at $0.00.

(d)    Payment of Cure Amounts. The Cure Costs shall be the responsibility of Seller, including but not limited to, any and all payments due to the Union Employees, any amounts owed under the Union Contract and any payments due under any applicable Multiemployer Pension Plan or other pension fund applicable to the Union Employees.

**2.3. Cure Costs**. Cure Costs shall be paid (or in the case of a dispute, the disputed amount escrowed) at the Closing from the sales proceeds.

**2.4 Assumed Liabilities.** At Closing, Purchaser shall assume all Liabilities arising or occurring from and after the Closing Date with respect to the Property, the Hotel, the Assigned Contracts, the Purchased Contracts, the Business, or the Rehired Employees, but expressly excluding the Retained Liabilities (the "Assumed Liabilities"). The Parties rights and obligations under this Section shall survive the Closing. The preceding sentence shall not be deemed to modify or otherwise limit any representation or warranty of Seller set forth in this Agreement or in any document delivered by Seller at Closing.

**2.5 Retained Liabilities.** At Closing, Seller shall retain all Liabilities arising or occurring prior to the Closing Date with respect to the Property, the Hotel, the Assigned Contracts, the Purchased Contracts or the Business (the "Retained Liabilities"). The Parties rights and obligations under this Section shall survive the Closing.

**ARTICLE III**
**PURCHASE PRICE**

**3.1 Purchase Price.** The purchase price for the Property is Thirty Eight Million Three Hundred Thousand and 00/100 Dollars ($38,300,000.00) (the "Purchase Price"), which shall be adjusted at Closing for the Prorations pursuant to Section 11.2, the Accounts Receivable pursuant to Section 11.3, and as otherwise expressly provided in this Agreement.

**3.2 Earnest Money.**

3.2.1.    Purchaser shall deposit with Escrow Agent the amount of $3,730,000 as Earnest Money no later than November 30, 2015. The Earnest Money shall be held by Escrow Agent in escrow as earnest money pursuant to the escrow agreement in the form attached hereto as Exhibit A, entered into among Seller, Purchaser and Escrow Agent (the "Earnest Money Escrow Agreement"), contemporaneously with the execution of this Agreement. Investment of Earnest Money. The Earnest Money shall be invested in a manner approved by Purchaser and Seller, which shall comply with any requirement of the Bankruptcy Court or the Sale Procedures Order.

3.2.2.    Disbursement of Earnest Money to Seller. At Closing, Purchaser shall cause Escrow Agent to disburse the Earnest Money to Seller, and Purchaser shall receive a credit against the Purchase Price in the amount of the Earnest Money disbursed to Seller. If this Agreement is terminated for any reason and Purchaser is not entitled to a refund of the Earnest Money under this Agreement, the Earnest Money shall be disbursed to Seller. This Section 3.2.3 shall survive the termination of this Agreement.

### 3.3 Payment of Purchase Price.

3.3.1. Payment at Closing. At Closing, Purchaser shall pay to Seller an amount equal to the Purchase Price (as adjusted pursuant to Section 3.1), less the Earnest Money.

### 3.4 Allocation of Purchase Price.

The Parties hereby agree that the Purchase Price shall be allocated among the Land, the Improvements and the Personal Property as mutually and reasonably agreed upon by the Parties. The Parties shall file all federal, state and local tax returns and related tax documents consistent with such allocation.

### 3.5 Like-Kind Exchange.

Notwithstanding anything to the contrary in this Agreement, Seller acknowledges and agrees that Purchaser has the absolute right to designate this transaction to qualify as a tax-free exchange under Section 1031 of the Code, in which event Purchaser shall have the absolute right to assign this Agreement to a "qualified intermediary" (as defined in Treas. Reg. § 1.1031(k)-1(g)(4) of the Code) or such other entity or entities as is necessary to carry out the 1031 Exchange. Seller shall execute and deliver such documents as may be required to complete the transactions contemplated by such tax-free exchange which are in form and substance reasonably acceptable to Seller, and otherwise cooperate with Purchaser in all reasonable respects with respect to such tax-free exchange, provided that (i) Seller shall not be required to take title to any property, and (ii) neither such tax-free exchange nor Seller's cooperation therewith shall result in the imposition of any cost or liability upon Seller.

## ARTICLE IV
## CONTINGENCIES

### 4.1 Due Diligence.

4.1.1. No Due Diligence Contingency. Purchaser acknowledges and agrees that Purchaser has completed all of its due diligence investigations with respect to the Property and is satisfied with the same except that all due diligence schedules attached hereto shall be updated on or before the entry of the Sale Procedures Order and there shall be no material adverse change with regard to same.

4.1.2. Board Approval. Seller acknowledges and agrees that Purchaser shall not be required to (i) deposit the Earnest Money into the escrow account or (ii) pay the Purchase Price to Seller at the Closing, unless and until the terms of this Agreement, and the transactions contemplated herein, have been formally approved and ratified by the board of directors of The Howard Hughes Corporation.

## ARTICLE V
## TITLE TO THE PROPERTY

**5.1 Title Commitment.** Purchaser shall obtain, subject to the entry of the Sale Order, at Seller's sole cost and expense, a commitment for an ALTA owner's title insurance policy from the Title Company for the Real Property, naming Purchaser as the insured and in an amount of the Purchase Price (the "Title Commitment"), together with a copy of all documents referenced therein and all departmental and UCC searches requested by Purchaser. Notwithstanding the foregoing, the aggregate cost to Seller of such Title Commitment and the premiums for the Title Policy (as hereinafter defined) shall not exceed the sum of $115,000.00, and Purchaser shall pay any excess.

**5.2 Survey.** Purchaser acknowledges its receipt of the Existing Survey. Purchaser shall have the right to obtain an Updated Survey at its sole cost and expense.

5.3 **Exceptions to Title**. Except as provided herein or otherwise excepted by Purchaser in writing, the sale of the Property to Purchaser hereunder shall be free and clear of any interest or liens in accordance with the Sale Order including but not limited to the claims under the Lis Pendens.

**5.3.1.** Unpermitted Exceptions. If Purchaser objects to any (a) liens, encumbrances or other exceptions to title (the "Title Exceptions") disclosed in the Title Commitment or any update thereto, or (b) encroachments by improvements on adjoining properties onto or over the Land, any encroachments of the Improvements onto or over adjoining properties, setback lines or easements or other survey defects (the "Survey Defects") disclosed in the Existing Survey or Updated Survey, the same shall constitute "unpermitted exceptions" to title to the Real Property (the "Unpermitted Exceptions"). Seller agrees that regardless of whether Purchaser shall make such objection, the following shall constitute Unpermitted Exceptions: (i) any mortgages, deeds of trust or other security interests (except to the extent Purchaser agrees to assume same); (ii) Taxes and water and sewage charges which are due and payable as of Closing; (iii) notes or notices of violations of any legal requirement noted in or issued by any Governmental Authority; and (iv) any other Title Exceptions objected to by Purchaser which may be removed by payment of a liquidated amount. Seller shall use its best efforts to cure any Unpermitted Exceptions, provided that Seller shall not be required to spend more than $200,000.00 to effect any such cure, provided further that such cap shall not apply to mortgages, deeds of trust, security interests, or other voluntary liens, or to any Taxes, or to any new encumbrances created by the voluntary acts of Seller.

**5.3.2.** Permitted Exceptions. All Title Exceptions and Survey Defects other than the Unpermitted Exceptions shall constitute "permitted exceptions" to title to the Real Property (the "Permitted Exceptions").

**5.3.3.** Failure to Cure. Seller shall have until the Closing Date to cure any Unpermitted Exceptions in accordance with Section 5.3.1. In the event that Seller shall be unable to deliver title as required under this Article V, including without limitation the curing of Unpermitted Exceptions in accordance with Section 5.3.1, Purchaser's sole right shall be either to (I) terminate this Agreement, in which case the Earnest Money shall be refunded to Purchaser in accordance with Section 3.2.4, and the Parties shall have no further rights or obligations under this Agreement, except those which expressly survive such termination, or (II) proceed to Closing pursuant to this Agreement and accept title to the Real Property subject to such Unpermitted Exceptions which thereafter shall be deemed to constitute Permitted Exceptions without offset or deduction from the Purchase Price. Seller shall have the one time option to extend the Closing Date by a period of no more than thirty (30) days in order to effect cure of any Unpermitted Exceptions, provided Seller gives written notice to Purchaser no later than five (5) Business Days prior to the scheduled Closing Date.

**5.4 Title Policy.** At Closing, at Seller's expense, the parties shall reasonably cooperate to cause the Title Company to issue an owner's title insurance policy to Purchaser in accordance with the Title Commitment, insuring Purchaser's good and marketable fee simple title to the Real Property as of the Closing Date, subject only to the Permitted Exceptions (the "Title Policy"). Notwithstanding the foregoing, the aggregate cost to Seller of the Title Commitment and the premiums for the Title Policy shall not exceed the sum of $115,000.00, and Purchaser shall pay any excess. Anything to the contrary notwithstanding, a Title Policy insuring good and marketable fee simple title to the Real Property as of the Closing Date is a condition precedent to Closing.

**5.5** <u>**Conveyance of the Property.**</u>  As a condition precedent to Closing, At Closing, Seller shall convey good and marketable fee simple title to the Real Property subject to all Permitted Exceptions, and the Personal Property, free and clear of all liens and encumbrances, except for the Equipment Leases which shall be subject only to the ownership interest of the lessor thereunder.

## ARTICLE VI
## CONDITION OF THE PROPERTY

**6.1** <u>**PROPERTY SOLD "AS IS".**</u> PURCHASER ACKNOWLEDGES AND AGREES THAT (A) THE PURCHASE OF THE PROPERTY SHALL BE ON AN "AS IS", "WHERE IS", "WITH ALL FAULTS" BASIS, SUBJECT TO WEAR AND TEAR FROM THE EFFECTIVE DATE UNTIL CLOSING, AND (B) EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT, SELLER HAS NO OBLIGATION TO REPAIR ANY DAMAGE TO OR DEFECT IN THE PROPERTY, REPLACE ANY OF THE PROPERTY OR OTHERWISE REMEDY ANY MATTER AFFECTING THE CONDITION OF THE PROPERTY.  EXCEPT FOR THE EXPRESS REPRESENTATIONS AND WARRANTIES MADE BY SELLER IN THIS AGREEMENT AND IN THE DEED TO BE DELIVERED TO PURCHASER AT THE CLOSING, SELLER MAKES NO REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, CONCERNING THE PROPERTY INCLUDING WITHOUT LIMITATION WITH RESPECT TO ANY HAZARDOUS SUBSTANCE OR ENVIRONMENTAL MATTERS. SELLER SPECIFICALLY DISCLAIMS ANY WARRANTY OF MERCHANTABILITY OR SUITABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE OF PURCHASER'S, WHETHER OR NOT SELLER HAS BEEN MADE AWARE OF ANY SUCH PURPOSE.

## ARTICLE VII
## REPRESENTATIONS AND WARRANTIES

**7.1** <u>**Seller's Representations and Warranties.**</u> To induce Purchaser to enter into this Agreement and to consummate the transaction described in this Agreement, Seller hereby makes the express representations and warranties in this Section 7.1, upon which Seller acknowledges and agrees that Purchaser is entitled to rely.

7.1.1.  <u>Organization and Power</u>. Seller is duly incorporated or formed (as the case may be), validly existing, in good standing in the jurisdiction of its incorporation or formation, and is qualified to do business in the jurisdiction in which the Property is located, and has all requisite power and authority to own the Property and conduct the Business as currently owned and conducted.

7.1.2.  <u>Authority and Binding Obligation</u>. Subject to approval of the Bankruptcy Court and entry of the Sale Procedures Order, (i) Seller has full power and authority to execute and deliver this Agreement and all other documents to be executed and delivered by Seller pursuant to this Agreement (the "<u>Seller Documents</u>"), and to perform all obligations of Seller under each of the Seller Documents, (ii) the execution and delivery by the signer on behalf of Seller of each of the Seller Documents, and the performance by Seller of its obligations under each of the Seller Documents, has been duly and validly authorized by all necessary action by Seller, and (iii) each of the Seller Documents, when executed and delivered, will constitute the legal, valid and binding obligations of Seller enforceable against Seller in accordance with its terms, except to the extent Purchaser itself is in default thereunder.

7.1.3.  <u>Consents and Approvals; No Conflicts</u>. Except for the entry of the Sale Procedures Order and the Sale Order, or as disclosed in <u>Schedule 7.1.3</u>, (i) no filing with, and no permit, authorization, consent or approval of, any Governmental Authority or other Person is necessary for execution or delivery by Seller of any of the Seller Documents, or the performance by Seller of any of its obligations under any of the Seller Documents or the consummation by Seller of the transaction described in this

Agreement, and (ii) neither the execution and delivery by Seller of any of the Seller Documents, nor the performance by Seller of any of its obligations under any of the Seller Documents, nor the consummation by Seller of the transaction described in this Agreement, will: (A) violate any provision of Seller's organizational or governing documents; (B) violate any Applicable Law to which Seller is subject; or (C) result in a violation or breach of, or constitute a default under any of the Material Contracts, or (D) result in the creation or imposition of any lien or encumbrance on the Property or any portion thereof.

7.1.4.  <u>Title to Personal Property</u>. Except as set forth in <u>Schedule 7.1.4</u>, Seller has good and valid title to all tangible Personal Property, which shall be free and clear of all liens and encumbrances as of the Closing except for the Equipment Leases which shall be subject only to the ownership interest of the lessor thereunder.

7.1.5.  <u>Condemnation</u>. Seller has not received any written notice of any pending condemnation proceeding or other proceeding in eminent domain, and to Seller's Knowledge, no such condemnation proceeding or eminent domain proceeding is threatened against or affecting the Property or any portion thereof.

7.1.6.  <u>Compliance with Applicable Law</u>. Except as set forth in <u>Schedule 7.1.6</u>, Seller has not received any written notice of a violation of any Applicable Law with respect to the Property or the Business which has not been cured or dismissed.

7.1.7.  <u>Litigation</u>. Except as set forth in <u>Schedule 7.1.7</u> and the Seller Litigation, Seller has not (i) been served with any court or administrative filing in any litigation or other legal proceeding with respect to the Property or the Business in which Seller is named a party which has not been resolved, settled or dismissed, or (ii) received written notice of any claim, charge or complaint from any Governmental Authority or other Person pursuant to any administrative, arbitration or similar adjudicatory proceeding with respect to the Property or the Business which has not been resolved, settled or dismissed, and Seller has not received any written notice threatening any such litigation or administrative, arbitration or other adjudicatory proceeding.

7.1.8.  <u>Employees</u>.

<u>Union Contract</u>. Seller shall assume and assign the Union Contract to Purchaser in accordance with Bankruptcy Code section 1113 except that the Seller shall be solely responsible for Cure Costs or other accrued but unpaid obligations as of the time of the Closing including, but not be limited to, any and all payments due to the Union Employees, any amounts owed under the Union Contract and any payments due under any applicable Multiemployer Pension Plan or other pension fund applicable to the Union Employees.

(a)  Except for the Union Contract, Seller is not a party to any collective bargaining agreement with any labor union with respect to the Employees. Seller has made available to Purchaser a correct and complete copy of the Union Contract. Seller has not received written notice from any Employee, Governmental Authority or other Person making a formal charge, complaint, or request for a grievance or arbitration proceeding against Seller alleging a breach or default under the Union Contract relating to the employment of the Union Employees which has not been resolved, settled or dismissed, and Seller has not received any written notice threatening any such charge, complaint, grievance or arbitration.

(b)  <u>Employment Agreements</u>. Except for the employment agreements set forth in <u>Schedule 7.1.8</u> (the "<u>Employment Agreements</u>"), Seller is not a party to any written employment or compensation agreements (other than general employee benefit plans) with any of the Employees, other than offer

15

letters for at-will employment. Seller has made available to Purchaser a correct and complete copy of all Employment Agreements. Schedule 7.1.8 sets forth a correct and complete list of the positions and compensation of each Employee at the Hotel as of the Effective Date.

7.1.9.  Taxes. Except as disclosed in Schedule 7.1.9, (i) all Taxes which would be delinquent if unpaid will be paid in full or prorated at Closing as part of the Prorations pursuant to Section 11.2; provided, however, that if any Taxes are payable in installments, such representation and warranty shall apply only to such installments which would be delinquent if unpaid at Closing, (ii) there do not exist any pending, or (to Seller's Knowledge) threatened or proposed, reassessment or special assessment or special penalties or interest with respect to Taxes and Seller has not received any written notice for special assessments or an audit of any Taxes which has not been resolved or completed, and (iii) Seller is not currently contesting any Taxes.

7.1.10.  Licenses and Permits. Schedule 7.1.10 sets forth a correct and complete list of the Licenses and Permits, and Seller has delivered to Purchaser a true and complete copy of the Licenses and Permits. Except as set forth in Schedule 7.1.10, Seller has not received any written notice from any Governmental Authority or other Person of (i) any violation, suspension, revocation or non renewal of any of the Licenses and Permits with respect to the Property or the Business that has not been cured or dismissed, or (ii) any failure by Seller to obtain any Licenses and Permits required for the Property or the Business that has not been cured or dismissed, or (iii) Seller has not received any written notice threatening any violation, suspension, revocation or non renewal of the Licenses and Permits.

7.1.11.  Tenant Leases. There are no leases, subleases, licenses, concessions or similar agreements granting to any other Person the right to use or occupy any portion of the Real Property, other than the Bookings.

7.1.12.  Material Contracts. Schedule 7.1.12 sets forth a correct and complete list of the Material Contracts, and Seller has made available to Purchaser a true and complete copy of the Material Contracts. Except as set forth on Schedule 7.1.12, Seller has neither given nor received any written notice of any breach or default under any of the Material Contracts which has not been cured, and no event has occurred or circumstance exists which, with notice or the passage of time, would result in a breach or default by Seller or to Seller's Knowledge, the other party thereunder.

7.1.13.  Management Agreements. Except for the Franchise Agreement, which Seller shall terminate as of Closing (unless Purchaser and Franchisor agree to an assignment of the Franchise Agreement to Purchaser on terms acceptable to Purchaser, in which case the Franchise Agreement shall be assigned by Seller to Purchaser at Closing if such assignment is approved by Franchisor), Seller is not a party to any management or franchise agreements with respect to the Hotel.

7.1.14.  Finders and Investment Brokers. Except for the Broker, Seller has not dealt with any Person who has acted, directly or indirectly, as a broker, finder, financial adviser or in such other capacity for or on behalf of Seller in connection with the transaction described by this Agreement in a manner which would entitle such Person to any fee or commission in connection with this Agreement or the transaction described in this Agreement. Subject to the Sale Procedures Order or any applicable order of the Bankruptcy Court, Seller shall pay at Closing all fees and commissions payable to the Broker.

7.1.15.  Foreign Person. Seller is a "United States person" (as defined in Section 7701(a)(30)(B) or (C) of the Code) for the purposes of the provisions of Section 1445(a) of the Code.

7.1.16.  Insurance. Schedule 7.1.16 sets forth a correct and complete list of each insurance policy maintained by Seller with respect to the Property and the Business. Seller has not received any written

notice of a breach or default under any such insurance policy which has not been cured or dismissed, or the cancellation of such insurance policy.

7.1.17.  Bookings.  Schedule 7.1.17 sets forth a correct report of all Bookings for the ninety (90) days following the Effective Date, which report shall be updated at Closing and delivered to Purchaser.

7.1.18.  Environmental Matters.   Schedule 7.1.18 sets forth a correct and complete list of all environmental assessments, reports and studies relating to the Property in Seller's possession (the "Environmental Reports"), and Seller has made available to Purchaser a true and complete copy of the Environmental Reports. Except as set forth in Schedule 7.1.18, Seller has not received any written notice from any Governmental Authority or other Person of any Environmental Claims which have not been resolved, settled or dismissed, and Seller has not received any written notice threatening any such Environmental Claim.

7.1.19.  Financial Statements. The financial statements for the year ended December 31, 2014 and and year to date financial statements from January 1 through September 30, 2015 with respect to the Business which were provided to Purchaser are true and complete copies of the financial statements prepared by Seller or an Affiliate with respect to the Business. The financial statements for the year ended December 31, 2014 with respect to the Business which were provided to Purchaser are the financial statements which were used to prepared Seller's tax return for the corresponding tax years, and have been prepared in accordance with U.S. Generally Accepted Accounting Principles and present fairly, in all material respects, the operating results of the Business for the periods covered by such financial statements, subject to standard year end adjustments for any year to date financial statements.

7.1.20.  Bankruptcy.  Subject to the time constraints of Section 2.3.2 herein, as promptly as reasonable after execution of this Agreement by all parties, Seller will file a petition for relief under chapter 11 of the Bankruptcy Code and, in connection therewith, will file and serve the "Sale Motion", and seek to obtain approval of the Sale Procedures Order and Sale Order.  Purchaser acknowledges and is aware that Seller shall continue to market the Property for sale and solicit higher and better offers until the Property is sold.

7.1.21.  Anti-Terrorism. None of Seller's property or interests is subject to being "blocked" under any Anti-Terrorism Laws and neither Seller nor any Person holding any direct or indirect interest in Seller is in violation of any Anti-Terrorism Laws. Neither Seller nor any of its affiliates, nor any of their respective partners, members, shareholders or other equity owners, and none of their respective employees, officers, directors, representatives or agents (collectively, a "Seller Party") is, nor will they become: (a) a person or entity, or owned or controlled by a person or entity, with whom U.S. persons or entities are restricted from doing business, or with whom U.S. persons or entities may transact business only subject to the imposition of significant fines and penalties, under regulations of the Office of Foreign Asset Control ("OFAC") of the U.S. Department of Treasury (including those named on OFAC's Specially Designated and Blocked Persons List) or under any statute, executive order or other governmental action; (b) designated by the President or OFAC pursuant to the Trading with the Enemy Act, 50 U.S.C. App. § 5, the International Emergency Economic Powers Act, 50 U.S.C. §§ 1701-06, the USA Patriot Act of 2001, Pub. L. No. 107-56, Executive Order 13224 (September 23, 2001), or any executive orders of the President issued pursuant to such statutes; or (c) controlled by the government of any country or person that is subject to an embargo by the U.S. government, including without limitation OFAC, that prohibits Purchaser from conducting the business activities contemplated by this Agreement with Seller.  Seller, including its Seller Parties, (a) is in compliance with, (b) is not under investigation by any governmental authority; (c) has not been charged with, convicted of, or assessed civil or criminal penalties; and (d) has not had any of its funds seized or forfeited in any action, for violation of any applicable anti-money laundering laws, including without limitation, the USA Patriot Act, the Bank

Secrecy Act, 31 U.S.C. § 5311 et seq., the Trading with the Enemy Act, 50 U.S.C. App. § 1 et seq., Executive Order 13224 (September 23, 2001), the International Emergency Economic Powers Act, 50 U.S.C. § 1701 et seq., and the sanction regulations promulgated pursuant thereto by OFAC, and laws relating to prevention and detection of money laundering in 18 U.S.C. §§ 1956-57.

      7.1.22. <u>Alterations</u>. <u>Schedule 7.1.22</u> sets forth a description of all improvement work or alterations being performed at the Hotel as of the Effective Date.

      7.1.23. <u>RPIE</u>. Seller has or will file all income and expense statements that are required to be filed with respect to the Property with respect to periods occurring prior to the Closing Date in compliance with applicable law (including the requirements of New York City Administrative Code Section 11-208.1, as it may be hereafter amended or replaced).

**7.2 <u>Purchaser's Representations and Warranties.</u>** To induce Seller to enter into this Agreement and to consummate the transaction described in this Agreement, Purchaser hereby makes the representations and warranties in this Section 7.2, upon which Purchaser acknowledges and agrees that Seller is entitled to rely.

      7.2.1. <u>Organization and Power</u>. Purchaser is duly incorporated or formed (as the case may be), validly existing and in good standing under the laws of the State of Delaware and has all requisite power and authority to own, lease and operate its properties and to carry on its business as currently being conducted.

      7.2.2. <u>Authority and Binding Obligation</u>. (i) Purchaser has full power and authority to execute and deliver this Agreement and all other documents to be executed and delivered by Purchaser pursuant to this Agreement (the "<u>Purchaser Documents</u>"), and to perform all obligations of Purchaser arising under each of the Purchaser Documents, (ii) the execution and delivery by the signer on behalf of Purchaser of each of the Purchaser Documents, and the performance by Purchaser of its obligations under each of the Purchaser Documents, has been duly and validly authorized by all necessary action by Purchaser, and (iii) each of the Purchaser Documents, when executed and delivered, will constitute the legal, valid and binding obligations of Purchaser enforceable against Purchaser in accordance with its terms, except to the extent Seller itself is in default thereunder.

      7.2.3. <u>Consents and Approvals; No Conflicts</u>. (i) no filing with, and no permit, authorization, consent or approval of, any Governmental Authority or other Person is necessary for the execution or delivery by Purchaser of any of the Purchaser Documents, the performance by Purchaser of any of its obligations under any of the Purchaser Documents, or the consummation by Purchaser of the transaction described in this Agreement, and (ii) neither the execution and delivery by Purchaser of any of the Purchaser Documents, nor the performance by Purchaser of any of its obligations under any of the Purchaser Documents, nor the consummation by Purchaser of the transaction described in this Agreement, will: (A) violate any provision of the organizational or governing documents of Purchaser; (B) violate any Applicable Law to which Purchaser is subject; or (C) result in a violation or breach of or constitute a default under any contract, agreement or other instrument or obligation to which Purchaser is a party or by which any of Purchaser's properties are subject.

      7.2.4. <u>Finders and Investment Brokers</u>. Except for Broker, Purchaser has not dealt with any Person who has acted, directly or indirectly, as a broker, finder, financial adviser or in such other capacity for or on behalf of Purchaser in connection with the transaction described by this Agreement in any manner which would entitle such Person to any fee or commission in connection with this Agreement or the transaction described in this Agreement.

7.2.5.  No Violation of Anti-Terrorism Laws.  None of Purchaser's property or interests is subject to being "blocked" under any Anti-Terrorism Laws, and neither Purchaser nor any Person holding any direct or indirect interest in Purchaser is in violation of any Anti-Terrorism Laws.  Neither Purchaser nor any of its affiliates, nor any of their respective partners, members, shareholders or other equity owners, and none of their respective employees, officers, directors, representatives or agents (collectively, a "Purchaser Party") is, nor will they become: (a) a person or entity, or owned or controlled by a person or entity, with whom U.S. persons or entities are restricted from doing business, or with whom U.S. persons or entities may transact business only subject to the imposition of significant fines and penalties, under regulations of the Office of Foreign Asset Control ("OFAC") of the U.S. Department of Treasury (including those named on OFAC's Specially Designated and Blocked Persons List) or under any statute, executive order or other governmental action; (b) designated by the President or OFAC pursuant to the Trading with the Enemy Act, 50 U.S.C. App. § 5, the International Emergency Economic Powers Act, 50 U.S.C. §§ 1701-06, the USA Patriot Act of 2001, Pub. L. No. 107-56, Executive Order 13224 (September 23, 2001), or any executive orders of the President issued pursuant to such statutes; or (c) controlled by the government of any country or person that is subject to an embargo by the U.S. government, including without limitation OFAC, that prohibits Seller from conducting the business activities contemplated by this Agreement with Purchaser.

7.2.6.  Patriot Act.  Purchaser, including its Purchaser Parties, (a) is in compliance with, (b) is not under investigation by any governmental authority; (c) has not been charged with, convicted of, or assessed civil or criminal penalties; and (d) has not had any of its funds seized or forfeited in any action, for violation of any applicable anti-money laundering laws, including without limitation, the USA Patriot Act, the Bank Secrecy Act, 31 U.S.C. § 5311 et seq., the Trading with the Enemy Act, 50 U.S.C. App. § 1 et seq., Executive Order 13224 (September 23, 2001), the International Emergency Economic Powers Act, 50 U.S.C. § 1701 et seq., and the sanction regulations promulgated pursuant thereto by OFAC, and laws relating to prevention and detection of money laundering in 18 U.S.C. §§ 1956-57.

## ARTICLE VIII
## COVENANTS

### 8.1 Confidentiality.

8.1.1.  Disclosure of Confidential Information.  Except as required by the Bankruptcy Court, Seller and Purchaser shall keep confidential and not make any public announcement or disclose to any Person the existence or any terms of this Agreement or any documents, materials, data or other information with respect to the Property or the Business which is not generally known or available to the public (the "Confidential Information"). Notwithstanding the foregoing, Seller and Purchaser shall be permitted to (i) disclose any Confidential Information to the extent required under Applicable Law (after giving the other Party prior notice and an opportunity to obtain relief from the disclosure requirement), and (ii) disclose any Confidential Information to any Person on a "need to know" basis, such as their respective shareholders, partners, members, trustees, beneficiaries, directors, officers, employees, attorneys, consultants, engineers, surveyors, lenders, investors, managers, franchisors and such other Persons whose assistance is required to consummate the transactions described in this Agreement; provided, however, that Seller or Purchaser (as the case may be) shall (A) advise such Person of the confidential nature of such Confidential Information, and (B) use commercially reasonable efforts to cause such Person to maintain the confidentiality of such Confidential Information.

8.1.2.  Public Announcements.  Notwithstanding Section 8.1.1, a Party shall have the right to make a public announcement regarding the transaction described in this Agreement, provided that Seller and Purchaser shall approve the form and substance of any such public announcement, which approval shall not be unreasonably withheld, conditioned or delayed.

8.1.3.  <u>Intentionally Omitted</u>.

8.1.4.  <u>Communication with Employees</u>. Purchaser shall have the right to interview the Employees for consideration of employment with Purchaser and meet with the head of the union under the Union Contract.

## 8.2  Conduct of the Business.

8.2.1.  <u>Operation in Ordinary Course of Business</u>. From the Effective Date until the Closing or earlier termination of this Agreement, Seller shall conduct the Business in the Ordinary Course of Business, including, without limitation, (i) maintaining the inventories of FF&E, Supplies, F&B and Retail Merchandise at levels maintained in the Ordinary Course of Business, (ii) performing maintenance and repairs for the Real Property and tangible Personal Property in the Ordinary Course of Business; and (iii) maintaining its current insurance coverages.

8.2.2.  <u>Contracts</u>. From the Effective Date until the Closing or earlier termination of this Agreement, Seller shall not, without Purchaser's prior written consent which shall not be unreasonably withheld, conditioned or delayed, (i) amend, extend, renew or terminate any Material Contracts or Licenses and Permits, except in the Ordinary Course of Business, nor (ii) enter into any new Material Contracts, nor (iii) accept any Bookings for any date which is more than ninety (90) days following the Closing Date.

## 8.3  Licenses and Permits.
Purchaser shall be responsible for obtaining the transfer of all Licenses and Permits (to the extent transferable) or the issuance of new licenses and permits, including, without limitation, the licenses and permits required for the sale and service of alcoholic beverages at the Hotel (the "<u>Liquor License</u>"). Purchaser, at its cost and expense, shall submit all necessary applications and other materials to the appropriate Governmental Authority and take such other actions to effect the transfer of Licenses and Permits or issuance of new licenses and permits, including, without limitation, the Liquor License, as of the Closing, and Seller shall cooperate (at Purchaser's expense) with Purchaser to cause the Licenses and Permits to be transferred or new licenses and permits to be issued to Purchaser.

## 8.4  Employees.
Subject to the terms of the Union Contract with respect to the Union Employees, Seller shall cause Employer to give all requisite notices, under the Union contract, and terminate the employment of all Employees effective as of the Closing, and Purchaser shall offer employment to such terminated Employees as Purchaser deems appropriate on terms determined solely by Purchaser. (The Union Employees who are rehired or whose employment is continued pursuant to the Union Contract and the terminated Employees who accept such offers of employment are referred to collectively herein as the "Rehired Employees").

## 8.5  Assignment of Mortgage.
Notwithstanding the provisions of Article V hereof (and unless waived by Purchaser), in lieu of obtaining a satisfaction, Seller agrees to request and use diligent efforts to cause the holders of any existing mortgages on the Property to assign same to Purchaser, or Purchaser's designee or lender, without representation or recourse, other than as to the outstanding principal balance. Purchaser shall bear the customary and reasonable document production costs and attorneys' fees of Seller and Seller's existing mortgagee in connection with such assignment of mortgage (but not with respect to matters unrelated to such assignment). Seller agrees to cooperate with Purchaser on its mortgage application, if any, and to execute and complete the customary and usual documents required by a lending institution for similar loans and the assignment documents from its existing lender, provided that Purchaser shall pay all costs and expenses thereof.

## 8.6  Tax Contests.

8.6.1. <u>Taxable Period Terminating Prior to Closing Date</u>. Seller shall retain the right to commence, continue and settle any proceeding to contest any Taxes for any taxable period which terminates prior to the Closing Date, and shall be entitled to any refunds or abatements of Taxes awarded in such proceedings. Seller represents and warrants that it has not initiated any tax contest for a taxable period which includes the Closing Date and any periods thereafter. This Section 8.6.1 shall survive the Closing.

8.6.2. <u>Intentionally deleted</u>.

8.6.3. <u>Taxable Period Commencing After Closing Date</u>. Purchaser shall have the right to commence, continue and settle any proceedings to contest Taxes for any taxable period which commences from and after the Closing Date, and shall be entitled to any refunds or abatements of Taxes awarded in such proceedings. This Section 8.6.3 shall survive the Closing.

8.6.4. <u>Cooperation</u>. Seller and Purchaser shall use commercially reasonable efforts to cooperate with the Party contesting the Taxes (at no cost or expense to the Party not contesting the Taxes other than any de minimis cost or expense or any cost or expense which the requesting Party agrees in writing to reimburse) and to execute and deliver any documents and instruments reasonably requested by the Party contesting the Taxes in furtherance of the contest of such Taxes. This Section 8.6.4 shall survive the Closing.

**8.7 <u>Notices and Filings.</u>** Seller and Purchaser shall use commercially reasonable efforts to cooperate with each other (at no cost or expense to the Party whose cooperation is requested, other than any de minimis cost or expense or any cost or expense which the requesting Party agrees in writing to reimburse) to provide written notice to any Person under any Contracts, Licenses and Permits, and to effect any registrations or filings with any Governmental Authority or other Person, regarding the change in ownership of the Property or the Business. This Section 8.7 shall survive the Closing.

**8.8 <u>Further Assurances.</u>** From the Effective Date until the Closing or earlier termination of this Agreement, Seller and Purchaser shall use commercially reasonable efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary, proper or advisable to consummate the transaction described in this Agreement, including, without limitation, (i) obtaining all necessary consents, approvals and authorizations required to be obtained from any Governmental Authority or other Person under this Agreement or Applicable Law, and (ii) effecting all registrations and filings required under this Agreement or Applicable Law. After the Closing, Seller and Purchaser shall use commercially reasonable efforts (at no cost or expense to such Party, other than any de minimis cost or expense or any cost or expense which the requesting Party agrees in writing to reimburse) to further effect the transaction contemplated in this Agreement. The immediately preceding sentence of this Section 8.8 shall survive the Closing.

**8.9 <u>Litigation Covenants.</u>** Seller hereby agrees that to fullest extent of the law, it shall indemnify, defend and hold harmless the Purchaser Indemnities for, from and against any claims, causes of action, lawsuits, liability, damages, losses, costs and expenses, including, without limitation, reasonable attorneys' fees, court costs including trial and all appeals, and costs related to discovery, subpoenas and the like, alleged against and/or incurred by any of the Purchaser Indemnitees which arises in any way from the Seller Litigation, and neither the limitations set forth in Section 15.4 of this Agreement, nor the maximum aggregate reimbursement amount set forth in Section 13.1 of this Agreement shall apply to the foregoing obligation; provided, however, that the foregoing obligations of Seller shall not apply to any matter arising in connection with Purchaser's own actions other than Purchaser's closing of the transaction

contemplated hereby and acquiring title to the Property. This paragraph shall survive the Closing or termination of this Agreement.

## ARTICLE IX
## CLOSING CONDITIONS

**9.1 Mutual Closing Conditions.**

      9.1.1.   <u>Satisfaction of Mutual Closing Conditions</u>. The respective obligations of Seller and Purchaser to close the transaction contemplated in this Agreement are subject to the satisfaction at or prior to Closing of the following conditions precedent (the "Mutual Closing Conditions"):

(a) <u>Sale Order</u>. The Bankruptcy Court shall have entered the Sale Order and there shall be no applicable stay in effect.

(b) <u>Consents</u>. Seller shall have received any required consents (i) from the Franchisor regarding the assignment of the Franchise Agreement, in the event that the Franchise Agreement is to be assigned to Purchaser pursuant to Section 7.1.13 hereof, and (ii) from The International Brotherhood of Teamsters and any other required parties regarding the assignment of the Union Contract to Purchaser.

      9.1.2.   <u>Failure of Mutual Closing Condition</u>. If any of the Mutual Closing Conditions is not satisfied at Closing, then each Party shall have the right to terminate this Agreement by providing written notice to the other Party, in which case the Earnest Money shall be refunded to Purchaser, and the Parties shall have no further rights or obligations under this Agreement, except for those which expressly survive such termination.

**9.2 Purchaser Closing Conditions.**

      9.2.1.   <u>Satisfaction of Purchaser Closing Conditions</u>. In addition to the Mutual Closing Conditions, Purchaser's obligations to close the transactions described in this Agreement are subject to the satisfaction at or prior to Closing of the following conditions precedent (the "Purchaser Closing Conditions"):

(a) <u>Seller's Deliveries</u>. All of the Seller Closing Deliveries shall have been delivered to Purchaser or deposited with Escrow Agent in the Closing Escrow to be delivered to Purchaser at Closing.

(b) <u>Representations and Warranties</u>. The representations or warranties of Seller in this Agreement (as qualified by any schedules to this Agreement and any amendments or supplements to such schedules) shall be true and correct in all material respects as of the Closing (or as of such other date to which such representation or warranty expressly is made).

(c) <u>Covenants and Obligations</u>. The covenants and obligations of Seller in this Agreement shall have been performed in all material respects.

(d) <u>Title Policy</u>. Purchaser shall have received the Title Company's commitment for the issuance of the Title Policy.

      9.2.2.   <u>Failure of Purchaser Closing Condition</u>. If any of the Purchaser Closing Conditions is not satisfied on the Closing Date, then Purchaser shall have the right (i) to terminate this Agreement by providing written notice to Seller, in which case the Earnest Money shall be refunded to Purchaser, and

the Parties shall have no further rights or obligations under this Agreement, except those which expressly survive such termination, or (ii) to waive any of the Purchaser Closing Conditions at or prior to Closing without offset or deduction from the Purchase Price except as expressly provided in this Agreement to the contrary provided, however, that any such waiver shall be made in writing executed by Purchaser.

**9.3 Seller Closing Conditions.**

        9.3.1.   Satisfaction of Seller Closing Conditions. In addition to the Mutual Closing Conditions, Seller's obligations to close the transactions contemplated in this Agreement are subject to the satisfaction at or prior to Closing of the following conditions precedent (the "Seller Closing Conditions"):

(a)  Receipt of the Purchase Price. Purchaser shall have (A) paid to Seller or deposited with Escrow Agent with written direction to disburse the same to Seller, the Purchase Price (as adjusted pursuant to Section 3.1), and (B) delivered written direction to Escrow Agent to disburse the Earnest Money to Seller.

(b)  Purchaser's Deliveries. All of the Purchaser Closing Deliveries shall have been delivered to Seller or deposited with Escrow Agent in the Closing Escrow to be delivered to Seller at Closing.

(c)  Representations and Warranties. The representations and warranties of Purchaser in this Agreement shall be true and correct in all material respects as of the Closing (or as of such other date to which such representation or warranty expressly is made).

(d)  Covenants and Obligations. The covenants and obligations of Purchaser in this Agreement shall have been performed in all material respects.

        9.3.2.   Failure of Seller Closing Condition. If any of the Seller Closing Conditions is not satisfied on the Closing Date, then Seller shall have the right to (i) terminate this Agreement by providing written notice to Purchaser, in which case the Earnest Money shall be disbursed to Seller in accordance with Section 3.2.2, and the Parties shall have no further rights or obligations under this Agreement, except those which expressly survive such termination, or (ii) waive any of the Seller Closing Conditions at or prior to Closing; provided, however, that any such waiver shall be made in writing executed by Seller.

**ARTICLE X**
**CLOSING**

**10.1    Closing Date.** The closing of the transaction described in this Agreement (the "Closing") shall occur on the date which is nineteen (19) days following the entry of the Sale Order, or such other date as agreed to in writing between Seller and Purchaser (the date on which the Closing occurs is referred to herein as the "Closing Date"). The Closing shall be effected through the Closing Escrow pursuant to the Closing Escrow Agreement as provided in Section 10.2. At Purchaser's option the Closing may be postponed on not more than two occasions for a period of up to fifteen (15) days each upon Purchaser's delivery of notice thereof to Seller given not less than five (5) Business Days prior to the then scheduled Closing Date, and in consideration for therefor, Purchaser shall deposit with Escrow Agent the additional sum of $500,000.00 for each such postponement, which shall be added to the Earnest Money and credited against the Purchase Price at Closing, but subject to the applicable provisions of this Agreement including Sections 3.2.3 and 3.2.4.

**10.2    Closing Escrow.** The Closing shall take place by means of an escrow (the "Closing Escrow"), and, at or prior to the Closing, the Parties shall enter into a closing escrow agreement with the Escrow Agent with respect to the Closing Escrow in form and substance reasonably acceptable to Seller,

Purchaser and the Escrow Agent (the "Closing Escrow Agreement") pursuant to which (i) the Purchase Price to be paid by Purchaser pursuant to Section 3.3 shall be deposited with Escrow Agent, (ii) all of the documents required to be delivered by Seller and Purchaser at Closing pursuant to this Agreement shall be deposited with Escrow Agent, and (iii) at Closing, the Purchase Price (as adjusted pursuant to this Agreement) and the Earnest Money shall be disbursed to Seller and the documents deposited into the Closing Escrow shall be delivered to Seller and Purchaser (as the case may be) pursuant to the Closing Escrow Agreement.

**10.3    Closing Deliveries.**

10.3.1. Seller's Deliveries. At the Closing, Seller shall deliver or cause to be delivered to Purchaser or deposited with Escrow Agent in the Closing Escrow to be delivered to Purchaser at Closing, all of the (i) documents set forth in this Section 10.3.1, each of which shall have been duly executed by Seller and acknowledged (if required), and (ii) other items set forth in this Section 10.3.1 (the "Seller Closing Deliveries"), as follows:

(a) A closing certificate in the form of Exhibit D, together with all exhibits thereto;

(b) A bargain and sale deed with covenant against grantor's acts (the "Deed") in the form of Exhibit E, conveying the Real Property to Purchaser, subject to the Permitted Exceptions;

(c) A Bill of Sale in the form of Exhibit F, transferring the FF&E, Supplies, IT Systems, F&B, Retail Merchandise, Intellectual Property, Books and Records, Plans and Specifications, Warranties, Bookings and Accounts Receivable to Purchaser on the terms set forth therein;

(d) An Assignment and Assumption of Contracts and Licenses and Permits in the form of Exhibit G, assigning the Contracts and Licenses and Permits to Purchaser on the terms set forth therein;

(e) An Assignment and Assumption of Union Contract, assigning the Union Contract to Purchaser on the terms set forth therein;

(f) A certificate or registration of title for any owned vehicle or other Personal Property included in the Property which requires such certification or registration, duly executed, conveying such vehicle or such other Personal Property to Purchaser, or in the event that such certificate or registration is lost, such documentation as is required to convey title to such vehicle;

(g) Such agreements, affidavits or other documents as may be reasonably and customarily required by the Title Company from Seller;

(h) Any real estate transfer tax declaration, tax returns or similar documents required under Applicable Law in connection with the conveyance of the Real Property;

(i) A FIRPTA affidavit in the form set forth in the regulations under Section 1445 of the Code;

(j) A certificate from the applicable state or local Governmental Authority stating that all sales and use taxes with respect to the Property or Business have been paid through the date of the issuance of such certificate, and, if any such taxes have not been paid, the amount due and payable as of the date of issuance of the certificate, which shall be paid by Seller at Closing; provided that if despite Seller's best efforts such certificate setting forth the amount due and payable is not obtained on or before the Closing Date, then Seller may postpone the Closing for a period of up to thirty (30) days from the

originally scheduled Closing Date upon Seller's delivery of notice thereof to Purchaser given not less than Five (5) Business Days prior to the Closing Date;

(k) A resolution of Seller, signed by Seller's authorized representative, authorizing the execution of this Agreement and the consummation of the transactions contemplated hereby;

(l) The Sale Order;

(m) A Certificate of Good Standing from New York State evidencing that Seller is in good standing under the laws of New York State;

(n) To the extent not previously delivered to Purchaser, all originals (or copies if originals are not available) of the Contracts, Licenses and Permits, Books and Records, keys and lock combinations, which shall be located at the Hotel on the Closing Date;

(o) An assignment of the Franchise Agreement, to the extent applicable pursuant to Section 7.1.13;

(p) The Closing Statement prepared pursuant to Section 11.1;

(q) Such other documents and instruments as may be reasonably requested by Purchaser in order to consummate the transaction described in this Agreement;

(r) The Executory Contract Order; and

(s) The assignment, in recordable along with related documents  customarily delivered with respect to an assignment of a mortgage ( i.e. note , mortgage, allonge etc) of any existing mortgages on the Property to Purchaser, or Purchaser's designee or lender, without representation or recourse, other than as to the outstanding principal balance.

   10.3.2.  Purchaser's Deliveries. At the Closing, Purchaser shall deliver or cause to be delivered to Seller or deposited with Escrow Agent in the Closing Escrow to be delivered to Seller all of the (i) documents set forth in this Section 10.3.2, each of which shall have been duly executed by Purchaser and acknowledged (if required), and (ii) other items set forth in this Section 10.3.2 (the "Purchaser Closing Deliveries"), as follows:

(a) The Purchase Price (as adjusted pursuant to this Agreement) to be paid by Purchaser;

(b) A letter of direction to Escrow Agent directing Escrow Agent to disburse the Earnest Money to Seller;

(c) A closing certificate in the form of Exhibit H, together with all exhibits thereto;

(d) A resolution of Purchaser, signed by Purchaser's authorized representative, authorizing the execution of this Agreement and the consummation of the transactions contemplated hereby;

(e) A Certificate of Good Standing from New York State evidencing that Purchaser is in good standing under the laws of New York State;

(f) A counterpart of each of the documents and instruments to be delivered by Seller under Section 10.3.1 which require execution by Purchaser; and

(g) Such other documents and instruments as may be reasonably requested by Seller or the Title Company in order to consummate the transaction described in this Agreement.

**10.4    Possession.** Seller shall deliver possession of the Real Property and tangible Personal Property to Purchaser upon completion of the Closing, subject to transient hotel guest occupancy and use.

**ARTICLE XI**
**PRORATIONS AND EXPENSES**

**11.1    Closing Statement.** No later than the day prior to Closing, the Parties, through their respective employees, agents or representatives, jointly shall make such examinations, audits and inventories of the Hotel as may be necessary to make the adjustments and prorations to the Purchase Price as set forth in Sections 11.2 and 11.3 or any other provisions of this Agreement. Based upon such examinations, audits and inventories, the Parties jointly shall prepare prior to Closing a closing statement (the "Closing Statement"), which shall set forth their best estimate of the amounts of the items to be adjusted and prorated under this Agreement. The Closing Statement shall be approved and executed by the Parties at Closing, and such adjustments and prorations shall be final with respect to the items set forth in the Closing Statement, except to the extent any such items shall be reprorated after the Closing as expressly set forth in Section 11.2.

**11.2    Prorations.** The items of revenue and expense set forth in this Section 11.2 shall be prorated between the Parties (the "Prorations") as of 11:59 p.m. on the day preceding the Closing Date (the "Cut-Off Time"), or such other time expressly provided in this Section 11.2, so that the Closing Date is a day of income and expense for Purchaser.

11.2.1. Taxes. All real property, personal property, and similar Taxes shall be prorated as of the Cut-Off Time between Seller and Purchaser. If the amount of any such Taxes is not ascertainable on the Closing Date, the proration for such Taxes shall be based on the most recent available bill; provided, however, that after the Closing, Seller and Purchaser shall reprorate the Taxes and pay any deficiency in the original proration to the other Party promptly upon receipt of the actual bill for the relevant taxable period. This Section 11.2.1 shall survive the Closing.

11.2.2. Intentionally omitted.

11.2.3. Contracts. Any amounts prepaid, accrued or due and payable under the Contracts (other than for utilities which proration is addressed separately in Section 11.2.5) shall be prorated as of the Cut-Off Time between Seller and Purchaser, with Seller being credited for amounts prepaid, and Purchaser being credited for amounts accrued and unpaid. Purchaser shall receive a credit for all deposits held by Seller under the Contracts (together with any interest thereon if interest is required to be paid to the counterparty) which are not transferred to Purchaser, and Purchaser thereafter shall be obligated to refund or apply such deposits in accordance with the terms of such Contracts. Seller shall receive a credit for all deposits made by Seller under the Contracts (together with any interest thereon) which are transferred to Purchaser or remain on deposit for the benefit of Purchaser.

11.2.4. Licenses and Permits. All amounts prepaid, accrued or due and payable under any Licenses and Permits transferred to Purchaser shall be prorated as of the Cut-Off Time between Seller and Purchaser. Seller shall receive a credit for all deposits made by Seller under the Licenses and Permits (together with any interest thereon) which are transferred to Purchaser or which remain on deposit for the benefit of Purchaser.

26

11.2.5. Utilities. All utility services shall be prorated as of the Cut-Off Time between Seller and Purchaser. The Parties shall use commercially reasonable efforts to obtain readings for all utilities as of the Cut-Off Time. If readings cannot be obtained as of the Closing Date, the cost of such utilities shall be prorated between Seller and Purchaser by estimating such cost on the basis of the most recent bill for such service; provided, however, that after the Closing, the Parties shall reprorate the amount for such utilities and pay any deficiency in the original proration to the other Party promptly upon receipt of the actual bill for the relevant billing period, which obligation shall survive the Closing. Seller shall receive a credit for all fuel stored at the Hotel based on Seller's cost for such fuel. Seller shall receive a credit for all deposits transferred to Purchaser or which remain on deposit for the benefit of Purchaser with respect to such utility contracts.

11.2.6. Compensation. Seller shall pay directly to the Rehired Employees all Compensation due to such Rehired Employees through the date immediately prior to the Closing Date on or before Seller's first payroll date on or after the Closing Date, and Purchaser shall not receive a credit for any Compensation; provided, however, that any portion of Compensation consisting of tax withholdings, employer taxes, and the like shall be paid to the appropriate collecting entity.

11.2.7. Accrued Vacation Pay. Seller shall pay directly to the Rehired Employees all Accrued Vacation Pay due to such Rehired Employees through the date immediately prior to the Closing Date on or before Seller's first payroll date on or after the Closing Date, and Purchaser shall not receive a credit for any Accrued Vacation Pay.

11.2.8. Bookings. Purchaser shall receive a credit for all prepaid deposits for Bookings scheduled to occur on or after the Closing Date, except to the extent such deposits are transferred to Purchaser.

11.2.9. Retail Merchandise and F&B. Seller shall receive a credit for all Retail Merchandise and unopened items of F&B (including, without limitation, all F&B in any "mini bars" in the guest rooms) based on Seller's cost for such items.

11.2.10. Restaurants and Bars. Seller shall close out the transactions in the restaurants and bars in the Hotel as of the regular closing time for such restaurants and bars during the night in which the Cut-Off Time occurs and retain all monies collected and receivables arising from such transactions as of such closing, and Purchaser shall be entitled to any monies collected from the restaurants and bars thereafter.

11.2.11. Vending Machines. Seller shall remove all monies from all vending machines, laundry machines, pay telephones and other coin operated equipment as of the Cut-Off Time and shall retain all monies collected therefrom as of the Cut-Off Time, and Purchaser shall be entitled to any monies collected therefrom after the Cut-Off Time.

11.2.12. Trade Payables. Except to the extent an adjustment or proration is made under another subsection of this Section 11.2, (i) Seller shall pay in full prior to the Closing all amounts payable to vendors or other suppliers of goods or services for the Business (the "Trade Payables") which are due and payable as of the Closing Date for which goods or services have been delivered to the Hotel prior to Closing, and (ii) Purchaser shall receive a credit for the amount of such Trade Payables which have accrued, but are not yet due and payable as of the Closing Date, and Purchaser shall pay all such Trade Payables accrued as of the Closing Date when such Trade Payables become due and payable; provided, however, Seller and Purchaser shall reprorate the amount of credit for any Trade Payables and pay any deficiency in the original proration to the other Party promptly upon receipt of the actual bill for such goods or services. Seller shall receive a credit for all advance payments or deposits made with respect to FF&E, Supplies, F&B and Retail Merchandise ordered, but not delivered to the Hotel prior to the Closing Date, and Purchaser shall pay the amounts which become due and payable for such FF&E, Supplies, F&B

27

and Retail Merchandise which were ordered prior to Closing. This Section 11.2.12 shall survive the Closing.

11.2.13.<u>Cash</u>. Seller shall receive a credit for all cash on hand or on deposit in any house bank at the Hotel which shall remain on deposit for the benefit of Purchaser.

11.2.14.<u>Other Adjustments and Prorations</u>. All other items of income and expense as are customarily adjusted or prorated upon the sale and purchase of a hotel property similar to the Property shall be adjusted and prorated between Seller and Purchaser accordingly.

**11.3    <u>Accounts Receivable.</u>**

11.3.1. <u>Guest Ledger</u>. At Closing, Seller shall receive a credit in an amount equal to: (i) all amounts charged to the Guest Ledger for all room nights up to (but not including) the night during which the Cut-Off Time occurs, and (ii) one half ($\frac{1}{2}$) of all amounts charged to the Guest Ledger for the room night which includes the Cut-Off Time (other than any restaurant or bar charges on the Guest Ledger which shall be prorated in accordance with Section 11.2.10), and Purchaser shall be entitled to retain all deposits made and amounts collected with respect to such Guest Ledger.

11.3.2. <u>Accounts Receivable (Other than Guest Ledger)</u>. Seller shall retain the right to collect all Accounts Receivable (other than the Guest Ledger which is addressed in Section 11.3.1), and Purchaser shall not receive a credit for the Accounts Receivable. Purchaser shall cooperate with Seller in collecting the Accounts Receivable, at no cost or expense to Purchaser other than any de minimis cost and expense or any cost or expense which Seller agrees in writing to reimburse. If any Accounts Receivable are paid to Purchaser after the Closing, Purchaser shall pay to Seller the amounts received by Purchaser within five (5) days after receipt of such amounts, without any commission or deduction for Purchaser.

**11.4    <u>Transaction Costs.</u>**

11.4.1. <u>Seller's Transaction Costs</u>. In addition to the other costs and expenses to be paid by Seller set forth elsewhere in this Agreement, Seller shall pay for the following items in connection with this transaction: (i) the fees and expenses of removing or curing any Unpermitted Exceptions which Seller elects to cure or remove pursuant to this Agreement; (ii) the commission due to Broker; (iii) one half ($\frac{1}{2}$) of the fees and expenses for the Escrow Agent; (iv) the fees and expenses for the Title Commitment and Title Policy, up to $115,000 in the aggregate; (v) any transfer, sales or similar tax and recording charges payable in connection with the conveyance of the Property; (vi) any fees or expenses payable for the assignment, transfer or conveyance of any Contracts, Licenses and Permits, IT Systems, Intellectual Property, Plans and Specifications and Warranties and (vii) the fees and expenses of its own attorneys, accountants and consultants.

11.4.2. <u>Purchaser's Transaction Costs</u>. In addition to the other costs and expenses to be paid by Purchaser as set forth elsewhere in this Agreement, Purchaser shall pay for the following items in connection with this transaction: (i) the fees and expenses incurred by Purchaser for Purchaser's inspections or otherwise in connection with any inspections of the Property; (ii) the fees and expenses for the Title Commitment and Title Policy in excess of $115,000, (iii) the fees and expenses for any Updated Survey; (iv) any mortgage tax, title insurance fees and expenses for any loan title insurance policies, recording charges or other amounts payable in connection with any financing obtained by Purchaser; (v) one half ($\frac{1}{2}$) of the fees and expenses for the Escrow Agent; and (vi) the fees and expenses of its own attorneys, accountants and consultants.

11.4.3. <u>Other Transaction Costs</u>. All other fees, costs and expenses not expressly addressed in this Section 11.4 or elsewhere in this Agreement shall be allocated between Seller and Purchaser in accordance with applicable local custom for similar transactions.

**ARTICLE XII**
**TRANSITION PROCEDURES**

**12.1    <u>Safe Deposit Boxes.</u>** Prior to the Closing, Seller shall notify all guests or customers who are then using a safe deposit box at the Hotel advising them of the pending change in ownership of the Hotel and requesting them to conduct an inventory and verify the contents of such safe deposit box. All inventories by such guests or customers shall be conducted under the joint supervision of employees, agents or representatives of the Parties. Upon such inventory and verification, Seller shall deliver to Purchaser all keys, receipts and agreements for such safe deposit box (and thereafter such safe deposit box shall be deemed an "<u>Inventoried Safe Deposit Box</u>"). If this Agreement is terminated after such inventory, Purchaser shall return all keys, receipts and agreements to Seller for such Inventoried Safe Deposit Boxes immediately upon such termination. Upon Closing, Seller shall deliver to Purchaser all keys for all safe deposit boxes not then in use, and a list of all safe deposit boxes which are then in use, but not yet inventoried by the depositor, with the name and room number of such depositor. After the Closing, the Parties shall make appropriate arrangements for guests and customers at the Hotel to inventory and verify the contents of the non Inventoried Safe Deposit Boxes, and upon such inventory and verification, Seller shall deliver to Purchaser all keys, receipt and agreements for such safe deposit box (and such safe deposit box thereafter shall constitute an Inventoried Safe Deposit Box). Purchaser shall be responsible for, and shall indemnify and hold harmless the Seller Indemnitees in accordance with ARTICLE XV from and against any Indemnification Loss incurred by any Seller Indemnitees with respect to, any theft, loss or damage to the contents of any safe deposit box from and after the time such safe deposit box is deemed an Inventoried Safe Deposit Box pursuant to this Section 12.1. Seller shall be responsible for, and shall indemnify and hold harmless the Purchaser Indemnitees in accordance with ARTICLE XV from and against any Indemnification Loss incurred by any Purchaser Indemnitees with respect to, any theft, loss or damage to the contents of any safe deposit box prior to the time such safe deposit box is deemed an Inventoried Safe Deposit Box.

**12.2    <u>Baggage.</u>** On the Closing Date, employees, agents or representatives of the Parties jointly shall make a written inventory of all baggage, boxes and similar items checked in or left in the care of Seller at the Hotel, and Seller shall deliver to Purchaser the keys to any secured area which such baggage and other items are stored (and thereafter such baggage, boxes and other items inventoried shall be deemed the "<u>Inventoried Baggage</u>"). Purchaser shall be responsible for, and shall indemnify and hold harmless the Seller Indemnitees in accordance with ARTICLE XV from and against any Indemnification Loss incurred by any Seller Indemnitees with respect to any theft, loss or damage to any Inventoried Baggage from and after the time of such inventory, and any other baggage, boxes or similar items left in the care of Purchaser which was not inventoried by the Parties. Seller shall be responsible for, and shall indemnify and hold harmless the Purchaser Indemnitees in accordance with ARTICLE XV from and against any Indemnification Loss incurred by any Purchaser Indemnitees with respect to any theft, loss or damage to any Inventoried Baggage prior to the time of such inventory, and any other baggage, boxes or similar items left in the care of Seller which was not inventoried by the Parties.

**ARTICLE XIII**
**DEFAULT AND REMEDIES**

**13.1    <u>Seller's Default.</u>** If, at or any time prior to Closing, Seller fails to perform its covenants or obligations under this Agreement in any material respect within seven (7) days after written notice from Purchaser (a "<u>Seller Default</u>"), then Purchaser, as its sole and exclusive remedy, may elect to (a)

29

terminate this Agreement, in which case the Earnest Money shall be refunded to Purchaser, and the Parties shall have no further rights or obligations under this Agreement, except those which expressly survive such termination; (b) proceed to Closing without offset or deduction to the Purchase Price, except as expressly provided in this Agreement; or (c) obtain a court order for specific performance.

**13.2    Purchaser's Default.** If Purchaser fails to perform any of its other covenants or obligations under this Agreement in any material respect for reasons other than due to a failure of a condition precedent to Purchaser's obligation to close as set forth in Section 9.2 hereof, and no Seller Default has occurred which remains uncured (a "Purchaser Default"), then Seller, as its sole and exclusive remedy, may elect to (A) terminate this Agreement by providing written notice to Purchaser, in which case the Earnest Money shall be disbursed to Seller in accordance with Section 3.2.2, and the Parties shall have no further rights or obligations under this Agreement, except those which expressly survive such termination, or (B) proceed to Closing pursuant to this Agreement.

**13.3    LIQUIDATED DAMAGES.** THE PARTIES ACKNOWLEDGE AND AGREE THAT IF THIS AGREEMENT IS TERMINATED PURSUANT TO SECTION 13.2 HEREOF, THE DAMAGES THAT SELLER WOULD SUSTAIN AS A RESULT OF SUCH TERMINATION WOULD BE DIFFICULT IF NOT IMPOSSIBLE TO ASCERTAIN. ACCORDINGLY, THE PARTIES AGREE THAT SELLER SHALL RETAIN THE EARNEST MONEY AS FULL AND COMPLETE LIQUIDATED DAMAGES (AND NOT AS A PENALTY) AS SELLER'S SOLE AND EXCLUSIVE REMEDY FOR SUCH TERMINATION. NOTWITHSTANDING THE FOREGOING, THE REMEDY OF LIQUIDATED DAMAGES SHALL NOT LIMIT, AND SHALL NOT BE DEEMED TO LIMIT, IN ANY WAY THE RIGHTS AND REMEDIES AVAILABLE TO SELLER AND THE OBLIGATIONS OF PURCHASER UNDER ARTICLE IV OF THIS AGREEMENT, ALL OF WHICH RIGHTS, REMEDIES AND OBLIGATIONS SHALL EXPRESSLY SURVIVE SUCH TERMINATION OF THIS AGREEMENT.

**ARTICLE XIV**
**RISK OF LOSS**

**14.1    Casualty.** If, at any time after the Effective Date and prior to Closing or earlier termination of this Agreement, the Property or any portion thereof is damaged or destroyed by fire or any other casualty (a "Casualty"), Seller shall give written notice of such Casualty to Purchaser promptly after the occurrence of such Casualty.

14.1.1. Material Casualty. If the amount of the repair restoration of the Property required by a Casualty equals or exceeds $250,000.00, as estimated by Seller's architect (a "Material Casualty") then Purchaser shall have the right to elect, by providing written notice to Seller within ten (10) days after Purchaser's receipt of the estimate from Seller's architect, to (a) terminate this Agreement, in which case the Earnest Money shall be refunded to Purchaser, and the Parties shall have no further rights or obligations under this Agreement, except those which expressly survive such termination, or (b) proceed to Closing, without terminating this Agreement, in which case Seller shall (i) provide Purchaser with a credit against the Purchase Price in an amount equal to the lesser of: (A) the applicable insurance deductible, and (B) the reasonable estimated costs for the repair or restoration of the Property required by such Material Casualty, and (ii) transfer and assign to Purchaser all of Seller's right, title and interest in and to all proceeds from all casualty and lost profits insurance policies maintained by Seller with respect to the Property or the Business. If the Closing is scheduled to occur within Purchaser's ten (10) day election period, the Closing Date shall be postponed until the date which is five (5) Business Days after the expiration of such ten (10) day election period.

14.1.2. Non Material Casualty. In the event of any Casualty which is not a Material Casualty, then Purchaser shall not have the right to terminate this Agreement, but shall proceed to Closing, in which

case Seller shall (A) provide Purchaser with a credit against the Purchase Price in an amount equal to the lesser of: (1) the applicable insurance deductible, and (2) the reasonable estimated costs for the repair or restoration required by such Casualty, and (B) transfer and assign to Purchaser all of Seller's right, title and interest in and to all proceeds from all casualty and lost profits insurance policies maintained by Seller with respect to the Hotel.

**14.2    Condemnation.** If, at any time after the Effective Date and prior to Closing or the earlier termination of this Agreement, any Governmental Authority commences any condemnation proceeding or other proceeding in eminent domain with respect to all or any portion of the Real Property (a "Condemnation"), Seller shall give written notice of such Condemnation to Purchaser promptly after Seller receives notice of such Condemnation.

14.2.1.  Material Condemnation. If the Condemnation would (i) result in the permanent loss of more than five percent (5%) of the fair market value of the Land or Improvements, (ii) result in any permanent material reduction or restriction in access to the Land or Improvements, or (iii) have a permanent materially adverse effect on the Business as conducted prior to such Condemnation (a "Material Condemnation"), then Purchaser shall have the right to elect, by providing written notice to Seller within ten (10) days after Purchaser's receipt of Seller's written notice of such Material Condemnation, to (A) terminate this Agreement, in which case the Earnest Money shall be refunded to Purchaser, and the Parties shall have no further rights or obligations under this Agreement, except those which expressly survive such termination, or (B) proceed to Closing, without terminating this Agreement, in which case Seller shall assign to Purchaser all of Seller's right, title and interest in all proceeds and awards from such Material Condemnation. If the Closing is scheduled to occur within Purchaser's ten (10) day election period, the Closing shall be postponed until the date which is five (5) Business Days after the expiration of such ten (10) day election period.

14.2.2.  Non-Material Condemnation. In the event of any Condemnation other than a Material Condemnation, Purchaser shall not have the right to terminate this Agreement, but shall proceed to Closing, in which case Seller shall assign to Purchaser all of Seller's right, title and interest in all proceeds and awards from such Condemnation.

## ARTICLE XV
## SURVIVAL, INDEMNIFICATION AND RELEASE

**15.1    Survival.** Except as expressly set forth in this Section 15.1, all representations, warranties, covenants, liabilities and obligations shall be deemed (i) if the Closing occurs, to merge in the Deed and not survive the Closing, or (ii) if this Agreement is terminated, not to survive such termination.

15.1.1.  Survival of Representations and Warranties. The representations and warranties in Sections 7.1.1, 7.1.2, 7.1.3, 7.1.14, 7.1.15, 7.1.20, 7.1.21, 7.1.23, and 7.2 shall survive Closing or the termination of this Agreement until the expiration of the applicable statute of limitations. All other representations and warranties of Seller in Section 7.1 shall survive the Closing for a period commencing on the Closing Date and expiring on the date which is six (6) months after the Closing Date (the period any representation or warranty survives termination or the Closing as set forth in this Section 15.1.1 is referred to herein as the "Survival Period").

15.1.2.  Survival of Covenants and Obligations. If this Agreement is terminated, only those covenants and obligations to be performed by the Parties under this Agreement which expressly survive the termination of this Agreement shall survive such termination. If the Closing occurs, only those covenants and obligations to be performed by the Parties under this Agreement which expressly survive the Closing shall survive the Closing.

15.1.3. <u>Survival of Indemnification</u>. This ARTICLE XV and all other rights and obligations of defense and indemnification as expressly set forth in this Agreement shall survive the Closing or termination of this Agreement.

**15.2    Indemnification by Seller.** Subject to the limitations set forth in any express provision of in this Agreement, Seller shall indemnify and hold harmless the Purchaser Indemnitees from and against any Indemnification Loss incurred by any Purchaser Indemnitee to the extent resulting from (i) the breach of any express representations or warranties of Seller in this Agreement which expressly survives the Closing or termination of this Agreement (as the case may be), (ii) the breach by Seller of any of its covenants or obligations under this Agreement which expressly survives the Closing or termination of this Agreement (as the case may be), and (iii) any Retained Liabilities.

**15.3    Indemnification by Purchaser.** Subject to the limitations set forth in any express provision of this Agreement, Purchaser shall indemnify and hold harmless the Seller Indemnitees from and against any Indemnification Loss incurred by any Seller Indemnitee to the extent resulting from (i) any breach of any express representations or warranties of Purchaser in this Agreement which expressly survives the Closing or termination of this Agreement (as the case may be), (ii) any breach by Purchaser of any of its covenants or obligations under this Agreement which expressly survives the Closing or termination of this Agreement (as the case may be), and (iii) any Assumed Liabilities.

**15.4    Limitations on Indemnification Obligations.**

15.4.1. <u>Failure to Provide Notice within Survival Period</u>. Notwithstanding anything else to the contrary in this Agreement, an Indemnitee which is seeking defense or indemnification for a breach of any representations or warranties shall be entitled to indemnification for such breach only if the Indemnitee has given written notice to the Indemnitor prior to the expiration of the applicable Survival Period.

15.4.2. <u>Indemnification Deductible and Cap</u>. Notwithstanding anything to the contrary in this Agreement, Seller shall not be required to provide indemnification to the Purchaser Indemnitees pursuant to clause (i) of Section 15.2 to the extent that (a) the aggregate of all Indemnification Losses under clause (i) of Section 15.2 does not exceed $150,000, (b) with respect to any individual Indemnification Loss, such Indemnification Loss does not exceed $10,000, or (c) such Indemnifications Losses exceed 25% of the Purchase Price, in the aggregate.

15.4.3. <u>Negligence or Willful Misconduct of Indemnitee</u>.  Notwithstanding anything to the contrary in this Agreement, (i) a Purchaser Indemnitee shall not be entitled to defense or indemnification to the extent the applicable Indemnification Loss results from the negligence or willful misconduct of, or breach of this Agreement by, any Purchaser Indemnitee, and (ii) a Seller Indemnitee shall not be entitled to defense or indemnification to the extent the applicable Indemnification Loss results from the negligence or willful misconduct of, or breach of this Agreement by, any Seller Indemnitee.

15.4.4. <u>WAIVER OF CERTAIN DAMAGES</u>. NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THIS AGREEMENT OR UNDER APPLICABLE LAW, SELLER (FOR ITSELF AND ALL SELLER INDEMNITEES) AND PURCHASER (FOR ITSELF AND ALL PURCHASER INDEMNITEES) HEREBY UNCONDITIONALLY AND IRREVOCABLY WAIVE AND DISCLAIM ALL RIGHTS TO CLAIM OR SEEK ANY CONSEQUENTIAL, PUNITIVE, EXEMPLARY, STATUTORY OR TREBLE DAMAGES.

# ARTICLE XVI
## MISCELLANEOUS PROVISIONS

**16.1**     <u>Notices</u>

16.1.1.  <u>Method of Delivery</u>. All notices, requests, demands and other communications required to be provided by any Party under this Agreement (each, a "<u>Notice</u>") shall be in writing and delivered, at the sending Party's cost and expense, by (i) personal delivery, (ii) certified U.S. mail, with postage prepaid and return receipt requested, (iii) overnight courier service, or (iv) facsimile transmission, with a verification copy sent on the same day by any of the methods set forth in clauses (i), (ii) or (iii), to the recipient Party at the following address, facsimile number or e-mail address:

If to Seller:

> Gemini Real Estate Advisors, LLC
> 16740 Birkdale Commons Parkway
> Suite 306
> Huntersville, N.C. 28078
> Attn: Dante Massaro
> Facsimile No.: 704- 895-7846

> With a copy to:

> Robins Kaplan LLP
> 800 Boylston Street
> Boston, MA 02199
> Attn: Mark S. LaConte, Esq.
> Facsimile No.: 617-267-8288
> E-mail address: MLaConte@RobinsKaplan.com

If to Purchaser:

> The Howard Hughes Corporation
> 13355 Noel Road, 22nd Floor
> Dallas, Texas 75240
> Attn: General Counsel
> Facsimile No.: 972-392-6290
> E-mail address: peter.riley@howardhughes.com

16.1.2.  <u>Receipt of Notices</u>. All Notices sent by a Party (or its counsel pursuant to Section 16.1.4) under this Agreement shall be deemed to have been received by the Party to whom such Notice is sent upon (i) delivery to the address or facsimile number of the recipient Party, provided that such delivery is made prior to 5:00 p.m. (local time for the recipient Party) on a Business Day, otherwise the following Business Day, or (ii) the attempted delivery of such Notice if (A) such recipient Party refuses delivery of such Notice, or (B) such recipient Party is no longer at such address or facsimile number, and such recipient Party failed to provide the sending Party with its current address or facsimile number pursuant to Section 16.1.3.

16.1.3. <u>Change of Address</u>. The Parties and their respective counsel shall have the right to change their respective address and/or facsimile number for the purposes of this Section 16.1 by providing a Notice of such change in address and/or facsimile number as required under this Section 16.1.

16.1.4. <u>Delivery by Party's Counsel</u>. The Parties agree that the attorney for such Party shall have the authority to deliver Notices on such Party's behalf to the other Party hereto.

**16.2    No Recordation.** No Party shall record this Agreement, or any memorandum of this Agreement, in any public records.

**16.3    Time is of the Essence.** Time is of the essence of this Agreement; provided, however, that notwithstanding anything to the contrary in this Agreement, if the time period for the performance of any covenant or obligation, satisfaction of any condition or delivery of any Notice or item required under this Agreement shall expire on a day other than a Business Day, such time period shall be extended automatically to the next Business Day.

**16.4    Assignment.** Purchaser shall not assign this Agreement or any interest therein to any Person, without the prior written consent of Seller, which consent may be withheld in Seller's sole discretion. Notwithstanding the foregoing, Purchaser shall have the right to assign all of its right, title and interest in this Agreement to any affiliate(s) of Purchaser by providing written notice to Seller no later than five (5) days prior to the Closing, provided that in any such event the originally named Purchaser shall remain liable for all Purchaser obligations hereunder.

**16.5    Successors and Assigns.** This Agreement shall be binding upon and inure to the benefit of the Parties, and their respective successors and permitted assigns.

**16.6    Third Party Beneficiaries.** This Agreement shall not confer any rights or remedies on any Person other than (i) the Parties and their respective successors and permitted assigns, and (ii) any Indemnitee to the extent such Indemnitee is expressly provided any right of defense or indemnification in this Agreement.

**16.7    GOVERNING LAW.** THIS AGREEMENT SHALL BE GOVERNED BY THE LAWS OF THE STATE OF NEW YORK, WITHOUT GIVING EFFECT TO ANY PRINCIPLES REGARDING CONFLICT OF LAWS.

**16.8    Rules of Construction.** The following rules shall apply to the construction and interpretation of this Agreement:

16.8.1. Singular words shall connote the plural as well as the singular, and plural words shall connote the singular as well as the plural, and the masculine shall include the feminine and the neuter, as the context may require.

16.8.2. All references in this Agreement to particular articles, sections, subsections or clauses (whether in upper or lower case) are references to articles, sections, subsections or clauses of this Agreement. All references in this Agreement to particular exhibits or schedules (whether in upper or lower case) are references to the exhibits and schedules attached to this Agreement, unless otherwise expressly stated or clearly apparent from the context of such reference.

16.8.3. The headings in this Agreement are solely for convenience of reference and shall not constitute a part of this Agreement nor shall they affect its meaning, construction or effect.

16.8.4. Each Party and its counsel have reviewed and revised (or requested revisions of) this Agreement and have participated in the preparation of this Agreement, and therefore any rules of construction requiring that ambiguities are to be resolved against the Party which drafted the Agreement or any exhibits hereto shall not be applicable in the construction and interpretation of this Agreement or any exhibits hereto.

16.8.5. The terms "hereby," "hereof," "hereto," "herein," "hereunder" and any similar terms shall refer to this Agreement, and not solely to the provision in which such term is used.

16.8.6. The terms "include," "including" and similar terms shall be construed as if followed by the phrase "without limitation."

16.8.7. The term "sole discretion" with respect to any determination to be made a Party under this Agreement shall mean the sole and absolute discretion of such Party, without regard to any standard of reasonableness or other standard by which the determination of such Party might be challenged.

**16.9    Severability.** If any term or provision of this Agreement is held to be or rendered invalid or unenforceable at any time in any jurisdiction, such term or provision shall not affect the validity or enforceability of any other terms or provisions of this Agreement, or the validity or enforceability of such affected term or provision at any other time or in any other jurisdiction.

**16.10    JURISDICTION AND VENUE.** ANY LITIGATION OR OTHER COURT PROCEEDING WITH RESPECT TO ANY MATTER ARISING FROM OR IN CONNECTION WITH THIS AGREEMENT SHALL BE CONDUCTED IN THE UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF NEW YORK AND SELLER (FOR ITSELF AND ALL SELLER INDEMNITEES) AND PURCHASER (FOR ITSELF AND ALL PURCHASER INDEMNITEES) HEREBY SUBMIT TO JURISDICTION AND CONSENT TO VENUE IN SUCH COURT AND WAIVE ANY DEFENSE BASED ON FORUM NON CONVENIENS.

**16.11    WAIVER OF TRIAL BY JURY.** EACH PARTY HEREBY WAIVES ITS RIGHT TO A TRIAL BY JURY IN ANY LITIGATION OR OTHER COURT PROCEEDING WITH RESPECT TO ANY MATTER ARISING FROM OR IN CONNECTION WITH THIS AGREEMENT.

**16.12    Prevailing Party.** If any litigation or other court action, arbitration or similar adjudicatory proceeding is commenced by any Party to enforce its rights under this Agreement against any other Party, all fees, costs and expenses, including, without limitation, reasonable attorneys fees and court costs, incurred by the prevailing Party in such litigation, action, arbitration or proceeding shall be reimbursed by the losing Party; provided, that if a Party to such litigation, action, arbitration or proceeding prevails in part, and loses in part, the court, arbitrator or other adjudicator presiding over such litigation, action, arbitration or proceeding shall award a reimbursement of the fees, costs and expenses incurred by such Party on an equitable basis.

**16.13    Incorporation of Recitals, Exhibits and Schedules.** The recitals to this Agreement, and all exhibits and schedules (as amended, modified and supplemented from time to time pursuant to Section 16.14) referred to in this Agreement are incorporated herein by such reference and made a part of this Agreement. Any matter disclosed in any schedule to this Agreement shall be deemed to be incorporated in all other schedules to this Agreement.

**16.14    Intentionally omitted.**

**16.15    Entire Agreement.** This Agreement sets forth the entire understanding and agreement of the Parties hereto, and shall supersede the Letter of Intent and any other agreements and understandings (written or oral) between the Parties on or prior to the Effective Date with respect to the transaction described in this Agreement.

**16.16    Amendments, Waivers and Termination of Agreement.** No amendment or modification to any terms or provisions of this Agreement, waiver of any covenant, obligation, breach or default under this Agreement or termination of this Agreement (other than as expressly provided in this Agreement), shall be valid unless in writing and executed and delivered by each of the Parties.

**16.17    Not an Offer.** The delivery by Seller of this Agreement executed by Seller shall not constitute an offer to sell the Property, and Seller shall have no obligation to sell the Property to Purchaser, unless and until all Parties have executed and delivered this Agreement to all other Parties.

**16.18    Execution of Agreement.** A Party may deliver executed signature pages to this Agreement by facsimile or electronic transmission to any other Party, which facsimile or electronic copy shall be deemed to be an original executed signature page. This Agreement may be executed in any number of counterparts, each of which shall be deemed an original and all of which counterparts together shall constitute one agreement with the same effect as if the Parties had signed the same signature page.

**[Remainder of page intentionally left blank;
Signatures on following pages]**

36

**IN WITNESS WHEREOF**, each Party has caused this Agreement to be executed and delivered in its name by a duly authorized officer or representative.

**SELLER:**

**33 PECK SLIP ACQUISITION LLC**

     By:  33 PECK SLIP HOLDING LLC,
            Its Sole Member

         By:  33 Peck Slip Manager LLC,
              Its Sole Manager

              By: _____
                  Name:
                  Title:

**PURCHASER:**

**THE HOWARD HUGHES CORPORATION**

By: _____
Name: Peter F. Riley
Title: Secretary

37

**Exhibit A**

**FORM OF EARNEST MONEY ESCROW AGREEMENT**

**THIS EARNEST MONEY ESCROW AGREEMENT** (this "Agreement") is made and entered into as of this _____ day of November, 2015 (the "Effective Date"), by and among 33 Peck Slip Acquisition LLC, a Delaware limited liability company ("Seller"), _____ ("Purchaser"), and Old Republic National Title Insurance Company ("Escrow Agent"). (Seller, Purchaser and Escrow Agent are sometimes referred to herein individually as a "Party", and collectively as the "Parties").

WHEREAS, Seller and Purchaser are parties to that certain Purchase and Sale Agreement of even dated herewith (the "Purchase Agreement"), for the sale and purchase of the hotel facility located at 33 Peck Slip, New York, New York and commonly known as Best Western Seaport Inn (the "Hotel"). (All initial capitalized terms used, but not defined, in this Agreement shall have the meaning set forth in the Purchase Agreement.)

WHEREAS, Purchaser is required to deposit certain monies into escrow with Escrow Agent to be held as earnest money for the benefit of Seller pursuant to the Purchase Agreement in connection with the purchase of the Hotel.

WHEREAS, Escrow Agent is willing to hold such earnest money in escrow, and invest and disburse such earnest money, on the terms set forth in this Agreement.

NOW, THEREFORE, in consideration of the mutual covenants set forth in this Agreement and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

1.    Deposit and Investment of Earnest Money

(a)    Deposit and Acceptance of Earnest Money. By its execution and delivery of this Agreement to Seller and Purchaser, Escrow Agent hereby acknowledges that it has received from Purchaser the amount of Three Million Seven Hundred Thirty Thousand Dollars ($3,730,000) (the "**Earnest Money**"). If Purchaser postpones the Closing Date pursuant to Section 10.1 of the Purchase Agreement and delivers to Escrow Agent the additional amounts required by such Section, then the term "Earnest Money" shall include all such additional amounts. Escrow Agent shall provide written confirmation to Seller and Purchaser of its receipt of such additional amounts immediately upon its deposit with Escrow Agent. Upon request by Seller or Purchaser at any time, Escrow Agent shall confirm to Seller or Purchaser (as the case may be) the amount of Earnest Money then on deposit with Escrow Agent pursuant to this Agreement.

(b)    Escrow Account. Escrow Agent shall hold the Earnest Money in a separate escrow account identified as account no. _____ (the "Escrow Account") for the benefit of Seller and Purchaser pursuant to this Agreement, and shall not commingle the Earnest Money with any other third-party deposits or its own funds.

(c)    Investment of Earnest Money. The Earnest Money or any portion thereof shall be invested in a money market savings account with Citibank, N.A., upon Purchaser's delivery to Escrow Agent of a completed Form W-9 and Escrow Agent's form of Investment Instructions; provided, however, that Escrow Agent shall not be obligated to invest the Earnest Money or any portion thereof

A-1

pursuant to this Section 1(c) until both Seller and Purchaser (i) provide their respective federal tax identification number to Escrow Agent, and (ii) execute and deliver to Escrow Agent any investment forms or direction letters reasonably requested by Escrow Agent. All interest and other amounts earned on the Earnest Money shall constitute additional Earnest Money for all purposes in this Agreement. Purchaser shall bear the risk of loss of the Earnest Money, except to the extent resulting from the negligence, willful default, intentional misconduct or breach of trust by Escrow Agent, its managers, officers, employees or agents.

2.    <u>Disbursement of Earnest Money</u>.

(a)    <u>Disbursement at Closing</u>. At Closing, Escrow Agent shall disburse the Earnest Money to Seller or to any other Person to whom Seller directs the Earnest Money to be disbursed by providing written notice to Escrow Agent.

(b)    <u>Disbursement if Closing Not Consummated</u>

(i)    If the Purchase Agreement is terminated for any reason or if Seller or Purchaser otherwise is entitled to receive the Earnest Money pursuant to the Purchase Agreement, either Seller or Purchaser (as the case may be) (the "Requesting Party") may provide written notice to Escrow Agent that the Purchase Agreement has been terminated or that Seller or Purchaser (as the case may be) otherwise is entitled to receive the Earnest Money pursuant to the Purchase Agreement and that the Earnest Money is to be distributed in accordance with the instructions given in such notice (a "Disbursement Request"). Escrow Agent shall provide written notice (the "Receipt Notice") to the other Party (the "Confirming Party") of its receipt of such Disbursement Request (together with a copy of the Disbursement Request) no later than two (2) Business Days after its receipt of such Disbursement Request.)

(ii)    In addition, at any time Purchaser (which shall be the Requesting Party for purposes of Section 2(b)(iii) below) may provide written notice to Escrow Agent that the Earnest Money is to be distributed to a replacement Escrow Agent (a "Transfer") in accordance with the instructions given in such notice (a "Transfer Request"). Escrow Agent shall provide a Receipt Notice to the Confirming Party as provided in Section 2(b)(i) above.

(iii)    If the Confirming Party disputes that the Requesting Party is entitled to receive the Earnest Money, or Transfer the Earnest Money, as the case may be, the Confirming Party shall provide written notice to Escrow Agent within five (5) Business Days after its receipt of the Receipt Notice disputing that the Requesting Party is entitled to receive the Earnest Money (a "Dispute Notice"). If Escrow Agent has not received a Dispute Notice from the Confirming Party within such five (5) Business Day period, the Confirming Party shall be deemed to have authorized the disbursement set forth in the Disbursement Request, and Escrow Agent shall disburse the Earnest Money pursuant to the instructions set forth in the Disbursement Request or Transfer Request, as applicable. If Escrow Agent receives a Dispute Notice within such five (5) Business Day period, Escrow Agent shall retain the Earnest Money in the Escrow Account pending receipt of separate written direction from each Seller and Purchaser authorizing the disbursement of the Earnest Money to the same Person as provided in Section 2, or a final unappealable order of court with respect to distribution of the Earnest Money. Notwithstanding the foregoing, if Escrow Agent receives contrary written directions from Seller and Purchaser or no written directions within six (6) months after the Effective Date, Escrow Agent shall have the right to deposit the Earnest Money with any court of competent jurisdiction in the state of New York and interplead Seller and Purchaser. Upon depositing the Earnest Money and filing its complaint in interpleader, Escrow Agent shall be released from all liability under this Agreement regarding the Earnest Money, except as otherwise expressly provided in this Agreement.

3.      Escrow Fees. All fees, costs and expenses of the Escrow Agent with respect to the escrow established pursuant to this Agreement (the "Escrow Fees") shall be shared equally between Seller and Purchaser. All such Escrow Fees shall be due and payable upon the earlier of: (i) the disbursement of the Earnest Money, or (ii) the deposit of the Earnest Money by Escrow Agent with a court of competent jurisdiction as set forth in Section 2.

4.      Compliance with Court Orders. Seller and Purchaser hereby acknowledge that Escrow Agent may accept, obey and comply with any and all writs, orders, judgments or decrees issued or entered by any court with or without jurisdiction (a "Court Order"), in which case, notwithstanding anything to the contrary in this Agreement, Escrow Agent shall not be liable to Seller or Purchaser by reason of such acceptance, obedience or compliance, regardless of whether such Court Order is subsequently reversed, modified, annulled, set aside or vacated.

5.      Release and Indemnification. Seller and Purchaser hereby release Escrow Agent and its officers, managers, employees and agents (each, an "Escrow Agent Party"), for any liability, damage, loss, cost or expense incurred by Seller or Purchaser to the extent resulting from (i) any action taken or not taken in good faith upon advice of Escrow Agent's counsel given with respect to any questions relating to its obligations under this Agreement, or (ii) any action taken or not taken in reliance upon any document, including any written notice provided to Escrow Agent pursuant to this Agreement, as to the due execution and the validity and effectiveness of such document, and the truth and accuracy of any information contained therein, which such Escrow Agent Party in good faith believes to be genuine, to have been signed or presented by a duly authorized person or persons and to comply with the terms of the Purchase Agreement and this Agreement, except to the extent resulting from the gross negligence, willful default, intentional misconduct or breach of trust by such Escrow Agent Party. Seller and Purchaser, jointly and severally, shall indemnify and hold harmless any Escrow Agent Party against any liability, damage, loss, cost or expense, including, without limitation, reasonable attorneys fees and court costs, incurred by such Escrow Agent Party to the extent resulting from the performance by any Escrow Agent Party of Escrow Agent's obligations under this Agreement, except to the extent resulting from the gross negligence, willful default, intentional misconduct or breach of trust by such Escrow Agent Party.

6.      Relationship of Parties. Seller and Purchaser acknowledge and agree that Escrow Agent is acting solely as a stakeholder at their request, and that Escrow Agent shall not be deemed to be the agent of either Seller or Purchaser.

7.      Notices

(a)      Method of Delivery. All notices, requests, demands and other communications (each, a "Notice") required to be provided by any Party to any other Party pursuant to this Agreement shall be in writing and shall be delivered (i) in person, (ii) by certified U.S. mail, with postage prepaid and return receipt requested, (iii) by overnight courier service, or (iv) by facsimile transmittal, with a verification copy sent on the same day by any of the methods set forth in clauses (i), (ii) and (iii), to the other Party to this Agreement at the following address or facsimile number (or to such other address or facsimile number as the Parties may designate from time to time pursuant to Section 7(c)):

If to Seller:

        Gemini Real Estate Advisors, LLC
        16740 Birkdale Commons Parkway
        Suite 306
        Huntersville, N.C. 28078
        Attn: Dante Massaro

Facsimile No.: 704- 895-7846

With a copy to:

Robins Kaplan LLP
800 Boylston Street
Boston, MA 02199
Attn: Mark S. LaConte, Esq.
Facsimile No.: 617-267-8288

<u>If to Purchaser</u>:



<u>With a copy to:</u>

<u>If to Escrow Agent</u>:

Old Republic National Title Insurance Company
400 Post Avenue, Suite 310
Westbury, NY 11590
Attention: Paul P. Reisman, Vice President and NYS Counsel

      (b)    <u>Receipt of Notices</u>. All Notices sent by any Party (or their respective counsel pursuant to Section 7(d)) under this Agreement shall be deemed to have been received by the Party to whom such Notice is sent upon (i) delivery to the address or facsimile number of the recipient Party, provided that such delivery is made prior to 5:00 p.m. (local time for the recipient Party) on a Business Day, otherwise the following Business Day, or (ii) the attempted delivery of such Notice if (A) such recipient Party refuses delivery of such Notice, or (B) such recipient Party is no longer at such address or facsimile number, and such recipient Party failed to provide the sending Party with its current address or facsimile number pursuant to this Section 7(c).

      (c)    <u>Change of Address</u>. The Parties (and the Persons to whom copies of Notices are to be delivered pursuant to Section 7(a)) shall have the right to change their respective address and/or facsimile number for the purposes of this Section 7 by providing a Notice of such change in address and/or facsimile as required under this Section 7.

      (d)    <u>Delivery by Party's Counsel</u>. The Parties agree that the attorney for such Party shall have the authority to deliver Notices on such Party's behalf to the other Parties hereto.

      8.    <u>Assignment</u>. Neither Seller nor Purchaser shall assign any of its rights, or delegate any of its obligations, in this Agreement, without the prior written consent of the other Party, except that

Purchaser shall have the right to assign this Agreement to any permitted assignee under the Purchase Agreement. Escrow Agent shall not, directly or indirectly, assign any of its rights, or delegate any of its obligations, in this Agreement, without the prior written consent of Seller and Purchaser.

9.   Successors and Assigns; Third Party Beneficiaries. This Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns pursuant to Section 8. This Agreement shall not confer any rights or remedies upon any Person other than the Parties any their respective successors and permitted assigns pursuant to this Section 8.

10.   Conflict with Purchase Agreement. If any of the terms or provisions of this Agreement conflict with, or are inconsistent with, any terms or provisions of the Purchase Agreement, the terms and provisions of this Agreement shall control.

11.   Governing Law; Severability. This Agreement shall be governed by the laws of the State of New York. If any term or provision of this Agreement is held to be or rendered invalid or unenforceable at any time in any jurisdiction, such term or provision shall not affect the validity or enforceability of any other terms or provisions of this Agreement, or the validity or enforceability of such affected terms or provisions at any other time or in any other jurisdiction.

12.   Jurisdiction; Venue. Any litigation or other court action regarding this Agreement shall be conducted in the New York State Supreme Court in New York County or the United States District Court for the Southern District of New York (including the Bankruptcy Court for the Southern District of New York), in the State of New York, and the each Party hereby submits to jurisdiction and consents to venue in such courts.

13.   Waiver of Trial by Jury. Each Party hereby waives its right to a trial by jury in any action or proceeding by any Party against any other Party with respect to any matter arising from or in connection with this Agreement.

14.   Prevailing Party. If any litigation or other court action, arbitration or similar adjudicatory proceeding is undertaken by any Party to enforce its rights under this Agreement, all fees, costs and expenses, including, without limitation, reasonable attorneys fees and court costs, of the prevailing Party in such action, suit or proceeding shall be reimbursed or paid by the Party against whose interest the judgment or decision is rendered. This Section 13 shall survive the termination of this Agreement.

15.   Recitals. The recitals to this Agreement are incorporated herein by such reference and made a part of this Agreement.

16.   Entire Agreement; Amendments to Agreement. This Agreement sets forth the entire understanding and agreement of the Parties hereto, and shall supersede any other agreements and understandings (written or oral) between or among the Parties on or prior to the date of this Agreement with respect to the transaction contemplated in this Agreement. No amendment or modification to any terms of this Agreement, waiver of any covenant, obligation, breach or default under this Agreement or termination of this Agreement (other than as expressly provided in this Agreement), shall be valid unless in writing and executed and delivered by each of the Parties.

17.   Counterparts. A Party may deliver executed signature pages to this Agreement by electronic transmission to any other Parties, which electronic copy shall be deemed to be an original executed signature page. This Agreement may be executed in any number of counterparts, each of which shall be deemed an original and all of which counterparts together shall constitute one agreement with the same effect as if the Parties had signed the same signature page.

A-5

[Remainder of page intentionally left blank;
Signatures on following pages]

IN WITNESS WHEREOF, Seller, Purchaser and Escrow Agent have caused this Agreement to be executed and delivered in their names by their respective duly authorized officers or representatives as of the Effective Date.

**SELLER:**

**33 PECK SLIP ACQUISITION LLC**

By:  33 PECK SLIP HOLDING LLC,
Its Sole Member

By:  33 Peck Slip Manager LLC,
Its Sole Manager

By: _____
Name: _____
Title: _____

**PURCHASER:**

[                              ]

By:     _____
Name:  _____
Title:   _____

**ESCROW AGENT:**

**Old Republic National Title Insurance Company**

By:     _____
Name:  _____
Title:   _____

**<u>Exhibit B</u>**

**<u>Intentionally Omitted</u>**

**Exhibit C**

**Intentionally Omitted**

**Exhibit D**

**FORM OF SELLER CLOSING CERTIFICATE**

     **THIS SELLER CLOSING CERTIFICATE** (this "Certificate") is made by 33 Peck Slip Acquisition LLC, a Delaware limited liability company ("Seller") and delivered to _____ ("Purchaser"), pursuant to that certain Purchase and Sale Agreement dated as of _____ (the "Agreement"), between Seller and Purchaser. (All initial capitalized terms used, but not defined, in this Certificate shall have the meaning set forth in the Agreement.)

     Seller hereby states and certifies to Purchaser that:

     1.    Attached hereto as Exhibit A is a true and complete copy of the authorizing resolutions for Seller, which resolutions authorize Seller's execution and delivery of the Agreement and the consummation of the transaction contemplated therein, and such resolutions have not been amended, modified or rescinded since the date of adoption, and are in full force and effect as of the date of this Certificate.

     2.    The representations and warranties of Seller under the Agreement (as the same may have been amended or supplemented by Seller pursuant to the Agreement) are true and correct as of the date of this Certificate (or as of such other date to which such representation or warranty expressly is made), except to the extent any breach of such representations or warranties would not have a material adverse effect on the Business or prevent Seller from consummating the transaction described in the Agreement.

     3.    Seller has performed each of its covenants and obligations under the Agreement in all material respects as of the date of this Certificate.

     [Remainder of page intentionally left blank;
Signatures on following pages]

IN WITNESS WHEREOF, Seller has caused this Certificate to be executed and delivered in its name by a duly authorized officer or representative as of this ___ day of _____.

SELLER:

**33 PECK SLIP ACQUISITION LLC**

By:  33 PECK SLIP HOLDING LLC,
     Its Sole Member

     By:  33 Peck Slip Manager LLC,
          Its Sole Manager

          By: _____
              Name:
              Title:

**Exhibit E**

**FORM OF DEED**

Standard N.Y.B.T.U. Form 8001
Bargain and Sale Deed, with Covenant against Grantor's Acts—Ind. or Corp.

CONSULT YOUR LAWYER BEFORE SIGNING THIS INSTRUMENT—THIS INSTRUMENT SHOULD BE USED BY LAWYERS ONLY.

**THIS INDENTURE,** made as of this _____ day of _____, 2015,

**BETWEEN**

**33 PECK SLIP ACQUISITION LLC,** a Delaware limited liability company, having an address at 16740 Birkdale Commons Parkway, Suite 306, Huntersville, NC  28078,

party of the first part, and

[                                          ], having an address at [                              ],

party of the second part.

**WITNESSETH,** that the party of the first part, in consideration of ten dollars and other valuable consideration paid by the party of the second part does hereby grant and release unto the party of the second part, the heirs or successors and assigns of the party of the second part forever,

**ALL,** that certain plot, piece or parcel of land and all buildings and improvements situated thereon erected, situate, lying and being more particularly described in Schedule "A" annexed hereto and forming a part hereof.

**TOGETHER** with all right, title and interest, if any, of the party of the first part in and to any streets and highways abutting the above described premises to the center lines thereof; **TOGETHER** with the appurtenances and all the estate and rights of the party of the first part in and to said premises; **TO HAVE AND TO HOLD** the premises herein granted unto the party of the second part, the heirs or successors and assigns of the party of the second part forever;

**AND** the party of the first part covenants that the party of the first part has not done or suffered anything whereby the said premises have been encumbered in any way whatsoever, except as aforesaid.

**AND** the party of the first part, in compliance with Section 13 of the Lien Law, covenants that the party of the first part will receive the consideration for this conveyance and will hold the right to receive such consideration as a trust fund to be applied first for the purpose of paying the cost of the improvement and will apply the same first to the payment of the cost of the improvement before using any part of the total of the same for any other purpose.

The word "party" shall be construed as if it read "parties" whenever the sense of this indenture so requires.

Being and intended to be the same premises conveyed to the party of the first part by deed dated March 14, 2014 and recorded on May 15, 2014 under CRFN No. 2014000167242.

**IN WITNESS WHEREOF,** the party of the first part has duly executed this deed the day and year first above written.

TAX MAP
DESIGNATION

Block:  107
Lot:  38

**33 PECK SLIP ACQUISITION LLC**

By:   33 PECK SLIP HOLDING LLC,
      Its Sole Member

      By:  33 Peck Slip Manager LLC,
           Its Sole Manager

           By: _____
               Name:
               Title:

**UNIFORM FORM CERTIFICATE OF ACKNOWLEDGMENT**
(Outside of New York State)

State of _____                )
                                   :ss.:
County of _____               )

On the _____ day of _____, in the year _____, before me, the undersigned, personally appeared _____, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual(s), or the person upon behalf of which the individual acted, executed the instrument, and that such individual made such appearance before the undersigned in the _____.

                                                        (Signature

_____
and Office of individual taking acknowledgment)

**Bargain and Sale Deed**
**With Covenant Against Grantor's Acts**

**33 PECK SLIP ACQUISITION LLC**

TO

**MORNING VIEW HOTELS - NEW YORK SEAPORT, LLC**

BLOCK            107
LOT              38
COUNTY OR TOWN   New York

**RETURN BY MAIL TO**:
Zeidel & Associates P.C.
800 Westchester Avenue, Suite N-307
Rye Brook, New York 10573

E-4

<u>**SCHEDULE A**</u>

**[TO BE ATTACHED]**

**Exhibit F**

**FORM OF BILL OF SALE**

**THIS BILL OF SALE**, is dated as of _____ (the "Effective Date"), from 33 Peck Slip Acquisition LLC, a Delaware limited liability company ("Seller"), to _____ ("Purchaser").

WHEREAS, Seller and Purchaser are parties to that certain Purchase and Sale Agreement dated as of _____ (the "Agreement"), pursuant to which Seller has agreed to sell, assign, transfer and convey to Purchaser, that certain hotel located at 33 Peck Slip, New York, NY and commonly known as the Best Western Seaport Inn (the "Hotel"), including all FF&E, Supplies, IT Systems, F&B, Retail Merchandise, Intellectual Property, Books and Records, Plans and Specifications, Warranties, Accounts Receivable (subject to the Agreement) and Bookings (collectively, the "Personal Property"), as provided in the Agreement. (All initial capitalized terms used, but not defined, in this Bill of Sale shall have the meaning set forth in the Agreement.)

NOW THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged:

Seller hereby sells, assigns, transfers and conveys to Purchaser all of its right, title and interest in and to all of the Personal Property, and Purchaser hereby purchases and accepts all of Seller's right, title and interest in and to all of the Personal Property, as of the Effective Date, on the terms set forth in this Bill of Sale.

IN WITNESS WHEREOF, Seller and Purchaser have caused this Bill of Sale to be executed and delivered in their names by their respective duly authorized officers or representatives as of the Effective Date.

SELLER:

**33 PECK SLIP ACQUISITION LLC**

By: 33 PECK SLIP HOLDING LLC,
Its Sole Member

By: 33 Peck Slip Manager LLC,
Its Sole Manager

By: _____
Name:
Title:

**Acknowledged and agreed:**

<u>PURCHASER</u>:

[                    ]


By:    _____
Name:  _____
Title: _____

**Exhibit G**

## FORM OF ASSIGNMENT AND ASSUMPTION OF CONTRACTS AND LICENSES AND PERMITS

**THIS ASSIGNMENT AND ASSUMPTION OF CONTRACTS AND LICENSES AND PERMITS** (this "Agreement") is made as of this _____ day of _____ (the "Effective Date"), by and between 33 Peck Slip Acquisition LLC, a Delaware limited liability company ("Assignor"), and _____ ("Assignee").

WHEREAS, Assignor and Assignee are parties to that certain Purchase and Sale Agreement dated as of _____ (the "Purchase Agreement"), pursuant to which Assignor has agreed to sell, assign, transfer and convey to Assignee, that certain hotel located at 33 Peck Slip, New York, NY and commonly known as the Best Western Seaport Inn (the "Hotel").

WHEREAS, in connection with the sale and purchase of the Hotel, Assignor has agreed to assign to Assignee, and Assignee has agreed to assume from Assignor, all of the Contracts, Licenses and Permits, except to the extent any of the foregoing are not transferable to Assignee without consent which consent has not been obtained (collectively, the "Assigned Documents"), and the deposits thereunder to the extent the same are transferable, as provided in the Purchase Agreement. (All initial capitalized terms used, but not defined, in this Agreement shall have the meaning set forth in the Purchase Agreement.)

NOW THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Assignor and Assignee hereby agree as follows:

4.     Assignment by Assignor. Assignor hereby assigns, transfers and conveys to Assignee all of the Assignor's right, title and interest in and to the Assigned Documents. Assignor shall remain liable for all Retained Liabilities with respect to the Assigned Documents.

5.     Acceptance and Assumption by Assignee. Assignee hereby accepts the assignment, transfer and conveyance of the Assigned Documents. Assignee agrees to perform all of the obligations, liabilities, covenants, duties and agreements of Assignor under the Assigned Documents from and after the date of this Agreement, and assume all Assumed Liabilities with respect to the Assigned Documents.

6.     Successors and Assigns; Third-Party Beneficiaries. This Agreement shall be binding upon and inure to the benefit of Assignor and Assignee, and their respective successors and assigns. This Agreement shall not confer any rights or remedies upon any Person other than the Assignor, Assignee and Indemnitees as expressly provided under the Purchase Agreement.

7.     Entire Agreement; Amendments to Agreement. This Agreement (including the recitals to this Agreement which are incorporated herein) and the Purchase Agreement set forth the entire understanding and agreement of the parties hereto, and shall supersede any other agreements and understandings (written or oral) between Assignor and Assignee on or prior to the date of this Agreement with respect to the matters set forth herein. No amendment or modification to any terms of this Agreement, waiver of any covenant, obligation, breach or default under this Agreement or termination of this Agreement (other than as expressly provided in this Agreement), shall be valid unless in writing and executed and delivered by Assignor and Assignee.

G-1

8.    <u>Counterparts</u>. This Agreement may be executed in any number of counterparts, each of which shall be deemed an original and all of which counterparts together shall constitute one agreement with the same effect as if the parties had signed the same signature page.

[Remainder of page intentionally left blank;
Signatures on following pages]

IN WITNESS WHEREOF, Assignor and Assignee have caused this Agreement to be executed and delivered in their names by their respective duly authorized officers or representatives as of the Effective Date.

ASSIGNOR:

**33 PECK SLIP ACQUISITION LLC**

By:  33 PECK SLIP HOLDING LLC,
     Its Sole Member

        By:  33 Peck Slip Manager LLC,
             Its Sole Manager

                By: _____
                    Name:
                    Title:

ASSIGNEE:

[                              ]

By:     _____
Name:   _____
Title:  _____

G-3

**Exhibit H**

**Intentionally Omitted**

**Exhibit I**

**FORM OF PURCHASER CLOSING CERTIFICATE**

      **THIS PURCHASER CLOSING CERTIFICATE** (this "Certificate") is made by _____ ("Purchaser") and delivered to 33 Peck Slip Acquisition LLC, a Delaware limited liability company ("Seller"), pursuant to that certain Purchase and Sale Agreement dated as of _____ (the "Agreement"), between Seller and Purchaser. (All initial capitalized terms used, but not defined in this Certificate shall have the meaning set forth in the Agreement.)

      Purchaser hereby states and certifies to Seller that:

      9.     Attached hereto as Exhibit A is a true and complete copy of the authorizing resolutions for Purchaser, which resolutions authorize Purchaser's execution and delivery of the Agreement and the consummation of the transaction contemplated therein, and such resolutions have not been amended, modified or rescinded since the date of adoption, and are in full force and effect as of the date of this Certificate.

      10.     The representations and warranties of Purchaser under the Agreement are true and correct in all material respects as of the date of this Certificate (or as of such other date to which such representation or warranty expressly is made).

      11.     Purchaser has performed each of its covenants and obligations under the Agreement in all material respects as of the date of this Certificate.

[Remainder of page intentionally left blank;
Signatures on following pages]

I-1

IN WITNESS WHEREOF, Purchaser has caused this Certificate to be executed and delivered in its name by a duly authorized officer or representative as of this ___ day of _____.

PURCHASER:

[                                                    ]

By: _____

Name: _____

Title: _____

## LIST OF SCHEDULES

| | |
|---|---|
| Schedule 2.1.1 | Land Description |
| Schedule 2.1.13 | Intellectual Property |
| Schedule 4.1 | Seller's Due Diligence Materials |
| Schedule 4.1.10 | Seller's Additional Due Diligence Materials |
| Schedule 7.1.3 | Consents and Approvals |
| Schedule 7.1.4 | Liens and Encumbrances to Personal Property Title |
| Schedule 7.1.6 | Written Notices of Law Violations |
| Schedule 7.1.7 | Pending or Threatened Litigation |
| Schedule 7.1.8 | Employment Agreements, Positions and Salaries |
| Schedule 7.1.9 | Taxes |
| Schedule 7.1.10 | Licenses and Permits |
| Schedule 7.1.12 | Material Contracts |
| Schedule 7.1.16 | Seller's Insurance Polices |
| Schedule 7.1.17 | Bookings Report |
| Schedule 7.1.18 | List of Environmental Reports |
| Schedule 7.1.22 | Improvement Work and Alterations |

**Schedule 2.1.1**
**Land Description**

**ALL THAT CERTAIN** plot, piece or parcel of land, with the buildings and improvements thereon erected, situate, lying and being in the Borough of Manhattan, County of New York, City and State of New York, bounded and described as follows:

BEGINNING at the corner formed by the intersection of the northerly side of Front Street with the Easterly side of Peck Slip;

RUNNING THENCE northerly along the easterly side of Peck Slip 61 feet 8 ½ inches;

THENCE easterly on a course forming an angle of 89 degrees 15 minutes 10 seconds on its southerly side of easterly side of Peck Slip for a distance of 73 feet 10 inches;

THENCE southerly on a course forming an angle of 86 degrees 10 minutes 10 seconds on its westerly side with the preceding course for a distance of 5 feet 0 inches;

THENCE easterly at right angles on its southerly side with the preceding course 28 feet 3 ½ inches to the center of a party wall:

THENCE southerly along the center of said party wall and on a course forming an angle of 91 degrees 20 minutes 10 seconds on its westerly side of a distance of 60 feet 7 inches to the northerly side of Front Street;

THENCE westerly along the northerly side of Front Street 27 feet 4 ½ inches to an angle point therein;

THENCE continuing along the northerly side of Front Street 71 feet 1 inch to the point or place of BEGINNING.

Said premises are known as 29-33 Peck Slip a/k/a/ 238-242 Front Street, New York, NY and designated as Block 107 Lot 38 as shown on the Tax Map of the City of New York, County of New York.

## Schedule 2.1.13
## Intellectual Property

None

## Schedule 4.1
## Seller's Due Diligence Materials

1.    In connection with this Agreement, Seller has made certain documents available to Purchaser through "Dropbox", a password protected electronic data room and web based storage area, ("Data Room"), including, without limitation, offering memorandums, financial records, insurance documents, existing loan documents, contracts, surveys and legal descriptions, architectural and engineering plans, payroll information, physical inventory, utility bills, property taxes, warranties and guarantees, environmental reports, title information, legal documents, flood insurance documents and landmark preservation presentations. Attached as Schedule 4.1-1 hereto is a listing of certain files made available through the Data Room.

**<u>Schedule 4.1-1</u>**
**<u>Seller's Due Diligence Materials</u>**

**1 - Offering Memorandum**

      2014.12 SeaportInn_BryantParkDevSite - Offering Memorandum

**2 - Property Financials**

    **2014 - Monthly P&L Statements**

      2014.9 Seaport - 2014 September P&L
      2014.10 Seaport - 2014 October P&L
      2014.11 Seaport - 2014 November P&L
      2014.12 Seaport - 2014 December P&L

    **2015 - Monthly P&L Statements**

      2015.1 Seaport - 2015 January P&L
      2015.2 Seaport - 2015 February P&L
      2015.3 Seaport - 2015 March P&L
      2015.4 Seaport - 2015 April P&L
      2015.5 Seaport - 2015 May P&L
      2015.6 Seaport - 2015 June P&L
      2015.7 Seaport - 2015 July P&L
      2015.8 Seaport - 2015 August P&L
      2015.9 Seaport - 2015 September P&L

    2015.8 Seaport - 2015 August TTM Summary
    Historical Cash Flow Summary

**3 - STR**

    **STAR Reports**

      2014.12 Seaport - 2014 December STAR
      2015.8 Seaport - 2015 August STAR
      2015.9 Seaport - 2015 September STAR
      BW Seaport - Jan 2015 STAR
      BW Seaport - Nov 2014 STAR

    **Custom Trend Reports - Aspirational Competitive Set**

      2014 - November Custom Trend

<u>Schedule 4.1-1</u>
<u>Seller's Due Diligence Materials</u>

**4 - Property Taxes**

- August 2014 Tax Bill
- August 2015 Tax Bill
- February 2014 Tax Bill
- February 2015 Tax Bill
- June 2014 Tax Bill
- June 2015 Tax Bill
- November 2013 Tax Bill
- November 2014 Tax Bill
- Real Estate Tax Bill 2010
- Real Estate Tax Bill 2011
- Real Estate Tax Bill 2012
- Real Estate Tax Bill 2013
- Taxes Balance Due

**5 - Development Plans**

**Landmark Preservations Submissions**

- BW Seaport - Awning Submission_Final
- BW Seaport - Lighting Submission_Final
- BW Seaport - Platform Removal Submission
- BW Seaport - Signage Submission_Final
- BW Seaport - Storefront Submission_Final

- Restaurant Construction Plans
- LPC Certificate of No Effect_33 Peck Slip_FINAL
- Hotel Construction Plans
- Certificate of Appropriateness

**6 - Third Party Reports**

- Phase I - 10.13.15
- PCA - 10.16.15
- ALTA Survey

**Schedule 4.1-1**
**Seller's Due Diligence Materials**

**7 - Contracts**
- Allstate
- Autoclerk #2
- Autoclerk
- Casey Fire Systems
- Classi Recycling Agreement
- Concord Elevator Industries
- Enviro Pest Management Agreement
- Geini
- KEY Computing
- Lodegenet #3
- Lodgenet #2
- Lodgenet
- Summary of Service Agreements - BW Seaport
- TimeWarner
- Verizon
- Vizergy

**8 - Union Agreement**
- Local 966 Union Agreement

**9 - Membership Agreement**
- BW Membership Transferee Acknowledgement
- BW Membership Application and Agreement_executed
- Best Western Seaport Membership Agreement
- Best Western Insurance Req

**10 - Court-Approved Auction Procedures**
- Procedures Order & Sale Procedures

## Schedule 4.1-1
## Seller's Due Diligence Materials

**11 – Liquor License Memorandum**

    Seaport Inn – Liquor License Memorandum

**12 – Qualified Bidder Form of PSA**

    Exhibit A to Sale Motion - Seaport Inn Purchase and Sale Agreement

    Qualified Bidder Form of PSA - Seaport Inn

**13 – Title Reports**

    Loan Policy (Proforma)

    Seaport Hotel - Title Report 2013

**14 – Payroll**

    Employee Census

    Seaport Staff Info

    Seaport Staffing

**15 – Physical Inventory**

    Bill of Sale and General Assignment

**16 – Utility Bills**

    ConEd 29 Peck Slip JSP

    ConEd 240 Front Street JSP

    Constellation JSP

    NYC Water Board March2014-Sept 2014

**17 – Warranties and Guarantees**

    HVAC Warranty Seaport

**18 – Other**

    Certificate of Occupancy - 33 Peck Slip

    Elevation Certificate - 33 Peck Slip

    Groups Due to Arrive

    Mar to Dec 2015 BOTB 031015

    Permits - AC Refrigerator, Com-Gen, Paint Storage

**Schedule 4.1-1**
**Seller's Due Diligence Materials**

**Schedule 4.1-1**
**Seller's Due Diligence Materials**

**Schedule 4.1-1**
**Seller's Due Diligence Materials**

**Schedule 4.1-1**
**Seller's Due Diligence Materials**

**<u>Schedule 4.1-1</u>**
**<u>Seller's Due Diligence Materials</u>**

## Schedule 4.1-1
## Seller's Due Diligence Materials

**Schedule 4.1-1**
**Seller's Due Diligence Materials**

**Schedule 4.1-1**
**Seller's Due Diligence Materials**

**<u>Schedule 4.1-1</u>**
**<u>Seller's Due Diligence Materials</u>**

**<u>Schedule 4.1-1</u>**
**<u>Seller's Due Diligence Materials</u>**

## Schedule 4.1-1
## Seller's Due Diligence Materials

**Schedule 4.1-1**
**Seller's Due Diligence Materials**

**<u>Schedule 4.1-1</u>**
**<u>Seller's Due Diligence Materials</u>**

**Schedule 4.1-1**
**Seller's Due Diligence Materials**

**<u>Schedule 4.1-1</u>**
**<u>Seller's Due Diligence Materials</u>**

## Schedule 4.1-1
## Seller's Due Diligence Materials

**<u>Schedule 4.1.10</u>**
**<u>Seller's Additional Due Diligence Material</u>**

None

## Schedule 7.1.3
## Consents and Approvals

1.  Any consents which may be required under the labor contract between Best Western Seaport Inn and Local 966, Affiliated with the International Brotherhood of Teamsters; dated June 11, 2011.

2.  Any consents which may be required under the Best Western International Membership Application and Agreement between PSF Seaport Realty and Best Western International; dated February 24, 2014 .

3.  Any governmental consents which may be required in connection with the transfer of the Licenses and Permits.

## Schedule 7.1.4
## Liens and Encumbrances to Personal Property Title

1.    Liens granted to 33 Peck Slip Capital LLC in connection with the mortgage financing of the Hotel as set forth in the Master Loan Agreement (Renovation Loan Agreement and Contingent Interest Agreement) between 33 Peck Slip Acquisitions and 33 Peck Slip Hotel Capital LLC; dated March 14, 2014

## <u>Schedule 7.1.6</u>
## <u>Written Notices of Law Violations</u>

1.    City of New York Fire Department Violation Code 20, Inspection and Testing: April 15, 2015 violation for failure to conduct one standpipe and sprinkler combo flow and pressure test.

## Schedule 7.1.7
## Pending or Threatened Litigation

1.  William T. Obeid, directly and derivatively on behalf of Gemini Real Estate Advisors LLC, Gemini Equity Partners, LLC, et al., Plaintiffs v. Bridgeton Holdings, LLC, Atit Jariwala, The Congress Group, and John Doe Defendants 1 – 10, Defendants, and, Gemini Real Estate Advisors, LLC, Gemini Equity Partners, LLC, et al., Case No. 152596/2015 in the Supreme Court of the State of New York, New York County.

2.  William T. Obeid, directly and Derivatively on behalf of Gemini Real Estate Advisors, LLC, et al., Plaintiff v. Christopher La Mack and Dante Massaro, defendants, and, Gemini Real Estate Advisors, LLC, et al., nominal defendants, Case No. 14-CV-06498-LTS in the U.S. District Court for the Southern District of New York.

3.  Christopher La Mack, Dante A. Massaro, and Gemini Real Estate Advisors, LLC v. William T. Obeid, Case No. 14-CV-12010 in the General Court of Justice Superior Court Division, Mecklenburg County, North Carolina.

## Schedule 7.1.8
## Employment Agreements

1.    Agreement between Best Western Seaport Inn and Local 966, Affiliated with the International Brotherhood of Teamsters for the period from April 1st, 2011 thru March 31st, 2016.

## Schedule 7.1.8 (continued)
## Positions and Compensation

| Employee | Description | Hours | Rate | Amount |
|---|---|---|---|---|
| **Department: 02 - Guest Services Representative** | | | | |
| Bartha, Douglas | hourly | 40.00 | 12.49 | 499.60 |
| De Paz, Emmanuel R | hourly | 16.00 | 11.00 | 176.00 |
| Szewczyk, Yustitia | hourly | 38.50 | 14.14 | 544.39 |
| **Department Totals: 02 - Guest Services Representative** | **hourly** | **94.50** | | **1219.99** |
| **Department: 06 - Executive Housekeeper** | | | | |
| Martinez, Susana | Salary | | | 711.54 |
| **Department Totals: 06 - Executive Housekeeper** | **Salary** | | | **711.54** |
| **Department: 09 - Housekeeper** | | | | |
| Lau, Fung-Kiu | hourly | 40.00 | 13.89 | 555.60 |
| Lee, Yuen-Ling | hourly | 40.00 | 13.29 | 531.60 |
| Lugowska, Ewa | hourly | 16.00 | 10.74 | 171.84 |
| Olivos, Raquel | hourly | 40.00 | 13.29 | 531.60 |
| Prawdzik, Hanna | hourly | 24.00 | 13.29 | 318.96 |
| Sanchez, Mercedes | hourly | 40.00 | 9.49 | 379.60 |
| Tsang, Oi-Mei | hourly | 40.00 | 12.39 | 495.60 |
| **Department: 10 - Housemen** | | | | |
| Grzegors, Grzelczyk | hourly | 40.00 | 12.14 | 485.60 |
| Rosario, Francisco | hourly | 40.00 | 9.99 | 399.60 |
| **Department Totals: 10 - Housemen** | **hourly** | **80.00** | | **885.20** |
| **Department: 11 - Breakfast Attendant** | | | | |
| Palmer, Kim D | hourly | 35.25 | 8.75 | 308.44 |
| **Department Totals: 11 - Breakfast Attendant** | **hourly** | **35.25** | | **308.44** |
| **Department: 14 - Night Audit** | | | | |
| Kim, William | hourly | 40.00 | 11.42 | 456.80 |
| **Department Totals: 14 - Night Audit** | **hourly** | **40.00** | | **456.80** |
| **Department: 50 - General Manager** | | | | |
| Mohammad, Zulfiqar | Salary | | | 1894.24 |
| **Department Totals: 50 - General Manager** | **Salary** | | | **1894.24** |
| **Department: 60 - Sales Manager** | | | | |
| Orona, Jessica | Salary | | | 769.23 |
| **Department Totals: 60 - Sales Manager** | **Salary** | | | **769.23** |
| **Department: 70 - Chief Engineer** | | | | |
| Baranowski, Andrzej | hourly | 40.00 | 18.19 | 727.60 |
| **Department Totals: 70 - Chief Engineer** | **hourly** | **40.00** | | **727.60** |

## <u>Schedule 7.1.9</u>
## <u>Taxes</u>

None

## Schedule 7.1.10
## Licenses and Permits

1.  Certificate of Appropriateness Permit for 33 Peck Slip ALA 240-242 Front Street, South Street Seaport, from the New York City Landmarks Preservation Commission.

2.  Permit for Best Western Seaport Inn a/k/a 240-242 Front Street, 33 Peck Slip New York, NY 10038, from the Fire Department, City of New York – Bureau of Fire Prevention.

3.  Permit for Best Western Seaport Inn a/k/a 240-242 Front Street, 33 Peck Slip New York, NY 10038, from the Fire Department, City of New York – Bureau of Fire Prevention.

4.  Permit for Best Western Seaport Inn a/k/a 240-242 Front Street, 33 Peck Slip New York, NY 10038, from the Fire Department, City of New York – Bureau of Fire Prevention.

5.  Certificate of Occupancy for 29 Peck Slip, from the City of New York Department of Buildings.

6.  Elevation Certificate for 33 Peck Slip Acquisition LLC, from U.S. Department of Homeland Security Federal Emergency Management Agency.

7.  Community Board #1—Manhattan Resolution; dated October 28, 2014.

8.  Community Board #1—Manhattan Resolution; dated April 28, 2015.

<u>**Schedule 7.1.12**</u>
<u>**Material Contracts**</u>

1. Maintenance and fire protection system contract between Best Western Seaport Inn and Allstate Services Group LLC; dated October 4, 2012.

2. Television programming contract between PFS Seaport Realty Company and Lodgenet; signed on October 14, 2011.

3. Computer service and network support contract between Best Western Plus Seaport Inn and Key Computing, Inc.; dated March 19, 2004.

4. Pest control service contract between Best Western Plus Seaport Inn and Downtown Enviro Pest Management Inc.; undated.

5. Recycling services contract between Best Western Seaport Inn and Downtown Classic Recycling New York, Corp.; dated November 1, 2004.

6. Labor contract between Best Western Seaport Inn and Local 966, Affiliated with the International Brotherhood of Teamsters; dated June 11, 2011.

7. Elevator service contract between Best Western Seaport Inn and Concord Elevator Industries Inc.; dated July 1, 2013.

8. Inspection and maintenance of fire alarms and sprinklers contract between Best Western – Seaport Inn and Casey Fire Systems, Inc.; dated September 1, 2011.

9. Best Western International, Inc. Membership Application and Agreement between 33 Peck Slip Acquisition LLC and Best Western International, Inc.; dated February 24, 2014.

11. Online hotel reservation service contract between 33 Peck Slip LLC D/B/A Best Western – Seaport and Booking.com BV; dated March 14, 2014.

12. Telephone services contract between WNW Hospitality D/B/A/ Best Western Seaport Inn and Verizon; signed on February 19, 2014.

14. Website hosting and operations platform contract between Best Western Seaport Inn and Vizergy; signed on April 16, 2014.

## Schedule 7.1.12 (continued)
## Material Contracts

15.    Wideband internet service contract between Best Western Seaport and Time Warner able Enterprises LLC; signed on March 3, 2015.

16.    Property management system software contract between WNW Hospitality/BW Seaport and AutoClerk; dated January 1, 2007.

### Schedule 7.1.16
### Seller's Insurance Polices

1.  Fidelity National Title Insurance Company title insurance policy no. dated March 4, 2014 and issued to 33 Peck Slip Hotel Capital LLC.

2.  National Union Fire Insurance Company of Pittsburgh, Pa. commercial umbrella liability policy no. CMTY063176527 effective April 26, 2014 to April 26, 2015 and issued to Gemini Real Estate Advisors, LLC.

3.  Allied World National Assurance scheduled location pollution legal liability policy no. 03088809 effective March 14, 2015 to March 14, 2016 and issued to 22 Peck Slip Acquisition, LLC.

4.  Zurich American Insurance Company commercial property insurance policy no. CPO5537983-00 effective April 26, 2014 to April 26, 2015 and issued to Gemini Real Estate Advisors, LLC.

## Schedule 7.1.17
## Bookings Report

Reservations Report

| Page 1 | | BEST WESTERN SEAPORT INN | | | | | | | | | | | | For Sep-02-2015 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Reservations Report | | | | | | | | | | | | Sep-02-2015 15:40:33 | |
| Conf | Group | Last Name | First Name | Source | Status | Arrival | Rate Class | Room Type | Req Room | Rooms | Days | Rate | Deposit | BWR Tier | BWR Number |
| 1509V5 | | | | BW--PY | GTD | Sep 2'15 Wed | 1X | 1K | | 2 | 1 | $199 | $0.00 | | |
| 1508K1 | | | | BW--PY | GTD | Sep 2'15 Wed | 3A | QQ | | 1 | 2 | $198 | $0.00 | BASE | |
| 150CH2 | | | | DR--JL | GTD | Sep 2'15 Wed | OV | QT | | 1 | 1 | $207 | $0.00 | | |
| 150CGC | | | | BW--PY | GTD | Sep 2'15 Wed | XZ | KT | | 1 | 1 | $207 | $0.00 | BASE | |
| 150BK2 | | | | DR--PY | GTD | Sep 2'15 Wed | RA | 1K | | 1 | 3 | $155 | $0.00 | | |
| 150BK4 | | | | DR--PY | GTD | Sep 2'15 Wed | RA | QQ | | 1 | 3 | $187 | $0.00 | | |
| 150CHY | | | | BW--PY | GTD | Sep 2'15 Wed | C1 | 1K | | 1 | 1 | $155 | $ 198.08 CR | | |
| 150BQ4 | | | | DR--JL | GTD | Sep 2'15 Wed | 3A | 1Q | | 1 | 4 | $171 | $0.00 | | |
| 150C0D | | | | DR--PY | GTD | Sep 2'15 Wed | 3A | 1K | | 1 | 2 | $180 | $0.00 | | |
| 150vCH | | | | BW--TY | GTD | Sep 2'15 Wed | RA | QE | | 1 | 3 | $138 | $0.00 | | |
| 150C6T | | | | BW--PY | GTD | Sep 2'15 Wed | C1 | QQ | | 1 | 2 | $163 | $ 365.94 CR | | |
| 150BH1 | | | | DR--PY | GTD | Sep 2'15 Wed | RA | 1Q | | 2 | 2 | $153 | $0.00 | | |
| 150C9B | | | | BW--PY | GTD | Sep 2'15 Wed | 1X | 1K | | 1 | 1 | $190 | $0.00 | | |
| 150BMJ | | | | DR--PY | GTD | Sep 2'15 Wed | RA | QR | | 1 | 2 | $153 | $0.00 | | |
| 1509CJ | | | | DR--PY | GTD | Sep 2'15 Wed | RA | 1K | | 1 | 3 | $138 | $ 0.00 | | |
| 150BK3 | | | | BW--PY | GTD | Sep 2'15 Wed | RA | 1K | | 1 | 3 | $185 | $0.00 | | |
| 150CHG | | | | DR--BW | GTD | Sep 2'15 Wed | 3A | 1K | | 1 | 1 | $182 | $0.00 | | |
| 150B0H | | | | DR--PY | GTD | Sep 2'15 Wed | RA | 3% | | 1 | 3 | $145 | $0.00 | | |
| 150CPL | | | | BW--PY | GTD | Sep 2'15 Wed | C1 | 1K | | 1 | 1 | $196 | $ 237.86 CR | | |
| 150CC4 | | | | BW--PY | GTD | Sep 3'15 Thu | C1 | QB | | 1 | 1 | $153 | $ 0.00 | | |
| 150BXT | | | | BW--PY | GTD | Sep 3'15 Thu | C4 | QE | | 1 | 3 | $137 | $ 0.00 | | |
| 150C9H | | | | BW--PY | GTD | Sep 3'15 Thu | RA | KT | | 4 | 1 | $210 | $ 0.00 | GOLD ELITE | |
| 150C3D | | | | BW--PY | GTD | Sep 3'15 Thu | 1X | QQ | | 1 | 1 | $240 | $ 0.00 | | |
| 150B7K | | | | DR--PY | GTD | Sep 3'15 Thu | RA | 1K | | 9 | 1 | $176 | $ 0.00 | | |
| 150EXF | | | | BW--PY | GTD | Sep 3'15 Thu | 5X | 1K | | 1 | 3 | $168 | $ 0.00 | | |
| 1509VT | | | | DR--PY | GTD | Sep 3'15 Thu | RA | 1K | | 1 | 1 | $166 | $ 0.00 | | |
| 1509F5 | | | | BW--PY | GTD | Sep 3'15 Thu | C1 | QQ | | 2 | 1 | $207 | $ 0.00 | | |
| 1508QF | | | | BW--PY | GTD | Sep 3'15 Thu | 5X | 1K | | 1 | 5 | $168 | $ 0.00 | | |
| 150C24 | | | | BW--AA | GTD | Sep 3'15 Thu | RA | QQ | | 1 | 3 | $198 | $ 0.00 | | |
| 150BXY | | | | DR--PY | GTD | Sep 3'15 Thu | RA | 1Q | | 1 | 6 | $155 | $ 0.00 | | |
| 1509BP | | | | BW--PY | GTD | Sep 3'15 Thu | 5X | 1K | | 1 | 5 | $168 | $ 0.00 | | |
| 150CC1 | | | | BW--PY | GTD | Sep 3'15 Thu | RA | QT | | 4 | 1 | $161 | $ 0.00 | | |
| 150B7H | | | | DR--PY | GTD | Sep 3'15 Thu | RA | 1K | | 1 | 1 | $144 | $ 0.00 | | |
| 150C7R | | | | BW--PY | GTD | Sep 3'15 Thu | 5% | 1K | | 1 | 3 | $107 | $ 0.00 | | |
| 150CQ1 | | | | BW-- | GTD | Sep 4'15 Fri | 5X | KT | | 1 | 4 | $150 | $ 0.00 | | |
| 1509SD | | | | DR--PY | GTD | Sep 4'15 Fri | RA | 1Q | | 1 | 3 | $199 | $ 0.00 | | |
| 1509DS | | | | BW-- | GTD | Sep 4'15 Fri | 5X | QQ | | 1 | 4 | $230 | $ 0.00 | | |
| 1509DT | | | | BW-- | GTD | Sep 4'15 Fri | 5X | QQ | | 1 | 4 | $230 | $ 0.00 | | |
| 1509DV | | | | BW-- | GTD | Sep 4'15 Fri | 5X | QQ | | 1 | 3 | $230 | $ 0.00 | | |
| 150CCN | | | | DR--PY | GTD | Sep 4'15 Fri | RA | 1K | | 1 | 4 | $155 | $ 0.00 | | |
| 150C9X | | | | BW-- | GTD | Sep 4'15 Fri | 5% | QE | | 1 | 3 | $176 | $ 0.00 | | |
| 1507CP | | | | BW--PY | GTD | Sep 4'15 Fri | 5X | QQ | | 4 | 1 | $222 | $ 0.00 | BASE | |
| 1509BU | | | | BW-- | GTD | Sep 4'15 Fri | 5X | 1K | | 1 | 4 | $199 | $ 0.00 | | |
| 150BLO | | | | DR--PY | GTD | Sep 4'15 Fri | RA | 1K | | 1 | 2 | $138 | $ 0.00 | | |
| 1508KK | | | | BW-- | GTD | Sep 4'15 Fri | 5X | 1K | | 1 | 3 | $199 | $ 0.00 | | |
| 1509M1 | | | | BW-- | GTD | Sep 4'15 Fri | FX | QE | | 1 | 2 | $30 | $ 0.00 | DIAMOND | |
| 150BH4 | | | | BW-- | GTD | Sep 4'15 Fri | 5X | QQ | | 1 | 3 | $230 | $ 0.00 | | |
| 1508HL | | | | BW-- | GTD | Sep 4'15 Fri | FX | QE | | 1 | 1 | $30 | $ 0.00 | DIAMO | |
| 150CHW | | | | BW-- | GTD | Sep 4'15 Fri | 5X | 1Q | | 1 | 3 | $196 | $ 0.00 | | |
| 15092Q | | | | BW-- | GTD | Sep 4'15 Fri | 5X | 1K | | 1 | 2 | $234 | $ 0.00 | | |
| 1509XG | | | | BW--JL | GTD | Sep 4'15 Fri | 5X | QQ | | 1 | 3 | $237 | $ 0.00 | | |
| 150C4B | | | | BW-- | GTD | Sep 4'15 Fri | 5X | 1K | | 1 | 3 | $191 | $ 0.00 | | |

**Schedule 7.1.17 (continued)**
**Bookings Report**

Reservations Report

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 150CHS | | | BW--- | GTD | Sep 4/15 Fri | 5X | QT | | | 1 | 4 | $168 | $0.00 | |
| 150C'D0 | | | BW--- | GTD | Sep 4/15 Fri | C5 | QE | | | 1 | 2 | $161 | $0.00 | |
| 1509U3 | | | BW--AA | GTD | Sep 4/15 Fri | MR | CQ | 408 | 1 | 4 | $169 | $0.00 | |
| 150CZB | | | BW--PY | GTD | Sep 4/15 Fri | RA | 1K | | | 1 | $190 | $0.00 | BASE |
| 1508QO | | | BW--- | GTD | Sep 4/15 Fri | 5X | QQ | | | 1 | 3 | $245 | $0.00 | |
| 150CDC' | | | DR--PY | GTD | Sep 4/15 Fri | RA | QE | | | 1 | $195 | $0.00 | |
| 1507RJ | | | BW--- | GTD | Sep 4/15 Fri | C5 | QR | | | 1 | 4 | $143 | $0.00 | |
| 150C56 | | | DR--PY | GTD | Sep 4/15 Fri | RA | 1K | | | 1 | $168 | $0.00 | |
| 150768 | | | DR--P' | GTD | Sep 4/15 Fri | RA | 1K | | | 4 | $168 | $0.00 | |
| 20a0CH | | | BW--- | GTD | Sep 4/15 Fri | C5 | QQ | | | 1 | $195 | $0.00 | |
| 150C7N | | | BW--- | GTD | Sep 4/15 Fri | 3A | KT | | | 1 | 2 | $223 | $0.00 | |
| 1508CG | | | BW--- | GTD | Sep 4/15 Fri | C5 | CQ | | | 1 | 3 | $195 | $0.00 | |
| 150B28 | | | BW--- | GTD | Sep 4/15 Fri | 1X | KT | | | 1 | 2 | $297 | $0.00 | |
| 150B29 | | | BW--- | GTD | Sep 4/15 Fri | 5X | KT | | | 1 | 3 | $252 | $0.00 | |
| 150BCD | | | BW--ED | GTD | Sep 4/15 Fri | FX | KT | | | 1 | 3 | $70 | $0.00 | DIAMOND |
| 150C2C | | | BW--- | GTD | Sep 5/15 Sat | 5X | QB | | | 1 | 3 | $760 | $0.00 | |
| 150CH9 | | | BW--- | GTD | Sep 5/15 Sat | 1X | QQ | | | 1 | 2 | $324 | $0.00 | |
| 150BW1 | | | DR--PY | GTD | Sep 5/15 Sat | RA | QE | | | 1 | 15 | $300 | $0.00 | |
| 1509MT | | | DR--JL | GTD | Sep 5/15 Sat | RA | 1Q | | | 1 | 15 | $300 | $0.00 | |
| 1509MV | | | DR--JL | GTD | Sep 5/15 Sat | RA | 1Q | | | 1 | 15 | $300 | $0.00 | |
| 1509MW | | | DR--JL | GTD | Sep 5/15 Sat | RA | 1Q | | | 1 | 15 | $300 | $0.00 | |
| 1509P2 | | | DR--JL | HOLD | Sep 5/15 Sat | RA | 1Q | | | 1 | 15 | $300 | $0.00 | |
| 1509MX | | | DR--JL | GTD | Sep 5/15 Sat | RA | QE | | | 1 | 15 | $300 | $0.00 | |
| 150B56 | | | BW--- | GTD | Sep 5/15 Sat | 5X | QQ | | | 1 | 3 | $252 | $0.00 | |
| 1509ST | | | BW--- | GTD | Sep 5/15 Sat | C5 | 1K | | | 1 | 3 | $169 | $0.00 | |
| 1508OP | | | BW--- | GTD | Sep 5/15 Sat | 1X | QB | | | 1 | 5 | $270 | $0.00 | |
| 1508HM | | | BW--ZB | GTD | Sep 5/15 Sat | RA | KT | | | 1 | 1 | $350 | $0.00 | DIAMOND |
| 150C5Y | | | BW--- | GTD | Sep 5/15 Sat | 1X | 1K | | | 1 | 4 | $376 | $0.00 | |
| 150B88 | | | BW--- | GTD | Sep 5/15 Sat | 5X | 1Q | | | 1 | 3 | $230 | $0.00 | |
| 150B85 | | | BW--- | GTD | Sep 5/15 Sat | 5X | QQ | | | 1 | 3 | $245 | $0.00 | |
| 1508B9 | | | BW--- | GTD | Sep 5/15 Sat | 5X | 1Q | | | 1 | 3 | $230 | $0.00 | |
| 150CDG | | | WJ--WK | GTD | Sep 5/15 Sat | RA | QT | | | 1 | 1 | $350 | $0.00 | |
| 150CDD | | | BW--- | GTD | Sep 5/15 Sat | C4 | 1K | | | 1 | 3 | $221 | $0.00 | |
| 150BJT | | | DR--PY | GTD | Sep 5/15 Sat | RA | QE | | | 1 | 2 | $260 | $0.00 | |
| 1507F3 | | | DR--PY | GTD | Sep 5/15 Sat | RA | 1K | | | 1 | 5 | $214 | $0.00 | |
| 1508X00 | | | BW--- | GTD | Sep 5/15 Sat | FX | 1K | | | 1 | 1 | $30 | $0.00 | DIAMOND |
| 1508TF | | | BW--- | GTD | Sep 5/15 Sat | 1X | QQ | | | 1 | 2 | $306 | $0.00 | |
| 150RSB | | | BW--- | GTD | Sep 5/15 Sat | 5X | 1Q | | | 1 | 3 | $230 | $0.00 | |
| 150B87 | | | BW--- | GTD | Sep 5/15 Sat | 5X | 1Q | | | 1 | 3 | $230 | $0.00 | |
| 1508HN | | | BW--- | GTD | Sep 6/15 Sun | FX | QE | | | 1 | 1 | $30 | $0.00 | DIAMOND |
| 150C63 | | | DR--PY | GTD | Sep 6/15 Sun | RA | 1Q | | | 1 | 15 | $184 | $0.00 | |
| 140BXF | | | BW--- | GTD | Sep 6/15 Sun | FX | 1K | | | 1 | 2 | $30 | $0.00 | DIAMOND |
| 150BXH | | | BW--- | GTD | Sep 6/15 Sun | 3A | 1K | | | 1 | 2 | $234 | $0.00 | DIAMOND |
| 150C0X | | | BW--- | GTD | Sep 6/15 Sun | 5C | QE | | | 1 | 4 | $243 | $0.00 | BASE |
| 140907 | | | BW--- | GTD | Sep 6/15 Sun | FX | 1K | | | 1 | 1 | $30 | $0.00 | DIAMOND |
| 150C9P | | | BW--- | GTD | Sep 6/15 Sun | 1X | 1K | | | 1 | 3 | $216 | $0.00 | |
| 150C69 | | | DR--PY | GTD | Sep 6/15 Sun | RA | 1K | | | 1 | 3 | $204 | $0.00 | |
| 1509X2 | | | BW--ZB | GTD | Sep 6/15 Sun | RA | KT | | | 1 | 1 | $240 | $0.00 | DIAMOND |
| 150C04 | | | BW--- | GTD | Sep 7/15 Mon | 1X | QQ | | | 1 | 3 | $200 | $0.00 | |
| 150C*U | | | BW--JL | GTD | Sep 7/15 Mon | CD | 1K | 504 | 1 | 24 | $260 | $0.00 | BASE |
| 150BF4 | | | BW--- | GTD | Sep 7/15 Mon | RA | 1F | | | 1 | 1 | $150 | $0.00 | DIAMOND |
| 150BFM | | | DR--PY | GTD | Sep 7/15 Mon | RA | 1E | | | 1 | 3 | $190 | $0.00 | |
| 130C7H | | | DP--PY | GTD | Sep 7/15 Mon | RA | 1Q | | | 1 | 3 | $150 | $0.00 | |
| 150906 | | | BW--- | GTD | Sep 7/15 Mon | FA | 1F | | | 1 | 1 | $230 | $0.00 | DIAMOND |
| 150CG9 | | | BW--- | GTD | Sep 7/15 Mon | B1 | QE | | | 1 | 4 | $140 | $0.00 | |

## Schedule 7.1.17 (continued)
## Bookings Report

Reservations Report

| Code | | | Date | | | | | | Price | Tax | Tier |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 150C9D | BW-- | GTD | Sep 7/15 Mon | 1X | QQ | | 1 | 3 | $190 | $0.00 | |
| 190CHX | BW-- | GTD | Sep 7/15 Mon | XZ | KT | | 1 | 2 | $144 | $0.00 | |
| 150BJW | BW-- | GTD | Sep 7/15 Mon | RA | KT | | 1 | 1 | $210 | $0.00 | BASE |
| 150BTQ | BW-- | GTD | Sep 8/15 Tue | 1X | QR | | | 4 | $200 | $0.00 | |
| 150C37 | BW-- | GTD | Sep 8/15 Tue | RA | 1K | | 1 | 2 | $220 | $0.00 | |
| 150BPD | BW-- | GTD | Sep 8/15 Tue | XZ | 1Q | | 1 | 3 | $171 | $0.00 | DIAMOND |
| 190C0N | BW-- | GTD | Sep 8/15 Tue | RA | 1K | | 1 | 2 | $189 | $0.00 | DIAMOND |
| 150CDQ | BW--PY | HOLD | Sep 8/15 Tue | CA | 1K | | 1 | 3 | $198 | $0.00 | BASE |
| 150BKQ | DR--PY | GTD | Sep 8/15 Tue | XZ | 1K | | 1 | 2 | $171 | $0.00 | BASE |
| 150BS4 | BW-- | GTD | Sep 8/15 Tue | 1X | 1K | | 1 | 3 | $190 | $0.00 | |
| 150C1M | BW--ZB | GTD | Sep 8/15 Tue | XZ | QQ | | 1 | 2 | $198 | $0.00 | |
| 150C7F | BW--ZE | GTD | Sep 8/15 Tue | C1 | QQ | | 1 | 2 | $196 | $0.00 | |
| 150BBX | BW-- | GTD | Sep 8/15 Tue | 3A | 1Q | | 1 | 2 | $180 | $0.00 | |
| 150BCN | BW-- | GTD | Sep 8/15 Tue | C1 | KT | | 1 | 2 | $213 | $0.00 | |
| 150CJ2 | BW-- | GTD | Sep 8/15 Tue | SC | QT | | 1 | 1 | $243 | $0.00 | |
| 150BMK | DR--PY | GTD | Sep 8/15 Tue | RA | 1Q | | 1 | 2 | $171 | $0.00 | |
| 150CB4 | DR--BW | GTD | Sep 8/15 Tue | 3A | 1K | | 1 | 1 | $216 | $0.00 | BASE |
| 150BT4 | DR--PY | GTD | Sep 8/15 Tue | RA | 1K | | 1 | 3 | $200 | $0.00 | |
| 150C9R | BW-- | GTD | Sep 8/15 Tue | C1 | 1K | | 1 | 3 | $153 | $0.00 | |
| 150BTF | DR--PY | GTD | Sep 8/15 Tue | RA | QQ | | 1 | 3 | $200 | $0.00 | |
| 150B06 | DR--PY | GTD | Sep 8/15 Tue | RA | QQ | | 1 | 2 | $180 | $0.00 | |
| 150B05 | DR--PY | GTD | Sep 8/15 Tue | RA | QQ | | 1 | 2 | $180 | $0.00 | |
| 150C9Y | BW-- | GTD | Sep 8/15 Tue | XZ | QB | | 1 | 2 | $207 | $0.00 | |
| 150CPB | DR--JL | GTD | Sep 8/15 Tue | RA | QT | | 1 | 1 | $270 | $0.00 | |
| 150CGF | BW-- | GTD | Sep 8/15 Tue | XZ | QB | | 1 | 3 | $225 | $0.00 | |
| 150CGT | BW-- | GTD | Sep 8/15 Tue | XN | QQ | | 1 | 2 | $205 | $0.00 | BASE |
| 150C5X | BW-- | GTD | Sep 8/15 Tue | | 1K | | 1 | 1 | $178 | $0.00 | |
| 150C7E | BW--PY | HOLD | Sep 8/15 Tue | RA | KT | 704 | 1 | 3 | $239 | $0.00 | DIAMOND |
| 150CFN | DR--EL | GTD | Sep 8/15 Tue | CD | 1K | | 1 | 2 | $259 | $0.00 | |
| 150CGH | DR--EL | GTD | Sep 8/15 Tue | RA | KT | | 1 | 2 | $279 | $0.00 | |
| 150C86 | BW-- | GTD | Sep 8/15 Tue | SA | QB | | 1 | 2 | $154 | $0.00 | |
| 150BB9 | BW-- | GTD | Sep 8/15 Tue | RA | 1K | | 1 | 2 | $200 | $0.00 | |
| 150CGK | BW-- | GTD | Sep 8/15 Tue | RA | KT | | 1 | 3 | $270 | $0.00 | BASE |
| 150B83 | BW-- | GTD | Sep 8/15 Tue | | QQ | | 1 | 2 | $240 | $0.00 | |
| 150B9S | BW--PY | GTD | Sep 8/15 Tue | AO | 1K | | 1 | 2 | $160 | $0.00 | |
| 150C2V | DR--PY | GTD | Sep 8/15 Tue | RA | 1K | | 1 | 2 | $189 | $0.00 | |
| 150BS9 | BW-- | GTD | Sep 8/15 Tue | 1X | KT | | 1 | 2 | $220 | $0.00 | |
| 150BCP | BW-- | GTD | Sep 8/15 Tue | C1 | KT | | 1 | 2 | $213 | $0.00 | |
| 150C9L | BW-- | GTD | Sep 8/15 Tue | 1X | 1K | | 1 | 1 | $220 | $0.00 | |
| 150CBB | DR--PY | GTD | Sep 8/15 Tue | RA | 1Q | | 1 | 3 | $220 | $0.00 | |
| 150C0F | BW-- | GTD | Sep 8/15 Tue | RA | QB | | 2 | | $210 | $0.00 | BASE |
| 150B7S | BW-- | GTD | Sep 8/15 Tue | 3A | QQ | | 1 | 6 | $198 | $0.00 | |
| 150CDV | BW-- | GTD | Sep 8/15 Tue | Z8 | 1K | | 1 | 1 | $187 | $0.00 | |
| 150BJ9 | BW-- | GTD | Sep 9/15 Wed | 3A | QQ | | 1 | 1 | $225 | $0.00 | BASE |
| 150CF3 | DR--PY | GTD | Sep 9/15 Wed | RA | QT | | 1 | 3 | $269 | $0.00 | Platinum |
| 150C5T | DR--PY | GTD | Sep 9/15 Wed | RA | 1Q | | 1 | 2 | $261 | $0.00 | |
| 150BMH | BW-- | GTD | Sep 9/15 Wed | RA | 1K | | 1 | 2 | $230 | $0.00 | BASE |
| 150BMR | BW--JL | GTD | Sep 9/15 Wed | 3A | 1K | | 1 | 5 | $207 | $0.00 | |
| 150CH1 | BW-- | GTD | Sep 9/15 Wed | 1X | QT | | 1 | 2 | $330 | $0.00 | |
| 150BBN | BW-- | GTD | Sep 9/15 Wed | C1 | 1K | | 1 | 2 | $187 | $0.00 | |
| 150CH8 | BW-- | GTD | Sep 9/15 Wed | RA | QT | | 1 | 1 | $330 | $0.00 | |
| 150CB5 | BW--PY | GTD | Sep 9/15 Wed | SC | QQ | | 1 | 1 | $279 | $0.00 | DIAMOND |
| 150C8L | BW-- | GTD | Sep 9/15 Wed | 3A | QB | | 1 | 1 | $270 | $0.00 | |
| 150B21 | BW-- | GTD | Sep 9/15 Wed | RA | QQ | | 1 | 1 | $240 | $0.00 | PLATINUM |
| 150B23 | BW-- | GTD | Sep 9/15 Wed | RA | QQ | | 1 | 1 | $240 | $0.00 | PLATINUM |
| 150BR9 | BW-- | GTD | Sep 9/15 Wed | RA | 1K | | 1 | 1 | $230 | $0.00 | BASE |
| 150B9D | BW-- | GTD | Sep 9/15 Wed | RA | QQ | | 1 | 2 | $234 | $0.00 | |

## Schedule 7.1.17 (continued)
## Bookings Report

Reservations Report

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 150978 | | | BW-- | GTD | Sep 9'15 Wed | C1 | 1K | | 1 | 1 $170 $ 0.00 | |
| 150BMV | | | BW-- | GTD | Sep 9'15 Wed | AO | 1K | | 1 | 1 $184 $ 0.00 | |
| 150BWP | | | BW-- | GTD | Sep 9'15 Wed | RA | 1K | | 1 | 1 $260 $ 0.00 | |
| 150BJC | | | BW-- | GTD | Sep 9'15 Wed | RA | QQ | | 1 | 2 $260 $ 0.00 | |
| 150BWX | | | BW-- | GTD | Sep 9'15 Wed | AO | 1K | | 1 | 1 $184 $ 0.00 | |
| 150BGK | | | BW-- | GTD | Sep 9'15 Wed | X? | 1K | | 1 | 3 $186 $ 0.00 | PLATINUM |
| 150BWV | | | BW-- | GTD | Sep 9'15 Wed | 3A | KT | | 1 | 1 $261 $ 0.00 | BASE |
| 150COW | | | BW-- | GTD | Sep 9'15 Wed | AO | QQ | | 1 | 1 $256 $ 0.00 | |
| 150CFC | | | DR--PY | GTD | Sep10'15 Thu | RA | 1K | | 1 | 3 $260 $ 0.00 | |
| 150BN6 | | | BW-- | GTD | Sep10'15 Thu | XZ | 1K | | 1 | 3 $275 $ 0.00 | |
| 150CF8 | | | BW-- | GTD | Sep10'15 Thu | SA | KT | | 1 | 1 $232 $ 0.00 | |
| 150BN2 | | | BW-- | OTD | Sep10'15 Thu | XZ | 1Q | | 1 | 3 $225 $ 0.00 | |
| 150BV4 | | | SA--EL | HOLD | Sep10'15 Thu | CD | 1F | | 1 | 6 $279 $ 0.00 | |
| 150BPH | | | BW-- | GTD | Sep10'15 Thu | 3A | KT | | 1 | 2 $252 $ 0.00 | BASE |
| 150C86 | | | BW-- | GTD | Sep10'15 Thu | 1X | 1K | | 1 | 3 $280 $ 0.00 | |
| 170EJF | | | BW-- | GTD | Sep10'15 Thu | 3A | 1K | | 1 | 1 $280 $ 0.00 | |
| 150B2G | | | BW-- | GTD | Sep10'15 Thu | RA | 1K | | 1 | 1 $252 $ 0.00 | |
| 150CDF | | | BW-- | GTD | Sep10'15 Thu | RA | 1K | | 1 | 1 $260 $ 0.00 | |
| 150CC8 | | | DR--PY | GTD | Sep10'15 Thu | RA | QQ | | 1 | 1 $280 $ 0.00 | |
| 150BN1 | | | DR--PY | GTD | Sep10'15 Thu | R_1 | 1K | | 1 | 1 $260 $ 0.00 | |
| 150CI3 | | | BW-- | GTD | Sep10'15 Thu | XZ | 1Q | | 1 | 2 $234 $ 0.00 | |
| 150BK9 | | | BW-- | GTD | Sep10'15 Thu | 3A | QQ | | 1 | 2 $232 $ 0.00 | |
| 150GN4 | | | BW-- | GTD | Sep10'15 Thu | X2 | 1Q | | 1 | 3 $225 $ 0.00 | |
| 150BDH | | | BW-- | GTD | Sep10'15 Thu | SC | 1K | | 1 | 2 $216 $ 0.00 | BASE |
| 150C6F | | | BW-- | GTD | Sep10'15 Thu | AO | 1K | | 1 | 1 $208 $ 0.00 | |
| 150BHX | | | BW-- | GTD | Sep10'15 Thu | RA | QQ | | 1 | 6 $260 $ 0.00 | BASE |
| 150BN7 | | | BW-- | GTD | Sep10'15 Thu | 3A | 1K | | 1 | 3 $225 $ 0.00 | |
| 150BJC | | | BW-- | GTD | Sep10'15 Thu | C1 | 1Q | | 1 | 8 $204 $ 0.00 | |
| 150BM3 | | | BW-- | GTD | Sep10'15 Thu | XZ | 1K | | 1 | 4 $207 $ 0.00 | PLATINUM |
| 150CFD | | | BW-- | GTD | Sep10'15 Thu | CK | QQ | | 1 | 1 $161 $ 0.00 | |
| 150BNC | | | DR--JL | GTD | Sep10'15 Thu | Gv | KT | | 1 | 2 $261 $ 0.00 | |
| 150C7R | | | DR--PY | GTD | Sep10'15 Thu | RA | QQ | | 1 | 3 $280 $ 0.00 | |
| 150BN3 | | | BW-- | GTD | Sep10'15 Thu | XZ | 1Q | | 1 | 3 $225 $ 0.00 | |
| 150BN9 | | | BW-- | GTD | Sep10'15 Thu | XZ | 1K | | 1 | 3 $225 $ 0.00 | |
| 150BQ5 | | | BW-- | GTD | Sep11'15 Fri | SC | 1K | | 1 | 1 $225 $ 0.00 | BASE | 7267 |
| 150BH5 | | | BW-- | GTD | Sep11'15 Fri | 3A | QQ | | 1 | 4 $198 $ 0.00 | |
| 150BH6 | | | BW-- | GTD | Sep11'15 Fri | 3A | 1K | | 1 | 4 $180 $ 0.00 | |
| 150BQ0 | | | DR--PY | GTD | Sep11'15 Fri | RA | 1K | | 1 | 1 $250 $ 0.00 | |
| 150BJ6 | | | DR--PY | GTD | Sep11'15 Fri | RA | 1K | | 1 | 2 $200 $ 0.00 | |
| 150BTT | | | BW-- | GTD | Sep11'15 Fri | RA | 1K | | 1 | 4 $280 $ 0.00 | |
| 150CCT | | | WI--JL | GTD | Sep11'15 Fri | 3A | QQ | 502 | 1 | 2 $252 $ 0.00 | |
| 150CCV | | | WI--JL | GTD | Sep11'15 Fri | 3A | QQ | 503 | 1 | 2 $252 $ 0.00 | |
| 15098? | | | BW-- | GTD | Sep11'15 Fri | 3A | KT | | 1 | 3 $142 $ 0.00 | BASE |
| 150CBK | | | BW-- | GTD | Sep11'15 Fri | 1X | QQ | | 1 | 3 $300 $ 0.00 | |
| 150BH3 | | | DR--PY | GTD | Sep11'15 Fri | RA | 1K | | 1 | 1 $200 $ 0.00 | |
| 150BHY | | | DR--PY | GTD | Sep11'15 Fri | RA | 1Q | | 1 | 2 $208 $ 0.00 | |
| 150BGW | | | DR--PY | GTD | Sep11'15 Fri | RA | 1Q | | 1 | 2 $200 $ 0.00 | |
| 150CFC | | | BW-- | GTD | Sep11'15 Fri | RA | 1K | | 1 | 5 $280 $ 0.00 | |
| 150BPC | | | BW-- | GTD | Sep11'15 Fri | RA | QQ | | 1 | 4 $270 $ 0.00 | |
| 150C0Q | | | BW--PY | GTD | Sep12'15 Sat | 3A | QT | | 1 | 5 $279 $ 0.00 | PLATINUM |
| 150BRK | | | BW-- | GTD | Sep12'15 Sat | 3A | 1K | | 1 | 4 $234 $ 0.00 | |
| 150CF9 | | | SA--EL | GTD | Sep12'15 Sat | CD | 1K | | 1 | 5 $259 $ 0.00 | |
| 150CCW | | | WI--JL | GTD | Sep12'15 Sat | 3A | 1K | | 1 | 1 $252 $ 0.00 | |
| 150CCX | | | BW-- | GTD | Sep12'15 Sat | 3A | 1K | | 1 | 1 $293 $ 0.00 | |
| 150CCY | | | WI--JL | GTD | Sep12'15 Sat | 3A | 1K | | 1 | 1 $270 $ 0.00 | |
| 150C0N | | | BW-- | GTD | Sep12'15 Sat | CA | QQ | | 1 | 1 $398 $ 0.00 | |

## Schedule 7.1.17 (continued)
## Bookings Report

Reservations Report

| Code | | | Type | Status | Date | Day | C1 | C2 | | Qty | Qty | Amt | Amt2 | Tier |
|------|--|--|------|--------|------|-----|----|----|--|-----|-----|-----|------|------|
| 150BJL | | | BW-- | GTD | Sep1215 Sat | 1X | QQ | | | 1 | 1 | $260 | $0.00 | |
| 150BJ0 | | | BW-- | GTD | Sep1215 Sat | RA | KT | | | 1 | 1 | $250 | $0.00 | BASE |
| 150B39 | | | DR--PY | GTD | Sep1215 Sat | RA | 1Q | | | 5 | 5 | $320 | $0.00 | |
| 150BQ7 | | | DR--PY | GTD | Sep1215 Sat | RA | 1K | | | 8 | 8 | $234 | $0.00 | |
| 1509TE | | | BW-- | GTD | Sep1215 Sat | 3A | 1K | | | 3 | 3 | $288 | $0.00 | |
| 150C6J | | | BW-- | GTD | Sep1315 Sun | 3A | QQ | | | 1 | 5 | $198 | $0.00 | PLATINUM |
| 150BVO | | | BW~ | GTD | Sep1315 Sun | 3A | QE | | | 1 | 3 | $216 | $0.00 | DIAMOND |
| 150B6W | | | BW-ED | GTD | Sep1315 Sun | 3A | 1Q | | | 1 | 3 | $216 | $0.00 | GOLD ELITE |
| 359BB5 | | | BW-- | GTD | Sep1315 Sun | XZ | 1K | | | 4 | 4 | $223 | $0.00 | |
| 1509Y8 | | | BW-- | GTD | Sep1315 Sun | XZ | QQ | | | 2 | 2 | $260 | $0.00 | |
| 150C14 | | | BW-- | GTD | Sep1315 Sun | XZ | 1Q | | | 2 | 2 | $207 | $0.00 | |
| 150C89 | | | BW-- | GTD | Sep1315 Sun | XZ | QQ | | | 5 | 5 | $198 | $0.00 | |
| 1420A7 | | | BW-- | GTD | Sep1315 Sun | XZ | 1K | | | 1 | 5 | $216 | $0.00 | |
| 150B26 | | | BW-- | GTD | Sep1315 Sun | RA | QQ | | | 3 | 3 | $260 | $0.00 | PLATINUM |
| 150CDT | | | BW-- | GTD | Sep1315 Sun | RA | QQ | | | 1 | 3 | $260 | $0.00 | PLATINUM |
| 150CGR | | | BW-- | GTD | Sep1315 Sun | RA | QQ | | | 6 | 6 | $198 | $0.00 | DIAMOND |
| 150CJ1 | | | BW-- | GTD | Sep1315 Sun | 1X | 1K | | | 2 | 3 | $200 | $0.00 | |
| 150BVR | | | BW-EL | HOLD | Sep1315 Sun | RA | 1K | | | 1 | 3 | $200 | $0.00 | GOLD ELITE |
| 150C3N | | | BW-- | GTD | Sep1315 Sun | XN | QE | | | 7 | 7 | $194 | $0.00 | |
| 150BJQ | | | BW-- | GTD | Sep1315 Sun | RA | 1K | | | 4 | 4 | $230 | $0.00 | BASE |
| 150B38 | | | DR--PY | GTD | Sep1415 Mon | 3A | 1Y | | | 3 | 3 | $769 | $0.00 | BASE |
| 150C65 | | | BW-- | GTD | Sep1415 Mon | XZ | 1C | | | 1 | 4 | $216 | $0.00 | |
| 150BVI | | | BW-PY | GTD | Sep1415 Mon | RA | QT | | | 1 | 4 | $216 | $0.00 | BASE |
| 150C67 | | | BW-- | GTD | Sep1415 Mon | XZ | QE | | | 3 | 3 | $235 | $0.00 | |
| 1309X3 | | | BW-- | GTD | Sep1415 Mon | SC | KT | | | 4 | 4 | $279 | $0.00 | |
| 150BBQ | | | BW-- | GTD | Sep1415 Mon | 1X | QQ | | | 3 | 5 | $260 | $0.00 | |
| 150B6D | | | BW-- | GTD | Sep1415 Mon | CJ | 1K | | | 1 | 3 | $221 | $0.00 | |
| 150BNH | | | BW-- | GTD | Sep1415 Mon | 3A | 1K | | | 1 | 4 | $204 | $0.00 | |
| 150CB7 | | | DR--PY | GTD | Sep1415 Mon | PA | 1K | | | 1 | 3 | $260 | $0.00 | |
| 150BQX | | | BW-- | GTD | Sep1415 Mon | AO | KT | | | 1 | 3 | $264 | $0.00 | |
| 150C0P | | | BW-- | GTD | Sep1415 Mon | 3A | QE | | | 6 | 6 | $243 | $0.00 | BASE |
| 150BXL | | | BW-- | GTD | Sep1415 Mon | CJ | QE | | | 1 | 1 | $26- | $0.00 | |
| 150BBK | | | BW-- | GTD | Sep1415 Mon | RA | QB | | | 3 | 3 | $300 | $0.00 | |
| 150BBY | | | BW-- | GTD | Sep1415 Mon | XZ | QE | | | 1 | 2 | $219 | $0.00 | BASE |
| 150BJP | | | BW-- | GTD | Sep1415 Mon | 1X | QQ | | | 1 | 2 | $780 | $0.00 | |
| 150B61 | | | DR--PY | GTD | Sep1415 Mon | GV | 1K | | | 1 | 1 | $269 | $0.00 | |
| 150B53 | | | BW-- | GTD | Sep1415 Mon | 3A | 1K | | | 1 | 2 | $216 | $0.00 | BASE |
| 150CJD | | | BW-- | GTD | Sep1415 Mon | 3A | 1Q | | | 1 | 2 | $240 | $0.00 | |
| 150BJR | | | BW-- | GTD | Sep1415 Mon | AO | QB | | | 1 | 1 | $256 | $0.00 | DIAMOND |
| 150CUX | | | DR--PY | HOLD | Sep1515 Tue | OV | 1K | | | 1 | 1 | $269 | $0.00 | |
| 150BVH | | | BW-- | GTD | Sep1515 Tue | FX | QT | | | 1 | 1 | $279 | $0.00 | |
| 150J58 | | | BW-- | GTD | Sep1515 Tue | FX | QE | | | 1 | 3 | $30 | $0.00 | DIAMOND |
| 150B31 | | | BW-- | GTD | Sep1515 Tue | 1C | 1C | | | 1 | 3 | $300 | $0.00 | BASE |
| 150B1V | | | BW-- | GTD | Sep1515 Tue | C1 | 1K | | | 1 | 2 | $255 | $0.00 | |
| 150CBD | | | BW-- | GTD | Sep1515 Tue | 3A | 1K | | | 1 | 3 | $270 | $0.00 | |
| 150BVM | | | BW-- | GTD | Sep1515 Tue | SA | KT | | | 1 | 2 | $277 | $0.00 | |
| 150BM5 | | | BW-- | GTD | Sep1515 Tue | 3A | QR | | | 1 | 3 | $306 | $0.00 | |
| 150BXX | | | BW-- | GTD | Sep1515 Tue | FX | QE | | | 3 | 3 | $30 | $0.00 | DIAMOND |
| 150BKW | | | BW-- | GTD | Sep1515 Tue | YC | 1K | | | 1 | 3 | $284 | $0.00 | |
| 150CGG | | | DR--PY | GTD | Sep1515 Tue | GV | 1K | | | 1 | 1 | $269 | $0.00 | |
| 150C4R | | | DR-EL | GTD | Sep1515 Tue | CD | 1K | | | 1 | 1 | $279 | $0.00 | |
| 150BQP | | | BW--PY | GTD | Sep1515 Tue | SC | KT | | | 1 | 1 | $387 | $0.00 | |
| 150BV9 | | | BK--AA | GTD | Sep1615 Wed | 3A | 1Q | | | 1 | 2 | $297 | $0.00 | |
| 150BVJ | | | BW-- | GTD | Sep1615 Wed | AO | K1 | | | 1 | 2 | $269 | $0.00 | |
| 150BL1 | | | BW-- | GTD | Sep1615 Wed | 3A | QE | | | 2 | 3 | $115 | $0.00 | DIAMOND |
| 150BDP | | | BW-- | GTD | Sep1615 Wed | 1X | 1K | | | 1 | 3 | $320 | $0.00 | |
| | | | DR--PY | GTD | Sep1615 Wed | PA | 1K | | | 1 | 2 | $320 | $0.00 | |

## Schedule 7.1.17 (continued)
## Bookings Report

Reservations Report

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| BW-- | GTD | Sep1615 Wed | RA | IK | | 1 | 1 | $530 | $0.00 | | |
| BW-- | GTD | Sep1615 Wed | 3A | QQ | | 1 | 1 | $333 | $0.00 | GOLD ELITE | |
| BW-- | GTD | Sep1615 Wed | ZB | IK | | 1 | 1 | $255 | $0.00 | | |
| BW-- | GTD | Sep1615 Wed | 1X | IX | | 1 | 1 | $320 | $0.00 | | |
| BW-- | GTD | Sep1615 Wed | 1X | IK | | 1 | 2 | $320 | $0.00 | | |
| BW-- | GTD | Sep1615 Wed | 3A | QQ | | 1 | 2 | $342 | $0.00 | BASE | |
| BW-- | GTD | Sep1615 Wed | 3A | QQ | | 1 | 2 | $342 | $0.00 | BASE | |
| BW-- | GTD | Sep1615 Wed | RA | QB | | 1 | 1 | $350 | $0.00 | | |
| BW--ZB | GTD | Sep1615 Wed | XZ | QQ | | 1 | 1 | $324 | $0.00 | | |
| BW--ZB | GTD | Sep1615 Wed | XZ | QQ | | 1 | 1 | $324 | $0.00 | | |
| BW-- | GTD | Sep1615 Wed | FR | KT | | 1 | 1 | $299 | $0.00 | | |
| BW-- | GTD | Sep1615 Wed | RA | IQ | | 1 | 1 | $320 | $0.00 | GOLD ELITE | |
| BW-- | GTD | Sep1615 Wed | 3A | IK | | 1 | 1 | $315 | $0.00 | | |
| BW--J75 | GTD | Sep1615 Wed | RA | KT | | 1 | 1 | $400 | $0.00 | | |
| BW-- | GTD | Sep1615 Wed | XZ | QE | | 1 | 1 | $324 | $0.00 | | |
| BW-- | GTD | Sep1615 Wed | C1 | QB | | 1 | 1 | $298 | $0.00 | | |
| BW-- | GTD | Sep1615 Wed | 3A | IK | | 1 | 1 | $330 | $0.00 | | |
| DR--PY | GTD | Sep1715 Thu | PA | IK | | 1 | 1 | $260 | $0.00 | | |
| BW-- | GTD | Sep1715 Thu | XZ | IK | | 1 | 2 | $270 | $0.00 | | |
| BW-- | GTD | Sep1715 Thu | 3A | IK | | 1 | 3 | $270 | $0.00 | BASE | |
| BW-- | GTD | Sep1715 Thu | AO | IK | | 1 | 1 | $256 | $0.00 | | |
| BW-- | GTD | Sep1715 Thu | XZ | IK | | 1 | 2 | $270 | $0.00 | | |
| DR--PY | GTD | Sep1715 Thu | RA | QE | | 1 | 1 | $260 | $0.00 | | |
| DR--PY | GTD | Sep1715 Thu | RA | QE | | 1 | 1 | $260 | $0.00 | | |
| BW-- | GTD | Sep1715 Thu | 1X | QQ | | 1 | 1 | $350 | $0.00 | | |
| DR--JL | GTD | Sep1715 Thu | RA | QQ | | 1 | 5 | $320 | $0.00 | | |
| DR--PY | GTD | Sep1715 Thu | RA | QQ | | 1 | 4 | $280 | $0.00 | | |
| BW--ED | GTD | Sep1715 Thu | RA | CF | | 1 | 1 | $300 | $0.00 | | |
| DR--PY | GTD | Sep1715 Thu | RA | IQ | | 1 | 3 | $300 | $0.00 | | |
| DR--PY | GTD | Sep1715 Thu | 3A | IQ | | 1 | 1 | $270 | $0.00 | | |
| BW-- | GTD | Sep1715 Thu | 3A | IK | | 1 | 4 | $232 | $0.00 | BASE | |
| BW-- | GTD | Sep1715 Thu | 3A | QO | | 1 | 4 | $279 | $0.00 | BASE | |
| DR--PY | GTD | Sep1815 Fri | RA | IK | | 1 | 4 | $260 | $0.00 | | |
| BW-- | GTD | Sep1815 Fri | 3A | QQ | | 1 | 3 | $260 | $0.00 | BASE | |
| BW--ED | GTD | Sep1815 Fri | 3A | QQ | | 1 | 3 | $270 | $0.00 | BASE | |
| BW-- | GTD | Sep1815 Fri | FX | IK | | 1 | 1 | $30 | $0.00 | DIAMOND | |
| DR--PY | GTD | Sep1815 Fri | 3A | IK | | 1 | 1 | $200 | $0.00 | | |
| BW-- | GTD | Sep1815 Fri | 3A | QQ | | 1 | 3 | $270 | $0.00 | PLATINUM | |
| BW-- | GTD | Sep1815 Fri | 3A | IQ | | 1 | 2 | $244 | $0.00 | BASE | |
| DR--PY | GTD | Sep1515 Sat | RA | IK | | 1 | 3 | $270 | $0.00 | BASE | |
| BW-- | GTD | Sep1915 Sat | 3A | KT | | 1 | 1 | $333 | $0.00 | BASE | |
| BW-- | GTD | Sep1915 Sat | C1 | QQ | | 1 | 6 | $272 | $0.00 | | |
| BW-- | GTD | Sep1915 Sat | 3A | QQ | | 1 | 4 | $342 | $0.00 | | |
| BW-- | GTD | Sep1515 Sat | 3S | QQ | | 1 | 1 | $306 | $0.00 | PLATINUM | |
| BW-- | GTD | Sep1915 Sat | XN | IK | | 1 | 1 | $259 | $0.00 | | |
| BW-- | GTD | Sep1915 Sat | 3A | IK | | 1 | 1 | $170 | $0.00 | BASE | |
| DR--PY | GTD | Sep1915 Sat | 3A | IQ | | 1 | 7 | $300 | $0.00 | | |
| BW-- | GTD | Sep1915 Sat | SC | QQ | | 1 | 2 | $297 | $0.00 | | |
| BW-- | GTD | Sep1915 Sat | 3A | IK | | 1 | 1 | $270 | $0.00 | BASE | |
| BW-- | GTD | Sep1915 Sat | XN | IK | | 1 | 1 | $275 | $0.00 | | |
| BW-- | GTD | Sep1915 Sat | FX | IK | | 1 | 1 | $30 | $0.00 | BASE | |
| DR--BW | GTD | Sep1915 Sat | RA | KT | | 1 | 1 | $550 | $0.00 | | |
| DR--BW | GTD | Sep1915 Sat | RA | KT | | 1 | 1 | $350 | $0.00 | | |
| BW-- | GTD | Sep1915 Sat | XZ | IQ | | 1 | 5 | $288 | $0.00 | | |
| BW-- | GTD | Sep1915 Sat | 3A | IK | | 1 | 1 | $306 | $0.00 | | |

Schedule 7.1.17

### Schedule 7.1.17 (continued)
### Bookings Report

Reservation Report

| Code | | BW | GTD/HOLD | Date | Day | XZ | Code2 | | | Qty | Rate | Amount | Notes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 150BSR | | BW-- | GTD | Sep20'15 Sun | XZ | 1Q | | | | 4 | $216 | $0.00 | |
| 150C36 | | BW-- | GTD | Sep20'15 Sun | RA | QQ | | | | 3 | $280 | $0.00 | |
| 150BY1 | | BW-- | GTD | Sep20'15 Sun | FR | 1K | | | | 5 | $223 | $0.00 | |
| 150CGX | | BW-- | GTD | Sep20'15 Sun | RA | QE | | | | 5 | $266 | $0.00 | |
| 150C6W | | DR--EL | GTD | Sep20'15 Sun | CD | 1X | | | | 5 | $279 | $0.00 | |
| 150BC9 | | BW-- | GTD | Sep20'15 Sun | 1X | 1K | | | | 1 | $2.0 | $0.00 | |
| 150BQ2 | | BW-- | GTD | Sep20'15 Sun | SC | 1K | | | | 4 | $180 | $0.00 | BASE |
| 150BJH | | DR--PY | GTD | Sep20'15 Sun | RA | 1K | | | | 9 | $180 | $0.00 | BASE |
| 150CGY | | BW-- | GTD | Sep20'15 Sun | RA | QE | | | | 5 | $260 | $0.00 | |
| 150C3P | | BW-- | GTD | Sep20'15 Sun | RA | 1K | | | | 4 | $260 | $0.00 | BASE |
| 150BM8 | | DR--PY | GTD | Sep20'15 Sun | RA | 1K | | | | 1 | $220 | $0.00 | |
| 150C9Q | | BW-- | GTD | Sep20'15 Sun | FR | QT | | | | 6 | $261 | $0.00 | |
| 150C56 | | SA--AF | GTD | Sep21'15 Mon | CD | 1Q | | | | 4 | $209 | $0.00 | |
| L0BFC | | BW-- | GTD | Sep21'15 Mon | XZ | 1Q | | | | 4 | $234 | $0.00 | |
| 150BXG | | BW-- | GTD | Sep21'15 Mon | 3A | 1Q | | | | 4 | $797 | $0.00 | BASE |
| 150BWW | | BW-- | GTD | Sep21'15 Mon | RA | 1K | | | | 2 | $297 | $0.00 | BASE |
| 1509X6 | | BW-- | GTD | Sep21'15 Mon | 1X | QQ | | | | 3 | $340 | $0.00 | |
| 150C9J | | BW-- | GTD | Sep21'15 Mon | FR | KT | | | | 2 | $299 | $0.00 | |
| 150CB0 | | DR--PY | HOLD | Sep21'15 Mon | CD | 1K | | | | 3 | $279 | $0.00 | Gold Elite |
| 150BSH | | BW-- | GTD | Sep21'15 Mon | 3A | 1K | | | | 3 | $288 | $0.00 | BASE |
| 150C4L | | SA--EL | GTD | Sep21'15 Mon | CD | 1K | | | | 4 | $269 | $0.00 | |
| 150BHH | | DR--PY | GTD | Sep21'15 Mon | RA | 1C | | | | 5 | $252 | $0.06 | |
| 150B3Q | | BW-- | GTD | Sep21'15 Mon | XZ | 1K | | | | 3 | $252 | $0.00 | |
| 150BND | | BW--AA | GTD | Sep21'15 Mon | SC | 1K | | | | 3 | $287 | $0.00 | GOLD ELI |
| 150BSL | | BW--BW | GTD | Sep21'15 Mon | 3A | 1Q | | | | 3 | $288 | $0.00 | BASE 66 |
| 150CBI | | DR--EL | HOLD | Sep21'15 Mon | CD | 1K | | | | 4 | $279 | $0.00 | |
| 1509W1 | | BW-- | GTD | Sep22'15 Tue | 3A | 1K | | | | 1 | $270 | $0.00 | BASE |
| 150B6H | | DR--PY | GTD | Sep22'15 Tue | RA | 1K | | | | 3 | $270 | $0.00 | |
| 150CBL | | BW-- | GTD | Sep22'15 Tue | 1X | QR | | | | 3 | $340 | $0.00 | |
| 150CFF | | BW-- | GTD | Sep22'15 Tue | FR | 1Q | | | | 1 | $299 | $0.00 | |
| 150BXS | | BW-- | GTD | Sep22'15 Tue | RA | 1K | | | | 5 | $297 | $0.00 | |
| 1509WM | | BW-- | GTD | Sep22'15 Tue | RA | QQ | | | | 3 | $320 | $0.00 | |
| 150BCT | | BW-- | GTD | Sep22'15 Tue | RA | QQ | | | | 1 | $320 | $0.00 | |
| 1509WL | | BW-- | GTD | Sep22'15 Tue | 1X | QQ | | | | 3 | $320 | $0.00 | |
| 150C94 | | BW-- | GTD | Sep22'15 Tue | FX | 1K | | | | 1 | $70 | $0.00 | DIAMOND |
| 150C7T | | BW--PY | HOLD | Sep22'15 Tue | RA | KT | 704 | | | 2 | $259 | $0.00 | DIAMOND |
| 150BRD | | BW-- | GTD | Sep22'15 Tue | C1 | 1K | | | | 1 | $272 | $0.00 | |
| 150C4W | | BW-- | GTD | Sep22'15 Tue | SC | 1K | | | | 3 | $297 | $0.00 | BASE |
| 150B2L | | BW-- | GTD | Sep22'15 Tue | 1X | 1K | | | | 4 | $300 | $0.00 | |
| 150BCW | | DR--PY | GTD | Sep23'15 Wed | RA | 1Q | | | | 7 | $270 | $0.00 | |
| 150CJ3 | | BW-- | GTD | Sep23'15 Wed | RA | QE | | | | 3 | $370 | $0.00 | |
| 150BMM | | BW-- | GTD | Sep23'15 Wed | 1X | QQ | | | | 2 | $320 | $0.00 | |
| 1509M5 | | BW-- | GTD | Sep23'15 Wed | XZ | 1Q | | | | 3 | $288 | $0.00 | |
| 150C7X | | BW-- | GTD | Sep23'15 Wed | XN | 1Q | | | | 1 | $275 | $0.00 | |
| 150BN0 | | BW--PY | GTD | Sep23'15 Wed | RA | 1Q | | | | 1 | $300 | $0.00 | DIAMOND |
| 150BOG | | BW-- | GTD | Sep23'15 Wed | FX | 1K | | | | 4 | $30 | $0.00 | BASE |
| 150C0D | | BW-- | GTD | Sep23'15 Wed | 1Q | 1K | | | | 1 | $265 | $0.00 | |
| 150C6P | | BW-- | GTD | Sep23'15 Wed | CX | 1Q | | | | 2 | $306 | $0.00 | BASE |
| 150C6Q | | BW-- | GTD | Sep23'15 Wed | SC | 1Q | | | | 2 | $306 | $0.00 | BASE |
| 150CJ9 | | BW-- | GTD | Sep23'15 Wed | RA | QE | | | | 3 | $370 | $0.00 | |
| 150BNK | | DR--PY | GTD | Sep23'15 Wed | RA | 1K | | | | 1 | $300 | $0.00 | |
| 150BPL | | BW-- | GTD | Sep23'15 Wed | 1X | 1F | | | | 5 | $300 | $0.00 | |
| 150BPQ | | BW-- | GTD | Sep23'15 Wed | 1Q | QQ | | | | 5 | $320 | $0.00 | |
| 150C7P | | BW-- | GTD | Sep23'15 Wed | XN | 1Q | | | | 1 | $320 | $0.00 | |
| 150BRC | | BW-- | GTD | Sep23'15 Wed | C1 | 1Q | | | | 4 | $272 | $0.00 | |
| 150CJ1 | | BW-- | GTD | Sep23'15 Wed | FR | QQ | | | | 3 | $299 | $0.00 | |
| 150BY5 | | BW-- | GTD | Sep23'15 Wed | FR | KT | | | | 6 | $299 | $0.00 | |

Schedule 7.1.17

## Schedule 7.1.17 (continued)
## Bookings Report

Reservations Report

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 150B06 | | | DR--FY | GTD | Sep23'15 Wed | RA | 1K | 1 | 4 $300 $0.00 | |
| 150CF2 | | | BW-- | GTD | Sep23'15 Wed | XN | QE | 1 | 1 $292 $0.00 | |
| 150BXY | | | BW-- | GTD | Sep23'15 Wed | 3A | QQ | 1 | 4 $3?5 $0.00 | |
| 150BTX | | | BW-- | GTD | Sep23'15 Wed | FX | 1K | 1 | 3 $303 $0.00 | DIAMOND |
| 150PXC | | | BW-- | GTD | Sep23'15 Thu | C1 | KT | 1 | 5 $281 $0.00 | |
| 150C0S | | | BW-- | GTD | Sep23'15 Thu | C2 | 1Q | 1 | 5 $288 $0.00 | |
| 150CTV | | | BW-- | GTD | Sep24'15 Thu | C1 | 1K | 1 | 1 $289 $0.00 | |
| 150B1F | | | DR--PY | GTD | Sep24'15 Thu | RA | 1K | 1 | 4 $270 $0.00 | |
| 150BBM | | | BW-- | GTD | Sep24'15 Thu | 5A | QQ | 1 | 2 $288 $0.00 | PLATINUM |
| 150C9R | | | BW-- | GTD | Sep25'15 Thu | RA | QT | 1 | 8 $3?0 $0.00 | BASE |
| 150CJC | | | BW-- | GTD | Sep25'15 Thu | RA | QT | 1 | 8 $360 $0.00 | BASE |
| 150PRM | | | BW-- | GTD | Sep24'15 Thu | LC | 1K | 1 | 4 $288 $0.00 | BASE |
| 150CCR | | | BW-- | GTD | Sep24'15 Thu | 3A | 1K | 1 | 2 $288 $0.00 | BASE |
| 150B07 | | | DR--FY | GTD | Sep24'15 Thu | RA | 1K | 1 | 3 $270 $0.00 | |
| 150PYP | | | BW--ED | GTD | Sep24'15 Thu | 3A | QQ | 1 | 3 $288 $0.00 | BASE |
| 150BJ3 | | | BW--AA | GTD | Sep25'15 Fri | GV | QQ | 1 | 3 $288 $0.00 | BASE |
| 150B9F | | | BW-- | GTD | Sep25'15 Fri | 1C | QQ | 1 | 2 $340 $0.00 | |
| 150CXG | | | BW-- | GTD | Sep25'15 Fri | AO | KT | 1 | 2 $369 $0.00 | BASE |
| 150BTP | | | DR--PY | GTD | Sep25'15 Fri | RA | 1K | 1 | 1 $320 $0.00 | |
| 150C1T | | | DR--PY | GTD | Sep25'15 Fri | RA | 1K | 1 | 7 $340 $0.00 | |
| 150BS1 | | | BW-- | GTD | Sep25'15 Fri | IX | 1K | 1 | 4 $300 $0.00 | |
| 150BBL | | | DR--ZB | GTD | Sep25'15 Fri | RA | QQ | 1 | 5 $210 $0.00 | |
| 150BBM | | | DR--ZB | GTD | Sep25'15 Fri | RA | QQ | 1 | 9 $210 $0.00 | |
| 150BT1 | | | BK--JL | GTD | Sep25'15 Fri | RA | 1Q | 1 | 9 $288 $0.00 | |
| 150BSY | | | BW-- | GTD | Sep25'15 Fri | IX | QQ | 1 | 4 $330 $0.00 | |
| 150B4G | | | BW-- | GTD | Sep25'15 Fri | FX | 1K | 1 | 1 $30 $0.00 | BASE |
| 150BS3 | | | BW-- | GTD | Sep25'15 Fri | IX | 1K | 1 | 4 $300 $0.00 | |
| 150C44 | | | BW-- | GTD | Sep25'15 Fri | 3A | QQ | 1 | 2 $324 $0.00 | |
| 150BCJ | | | BW-- | GTD | Sep26'15 Sat | IX | 1K | 1 | 2 $340 $0.00 | |
| 150BBF | | | BW-- | GTD | Sep26'15 Sat | IX | QQ | 1 | 3 $360 $0.00 | |
| 150BWG | | | BW-- | GTD | Sep26'15 Sat | SC | QQ | 1 | 6 $360 $0.00 | |
| 150BD4 | | | BW-- | GTD | Sep26'15 Sat | IX | 1K | 1 | 1 $340 $0.00 | |
| 150C32 | | | BW-- | GTD | Sep26'15 Sat | 3A | 1Q | 1 | 3 $321 $0.00 | |
| 150BJ7 | | | BW-- | GTD | Sep26'15 Sat | 3A | QQ | 1 | 1 $324 $0.00 | |
| 150BJZ | | | BW-- | GTD | Sep26'15 Sat | 3A | 1Q | 1 | 5 $756 $0.00 | |
| 150B9H | | | BW-- | GTD | Sep26'15 Sat | C1 | 1K | 1 | 4 $289 $0.00 | |
| 150B9N | | | BW--4A | GTD | Sep26'15 Sat | 3A | QQ | 1 | 1 $224 $0.00 | |
| 150C3S | | | BW--ZB | GTD | Sep26'15 Sat | IX | KT | 607 | 5 $390 $0.00 | |
| 150B2H | | | DR--PY | GTD | Sep26'15 Sat | RA | 1Q | 1 | 4 $288 $0.00 | |
| 150C1Q | | | DR--PY | GTD | Sep26'15 Sat | RA | 1K | 1 | 2 $333 $0.00 | |
| 150C8S | | | DR--PY | HOLD | Sep26'15 Sat | RA | QE | 1 | 1 $0 $0.00 | |
| 150C8T | | | DR--PY | GTD | Sep26'15 Sat | RA | QE | 1 | 1 $430 $0.00 | |
| 150C6x | | | DR--PY | GTD | Sep26'15 Sat | RA | 1Q | 315 | 1 $380 $0.00 | |
| 150C3B | | | BW-- | GTD | Sep26'15 Sat | C1 | QQ | 1 | 6 $323 $0.00 | |
| 150B2J | | | BW-- | GTD | Sep26'15 Sat | C1 | 1Q | 1 | 5 $272 $0.00 | |
| 150BBG | | | BW-- | GTD | Sep26'15 Sat | 3A | 1K | 1 | 1 $306 $0.00 | |
| 150B19 | | | BW-- | GTD | Sep26'15 Sat | 3A | QQ | 1 | 6 $315 $0.00 | BASE |
| 150PFR | | | BW-- | GTD | Sep26'15 Sat | 3A | 1Q | 1 | 3 $342 $0.00 | |
| 150B4F | | | BW-- | GTD | Sep26'15 Sat | FX | 1K | 1 | 1 $30 $0.00 | BASE |
| 150C1P | | | DR--FY | GTD | Sep26'15 Sat | RA | 1K | 1 | 2 $333 $0.00 | |
| 150BBD | | | BW-- | GTD | Sep26'15 Sat | IX | QQ | 1 | 3 $360 $0.00 | |
| 150C8B | | | BW-- | GTD | Sep26'15 Sat | C1 | 1K | 1 | 5 $324 $0.00 | |
| 150B11 | | | BW-- | GTD | Sep29'15 Sat | C1 | QQ | 1 | 5 $296 $0.00 | |
| 150C1Y | | | BW-- | GTD | Sep27'15 Sun | IX | 1X | 1 | 5 $725 $0.00 | |
| 150B67 | | | BW-- | GTD | Sep27'15 Sun | 3A | 1Q | 1 | 3 $216 $0.00 | GOLD ELITE |
| 150C5R | | | BW-- | GTD | Sep27'15 Sun | QQ | 1 | 3 $306 $0.00 | |

Schedule 7.1.17

## Schedule 7.1.17 (continued)
## Bookings Report

Reservations Report

| Code |
|------|
| 150B74 |
| 150BRF |
| 150BWP |
| 1209PV |
| 1509PV |
| 150BX0 |
| 150C4S |
| 150CGV |
| +50B0R |
| 150B4G |
| 150C3X |
| 150C9K |
| 150BYB |
| 150BPH |
| 150BY0 |
| 150BY0 |
| 150B0S |
| 150C5Q |
| 137CDS |
| 150BE-49 |
| 150C50 |
| 150C58 |
| 150C33 |
| 150CBK |
| 150BX0 |
| 150BVW |
| 150BMW |
| 150BW7 |
| 150BW8 |
| 150BX7 |
| 150BX6 |
| 150BX3 |
| 150BQG |
| 150BMR |
| 150BMP |
| 150BQF |
| 150BQO |
| 150BSG |
| 150B50 |
| 150BSH |
| 150B4K |
| 150B9S |
| 150B5X |
| 150B43 |
| 150BC7 |
| 150C4Y |
| 150BT9 |
| 150BRQ |
| 150B0J |
| 150C56 |
| 150BQ6 |
| 150CJ0 |
| 150CHV |
| 150BJJ |
| 150BYX |
| 150CGJ |

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| BW-- | CTD | Sep27'15 Sun | 3A | QQ | | 1 | 3 | $233 | $0.00 | BASE |
| BW-- | GTD | Sep27'15 Sun | 3A | 1K | | 1 | 3 | $225 | $0.00 | GOLD ELITE |
| BW-- | GTD | Sep27'15 Sun | 1X | 1K | | 1 | 3 | $250 | $0.00 | |
| BW-- | CTD | Sep27'15 Sun | SC | 1K | | 1 | 2 | $234 | $0.00 | BASE |
| BW-- | CTD | Se-27'15 Sun | 9C | 1K | | 1 | 2 | $234 | $0.00 | BASE |
| BW-- | GTD | Sep28'15 Mon | Z8 | 1Q | | 1 | 4 | $238 | $0.00 | |
| BW-- | GTD | Sep28'15 Mon | 3A | 1Q | | 1 | 3 | $289 | $0.00 | |
| BW-- | GTD | Sep28'15 Mon | A0 | KT | | 1 | 5 | $269 | $0.00 | |
| BW-- | GTD | Sep28'15 Mon | 1X | QB | | 1 | 1 | $260 | $0.00 | |
| BW-- | GTD | Sep28'15 Mon | SC | 1K | | 1 | 3 | $242 | $0.00 | GOLD ELITE |
| BW-- | GTD | Sep28'15 Mon | 3A | 1Q | | 1 | 2 | $288 | $0.00 | |
| BW-- | GTD | Sep28'15 Mon | Z8 | KT | | 1 | 3 | $309 | $0.00 | BASE |
| BW-- | GTD | Sep28'15 Mon | 1X | 1K | | 1 | 2 | $280 | $0.00 | |
| DR--PY | GTD | Sep28'15 Mon | 1X | 1K | | 1 | 2 | $280 | $0.00 | |
| BW-- | GTD | Sep28'15 Mon | Z8 | 1Q | | 1 | 4 | $238 | $0.00 | |
| BW-- | GTD | Sep28'15 Mon | 1X | 1K | | 1 | 1 | $280 | $0.00 | |
| BW-- | GTD | Sep28'15 Mon | 1X | QB | | 1 | 1 | $260 | $0.00 | |
| DR--PY | GTD | Sep28'15 Mon | 1X | 1K | | 1 | 4 | $388 | $0.00 | |
| BW-- | GTD | Sep29'15 Tue | XZ | KT | | 1 | 2 | $369 | $0.00 | |
| BW-- | GTD | Sep29'15 Tue | XZ | 1K | | 1 | 1 | $252 | $0.00 | |
| BW-- | GTD | Sep29'15 Tue | XN | KT | | 1 | 1 | $284 | $0.00 | |
| BW-- | CTD | Sep29'15 Tue | XZ | 1Q | | 1 | 2 | $288 | $0.00 | |
| BW-- | GTD | Sep29'15 Tue | C1 | QQ | | 1 | 2 | $255 | $0.00 | |
| BW-- | GTD | Sep29'15 Tue | A0 | 1Q | | 1 | 2 | $264 | $0.00 | |
| BW-- | GTD | Sep29'15 Tue | 1X | 1K | | 1 | 1 | $280 | $0.00 | |
| BX--JL | GTD | Sep29'15 Tue | RA | 1Q | | 1 | 4 | $252 | $0.00 | |
| BW-- | GTD | Sep29'15 Tue | A0 | 1Q | | 1 | 1 | $252 | $0.00 | |
| BW-- | GTD | Sep29'15 Tue | 3A | QQ | | 1 | 3 | $270 | $0.00 | BASE |
| BW-- | GTD | Sep29'15 Tue | 3A | 1Q | | 1 | 3 | $252 | $0.00 | BASE |
| BW-- | GTD | Sep29'15 Tue | 1X | 1K | | 1 | 1 | $280 | $0.00 | |
| BW-- | GTD | Sep30'15 Wed | 1X | 1K | | 1 | 1 | $280 | $0.00 | |
| DR--PY | GTD | Sep30'15 Wed | RA | 1Q | | 1 | 1 | $252 | $0.00 | |
| BW-- | GTD | Sep30'15 Wed | 1X | 1K | | 1 | 1 | $280 | $0.00 | |
| DR--PY | GTD | Sep30'15 Wed | RA | 1K | | 1 | 1 | $252 | $0.00 | |
| DR--PY | GTD | Sep30'15 Wed | RA | 1K | | 1 | 3 | $252 | $0.00 | |
| BW-- | GTD | Sep30'15 Wed | 1X | 1K | | 1 | 1 | $280 | $0.00 | |
| BW-- | GTD | Sep30'15 Wed | 1X | 1K | | 1 | 1 | $280 | $0.00 | |
| DR--PY | GTD | Sep30'15 Wed | RA | 1Q | | 1 | 1 | $252 | $0.00 | |
| BW-- | GTD | Sep30'15 Wed | C1 | 1K | | 1 | 2 | $221 | $0.00 | |
| DR--PY | GTD | Sep30'15 Wed | RA | 1Q | | 1 | 1 | $252 | $0.00 | |
| BW-- | GTD | Sep30'15 Wed | XN | 1K | | 1 | 1 | $211 | $0.00 | |
| BW-- | GTD | Sep30'15 Wed | C1 | QQ | | 1 | 2 | $272 | $0.00 | |
| BW-- | GTD | Sep30'15 Wed | C1 | QB | | 1 | 1 | $221 | $0.00 | |
| BW-- | GTD | Sep30'15 Wed | XN | 1K | | 1 | 1 | $211 | $0.00 | |
| DR--PY | GTD | Oct 1'15 Thu | RA | QQ | | 1 | 3 | $280 | $0.00 | |
| BW-- | GTD | Oct 1'15 Thu | 3A | 1K | | 1 | 24 | $252 | $0.00 | |
| BW-- | GTD | Oct 1'15 Thu | 3A | 1K | | 1 | 1 | $252 | $0.00 | BASE |
| BW-- | GTD | Oct 1'15 Thu | 3A | 1Q | | 1 | 6 | $260 | $0.00 | |
| BW-- | GTD | Oct 1'15 Thu | SC | 1K | | 1 | 7 | $234 | $0.00 | DIAMOND |
| BW-- | GTD | Oct 1'15 Thu | SC | QQ | | 1 | 3 | $288 | $0.00 | BASE |
| DR--PY | GTD | Oct 2'15 Fri | RA | 1Q | | 1 | 4 | $234 | $0.00 | |
| BW-- | GTD | Oct 2'15 Fri | C1 | 1K | | 1 | 3 | $187 | $0.00 | |
| BW-- | GTD | Oct 2'15 Fri | C1 | QB | | 1 | 2 | $187 | $0.00 | |
| DR--PY | GTD | Oct 2'15 Fri | RA | 1K | | 1 | 6 | $260 | $0.00 | |
| BW--ED | GTD | Oct 2'15 Fri | RA | 1K | | 1 | 1 | $234 | $0.00 | |
| BW--AA | GTD | Oct 2'15 Fri | RA | QQ | | 1 | 2 | $270 | $0.00 | |

**Schedule 7.1.17 (continued)**
**Bookings Report**

Reservations Report

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| BW-- | GTD | Oct 3'15 Fri | 3A | QQ | | 1 | 2 | $334 | $0.00 | BASE |
| DR--PY | GTD | Oct 3'15 Sat | RA | 1Q | | 1 | 5 | $225 | $0.00 | |
| BW-- | GTL | Oct 3'15 Sat | 3A | QE | | 1 | 3 | $261 | $0.00 | |
| DR--PY | GTD | Oct 3'15 Sat | PA | 1K | | 1 | 3 | $225 | $0.00 | |
| BW-- | GTD | Oct 3'15 Sat | C1 | 1K | | 1 | 7 | $238 | $0.00 | |
| BW-- | GTD | Oct 3'15 Sat | 3A | QQ | | 1 | 3 | $288 | $0.00 | |
| BW--JL | GTD | Oct 3'15 Sat | CK | QQ | | 1 | 3 | $270 | $0.00 | BASE |
| BW--JL | GTD | Oct 3'15 Sat | CK | 1Q | | 1 | 3 | $252 | $0.00 | BASE |
| BW-- | GTD | Oct 3'15 Sat | 3A | KT | | 1 | 3 | $297 | $0.00 | GOLD ELITE |
| BW-- | GTD | Oct 3'15 Sat | XZ | 1F | | 1 | 3 | $288 | $0.00 | |
| BW-- | GTD | Oct 3'15 Sat | 3A | 1K | | 1 | 2 | $252 | $0.00 | |
| BW-- | GTE | Oct 3'15 Sat | CK | QQ | | 1 | 2 | $288 | $0.00 | |
| DR--PY | GTD | Oct 3'15 Sat | RA | 1K | | 1 | 1 | $225 | $0.00 | |
| BW-- | GTD | Oct 3'15 Sat | 3A | 1K | | 1 | 3 | $252 | $0.00 | |
| BW-- | GTD | Oct 4'15 Sun | 3A | 1Q | | 1 | 4 | $225 | $0.00 | BASE |
| BW-- | GTD | Oct 4'15 Sun | XZ | 1K | | 1 | 5 | $225 | $0.00 | |
| BW-- | GTD | Oct 4'15 Sun | C1 | QF | | 1 | 5 | $213 | $0.00 | |
| DR--PY | GTD | Oct 4'15 Sun | RA | QQ | | 1 | 1 | $270 | $0.00 | |
| DR--PY | GTD | Oct 4'15 Sun | RA | 1K | | 1 | 3 | $207 | $0.00 | |
| DR--PY | GTD | Oct 4'15 Sun | RA | 1K | | 1 | 4 | $225 | $0.00 | |
| BW-- | GTD | Oct 4'15 Sun | 3A | 1K | | 1 | 6 | $234 | $0.00 | BASE |
| DR--PY | GTD | Oct 4'15 Sun | RA | QE | | 1 | 3 | $260 | $0.00 | |
| DR--PY | GTD | Oct 4'15 Sun | RA | QQ | | 1 | 3 | $270 | $0.00 | |
| DR--PY | GTD | Oct 4'15 Sun | RA | QQ | | 1 | 3 | $270 | $0.00 | |
| DR--PY | GTD | Oct 4'15 Sun | PA | QQ | | 1 | 3 | $225 | $0.00 | |
| BW-- | GTD | Oct 5'15 Mon | C1 | 1K | | 1 | 4 | $225 | $0.00 | |
| DR--PY | GTD | Oct 5'15 Mon | RA | 1K | | 1 | 4 | $220 | $0.00 | |
| DR--PY | GTD | Oct 5'15 Mon | RA | 1Q | | 1 | 2 | $220 | $0.00 | |
| DR--PY | GTD | Oct 5'15 Mon | RA | 1K | | 1 | 2 | $198 | $0.00 | |
| BW-- | GTD | Oct 5'15 Mon | FX | QF | | 1 | 1 | $90 | $0.00 | |
| DR--PY | GTD | Oct 5'15 Mon | RA | 1K | | 1 | 7 | $198 | $0.00 | |
| DR--PY | GTD | Oct 5'15 Mon | RA | 1K | | 1 | 7 | $270 | $0.00 | |
| BW-- | GTD | Oct 5'15 Mon | C1 | 1K | | 1 | 3 | $213 | $0.00 | |
| BW-- | GTD | Oct 5'15 Mon | XZ | 1Q | | 1 | 3 | $225 | $0.00 | |
| BW-- | GTD | Oct 5'15 Mon | XZ | 1K | | 1 | 3 | $225 | $0.00 | |
| BW-- | GTD | Oct 5'15 Mon | C1 | 1K | | 1 | 2 | $213 | $0.00 | |
| BW-- | GTD | Oct 6'15 Tue | 3A | QQ | | 1 | 8 | $261 | $0.00 | PLATINUM |
| BW-- | GTD | Oct 6'15 Tue | C1 | QQ | | 1 | 5 | $366 | $0.00 | BASE |
| BW-- | GTD | Oct 6'15 Tue | C1 | QB | | 1 | 2 | $270 | $0.00 | |
| BW-- | GTD | Oct 6'15 Tue | C1 | QB | | 1 | 2 | $270 | $0.00 | |
| BW--JL | GTD | Oct 6'15 Tue | 3A | 1K | | 1 | 2 | $252 | $0.00 | BASE |
| BW-- | GTD | Oct 6'15 Tue | 1K | QQ | | 1 | 5 | $300 | $0.00 | |
| BW-- | GTD | Oct 7'15 Wed | C1 | 1K | | 1 | 3 | $213 | $0.00 | |
| BW-- | GTD | Oct 7'15 Wed | 3A | 1K | | 1 | 3 | $345 | $0.00 | BASE |
| BW-- | GTD | Oct 7'15 Wed | RA | QQ | | 1 | 3 | $300 | $0.00 | BASE |
| BW-- | GTD | Oct 7'15 Wed | 1X | 1K | | 1 | 1 | $250 | $0.00 | |
| BW-- | GTD | Oct 7'15 Wed | 1X | 1K | | 1 | 3 | $250 | $0.00 | |
| BW--JL | GTD | Oct 7'15 Wed | SC | 1K | | 1 | 3 | $225 | $0.00 | BASE |
| BW-- | GTD | Oct 7'15 Wed | C1 | QQ | | 1 | 3 | $260 | $0.00 | |
| BW-- | GTD | Oct 7'15 Wed | 1X | QQ | | 1 | 3 | $260 | $0.00 | |
| BW-- | GTD | Oct 7'15 Wed | 1X | QQ | | 1 | 3 | $290 | $0.00 | |
| BW-- | GTD | Oct 7'15 Wed | 3A | 1K | | 1 | 3 | $275 | $0.00 | |
| DP--PY | GTD | Oct 7'15 Wed | RA | 1Q | | 1 | 3 | $250 | $0.00 | |
| BW-- | GTD | Oct 8'15 Thu | 3A | 1K | | 1 | 5 | $288 | $0.00 | |
| BW-- | GTD | Oct 8'15 Thu | 3A | QQ | | 1 | 1 | $288 | $0.00 | |
| BW-- | GTD | Oct 8'15 Thu | 3A | 1K | | 1 | 3 | $252 | $0.00 | |

### Schedule 7.1.17 (continued)
### Bookings Report

Reservation Report

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 150CHD | | | BW-- | GTD | Oct 915 Fri | 3A | 1K | | | 7 | $270 | $0.00 | BASE |
| 150C2X | | | BW-- | GTD | Oct 915 Fri | 3A | QQ | | | 3 | $279 | $0.00 | |
| 1508ST | | | BW-- | GTD | Oct 915 Fri | 1X | QQ | | 1 | 2 | $300 | $0.00 | |
| 150CBD | | | BW-- | GTD | Oct 915 Fri | 3A | 1K | | 1 | 3 | $288 | $0.00 | |
| 150bWF | | | BW-- | GTD | Oct 915 Fri | 1X | 1K | | 1 | 3 | $290 | $0.00 | BASE |
| 150C4F | | | BW-- | GTD | Oct 915 Fri | 3A | 1K | | 1 | 3 | $261 | $0.00 | GOLD ELITE |
| 150B30 | | | BW-- | GTD | Oct 915 Fri | CK | 1K | | 1 | 2 | $252 | $0.00 | BASE |
| 150BD5 | | | BW-- | GTD | Oct 915 Fri | 3A | 1K | | 1 | 2 | $252 | $0.00 | BASE |
| 150C2J | | | BW-- | GTD | Oct 915 Fri | 3A | QQ | | 1 | 2 | $288 | $0.00 | BASE |
| 150BX0 | | | BW-- | GTD | Oct1015 Sat | C1 | QQ | | | 1 | $306 | $0.00 | |
| 150C9X | | | BW-- | GTD | Oct1015 Sat | 1X | QQ | | 1 | 2 | $380 | $0.00 | |
| 150BHD | | | BW-- | GTD | Oct1015 Sat | 1X | 1K | | 1 | 3 | $280 | $0.00 | |
| 150B44 | | | BW-- | GTD | Oct1015 Sat | 3A | 1K | | 1 | 3 | $252 | $0.00 | BASE |
| 150BRI | | | BW-- | GTD | Oct1015 Sat | CK | QQ | | | 3 | $288 | $0.00 | BASE |
| 150BLJ | | | BW-- | GTD | Oct1015 Sat | C1 | QQ | | | 2 | $272 | $0.00 | |
| 150BV6 | | | BW--PY | GTD | Oct1015 Sat | RA | KT | | 704 | 2 | $291 | $0.00 | BASE |
| 150C0W | | | BW-- | GTD | Oct1015 Sat | 3A | 1K | | 1 | 3 | $281 | $0.00 | |
| 150BV7 | | | BW-- | GTD | Oct1015 Sat | 3A | QQ | | 1 | 4 | $288 | $0.00 | |
| 150B3V8 | | | BW-- | GTD | Oct1015 Sat | SC | QQ | | | 4 | $288 | $0.00 | |
| 150BVB | | | DR--P\ | GTD | Oct1015 Sat | RA | QE | | 1 | 1 | $310 | $0.00 | |
| 150C7D | | | BW-- | GTD | Oct1015 Sat | C1 | QQ | | 1 | 5 | $298 | $0.00 | |
| 150BR8 | | | DR--JL | GTD | Oct1115 Sun | 3A | QQ | | 1 | 4 | $252 | $0.00 | |
| 150BR6 | | | DR--JL | GTD | Oct1115 Sun | 3A | QQ | | 1 | 4 | $252 | $0.00 | |
| 150CD9 | | | BW-- | GTD | Oct1115 Sun | 1X | 1K | | 1 | 5 | $260 | $0.00 | |
| 150BQW | | | BW-- | GTD | Oct1215 Mon | 1X | 1K | | 1 | 5 | $260 | $0.00 | |
| 150BHT | | | BW-- | GTD | Oct1215 Mon | 3A | QQ | | 1 | 3 | $261 | $0.00 | BASE |
| 150CB6 | | | BW-- | GTD | Oct1215 Mon | C1 | QQ | | 1 | 7 | $247 | $0.00 | |
| 150C8M | | | BW-- | GTD | Oct1315 Tue | 1K | 1K | | 1 | 2 | $252 | $0.00 | |
| 150BQV | | | BW-- | GTD | Oct1315 Tue | SC | 1Q | | 1 | 4 | $252 | $0.00 | BASE |
| 150BL4 | | | BW-- | GTD | Oct1315 Tue | 3A | 1K | | 1 | 4 | $252 | $0.00 | BASE |
| 150BX5 | | | BW-- | GTD | Oct1315 Tue | 3A | QQ | | 1 | 3 | $270 | $0.00 | |
| 150B7J | | | BW--PY | GTD | Oct1315 Tue | 3A | 1F | | 1 | 4 | $234 | $0.00 | |
| 150CC7 | | | DR--PY | GTD | Oct1315 Tue | 3A | 1K | | 1 | 3 | $360 | $0.00 | |
| 150BR3 | | | BW-- | GTD | Oct1415 Wed | FX | 1K | | 1 | 1 | $30 | $0.00 | PLATINUM |
| 150CFJ | | | BW-- | GTD | Oct1415 Wed | FX | 1K | | 1 | 1 | $224 | $0.00 | |
| 150CF2 | B00B15 | | DR--ZB | HOLD | Oct1415 Wed | CD | 1K | | 1 | 5 | $269 | $0.00 | |
| 150C8H | | | BW-- | GTD | Oct1415 Wed | AO | 1K | | 1 | 1 | $224 | $0.00 | |
| 1509VK | | | BW-- | GTD | Oct1415 Wed | RA | 1Q | | 1 | 2 | $280 | $0.00 | |
| 1509VL | | | BW-- | GTD | Oct1415 Wed | RA | 1Q | | 1 | 2 | $280 | $0.00 | |
| 150C4G | | | BW-- | GTD | Oct1415 Wed | AO | KT | | 1 | 2 | $248 | $0.00 | |
| 150CFT | | | BW-- | GTD | Oct1415 Wed | RA | 1Q | | 1 | 3 | $230 | $0.00 | DIAMOND |
| 150CC2 | | | BW-- | GTD | Oct1415 Wed | 3A | QQ | | 1 | 4 | $297 | $0.00 | |
| 150B34 | | | BW-- | GTD | Oct1415 Wed | 3A | 1K | | 1 | 4 | $252 | $0.00 | |
| 150CF1 | B00B15 | | DR--ZB | HOLD | Oct1415 Wed | CD | 1K | | 1 | 5 | $269 | $0.00 | |
| 150CFQ | | | DR--PY | GTD | Oct1415 Wed | RA | 1K | | 1 | 4 | $252 | $0.00 | |
| 150C7Q | | | BW-- | GTD | Oct1515 Thu | 3A | 1F | | 1 | 3 | $252 | $0.00 | BASE |
| 150CFG | | | DR--JL | GTD | Oct1515 Thu | 3A | QQ | | 1 | 3 | $209 | $0.00 | BASE |
| 150C1H | | | BW-- | GTD | Oct1515 Thu | 3A | 1K | | 1 | 3 | $252 | $0.00 | BASE |
| 150B4R | | | BW-- | GTD | Oct1515 Thu | Z8 | 1K | | 1 | 1 | $231 | $0.00 | |
| 150CHF | | | BW-- | GTD | Oct1615 Fri | 3A | 1K | | 1 | 3 | $270 | $0.00 | BASE |
| 150BP3 | | | BW-- | GTD | Oct1615 Fri | SC | QQ | | 1 | 2 | $270 | $0.00 | BASE |
| 150B4J | | | BW-- | GTD | Oct1615 Fri | 3A | KT | | 1 | 1 | $270 | $0.00 | |
| 1509W0 | | | BW-- | GTD | Oct1615 Fri | 1X | 1K | | 1 | 2 | $280 | $0.00 | |
| 1508AF | | | SA--EL | GTD | Oct1615 Fri | CD | QQ | | 1 | 2 | $199 | $0.00 | |
| 150CB8 | | | BW-- | GTD | Oct1615 Fri | 3A | 1K | | 1 | 2 | $252 | $0.00 | BASE |
| 150CB9 | | | BW-- | GTD | Oct1615 Fri | 3A | 1K | | 1 | 2 | $252 | $0.00 | BASE |

**Schedule 7.1.18**
**List of Environmental Reports**

1.    Phase I Environmental Site Assessment prepared by EBI Consulting; dated October 13, 2015.

**Schedule 7.1.22**
**Improvement Work and Alterations**

None

# <u>EXHIBIT B</u>

75640847.1

**The Howard Hughes Corporation**
Corporate Office
One Galleria Tower
Suite 950
13355 Noel Road
Dallas, TX 75240

T 214.741.7744
F 972.392.6290
peter.riley@howardhughes.com

**Peter F. Riley**
*General Counsel*

November 24, 2015

<u>Via E-Mail</u>

Scott Gautier
Robins Kaplan LLP
2049 Century Park East, Suite 3400
Los Angeles, CA 90067

Re:    <u>Bid Letter for 33 Peck Slip</u>
       <u>Chapter 11 Case No. 15-12479 (JLG)</u>

Dear Mr. Gautier:

Enclosed is our executed Modified Purchase Agreement (MPA) with a qualifying minimum bid of $38,300,000 pursuant to the Court-ordered sales procedures. We would like to participate as a Qualified Bidder for the above referenced Property at the auction scheduled for December 1, 2015 at 11:00am (EDT) at the United States Bankruptcy Court for the Southern District of New York, Courtroom 601, One Bowling Green, New York, NY 10004.

The Howard Hughes Corporation is a NYSE-listed company trading under the symbol HHC. We currently have a market capitalization of approximately $5 Billion. As you can see from the attached balance sheet that was included in our most recent 10-Q, The Howard Hughes Corporation has sufficient cash on hand to close this transaction. As you may also know, we are currently developing a $400 million project at The South Street Seaport two blocks to the south of the Property.

We have included a temporary condition in our executed MPA that I would like to bring to your attention. The agreement is still subject to the approval of our Board of Directors, which will be meeting to consider the matter before we submit the required Good Faith Deposit on November 30, 2015. If the Board of Directors approves by that date, the condition is inapplicable.

Assuming we obtain board approval and submit our deposit on November 30, 2015, I trust that the Debtors will deem us a Qualified Bidder. Please let me know if you require any further information.

Sincerely,

Peter F. Riley
General Counsel

#12532 v2

Table of Contents

## THE HOWARD HUGHES CORPORATION

## CONDENSED CONSOLIDATED BALANCE SHEETS

### UNAUDITED

| | September 30, 2015 | December 31, 2014 |
|---|---|---|
| | (In thousands, except share amounts) | |
| **Assets:** | | |
| Investment in real estate: | | |
| Master Planned Community assets | $ 1,672,763 | $ 1,641,063 |
| Land | 305,634 | 317,211 |
| Buildings and equipment | 1,478,489 | 1,243,979 |
| Less: accumulated depreciation | (213,040) | (157,182) |
| Developments | 1,205,124 | 914,303 |
| Net property and equipment | 4,448,970 | 3,959,374 |
| Investment in Real Estate and Other Affiliates | 56,191 | 53,686 |
| Net investment in real estate | 4,505,161 | 4,013,060 |
| Cash and cash equivalents | 450,647 | 560,451 |
| Accounts receivable, net | 32,051 | 28,190 |
| Municipal Utility District receivables, net | 136,196 | 104,394 |
| Notes receivable, net | 23,610 | 28,630 |
| Deferred expenses, net | 73,263 | 75,070 |
| Prepaid expenses and other assets, net | 323,596 | 310,136 |
| Total assets | $ 5,544,524 | $ 5,119,931 |
| | | |
| **Liabilities:** | | |
| Mortgages, notes and loans payable | $ 2,322,296 | $ 1,993,470 |
| Deferred tax liabilities | 84,214 | 62,205 |
| Warrant liabilities | 308,630 | 366,080 |
| Uncertain tax position liability | 4,823 | 4,653 |
| Accounts payable and accrued expenses | 489,035 | 466,017 |
| Total liabilities | 3,208,998 | 2,892,425 |
| | | |
| Commitments and Contingencies (see Note 15) | | |
| | | |
| **Equity:** | | |
| Preferred stock: $.01 par value; 50,000,000 shares authorized, none issued | — | — |
| Common stock: $.01 par value; 150,000,000 shares authorized, 39,714,838 shares issued and outstanding as of September 30, 2015 and 39,638,094 shares issued and outstanding as of December 31, 2014 | 398 | 396 |
| Additional paid-in capital | 2,845,021 | 2,838,013 |
| Accumulated deficit | (506,096) | (606,934) |
| Accumulated other comprehensive loss | (7,569) | (7,712) |
| Total stockholders' equity | 2,331,754 | 2,223,763 |
| Noncontrolling interests | 3,772 | 3,743 |
| Total equity | 2,335,526 | 2,227,506 |
| Total liabilities and equity | $ 5,544,524 | $ 5,119,931 |

See Notes to Condensed Consolidated Financial Statements.

3