# EXHIBIT A

12-8-15 redline of Fortuna bid PSA vs Bridgeton signed PSA

# HOTEL PURCHASE AND SALE AGREEMENT

**Dated as of ~~September 2,~~December ___, 2015**

**By and Between**

**GEMINI 37 WEST 24TH STREET MT, LLC,**
**a Delaware limited liability company**
**as the Seller**

**and**

**~~BRIDGETON ACQUISITIONS~~FORTUNA 37 WEST 24TH STREET LLC,**
**a ~~Delaware~~Delaware limited liability company**
**as the Purchaser**

## HOTEL PURCHASE AND SALE AGREEMENT

**THIS HOTEL PURCHASE AND SALE AGREEMENT** (this "Agreement") is entered into as of the ~~2nd~~____ day of ~~September~~December, 2015 (the "Effective Date"), by and between GEMINI 37 WEST 24TH STREET MT, LLC, a Delaware limited liability company (the "Seller"), and ~~BRIDGETON ACQUISITIONS~~FORTUNA 37 WEST 24TH STREET LLC, a ~~Delaware~~Delaware limited liability company, or its assigns (the "Purchaser").

### RECITALS:

**A.**     The Seller is the owner of the land more particularly described on **Exhibit "A"** attached hereto and made a part hereof (the "Land").

**B.**     ~~.~~The Seller is the owner of the hotel located on the Land and commonly known as Wyndham Garden, consisting of approximately one hundred twenty-four (124) guest rooms and two (2) one bedroom suites (the "Hotel") and certain other on-site improvements and facilities with an address at 37 West 24th Street, New York, New York (collectively, the Real Property, Easements, Improvements, Personal Property, Leases, Governmental Permits, Operating Contracts and Intangible Property  (all such terms as hereafter defined) are hereafter referred to as the "Property").

**C.**     The Seller ~~will file~~has filed a petition under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court")

**D.**     The Seller desires to sell the Property to the Purchaser, and the Purchaser desires to purchase the Property from the Seller, on the terms and conditions set forth below in this Agreement, in accordance with and pursuant to section 105, 363 and 365 of the Bankruptcy Code.

### AGREEMENT:

**NOW, THEREFORE**, in consideration of the foregoing Recitals, and the mutual agreements herein set forth, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Seller and the Purchaser agree as follows:

### ~~ARTICLE 1~~

### ARTICLE 1
### DEFINED TERMS AND THE PROJECT

1.1     **Defined Terms**

"Accepted Equipment Leases" shall have the meaning assigned thereto in Section 1.2.8.

"Accepted Operating Contracts" shall have the meaning assigned thereto in Section 1.2.8.

"Accounts Receivable" shall have the meaning assigned thereto in Section 7.1.2.

"Adjustment Time" shall have the meaning assigned thereto in Section 7.1.

"Advance Reservations" shall mean reservations and agreements made or entered into by the Seller and/or the Manager or Sub-Manager prior to the Closing and to be assumed by the Purchaser for hotel rooms or meeting rooms to be utilized after the Closing, or for catering services or other hotel services to be provided at the Hotel after the Closing.

"Adjustment TimeAgreement" shall have the meaning assigned thereto in the Preamble of this Agreement.

"Allocation" shall have the meaning assigned thereto in Section 7.1.2.2.

"Bankruptcy Case" shall have the meaning assigned thereto in Section 6.1.

"Bankruptcy Code" shall have the meaning assigned thereto in the Recitals.

"Bankruptcy Court" shall have the meaning assigned thereto in the Recitals.

"Books" shall have the meaning assigned thereto in Section 1.2.7.

"Broker" shall have the meaning assigned thereto in Section 9.1.

"Casualty Loss" shall have the meaning assigned thereto in Section 11.1.

"Casualty Notice" shall have the meaning assigned thereto in Section 11.1.

"Casualty Termination Notice" shall have the meaning assigned thereto in Section 11.2.1.

"Claiming Party" shall have the meaning assigned thereto in Section 6.4.

"Closing" shall have the meaning assigned thereto in Section 2.4.

"Closing Date" shall have the meaning assigned thereto in Section 2.4.

"Closing Documents" shall have the meaning assigned thereto in Section 5.1.

"COBRA" shall have the meaning assigned thereto in Section 7.1.15.8.

"Code" shall have the meaning assigned thereto in Section 7.1.15.8.

"Condemnation Termination Notice" shall have the meaning assigned thereto in Section 11.3.

"Confirmation Order" shall mean an order entered by the Bankruptcy Court confirming a plan of reorganization that contains, among other things, provisions for the sale of the Property hereunder.

"Consumable Inventories" shall mean all merchandise, food and beverages owned by the Seller or the Manager or (if paid for by Seller or the Manager) the Sub-Manager as of the Closing Date and held for sale or otherwise for consumption in connection with the operation of the Property, including, but not limited to (i) food, (ii) liquor, beer, wine, and other beverages, and (iii) inventory in any minibar, gift shop or other retail facility in the Hotel.

"Current Tax Year" shall have the meaning assigned thereto in Section 7.1.5.

"DDI Delivery Date" shall have the meaning assigned thereto in Section 3.1.

"Deed" shall mean the Bargain and Sale Deed Without Covenant Against Grantor's Acts, as further described in Section 5.1.1.

"Defaulting Party" shall have the meaning assigned thereto in Section 6.4.

"Deposits" shall have the meaning assigned thereto in Section 1.2.4.

"Due Diligence Materials" shall have the meaning assigned thereto in Section 3.1.

"Earnest Money" shall have the meaning assigned thereto in Section 2.3

"Easements" shall have the meaning assigned thereto in Section 1.2.2.1.2.1.

"Effective Date" shall have the meaning assigned thereto in the Preamble of this Agreement.

"Email" shall have the meaning assigned thereto in Section 15.2.

"Employee Benefits" shall have the meaning assigned thereto in Section 7.1.15.4.

"Environmental Laws" shall have the meaning assigned thereto in Section 12.10.

"Environmental Reports" shall have the meaning assigned thereto in Section 12.10.

"ERISA" shall have the meaning assigned thereto in Section 7.1.15.7.

"Escrow Agent" shall mean the Title Company.

"Equipment Leases" shall have the meaning assigned thereto in Section 1.2.3, and

"Excluded Intangible Property" shall have the meaning assigned thereto in Section 1.2.7.

"Excluded Personal Property" shall have the meaning assigned thereto in Section 1.2.3.

"Existing Survey" shall have the meaning assigned thereto in Section 4.1.

"FAMLA" shall have the meaning assigned thereto in Section 7.1.15.9.

"FF&E" shall mean all personal property, fixtures, furnishings, equipment, chattels, furniture, appliances, apparatus, fittings, machinery, apparatus, building supplies, pools, files, vehicles and records, and all other articles of tangible personal property owned by the Seller or the Manager or (if paid for by Seller or the Manager) the Sub-Manager and located on the Real Property on the date hereof and used or usable in connection with any part of the Hotel, subject to depletion and including such resupplies as shall occur and be made in the Ordinary Course of Business, and including without limitation all such items (or portions thereof or parts therefor) currently held for repair, replacement or restoration.

"Free and Clear" shall have the meaning assigned thereto in Section 6.1.

"FRG Assignee" shall have the meaning assigned thereto in Section 15.3(b).

"Governmental Authority" shall have the meaning assigned thereto in Section 7.1.5. or "governmental authority" shall mean any Federal, State or City governmental authority, commission, body, agency, department or office having jurisdiction over the Property or any part thereof, any existing or intended uses of or activities at the Property, or Seller.

"Governmental Permits" shall have the meaning assigned thereto in Section 1.2.5.

"Hazardous Substances" shall have the meaning assigned thereto in Section 12.10.

"Hotel" shall have the meaning assigned thereto in the Recitals of this Agreement.

"Improvements" shall have the meaning assigned thereto in Section 1.2.2.

"Intangible Property" shall have the meaning assigned thereto in Section 1.2.7.

"Land" shall have the meaning assigned thereto in the Recitals to this Agreement.

"Leases" shall have the meaning assigned thereto in Section 1.2.4.

"Limitation Amount" shall have the meaning assigned thereto in Section 12.18.

"Liquor License PeriodProperty" shall have the meaning assigned thereto in Section 1.2.7.14.1(b).

"Liquor Licenses" shall have the meaning assigned thereto in Section 14.1.

"Litigations and Actions" shall have the meaning assigned thereto in Section 12.2.

"Losses" shall have the meaning assigned thereto in Section 10.3(b).

"Management Agreement" or "management arrangements" shall have the meaning assigned thereto in Section 1.2.6.

"Manager" shall have the meaning assigned thereto in Section 1.2.6.

"Material Portion" shall have the meaning assigned thereto in Section 11.3.

"Multiemployer Pension Plan" shall have the meaning assigned thereto in Section 7.1.15.7.

"Notice" shall have the meaning assigned thereto in Section 15.2.

"NYS Tax Department" shall have the meaning assigned thereto in Section 15.21.

"Operating Contracts" shall have the meaning assigned thereto in Section 1.2.6.

"Operating Equipment" shall mean all supplies and other materials used or intended for use, but not for sale, in connection with the Property which are now or later may be placed upon or used in connection with the operation of the Property regardless of whether enumerated herein, including, without limitation, all china, glassware, silverware, table and bed linens, uniforms, works of art, towels, telephones, TVs, VCRs, DVD players, CD players, Blue Ray equipment, radios, hair dryers, bedding, window treatments, floor coverings, safety equipment supplies, excluding Supply Inventories, and including without limitation all such items (or portions thereof or parts therefor) currently held for repair, replacement or restoration.

"Operations Settlement" shall have the meaning assigned thereto in Section 7.1.

"Ordinary Course of Business" shall mean maintenance of the Property in the condition, and operation of the hotel business conducted thereon, in a manner consistent with the manner in which the Property has been maintained and such hotel business been conducted during the twelve (12) months preceding the date of the most recent financial report delivered to the Purchaser, including, without limitation, booking Advance Reservations in accordance with rate schedules similar to those employed at the Property during the preceding twelve (12) months, and with hotel management practices during such preceding twelve (12) months.

"Overnight Delivery" shall have the meaning assigned thereto in Section 15.2.

"Payables" shall have the meaning assigned thereto in Section 7.1.1.

"Permitted Exceptions" shall have the meaning assigned thereto in Section 4.3.

"Personal Property" shall have the meaning assigned thereto in Section 1.2.3.

"Plans and Studies" shall have the meaning assigned thereto in Section 1.2.7.

"Property" shall have the meaning assigned thereto in the Preamble of this Agreement.

"Property Information" shall have the meaning assigned thereto in Section 15.7(d).

"Property Taxes" shall mean all non-delinquent real property taxes, assessments and other governmental imposition of any kind or nature, including without limitation, any special assessment or similar charges, as further defined in Section 7.1.5.

"Purchase Price" shall have the meaning assigned thereto in Section 2.1

"Purchased Contracts" shall have the meaning assigned thereto in Section 1.3(b)(ii).

"Purchaser" shall have the meaning assigned thereto in the Preamble of this Agreement.

"Purchaser-Related Entities" shall have the meaning assigned thereto in Section 10.3(b).

"Purchaser's Affiliate" shall have the meaning assigned thereto in Section 15.3.

"Purchaser's Agent" shall have the meaning assigned thereto in Section 7.1.15.1.

"Purchaser's Knowledge" and "Knowledge of the Purchaser" shall have the meaning assigned thereto in Section 13.10.

"Purchaser's Post-Closing Matters" shall have the meaning assigned thereto in Section 10.4.

"Purchaser's Representatives" shall have the meaning assigned thereto in Section 15.7(d).

"Purchaser Update Certificate" shall have the meaning assigned thereto in Section 13.9.

"Real Estate Transfer Tax Returns" shall have the meaning assigned thereto in Section 5.3.2.

"Real Property" shall have the meaning assigned thereto in Section 1.2.1.

"Rejected Equipment Leases" shall have the meaning assigned thereto in Section 1.2.8.

"Rejected Operating Contracts" shall have the meaning assigned thereto in Section 1.2.8.

"RPT" shall have the meaning assigned thereto in Section 5.3.2.

"Sale Hearing" shall have the meaning assigned thereto in Section 6.1.

"Sale Motion" shall have the meaning assigned thereto in Section 1.3(c).

"Sale Order" shall mean an order of the Bankruptcy Court approving the sale of the Property.  If no separate "Sale Hearing" is held (as defined in the Sale Procedures Order) prior to the entry of the Confirmation Order, the Confirmation Order shall constitute the Sale Order.

"Sale Procedures Order" shall have the meaning assigned thereto in Section 6.1.

"Seller" shall have the meaning assigned thereto in the Preamble of this Agreement.

"Seller Encumbrance" shall have the meaning assigned thereto in Section 4.4(a)

"Seller Organizational Documents" shall have the meaning assigned thereto in Section 1.2.7.

"Seller's Contracts" shall have the meaning assigned thereto in Section 1.3(a).

"Seller's Knowledge" and "Knowledge of the Seller" shall have the meaning assigned thereto in Section 12.16.

"Seller's Post-Closing Matters" shall have the meaning assigned thereto in Section 10.3(a).

"Seller-Related Entities" shall have the meaning assigned thereto in Section 10.4(b).

"Seller Update Certificate" shall have the meaning assigned thereto in Section 12.17.

"Sub-Manager" shall have the meaning assigned thereto in Section 1.2.6.

"Sub-Management Agreement" shall have the meaning assigned thereto in Section 1.2.6.

"Successful Bidder" has the meaning set forth in the Sale Motion.

"Supply Inventories" shall mean (i) engineering supplies, (ii) food and beverage service supplies, (iii) guest and guest room supplies, (iv) housekeeping supplies, (v) dry cleaning supplies and (vi) office supplies.

"Surety Period" shall have the meaning assigned thereto in Section 7.1.15.7.

"Taking" shall have the meaning assigned thereto in Section 11.3.

"Title Commitment" shall have the meaning assigned thereto in Section 4.1(a).

"Title Company" shall mean Kensington Vanguard National Land Services, as agent for First American Title Insurance Company.

"Title Exam Deadline" shall have the meaning assigned thereto in Section 4.4(a).

"Title Objection" shall have the meaning assigned thereto in Section 4.4(a).

"Title Policy" shall have the meaning assigned thereto in Section 4.1(a).

"Transaction" shall have the meaning assigned thereto in Section 6.1.

"Updated Survey" shall have the meaning assigned thereto in Section 4.1.

"UST Guidelines" means the "Operating Guidelines and Reporting Requirements for Debtor's In Possession and Trustees (Revised 11/27/13)" promulgated by the Office of the United States Trustee for the Southern District of New York and applicable in the Bankruptcy Case.

"Violation" shall have the meaning assigned thereto in Section 4.3(b).

"WARN Act" shall have the meaning assigned thereto in Section 7.1.15.2.

"<u>Warranties and Guaranties</u>" shall have the meaning assigned thereto in Section 1.2.7.

"<u>Withdrawal Liability</u>" shall have the meaning assigned thereto in Section 7.1.15.7.

"Wyndham Franchise Agreement" shall have the meaning assigned hereto in Section 1.5.

1.2    **Purchase and Sale**.  The Seller agrees to sell, assign, transfer, grant and convey the Property to the Purchaser, and the Purchaser agrees to purchase the Property from the Seller, for the Purchase Price and upon the terms and conditions herein set forth, which Property consists of the following:

1.2.1    **Real Property**.  The Land, together with (i) all air rights, riparian rights, easements, rights-of-way, rights of ingress and egress, licenses or other interests in or to any land, highway, street, road, avenue, strips and/or gores open or proposed, in, on, across, abutting or adjoining the Land and (ii) all other rights, benefits, privileges, easements, tenements, hereditaments, and appurtenances, if any, thereon or in any way appertaining to the Land (collectively, the "<u>Real Property</u>", and the matters set forth in clauses (i) and (ii) of this sentence, collectively, the "Easements").

1.2.2    **Improvements**.   All of the buildings, fixtures, structures and improvements located on the Real Property, including, but not limited to, the Hotel, together with any and all facilities, amenities and other improvements located thereon (the "<u>Improvements</u>").

1.2.3    **Personal Property**.  All of the personal property owned by the Seller or the Manager or (if paid for by the Seller or the Manager) the Sub-Manager and located on or in the Property and/or used in the ownership, operation and maintenance of the Improvements, including, without limitation, FF&E, Operating Equipment, Supply Inventories and Consumable Inventories as well as all other personal property presently located on and used in the operation of the Property (but specifically excluding any items of personal property (x) owned by tenants or hotel guests, or (if not paid for by Seller or the Manager or) the Sub-Manager, or (y) leased under any leases of equipment described on **Exhibit "C"** attached hereto and made a part hereof ("<u>Equipment Leases</u>").  The property owned by the Seller or the Manager to be excluded from this conveyance, if any, is described on **Exhibit "D"** attached hereto and made a part hereof (the "<u>Excluded Personal Property</u>").

In addition, the term "Personal Property" shall include, to the extent assignable: all other items of personalty owned by the Seller or the Manager or (if paid for by the Seller or the Manager) the Sub-Manager which are now, or later may be, placed upon, attached to, or used in connection with the operation of the Property regardless of whether enumerated herein, including, without limitation, furnaces, water heaters, boilers, plumbing and bathroom fixtures, piping, mechanical systems, refrigeration, heating and air conditioning systems, sprinkler systems, washtubs, sinks, gas and electric fixtures, awnings, screens, ovens, stoves, kitchen appliances and fixtures, window shades, drapes, elevators, motors, cabinets, landscaping, uniforms, computers and computer equipment and related hardware (including, without limitation, the computer hardware for the front and back house reservations and accounting systems), and all art in the Hotel, access codes and the like, and all service arrangements or other operating manuals with

respect to any of the third party systems or vendors at the Property or held elsewhere for use in connection with the Property.

All of the foregoing items in this Section 1.2.3 other than the Excluded Personal Property are referred to collectively as the "Personal Property". The term "Personal Property" shall not include the Excluded Personal Property or insurance policies, utility deposits, operating bank accounts or any reserve accounts including those relating to taxes, insurance, capital expenditures, or cash on deposit, or operating manuals of the Seller or the Manager, and inventory in any gift shop in the Hotel.

1.2.4   **Leases**. Subject to ~~section~~Section 1.3, all of the Seller's rights, obligations and interests in, under and to all leases, subleases, licenses, concessions, agreements and other agreements for use and occupancy of any portion of the Property (the "Leases"), together with all security deposits and damage deposits, if any, deposited by tenants in connection with the Leases ("Deposits"). The existing Leases and Deposits are more particularly described in **Exhibit "E"** attached hereto and made a part hereof. The term "Lease" shall not include bookings for rooms, banquet facilities and other services of the Hotel.

1.2.5   **Governmental Permits**. Subject to ~~section~~Section 1.3, any transferable consents, authorizations, variances, or waivers, licenses, permits for the discharge of treated waste, use of the Property or otherwise, and approvals from any governmental or quasi- governmental agency, department, board, commission, bureau or other entity or instrumentality in respect of the Property heretofore or hereafter held by or granted to the Seller or the Seller's agents with respect to the Property to the extent assignable (excluding any Liquor Licenses, subject to Section 14.1, franchises granted to the Seller or the Manager and any operating permits or Governmental Permits that are not assignable) used in or related to the ownership, occupancy and operation of all or any part of the Property ("Governmental Permits"). The existing Governmental Permits, including, but not limited to the Liquor Licenses, are more particularly described in ~~Exhibit "F" attached hereto and made a part hereof.~~ **Exhibit "F"** attached hereto and made a part hereof.

1.2.6   **Operating Contracts**. Subject to ~~section~~Section 1.3, all purchase, service, maintenance, repair, utility, employment contracts and/or agreements, and all other contracts and/or agreements of the Seller, or its agents on behalf of the Seller, respecting the ownership, maintenance, repair, renovation, management, service, use and operation of the Property, including any agreements for electric, gas, telephone, cable television, security alarm monitoring, sewer, trash collection or similar services, supply contracts, and leasing brokerage agreements, to the extent transferable ("Operating Contracts"), excluding, however, any hotel management agreement (the "Management Agreement") between the Seller and Gemini Property Management, LLC (the "Manager") or any of Seller's or Manager's right, title or interest in or to the sub- management agreement (the "Sub-Management Agreement") between Manager and Bridgeton Hotel Management LLC, an affiliate of the Purchaser (the "Sub-Manager"), if applicable. The Manager and Sub-Manager shall each provide a letter including an acknowledgment of its consent to terminate all rights, benefits and obligations it has with regard to the management or operation of the Property at the Closing, as set forth in **Exhibit "N-1"** and **Exhibit "N-2"**, respectively, attached hereto and made a part hereof. Purchaser shall not assume, and Purchaser shall have no liability or obligation under or with respect to, the Management Agreement or the Sub-Management Agreement; Purchaser shall have no liability or obligation to

the Manager or the Sub-Manager; and this sentence shall survive the Closing.  A list of each of the Operating Contracts (including only purchase orders over $10,000.00) affecting the Property is set forth in  **Exhibit "G"** attached hereto and made a part hereof.

       1.2.7      **Intangible Property**.  All books, records, accounts, ledgers, files, guest registers, maintenance records, rental and reservation records, guest incentive program information, and customer and/or frequent guest lists used in connection with the operation and maintenance of the Property (collectively, the "Books"); provided, however, that the Books shall specifically exclude (a) all internal correspondence, memoranda, instruments and other documents concerning the organizational structure and operations of the Seller (collectively, the "Seller Organizational Documents"); (b) proprietary operating policy and procedure manuals of the Seller; and (c) software relating to the Seller's books and records, other than records relating to the Hotel's operating results; provided further, however, that the following shall also be assigned to Purchaser at Closing: any warranties and guaranties relating to the Property (the "Warranties and Guaranties"); all of the following which are not proprietary to the Seller: (i) computer software and (ii) all computer related and other data concerning the Property; and any other intangible property not listed above in this Section 1.2.7 in which the Seller or its agents have acquired an interest in connection with the Property (collectively, the "Intangible Property"); all plans, specifications, drawings, engineering, environmental and soils reports or test results and similar materials in the possession of the Seller or the Manager or Sub-Manager (collectively, the "Plans and Studies"); and any registrations, or entitlements, or approvals pertaining to the Property; and thereafter, it being agreed and intended by the parties that the entirety of the transferable assets located at or used in connection with the Property shall be conveyed to the Purchaser; provided, however, that the Intangible Property shall expressly exclude the following (collectively referred to as the "Excluded Intangible Property"): any national customer lists, reservation systems and records (other than records relating to the period from and after the Closing) owned and maintained by the Seller or any of its affiliates (and any proprietary software of the Seller, or any of its respective affiliates).

       On or prior to the Closing Date, the Seller ~~has delivered~~shall deliver to the Purchaser true and correct copies of any Warranties and Guaranties, Books and other Intangible Property in the possession of the Seller, and ~~by its execution of this Agreement~~, at Closing if requested by Seller, the Purchaser ~~hereby acknowledges~~shall acknowledge receipt of such Warranties and Guaranties, Books and other Intangible Property.

       1.2.8      **Assumption of Liabilities by the Purchaser.**  Notwithstanding anything to the contrary contained in this Agreement: (a) prior to the execution of this Agreement, the Seller has delivered to the Purchaser certain Operating Contracts and Equipment Leases which the Seller proposes that the Purchaser assume at Closing as listed on **Exhibit "C"** and **Exhibit "G"**, respectively, and (b) prior to ten (10) days after the Effective Date, the Purchaser will complete its review of such agreements set forth on **Exhibit "C"** and **Exhibit "G"**, respectively, and will advise the Seller which Operating Agreements (the "Accepted Operating Contracts") and Equipment Leases (the "Accepted Equipment Leases") will be assumed by the Purchaser at Closing; except for any Operating Contracts or Equipment Leases expressly rejected by the Purchaser in writing~~, as shall be reflected on such **Exhibit "C"** and **Exhibit "G"**~~ (the "Rejected Operating ~~Agreements~~Contracts" and the "Rejected ~~Operating~~Equipment Leases"), the Purchaser shall be deemed to have accepted all of such Operating Contract and Equipment Leases.  At or

prior to the Closing, the Seller shall terminate any Rejected Operating Contracts and Rejected Equipment Leases. The, Purchaser shall have no liabilities or obligation with respect thereto, and this sentence shall survive the Closing.  At the Closing, the Purchaser shall assume any and all Accepted Operating Contracts and Accepted Equipment Leases pursuant to the Assignment and Assumption Agreement, set forth as  **Exhibit J** attached hereto and made a part hereof.  Any termination cost in connection with such Equipment Leases or Operating Contracts not accepted by the Purchaser shall be the responsibility of the Seller., and this sentence shall survive the Closing.  Notwithstanding anything contained herein to the contrary, in no event shall the Purchaser have any duty, liability or obligation under this Agreement with respect to the Property, or any Operating Contracts and any Equipment leases prior to Closing, except for the Purchaser's duties, liabilities and obligations under the Management Agreement or Sub-Management Agreement, if any, all other documents executed in connection with the Management Agreement or Sub-Management Agreement, or otherwise arising under or in connection with the Purchaser's status and capacity as an affiliate of the Sub- Manager of the Property pursuant to the Sub-Management Agreement, and the indemnities (if applicable) contained in Section 3.3 and elsewhere in this Agreement and the other Closing Documents; and the Seller shall not have any duty, liability or obligation with respect to the Property, or such Accepted Operating Contracts and Accepted Equipment Leases after the Closing, except as otherwise expressly set forth in this Agreement or in the other Closing Documents.

### 1.3   **Executory Contracts**.

(A) (a) In the Bankruptcy Case, Seller shall assume any Accepted Operating Contracts and Accepted Equipment Leases, and shall assign the same to Purchaser at Closing as hereinabove provided.  Any Operating Contracts or Equipment Leases designated as a Rejected Operating Contract or Rejected Equipment Lease may be assumed or rejected by Sellers Seller in Sellers' Seller's sole discretion and shall be deemed an "Excluded Contract".  Any such designation may be made by Purchaser by giving notice thereof in accordance with Section 15.2 on or prior to the Bid Submission Deadline.deadline set forth in Section 1.2.8 hereof.  Any such designation shall be subject to change by Purchaser from time to time in Purchaser's sole discretion by giving written notice thereof to Sellers Seller in accordance with Section 15.2 on or prior to the Bid Submission Deadline.deadline set forth in Section 1.2.8 hereof.  At 5:00 p.m. Eastern time on the Bid Submission Deadlinedeadline set forth in Section 1.2.8 hereof, all such designations made by Purchaser shall be become final and binding upon Purchaser and, except as otherwise set forth below, all Sellers'Operating Contracts and Equipment Leases (collectively, "Seller's Contracts") as to which Purchaser has made no such designation shall be deemed Excluded Contracts.

(b) (b) Notwithstanding the foregoing,

(i)   so long as an Excluded Contract has not been rejected by the SellersSeller pursuant to Section 365 of the Bankruptcy Code, SellersSeller shall, upon written request by Purchaser, assume and assign such Excluded Contract to Purchaser or its designee for no additional consideration (other than any obligation of Purchaser under this Agreement to pay for cure costs); and

(ii) (ii) if at any time ~~Sellers~~Seller become aware, on or before the Closing Date, of any ~~Sellers'~~Seller's Contract that has not been included on the Schedules attached hereto, ~~Sellers~~Seller shall promptly thereafter advise Purchaser of the existence, and provide Purchaser with a copy, of such Contract and Purchaser thereupon shall have the right (but not obligation) to request, by written notice to ~~Sellers~~Seller within five (5) days, that ~~Sellers~~Seller assume, assign and sell such ~~Sellers'~~Seller's Contract to Purchaser, in which case ~~Sellers~~Seller shall use commercially reasonable efforts to assume, assign and sell such ~~Sellers'~~Seller's Contract to Purchaser, as promptly as reasonably practicable, on the same terms and conditions as would be applicable under this Agreement to the Accepted Operating Contracts or Accepted Equipment Leases, as applicable (the "Purchased Contracts").

~~(c)~~ (c)  As part of a plan of reorganization filed by the Seller in the Bankruptcy Case and the motion submitted by Seller in connection with the sale of the Property in the Bankruptcy Case, seeking approval of the Sale Procedures Order (the "Sale Motion"), ~~Sellers~~Seller shall seek approval by the Bankruptcy Court of the sale, assumption and assignment by ~~Sellers~~Seller to Purchaser of all ~~Sellers' Contracts identified on the Schedules attached hereto. Sellers~~the Accepted Operating Contracts and Accepted Equipment Leases.  Seller shall serve the Sale Motion on all counterparties to all such ~~Sellers'~~Seller's Contracts along with a notice specifically stating that ~~Sellers are~~Seller is or may be seeking the sale, assumption and assignment of such ~~Sellers'~~Seller's Contracts and shall notify such parties of the deadline for objecting to the Cure Costs, which deadline shall be not less than three (3) Business Days prior to the ~~Bid Submission Deadline.~~deadline set forth in Section 1.2.8 hereof.  As part of the Sale Motion, ~~Sellers~~Seller shall seek authority to file with the Bankruptcy Court the list identifying such ~~Sellers'~~Seller's Contracts and the amounts necessary to cure defaults under each of such Contract, so as to enable any such party to object to the proposed Cure Costs and the Bankruptcy Court to determine such Cure Costs as promptly as reasonably possible.  In cases in which ~~Sellers are~~Seller is unable to establish that a default exists, the relevant Cure Cost shall be set at $0.00.

1.4        **[Intentionally Omitted.]**

~~1.4        Payment of Cure Amounts. The Assumed Cure Costs shall be the responsibility of Purchaser. Cure Costs shall be paid promptly to the parties to whom and pursuant to the terms by which the Bankruptcy Court directs such payments to be made.~~

1.5        **No Assignment or Assumption of Wyndham Franchise Agreement**. Pursuant to Paragraph 18 of the Sale Procedures Order (unless Purchaser shall notify Seller otherwise before Seller shall have terminated the Wyndham Franchise Agreement), Seller shall not assign to Purchaser, and Purchaser shall not assume, the existing Wyndham Garden Hotel Franchise Agreement dated as of July 31, 2006 between Wyndham Hotels & Resorts, LLC and FGC 37 West 24th, LLC, as assigned to Seller by Assignment, Assumption and Amendment Agreement dated as of "_____, 2008" among FGC 37 West 24th, LLC, Seller and Wyndham Hotels & Resorts, LLC, as the same may have been modified, restated or supplemented (the "Wyndham Franchise Agreement"), and Purchaser shall have no obligation or liability with respect thereto or to Wyndham Hotels & Resorts, LLC.  This Section 1.5 shall survive the Closing.

**ARTICLE**

2

## ARTICLE 2
## PURCHASE AND CLOSING

2.1 **Purchase Price**.  The total purchase price which the Purchaser agrees to pay for the Property equals ~~Fifty-Seven Million~~FIFTY-EIGHT MILLION TWO HUNDRED FORTY THOUSAND and 00/100 U.S. Dollars ($~~57,000,000.00~~58,240,000.00) (the "Purchase Price").  Subject to the provisions of Articles 4, 5 and 7 hereof, the Purchase Price shall be paid by the Purchaser at Closing in immediately available funds.

2.2 **Allocation**.  The Seller and the Purchaser agree that the Purchase Price shall be allocated among the Land, Personal Property, Real Property, and other Property as determined by agreement of parties prior to the Closing for federal, state and local tax purposes in accordance with Section 1060 of the Code.  The Seller shall, within ten (10) business days after the Effective Date, prepare and deliver to the Purchaser for its review a schedule allocating the Purchase Price (and any other items that are required for federal income tax purposes to be treated as part of the Purchase Price) among the Hotel's assets (such schedule, the "Allocation").  The Purchaser shall review such Allocation and provide any objections to the Seller within ten (10) business days after the receipt thereof.  If the Purchaser timely objects to the Allocation in a Notice to the Seller, the Purchaser and the Seller shall negotiate in good faith to resolve such objection(s). Upon reaching an agreement on the Allocation, the Purchaser and the Seller shall (i) cooperate in the filing of any forms (including Form 8594 under Section 1060 of the Code) with respect to the Allocation as finally resolved, including any amendments to such forms required pursuant to this Agreement with respect to any adjustment to the Purchase Price, and (ii) shall file all federal, state and local tax returns and related tax documents consistent with such Allocation, as the same may be adjusted by any other applicable provisions of this Agreement.  Notwithstanding the foregoing, if, after negotiating in good faith, the parties to this Agreement are unable to agree on a mutually satisfactory Allocation, each of the Purchaser and the Seller shall use its own allocation for purposes of this Section 2.2.  Without limitation to the generality of the foregoing, Purchaser and Seller shall use the Allocation (including any allocation by Purchaser pursuant to the preceding sentence, if applicable) in any bulk sale tax notification that Purchaser and/or Seller is obligated to file (including as set forth in Section 15.21 hereof).

2.3 **Earnest Money**. ~~Within five (5) days of the execution of this Agreement,~~ No later than December 14, 2015, the Purchaser shall deposit with the Escrow Agent, by wire transfer of immediately available federal funds in the amount of Three Million and 00/100 U.S. Dollars ($3,000,000.00) as earnest money (such amount together with additional deposits as set forth herein, together with interest earned thereon is collectively called "Earnest Money").  The Earnest Money shall be invested by the Escrow Agent in interest bearing deposit accounts pursuant Section 2.5.  At the Closing, the Earnest Money shall be paid to the Seller and credited to the Purchase Price payable by the Purchaser to the Seller.  If the Closing does not occur, the Earnest Money shall be paid over in accordance with the terms of this Agreement, including Sections 2.5, 10.1 and 10.2.  This Agreement shall not be enforceable against the Seller unless and until the Earnest Money is deposited with Escrow Agent as provided herein.  Notwithstanding any provision of this Agreement to the contrary, if Purchaser is not the Successful Bidder pursuant to

(and as defined in) the Sale Procedures Order, then Seller shall cause the Earnest Money to be returned to Purchaser as and when required in Paragraph 10 of Exhibit A Sale Procedures annexed to the Sale Procedures Order.

2.4      **Closing**.  The closing of title to the Property and the consummation of the purchase and sale of the Property (the "Closing") shall take place in escrow through the Escrow Agent on the earlier of (a) fourteen (14) days after the entry of the Sale Order no later than December 30, 2015; or (b) on such later date as may be mutually agreed by the parties in writing (the "Closing Date").  Purchaser may, by notice to Seller, adjourn the Closing on one or more occasions to no later than February 29, 2016.

2.5      **Escrow Agent**.  In connection with the Purchaser's deposit of the Earnest Money with the Escrow Agent, the parties acknowledge and agree that:

2.5.1      The Escrow Agent shall hold possession of, keep, deliver and dispose of the Earnest Money subject to the terms and conditions of this Agreement and in accordance with the applicable UST Guidelines; provided, however, that the Escrow Agent is to be considered as a depository only, shall not be deemed to be a party to this Agreement, except for the purposes of holding the Earnest Money, and shall not be responsible or liable in any manner whatsoever for the sufficiency, manner of execution or validity of any written instructions, certificates or any other documents received by it, nor as to the identity, authority or right of any persons (other than the Escrow Agent) executing this Agreement.  The Escrow Agent shall be entitled to rely at all times on instructions given by the Seller and/or the Purchaser, as the case may be and as required hereunder, without any necessity of verifying the authority therefore, except as set forth in Sections 2.5.2 through 2.5.4.

2.5.2      If the Escrow Agent receives a written statement executed by the Purchaser that title to the Property has not closed under this Agreement because the Seller has failed to close under this Agreement, or because of a default by the Seller causing a failure to close under this Agreement, or because of the Purchaser's termination of this Agreement as permitted by and in accordance with the provisions of this Agreement, the Escrow Agent shall, within two (2) business days after receipt of such written statement, deliver a copy of said statement to the Seller, and shall return the Earnest Money to the Purchaser immediately after the tenth (10th) business day after receipt by the Escrow Agent of said statement from the Purchaser unless the Escrow Agent, on or before such tenth (10th) business day, receives Notice from the Seller contesting the accuracy of the Purchaser's statement and demanding retention of the Earnest Money by the Escrow Agent.

2.5.3      If the Escrow Agent receives a written statement executed by the Seller that title to the Property has not closed under this Agreement because the Purchaser has failed to close under this Agreement, or because of a default by the Purchaser under this Agreement, the Escrow Agent shall, within two (2) business days after receipt of such written statement, deliver a copy of said statement to the Purchaser, and shall deliver the Earnest Money to the Seller immediately after the tenth (10th) business day after receipt by the Escrow Agent of said statement from the Seller unless the Escrow Agent, on or before such tenth (10th) business day, receives Notice from the Purchaser contesting the accuracy of the Seller's statement and demanding retention of the Earnest Money by the Escrow Agent.

2.5.4    Upon receipt by the Escrow Agent of a written contesting statement from the Seller under Section 2.5.2, or from the Purchaser under Section 2.5.3, the Escrow Agent shall retain the Earnest Money and thereafter deliver the same to either the Seller or the Purchaser (or otherwise) as the Seller and the Purchaser direct by a Notice jointly executed by both of them; provided, however, that the Escrow Agent may, at any time before receiving any such joint Notice, and on Notice to the Seller and the Purchaser, surrender the Earnest Money to a court of competent jurisdiction, by means of an interpleader action or otherwise, for such disposition as may be directed by such court.

2.5.5    The Escrow Agent shall not at any time be held liable for actions taken or omitted to be taken in good faith and without gross negligence or willful misconduct.  The Seller and the Purchaser shall indemnify the Escrow Agent from any claims or demands for losses arising out of the Escrow Agent's activities hereunder as the holder of the Earnest Money, except for any claims or losses resulting from the gross negligence or willful misconduct of the Escrow Agent.

2.5.6    It is further understood and agreed by the Seller and the Purchaser that if, as a result of any disagreement between them or adverse claims and demands being made by either or both of them upon the Escrow Agent, or if the Escrow Agent otherwise shall become involved in litigation with respect to the disbursement of the Earnest Money, such parties agree that they, jointly and severally, are and shall be liable to the Escrow Agent and shall reimburse the Escrow Agent on demand for all reasonable costs, expenses and counsel fees it shall incur or be compelled to pay by reason of such litigation.  The Seller and the Purchaser agree between themselves that each shall be responsible to advance one-half of all amounts due to the Escrow Agent for such costs, expenses and counsel fees; provided, however, that any such advance by the Seller or the Purchaser as a result of any dispute or litigation between them shall be without prejudice to their right to recover such amounts as damages from the breaching party.

2.5.7    In taking or omitting to take any action whatsoever hereunder with respect to the disbursement of the Earnest Money, the Escrow Agent shall be protected in relying upon any notice, paper or other document believed by it to be genuine, or upon evidence deemed by it to be sufficient, and in no event shall the Escrow Agent be liable hereunder for any act performed or omitted to be performed by it hereunder in the absence of gross negligence or bad faith.  The Escrow Agent may consult with counsel in connection with its duties hereunder and shall be fully protected in any act taken, suffered or permitted by it in good faith and without gross negligence in accordance with the advice of such counsel.

2.5.8    The Earnest Money will be deposited into an interest bearing account at an institution insured by the Federal Deposit Insurance Corporation (FDIC), which shall comply with any requirement of the Bankruptcy Court and the UST Guidelines.  The Escrow Agent shall not be responsible for any loss, diminution in value or failure to achieve a greater profit as a result of the deposit of the Escrow Funds, or for failure of any financial institution in which the Escrow Funds are deposited.  Interest shall accrue to the benefit of the Purchaser upon closing or otherwise to the party entitled to the Earnest Money pursuant to the terms hereof.  The Purchaser's tax identification number shall be provided to the Escrow Agent within five (5) days of written request (which may be via sent via email).

## ARTICLE 3

2.6    **Execution, Dating and Delivery of this Agreement**.  This Agreement shall first be executed by Purchaser and delivered to Seller pursuant to the Sale Procedures Order.  If, and within (1) Business Day after, Purchaser shall be selected as the Successful Bidder under (and as defined in) the Sale Procedures Order, Seller shall execute and date this Agreement as of the date of Seller's such execution (such date thereupon being the "Effective Date" for all purposes of this Agreement) and return this fully executed Agreement to Purchaser by hand or by Overnight Delivery.

## ARTICLE 3
## DUE DILIGENCE AND INSPECTION OF PROJECT

3.1    **Due Diligence and Inspection**.(a) (a)      To the extent not already within the possession of the Purchaser or Sub-Manager(including any internet dropbox made available to Purchaser), the Seller shall deliver to the Purchaser a copy of all of the due diligence information set forth on **Exhibit "H"** attached hereto and made a part hereof (collectively, the "Due Diligence Materials") within three (3) business days after the Effective Date (the "DDI Delivery Date").  The Purchaser may make prints or photocopies of any of the Due Diligence Materials for the Purchaser's use and review on or off the Property.

3.2    **Continuing Right of Access for Inspection**

(a)      )-Subject to Section 15.7 and to the rights of existing tenants and then existing Hotel guests, at all times prior to Closing (with at least 24 hours email, oral or telephonic notice to the Seller), the Purchaser, its agents, employees, and representatives shall have reasonable access to the Property, during the Seller's normal business hours, for the purpose of conducting surveys, engineering, geotechnical, and environmental inspections and tests, feasibility studies, and any other inspections, studies, tests reasonably required by the Purchaser or any other purpose of the Purchaser related to the Purchaser's planned purchase, remodeling, if any, use, financing or operation of the Property, including without limitation, the right to conduct a "walk-through" of the Property prior to Closing, and subject to the provisions restricting access for certain matters, as set forth in Article 8, as well as the provisions of this Section 3.2(a).

(b)      b)-Notwithstanding the foregoing, neither the Purchaser nor its agents, employees, contractors or representatives shall undertake any invasive testing of the Property without the prior written consent of the Seller in each instance.  Prior to any invasive inspection approved by the Seller, the Purchaser shall deliver to the Seller certificates reasonably satisfactory to the Seller evidencing that the Purchaser's consultants and agents carry and maintain such general liability insurance policies with such companies and in such scope and amounts as are acceptable to the Seller in its reasonable discretion, in all cases naming the Seller as an additional insured and loss payee thereunder.  The Purchaser's right of inspection of the Property pursuant to the terms of this Section 3.2 and elsewhere shall not interfere with the rights of the tenants and Hotel guests and the operations of the Hotel, and shall not include employee interviews, except as set forth in Section 8.4.

3.3     **Due Diligence Indemnity**.  The Purchaser shall keep the Property free and clear of any liens arising from any due diligence conducted by the Purchaser or the Purchaser's agents and does hereby indemnify and defend the Seller from all claims, liabilities, losses, costs or expenses (including reasonable attorney's fees) asserted against the Seller or the Property as a result of (i) any inspections of the Property made or conducted by the Purchaser or its agents, employees, contractors or representatives, or (ii) the Purchaser's failure to pay any bills, invoices or other charges relating to any inspections, investigations, evaluations, or due diligence inquiries by the Purchaser, its agents, employees, contractors or representatives, or (iii) any violations of its confidentiality obligations and access limitation set forth in Sections 15.7 and 8.4 respectively. The foregoing obligations of the Purchaser shall survive any termination of this Agreement.

3.4     **Intentionally Omitted**.

3.5     **Use of Property-Related Information**.  The Purchaser agrees that it will not use or permit its affiliates to use any of the Due Diligence Materials or any other information provided to the Purchaser or its agents, employees, contractors or representatives pursuant to this Agreement for any other purpose other than evaluation of the purchase of the Property. (including any financing therefor).  The foregoing obligations of the Purchaser shall survive Closing or any termination of this Agreement, and shall be subject to the confidentiality provisions set forth in Section 15.7.

3.6     **AS-IS**

(a)     )-the Purchaser acknowledges that the Purchaser has ascertained for itself the value and condition of the Property, and the Purchaser is not relying on, nor has the Purchaser been influenced by, any representation of the Seller, or any agent or representative of the Seller, regarding the value, condition or any aspect of the Property, other than as expressly set forth in this Agreement or the Closing Documents.  If this Agreement required the Seller to make any representation or warranty, express or implied (beyond those set forth in this Agreement or the Closing Documents), relating to the Property, or to accept any greater liability with respect to the Property, the Seller would have required a materially higher Purchase Price for the Property or refused to sell the Property.  The Purchaser agrees that the Purchaser's satisfaction or waiver of the Purchaser's contingencies is the Purchaser's acknowledgment that it has had every opportunity to conduct whatever inspection, test, or analysis of the Property the Purchaser deemed to be relevant to its decision to purchase the Property.  The Seller shall not be responsible for any failure to investigate the Property on the part of any person.

(b)     b)  EXCEPT FOR THE EXPRESS REPRESENTATIONS AND WARRANTIES MADE BY THE SELLER IN THIS AGREEMENT, OR THE CLOSING DOCUMENTS EXECUTED BY THE SELLER PURSUANT TO SECTION 5.1, THE SELLER MAKES NO WARRANTY, EXPRESS OR IMPLIED, AS TO THE CONDITION OR STATE OF REPAIR OF THE PROPERTY OR ANY PORTION THEREOF, INCLUDING, BUT NOT LIMITED TO ANY PHYSICAL, ENGINEERING OR ENVIRONMENTAL CONDITION OF THE PROJECT, OR OF VISIBLE OR HIDDEN DEFECTS IN MATERIAL, WORKMANSHIP OR CAPACITY OF THE PROJECT OR ANY PORTION THEREOF, OR OF ANY ECONOMIC RESULTS TO BE OBTAINED OR PREDICTED IN THE OWNERSHIP AND OPERATION OF THE PROJECT, INCLUDING, BUT NOT LIMITED TO ANY REVENUES

GENERATED BY THE PROPERTY AND EXPENSES INCURRED IN ITS OPERATION, AND THERE ARE NO IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE AS TO THE PROJECT OR ANY PORTION THEREOF. THE PURCHASER FURTHER ACKNOWLEDGES THAT, SUBJECT TO THE REPRESENTATIONS AND WARRANTIES OF THE SELLER CONTAINED HEREIN OR IN THE CLOSING DOCUMENTS EXECUTED BY THE SELLER, THE PURCHASER IS EXPERIENCED IN REAL ESTATE MATTERS AND HAS MADE ITS OWN EVALUATION CONCERNING THE VALUE OF THE PROPERTY (INCLUDING ITS PHYSICAL CONDITION AND INCOME POTENTIAL), (I) DELIVERY OF THE PROPERTY AT CLOSING WILL BE "AS IS, WHERE IS" AND WITH ALL FAULTS, SUBJECT TO ORDINARY WEAR AND TEAR, AND (II) THE SELLER HAS DISCLAIMED ANY EXPRESS OR IMPLIED WARRANTIES WITH RESPECT TO THE PROJECT OR ANY ECONOMIC RESULTS TO BE OBTAINED IN THE FUTURE FROM THE OWNERSHIP AND OPERATION OF THE PROJECT.

(c)      )-This Agreement and the Closing Documents, as written, contains all the terms of the agreement entered into between the parties as of the date hereof, and the Purchaser acknowledges that, except for any representations and warranties expressly set forth in this Agreement and the Closing Documents, neither the Seller nor any of the Seller's affiliates, nor any of their agents or representatives, has made any representations or held out any inducements to the Purchaser, and the Seller hereby specifically disclaims any representation, oral or written, past, present or future, other than those specifically set forth in this Agreement or in the Closing Documents.  Without limiting the generality of the foregoing, except as set forth in this Agreement, the Purchaser has not relied on any representations or warranties, and neither the Seller nor any of the Seller's affiliates, nor any of their agents or representatives has made or is willing to make any representations or warranties, express or implied, other than as are expressly set forth operating herein or in the Closing Documents, as to (i) the status of title to the Property, (ii) the Operating Contracts, (iii) the Governmental Permits, (iv) the current or future real estate tax liability, assessment or valuation of the Property, (v) the potential qualification of the Property for any and all benefits conferred by any laws whether for subsidies, special real estate tax treatment, insurance, mortgages or any other benefits, whether similar or dissimilar to those enumerated, (vi) the compliance of the Property in its current or any future state with applicable Laws or any violations thereof, including, without limitation, those relating to access for the handicapped, environmental or zoning matters, and the ability to obtain a change in the zoning or a variance in respect to the Property' non-compliance, if any, with zoning laws, (vii) the nature and extent of any right-of-way, lease, possession, lien, encumbrance, license, reservation, condition or otherwise, (viii) the availability of any financing for the purchase, alteration, rehabilitation or operation of the Property from any source, including, without limitation, any government authority or any lender, (ix) the future use of the Property, including, without limitation, the use of the Property for hotel or other purposes, (x) the present and future condition and operating state of any Personal Property and the present or future structural and physical condition of the improvements, their suitability for rehabilitation or renovation, or the need for expenditures for capital improvements, repairs or replacements thereto, or (xi) the actual or projected income or operating expenses of the Property, or (xii) any costs arising in connection with retaining or securing a franchise with a franchisor.

(d)      d)-the Purchaser acknowledges that the Seller has afforded the Purchaser the right to full and complete investigations, examinations and inspections of the Property and all

Due Diligence Materials.  The Purchaser acknowledges and agrees that, except as set forth in this Agreement or in the Closing Documents, (i) the Due Diligence Materials delivered or made available (or to be delivered or made available after the Effective Date), to the Purchaser and the Purchaser's Representatives by the Seller or the Seller's affiliates, or any of their agents or representatives may have been prepared by third parties and may not be the work product of the Seller or any of the Seller's affiliates; (ii) neither the Seller nor any of the Seller's affiliates may have made any independent investigation or verification of, or have any knowledge of, the accuracy or completeness of, the Due Diligence Materials which has not been prepared by or with the active involvement of the Seller or its respective affiliates; and (iii) any further distribution of the Due Diligence Materials is subject to Section 15.7.

(e)       )–the Purchaser acknowledges it has visited the Property, and that it has or will undertake a thorough inspection of the Property and the Due Diligence Materials.  Subject to and except for the representations, warranties and covenants expressly set forth in this Agreement or in the Closing Documents, the Seller shall not be liable or bound in any manner by any oral or written information pertaining to the Property furnished by the Seller, the Seller's affiliates, their agents or representatives, any real estate broker, or other person.

(f)       )——The provisions of this Section 3.6 shall survive the termination of this Agreement and the Closing.

3.7    **Inventory Taking**.  On the day immediately preceding the Closing Date, the Seller (or the Manager) and the Purchaser shall jointly conduct a count of the Supply Inventories, Consumable Inventories, Operating Equipment and any other inventories of furniture or any other Personal Property in the Hotel requested by the Purchaser, all in accordance with and subject to the provisions of Article 7.

## ~~ARTICLE~~
## ~~4~~
## TITLE REVIEW, TITLE COSTS

4.1    **Title Documents**.

(a)       )–Title Policy.  The Purchaser shall promptly order, at the Purchaser's sole cost and expense, an ALTA title commitment (the "Title Commitment") from the Title Company for an Owner's ALTA Policy of Title Insurance (the "Title Policy"), issued by the Title Company as of the date and time of the recording of the Deed, in the amount of the Purchase Price, insuring the Purchaser as owner of fee simple title to the Real Property, Improvements and the Easements, and subject only to the Permitted Exceptions, and shall direct the Title Company to deliver a copy of the Title Commitment, including all updates and continuations thereof, together with true and complete copies of all instruments giving rise to any claimed defects or exceptions to title to the Real Property, to the Seller.

(b)       b)–Survey.  The Seller shall, to the extent in the possession of the Seller, deliver to the Purchaser's Attorney a copy of the Seller's existing survey of the Real Property, Improvements and Easements (the "Existing Survey").  The Purchaser may obtain an update of the

Existing Survey or its own survey of the Real Property, Improvements and Easements (each, an "Updated Survey") at the Purchaser's sole expense.

    4.2    **Title and Survey Costs**.  All costs incurred for title searches, municipal searches and preparation of the Title Commitment, the Title Policy (including the costs of any and all endorsements) and the Updated Survey shall be paid by the Purchaser.

    4.3    **Permitted Exceptions**.

    (a)    )Subject to this Section 4 and as set forth in the Sale Order, title to the Property shall be conveyed to the Purchaser free and clear of all encumbrances other than the Permitted Exceptions. For purposes of this Agreement, any matter that is disclosed in the Title Commitment or the Exiting Survey or any Updated Survey and to which the Purchaser does not object (or is deemed to approve) pursuant to the following provisions (or to which the Purchaser so objects but subsequently waives or consents to title insurance over), together with any of the following matters are collectively referred to herein as the "Permitted Exceptions":

    (i)    i)All presently existing and future liens for unpaid real estate taxes and water and sewer charges not due and payable as of the Closing, subject to adjustment as herein provided;

    (ii)    ii)All present and future zoning, building, environmental and other laws, ordinances, codes, restrictions and regulations of all governmental authorities having jurisdiction with respect to the Property, including, without limitation, landmark designations and all zoning variances and special exceptions, if any.

    (iii)    iii)All covenants, restrictions and rights and all easements and agreements for the erection and/or maintenance of water, gas, steam, electric, telephone, sewer or other utility pipelines, poles, wires, conduits or other like facilities, and appurtenances thereto, over, across and under the Property.

    (iv)    iv)Any state of facts which would be shown on or by an accurate, current survey of the Property.

    (v)    v)Rights of tenants of the Property pursuant to the Leases, and any and all amendments, assignments and subleases, with Seller, or any predecessor fee owner of the Property, to the extent such Leases, amendments, assignments and subleases are listed on **Exhibit "E"**, and others claiming by, through or under any such tenants.

    (vi)    vi)Any financing statements filed on a date more than five (5) years prior to the Closing and any financing statements, chattel mortgages, encumbrances or mechanics' or other liens filed against property which is not part of the Property;

    (vii)    vii)All Violations whether or not noted or issued at the date hereof or as of the date of Closing;

(viii)    ~~viii)~~ Consents by Seller or any former owner of the Property for the erection of any structure or structures on, under or above any street or streets on which the Property may abut.

(ix)    ~~(ix)~~ Possible encroachments and/or projections of stoop areas, roof cornices, window trims, vent pipes, cellar doors, steps, columns and column bases, flue pipes, signs, piers, lintels, window sills, fire escapes, satellite dishes, protective netting, sidewalk sheds, ledges, fences, coping walls (including retaining walls and yard walls), air conditioners and the like, if any, on, under or above any street or highway, the Property or any adjoining property, provided same do not render title unmarketable.

(x)    ~~(x)~~ Variations between tax lot lines and lines of record title, provided same do not render title unmarketable.

(xi)    ~~(xi)~~ The standard conditions to and ~~exceptions to~~ exclusions from title insurance contained in the form of Title Policy ~~or,~~ and the exceptions accepted by Purchaser at Closing in the "marked up" title commitment issued to Purchaser by the Title Company.

(xii)    ~~(xii)~~ Any lien or encumbrance (including, without limitation, any mechanic's lien and materialmen's lien) the removal of which is the obligation of ~~the Sub-Manager or~~ any tenant of the Property;

(xiii)    ~~(xiii)~~ Any other matter which the Title Company may raise as an exception to title, provided the Title Company will insure against collection or enforcement of same out of the Property and/or that no prohibition of present use or maintenance of the Property will result therefrom, as may be applicable.

(b)    ~~b)~~ If the Property shall be subject to any violations of law or municipal ordinances, orders or requirements whatsoever, noted in or issued by any governmental authorities having jurisdiction over the Property as of the date of this Agreement or at any time prior to Closing (collectively, "Violations"), the Seller, in its sole and absolute discretion, shall either (a) to the extent such Violations can be cured by the payment of a liquidated sum, pay or cause the Title Company to pay any such Violations prior to the Closing Date, or (b) give the Purchaser a credit at Closing in the amount necessary to pay or cure such Violations, in which case the Purchaser shall assume the responsibility to remedy such Violations. Notwithstanding the foregoing, the Seller shall have the right to terminate this Agreement if the Violations are in excess of Twenty Five Thousand and 00/100 Dollars ($25,000.00); provided, however, the Purchaser shall have the right to nullify any such termination by Notice to the Seller if the Purchaser expressly agrees to assume all liability for the payment and satisfaction of any Violations in excess of Twenty Five Thousand and 00/100 Dollars ($25,000.00); it being understood and agreed that the Seller shall in no event be responsible for the payment of more than Twenty Five Thousand and 00/100 Dollars ($25,000.00) to satisfy any Violations.  The Seller shall have no obligation to remedy Violations caused by the Purchaser ~~or the Sub-Manager,~~ or otherwise noted subsequent to the date hereof except to the extent provided in Section 4.4.

4.4    **Title Approval**.

(a)        )  The Purchaser shall have five (5) business days from the date the Purchaser shall receive the Title Commitment (the "Title Exam Deadline") to notify the Seller, in writing, of such objections as the Purchaser may have to anything contained in the Title Commitment or the Survey, other than Permitted Exceptions.  Any item contained in the Title Commitment or any matter shown on the Survey to which the Purchaser does not object prior to the Title Exam Deadline shall be deemed a Permitted Exception.  If the Purchaser shall notify the Seller of objections to title or to matters shown on the Survey (other than Permitted Exceptions) prior to the Title Exam Deadline ("Title Objection"), the Seller shall have the right, but not the obligation, to cure such Title Objections; provided, however, that at any time prior to Closing, the Seller shall, at its sole cost and expense, remove or otherwise satisfy, by payment or other appropriate measure of satisfaction, any Seller Encumbrance, which may include removal of such Seller Encumbrance at or before Closing in the Sale Order.  For the purposes of this Agreement, "Seller Encumbrance" shall mean: any contractors, mechanics and materialman's liens or similar liens for unpaid work at the Property for which Seller is responsible, any judgment liens against the Property for which Seller is responsible; any lis pendenses against (or derivatively on behalf of) Seller; and any mortgages or deeds of trust currently encumbering the Property, unless such mortgages or deeds of trust are being assigned to and assumed by the Purchaser at Closing.or Purchaser's mortgage lender at Closing.  (At Purchaser's option, Seller shall cause any and all such mortgages to be assigned to Purchaser or Purchaser's mortgage lender at Closing, at no cost to Purchaser.)  Notwithstanding anything to the contrary, the parties acknowledge that a Notice of Pendency has been filed against the Property (Index No. 152596/2015), and agree that said Notice of Pendency of record shall be removed at or before Closing pursuant to the Sale Order.

Within five (5) business days after receipt of the Purchaser's Notice of Title Objections, the Seller shall notify the Purchaser in writing whether the Seller elects to attempt to cure such Title Objections or whether such Title Objections will be removed at or before Closing by the Sale Order.  If the Seller fails to give the Purchaser such Notice of election within such time period, then the Seller shall be deemed to have elected not to attempt to cure the matter.  If the Seller elects to attempt to cure, the Seller shall have until the Closing Date to attempt to remove, satisfy or cure the same; provided, however, that if additional time is needed to cure such defect, the Seller shall be entitled to a reasonable adjournment, but in no event shall such adjournment exceed thirty (30) days after the Closing Date set forth herein.  If the Seller elects not to cure any Title Objections specified in the Purchaser's Notice, or if the Seller is unable to effect a cure prior to the Closing (or any date to which the Closing has been adjourned), the Purchaser shall have the following options: (i) to accept a conveyance of the Property subject to the Permitted Exceptions, specifically including any matter objected to by the Purchaser which the Seller is unwilling or unable to cure, and without reduction of the Purchase Price; or (ii) to terminate this Agreement by sending Notice thereof to the Seller, and upon delivery of such Notice of termination, this Agreement shall terminate and the Earnest Money shall be returned to the Purchaser, and thereafter neither party to this Agreement shall have any further rights, obligations or liabilities hereunder except to the extent that any right, obligation or liability set forth herein expressly survives termination of this Agreement.   The preceding sentence and the following paragraph shall not be deemed to limit Seller's obligation to remove Seller Encumbrances as set forth in the preceding paragraph.

If the Seller notifies (or is deemed to have notified) the Purchaser that the Seller does not intend to attempt to cure any Title Objection, or if, having commenced attempts to cure any such objection, the Seller later notifies the Purchaser that the Seller will be unable to effect a cure thereof, the Purchaser shall, within five (5) days after such Notice has been given, notify the Seller in writing whether the Purchaser shall elect to accept the conveyance under clause (i), above, or to terminate this Agreement under clause (ii) above.  In the event the Purchaser does not so timely notify the Seller within such five (5) day period, then the Purchaser shall be deemed to have elected to accept the conveyance under clause (i) above.

(b)     b) Subject to Section 4.4(c), if after the Effective Date, title to the Property becomes encumbered by any matter other than a Seller Encumbrance or a Permitted Exception by reason of the acts or omissions of the Seller, the Seller shall use reasonable efforts to correct any such encumbrance, except that the Seller shall not be required to expend in excess of Fifty Thousand and 00/100 Dollars ($50,000.00) in the aggregate to clear all such encumbrances described in Section 4.3.  If, despite such reasonable efforts and expenditures, the Seller does not remove (by bonding or otherwise) any such encumbrance to the reasonable satisfaction of the Purchaser and the Title Company on or prior to the Closing Date, or obtain affirmative coverage from the Title Company (without additional premiums) on or prior to the Closing Date or, as to liquidated claims, escrow with the Escrow Holder an amount equal to the estimated amount of the claim plus  reasonable attorneys' fees (as estimated by the Seller and the Purchaser) then, the Purchaser shall have the option by Notice delivered to the Seller on or before the Closing Date, of either (y) accepting the title as it then is and proceeding to Closing, or (z) terminating this Agreement, in which event the Earnest Money shall be returned immediately to the Purchaser, and thereupon neither party shall have any further obligation or liabilities under this Agreement except those that are expressly stated herein to survive termination.  Notwithstanding anything to the contrary contained in this Article 4, the aggregate maximum liability of the Seller to cure any title defects, Violations or encumbrances, other than the Seller Encumbrances, shall not exceed Fifty Thousand and 00/100 Dollars ($50,000.00).

(c)     ) The Purchaser agrees that the Seller may use the proceeds of the Purchase Price for the purpose of removing the Seller Encumbrances or any other matters encumbering the Property at Closing.

(d)     The provisions of this Section 4 shall survive the Closing.

## ~~ARTICLE 5~~

## ARTICLE 5
## CLOSING PROCEDURE

5.1     **Seller's Performance**.  At Closing, the Seller shall deliver to the Purchaser all of the following, the delivery of which shall be a condition to the Purchaser's obligation to consummate the purchase of the Property (collectively, the "Closing Documents"): **Deed**.  The Seller shall execute and deliver to the Purchaser for recording a Bargain and Sale Deed (Without Covenant Against Grantor's Acts) in form substantially similar to ~~Exhibit "I" (the "Deed")~~

~~conveying to the Purchaser the Real Property and the Improvements and any other portion of the Property comprised of real estate.~~ **Exhibit "I"** (the "Deed") conveying to the Purchaser the Real Property and the Improvements and any other portion of the Property comprised of real estate.

       5.1.2    **Bill of Sale; Assignment and Assumption**.  The Seller shall execute and deliver to the Purchaser a Bill of Sale, in the form annexed to this Agreement as **Exhibit "J- 1"** which transfers and assigns the property attached to the Real Property.  The Seller shall also execute an Assignment and Assumption in the form annexed to this Agreement as **Exhibit "J-2"** that transfers and assigns the Leases, Deposits, Supply Inventories, Operating Equipment, Consumable Inventories, Plans and Studies, Warranties and Guaranties, Accepted Operating Contracts, Accepted Equipment Leases, Governmental Permits, Books, and other Personal Property and Intangible Property, to the Purchaser.

       5.1.3    **Affidavit**.  An affidavit requested by the Title Company, executed by the Seller, in form and substance as generally used by the Title Company for such transactions, in form and content reasonably acceptable to the Seller.

       5.1.4    **Originals**.  The original Governmental Permits, Plans and Studies, Leases, Equipment Leases, Operating Contracts, Warranties and Guaranties, and Books being assigned or transferred at Closing, to the extent originals are in the possession of the Seller or the Manager, and if any of them are not in the possession of the Seller or ~~its agents~~the Manager, then copies of such documents, to the extent they are in the Seller~~'s~~ or the Manager's possession, certified by the Seller as true and correct to the Knowledge of the Seller.

       5.1.5    **Management Company ~~Termination~~.Terminations**.  An original of ~~the~~a notice of termination executed by ~~the~~ each of the Manager and the Sub-Manager stating that any rights it has with regard to the management of the Hotel, or to receive proceeds from any party in connection therewith, has been terminated as of the Closing and is without any further force and effect against the Property, and containing a release of the Seller and the Purchaser by the Manager or the Sub-Manager, respectively, in a form annexed to this Agreement as **Exhibit "N-1"** or as **Exhibit "N-2"**, respectively.

       5.1.6    **Interim Liquor Operations Agreement**.  If the Purchaser has not received a new Liquor License prior to or at the Closing, the Seller shall execute and deliver to the Purchaser an Interim Liquor Operations Agreement which shall be in form agreed to by the Purchaser and the Seller prior to Closing and shall be drafted in accordance with the terms of Section 14.1.

       5.1.7    **Notices of Closing**.  Notices of the Closing, originally executed by the Seller, individually addressed to all tenants, utility companies and such other third parties as the Purchaser may deem reasonably necessary or the Seller shall reasonably request, all in such form as the Purchaser and the Seller shall reasonably agree.

       5.1.8    **FIRPTA Certificate**.  A certificate with respect to Section 1445 of the Internal Revenue Code in the form annexed to this Agreement as **Exhibit "L"**, originally executed by the Seller, stating that the Seller is not a foreign entity as defined in the Internal Revenue Code and I.R.S. Regulations.

5.1.9    **Seller's Authority Documents**.    Copies of resolutions of the Seller consenting to this sale, certified as true, complete and unrevoked by an authorized officer of the Seller, evidencing the power and authority of the Seller to enter into and consummate this Agreement and certain specified corporate officers to execute and deliver all documents, instruments or certificates required to be executed and delivered by the Seller.

5.1.10    **Closing Statement**.    A counterpart, originally executed by the Seller, of a closing statement conforming to the payments, apportionments and adjustments to be made pursuant to the provisions of this Agreement.

5.1.11    **Transfer Tax Certificate**.    Real Estate Transfer Tax Returns, if applicable, originally executed by the Seller.

5.1.12    **Lists, etc**.    A current listing of any Deposits and other deposits, prepaid amounts held by the Seller with respect to the Property and an assignment of such Deposits and other deposits and prepaid amounts.

5.1.13    **Other Documents and Instruments**.    Such other documents and instruments as are expressly contemplated hereunder and such other reasonable documents as are customarily executed in the jurisdiction in which the Property is located in connection with the conveyance of real property and any other documents as reasonably may be required by the Title Company and necessary to consummate this transaction and to otherwise effect the agreements of the parties to this Agreement.

5.1.14    **Keys**.    All of the keys in the Seller's or the Manager's possession properly labeled and organized relating to the Hotel, and all combinations and passcodes to all locks, safes and security systems at the Hotel.

Court.

5.1.15   ~~5.1.15.~~   **Sale Order**.   A copy of the Sale Order entered by the Bankruptcy Court.

5.2   ~~5.2~~   **Purchaser's Performance**.  At Closing, the Purchaser shall deliver to the Seller, or the applicable party described below, all of the following, the delivery of which shall be a condition to the Seller's obligation to consummate the sale of the Property.

5.2.1   **Payment of Purchase Price**.  Payment to the Seller, by wire transfer of immediately available funds, of the Purchase Price, adjusted for the prorations hereinafter provided for and reduced by the Earnest Money (including any interest earned thereon) which shall be immediately paid to the Seller by the Escrow Agent at the Closing.

5.2.2   **Payment of Certain Costs**.  Deliver to the Title Company or other applicable party the amount of money required for the payment of such costs, expenses and other items as are required to be paid by the Purchaser hereunder.

5.2.3   **Assignment and Assumption**.  A duly executed and acknowledged Assignment and Assumption assuming each of the Leases listed on **Exhibit "E"**, Accepted Equipment Leases, Accepted Operating Contracts, and the Governmental Permits listed on ~~**Exhibit "F"**, such assumption to be contained within the Assignment and Assumption annexed to this Agreement as **Exhibit "J-2"**~~**Exhibit "F"**, such assumption to be contained within the Assignment and Assumption annexed to this Agreement as **Exhibit "J-2"**.

5.2.4   **Interim Liquor Operations Agreement**.  If delivered by the Seller pursuant to Section 5.1.6, a duly executed Interim Liquor Operations Agreement prepared in accordance with Sections 5.1.6 and 14.1.

5.2.5   **Notice of Closing**.  Notices of the Closing originally executed by the Purchaser, individually addressed to all tenants, utility companies, and such other third parties as the Purchaser may deem reasonably necessary or the Seller shall reasonably request, all in such form as the Purchaser and the Seller shall reasonably agree.

5.2.6   **Certification**.  A copy of the corporate resolutions or other evidence of authority of the Purchaser, each being certified as true, complete and unrevoked by an authorized officer of each such party, approving the transaction contemplated herein and evidencing and confirming the power and authority of the party or parties executing and delivering any instruments, documents or certificates on behalf of the Purchaser.

5.2.7   **Closing Statement**.  A counterpart, originally executed by the Purchaser, of a closing statement conforming to the payments, apportionments and adjustments to be made pursuant to the provisions of this Agreement.

5.2.8   **Transfer Tax Certificate**.  Real Estate Transfer Tax Returns, if applicable, originally executed by the Purchaser.

5.2.9   ~~**Management Company Termination**.  An original of the notice of termination executed by the Sub Manager stating that any rights it has with regard to the management of the Hotel, or to receive proceeds from any party in connection therewith has been~~

~~terminated as of the Closing and is without any further force and effect against the Property, and containing a release of the Seller, Manager and the Purchaser by the Sub-Manager, in a form annexed to this Agreement as **Exhibit "N-2"**.~~**[Intentionally omitted.]**

       5.2.10     **Other Documents and Instruments**.  Such other documents and instruments as are expressly contemplated hereunder and such other reasonable documents as are customarily executed in the jurisdiction in which the Property is located in connection with the conveyance of real property and any other documents as reasonably may be required by the Title Company and necessary to consummate this transaction and to otherwise effect the agreements of the parties to this Agreement.

    5.3     **Sales and Transfer Taxes**.

       5.3.1     **Sales Taxes**.

       (a)     )the Seller shall (i) pay any and all state and local sales taxes payable in connection with the transfer of the Property and all other transfers and sales taxes  pursuant to the provisions of this Agreement, and (ii) file with the New York State Department of Taxation and Finance a final sales tax return with respect thereto.  The Seller and the Purchaser agree to cooperate, in all reasonable respects (which shall in no event be deemed to require the Seller to incur any expense <u>other than payment of the sales taxes pursuant to the preceding sentence</u>), in the preparation and filing of such sales tax return.

       (b)     ~~b)~~the Seller shall be liable and pay for any and all sales, use and occupancy taxes which accrued in relation to the operation of the Hotel before the Closing Date.  The Purchaser shall be liable and pay for any and all sales, use and occupancy taxes which accrue in relation to the operation of the Hotel from and after the Closing Date.

       5.3.2     **Transfer Taxes**.  To the extent that any exist and are required to be paid to the appropriate governmental authorities in connection with the transaction contemplated by this Agreement, the Seller and the Purchaser agree that the Seller shall pay to the relevant State, County and City taxing authorities at Closing any and all real property transfer taxes ("<u>RPT</u>") that may be payable in connection with the transfer of the Property and other transactions contemplated herein.  At or prior to Closing, the Seller and the Purchaser each agree to complete, execute and cause to be delivered to the Title Company to be filed and recorded with the appropriate governmental authorities any returns and/or statements required in connection with the RPT, including without limitation, a New York State Combined Real Estate Transfer Tax Return and Credit Line Mortgage Certificate, Form TP 584 for the conveyance of the Property, a New York City Department of Finance Real Property Transfer Tax Return for the conveyance of the Property, and a New York State Real Property Transfer Report, <u>and </u>Form RP-5217NYC (collectively, the "<u>Real Estate Transfer Tax Returns</u>").**Survival**.  The provisions of this Section 5.3 shall survive the Closing.

~~**ARTICLE 6**~~
**CONDITIONS TO CLOSING**

6.1     **Bankruptcy**. ~~As promptly as reasonable after execution of this Agreement by all parties, Seller will file~~ Seller has filed a petition for relief under chapter 11 of the Bankruptcy Code and, in connection therewith, ~~will prepare, file~~has prepared, filed and ~~serve~~served a plan of reorganization and a motion in such case (the "Bankruptcy Case") requesting that the Bankruptcy Court, among other things, enter the Confirmation Order or a separate Sale Order authorizing Seller, to the extent of ~~their~~Seller's right, title and interest, to (i) transfer the Property to Purchaser free and clear of all Liens ("Free and Clear"), except as otherwise set forth in this Agreement, and (ii) assume and assign ~~the Assigned Contracts and~~ the Purchased Contracts to Purchaser. Accordingly, Purchaser acknowledges and is aware that (i) the transaction set forth in this Agreement (the "Transaction") and this Agreement shall be noticed to creditors and parties in interest in the Bankruptcy Case, (ii) the sale contemplated by the Transaction and this Agreement is subject to any higher or better offers, including at any hearing held to approve the Transaction (the "Sale Hearing"), as well as any objections by creditors and parties in interest, and (iii) Seller and its agents and representatives are obligated to continue to market the Property for sale and to solicit higher or better offers until the Property is sold. ~~Seller shall use its reasonable efforts to obtain from the~~ The Bankruptcy Court ~~entry of~~entered a bidding procedures order~~, substantially in the form attached as Exhibit B~~ on November 20, 2015 (the "Sale Procedures Order")~~, no later than October 9, 2015. Seller does not guarantee that the Bankruptcy Court will approve the Sale Procedures Order without any modification thereto and approval of the Sale Procedures Order in whole or in part is not a condition to this Agreement or the consummation of the Transaction by any party hereto~~.

6.2     **Conditions to Obligations of the Purchaser**.  The obligations of the Purchaser to execute and deliver the applicable closing documents, to pay the Purchase Price and to perform the Purchaser's other obligations at the Closing under this Agreement are and shall be subject to the satisfaction of each of the following conditions at or prior to the Closing, unless otherwise specified:

6.2.1     The Sale Order shall have been entered by the Bankruptcy Court, which order (a) shall ~~approve~~constitute the approval of the transfer of the Property to Purchaser free and clear of all liens, claims ~~and encumbrances, (b) shall find~~, interests and encumbrances and (b) shall constitute a finding that Purchaser is a good faith purchaser and, if separate from the Confirmation Order, entitled to the protections of Section 363(m) of the Bankruptcy Code ~~and (c) be in form and substance reasonably acceptable to Purchaser~~.

6.2.2     On the Closing Date, title to the Property shall be free of encumbrances other than Permitted Exceptions.

6.2.3     All of the representations and warranties of the Seller contained in this Agreement shall have been true and correct in all material respects when made, and shall be true and correct in all material respects on the Closing Date with the same effect as if made on and as of such date.

6.2.4     The Seller shall have performed, observed, and complied in all material respects with all covenants, agreements, and conditions required by this Agreement to be performed, observed, and complied with on the Seller's part prior to or as of the Closing Date.

6.2.5     The Seller shall have executed, where applicable, and delivered to the Purchaser the Closing Documents to be executed and delivered by the Seller.

6.2.6     There shall have occurred no Casualty Loss or Taking under Article 11 (or, if any has occurred, the Purchaser shall not have given a Casualty Termination Notice or Condemnation Termination Notice as permitted in Article 11).

6.2.7     All other conditions to the Purchaser's obligations which                        are specifically set forth in this Agreement shall have been fulfilled.

6.3     **Conditions to Obligations of the Seller**.  The obligations of the Seller to execute and deliver the applicable closing documents and to perform the Seller's other obligations at the Closing under this Agreement are and shall be subject to the satisfaction of each of the following conditions at or prior to the Closing:

6.3.1     The Sale Order shall have been entered by the Bankruptcy Court, which order (a) shall approveconstitute the approval of the transfer of the Property to Purchaser free and clear of all liens, claims, interests and encumbrances, and (b) shall findconstitute a finding that Purchaser is a good faith purchaser and, if separate from the Confirmation Order, entitled to the protections of Section 363(m) of the Bankruptcy Code and (c) be in form and substance reasonably acceptable to Purchaser.

6.3.2     All of the representations and warranties of the Purchaser contained in this Agreement shall have been true and correct in all material respects when made, and shall be true and correct in all material respects on the Closing Date with the same effect as if made on and as of such date.

6.3.3     The Purchaser shall have performed, observed and complied in all material respects with all covenants, agreements, and conditions required by this Agreement to be performed, observed, and complied with on the Purchaser's part prior to or on the Closing Date.

6.3.4     The Purchaser shall have paid the Purchase Price pursuant to and in accordance with the provisions of this Agreement.

6.3.5     The Purchaser shall have executed where applicable, and delivered to the Seller, the Closing Documents to be executed and delivered by the Purchaser.

6.3.6     There shall have occurred no Casualty Loss or Taking under Article 11 (or, if any has occurred, the Seller shall not have given a Casualty Termination Notice as permitted in Article 11).

6.3.7     All other conditions to the Seller's obligations which are specifically set forth in this Agreement shall have been fulfilled.

6.4     **Failure of a Condition**.  In the event that a condition is not satisfied under Section 6.2 and is not due to a default by the Seller, or under Section 6.3 and is not due to a default by the Purchaser, and the Purchaser under Section 6.2 or the Seller under Section 6.3 shall elect not to close due to such failure, then, subject to the next sentence, this Agreement shall terminate, the

Earnest Money shall be returned to the Purchaser, and neither the Purchaser nor the Seller shall have any obligations or duties to the other under this Agreement except for those obligations which expressly survive such termination as set forth in this Agreement.  Nonetheless, the provisions of this Section 6.4 with regard to the return of the Earnest Money shall be subject to the terms of Section 2.5.

Notwithstanding anything contained in this Section 6.4 to the contrary, in the event that the reason for either the Purchaser electing not to close under Section 6.26.2, or the Seller electing not to close under Section 6.3, and such reason also gives rise to the Purchaser having a claim for a default by the Seller under Section 10.2 or the Seller having a claim for a default by the Purchaser under Section 10.1, then in such event, the party claiming (the "Claiming Party") such default against the other party (the "Defaulting Party") may elect not to close and proceed against the Defaulting Party and enforce the Claiming Party's rights under Article 10.

## ~~ARTICLE 7~~

## ARTICLE 7
## PRORATIONS AND ADJUSTMENTS.

7.1      **Prorations**.   At Closing, the following adjustments and prorations shall be computed as of 12:01 a.m. on the Closing Date (hereinafter called the "Adjustment Time"), and the cash balance of the Purchase Price shall be adjusted to reflect such prorations. Except as otherwise expressly provided herein, all items of revenue, cost and expense of the Property with respect to the period prior to the Adjustment Time shall be for the account of the Seller, and all items of revenue, cost and expense of the Property with respect to the period after the Adjustment Time shall be for the account of the Purchaser.  All income, expenses and liabilities as described in this Section 7.1 which can be determined on the Closing Date will be settled pursuant to an operations settlement prepared in accordance with the final night audit to be performed by the Seller and the Purchaser, and settlement thereof will occur on the Closing Date (hereinafter referred to as the "Operations Settlement").  To the extent such items cannot be determined on the Closing Date, final settlements shall occur prior to sixty (60) days following the Closing Date, and again, with respect to items that cannot be finalized as of the sixtieth (60th) day, on the date which is one hundred twenty (120) days following the Closing Date.  Within five (5) business days after the interim and final settlement completion of such adjustments, the Seller and the Purchaser shall make such payments to the other as may be required as a result of such adjustments.

7.1.1      **Payables Excluding Employee Benefits**.   Except to the extent an adjustment or proration is made under another Section of this Article 7, (i) the Seller shall pay in full prior to the Closing all amounts payable to vendors or other suppliers of goods or services to the Hotel (the "Payables") which are due and payable as of the Closing Date for which goods or services have been delivered to the Hotel prior to Closing, and (ii) the Purchaser shall receive a credit for the amount of such Payables which have accrued, but are not yet due and payable as of the Closing Date, and the Purchaser shall pay all such Payables accrued as of the Closing Date when such Payables become due and payable up to the amount of such credit; provided, however, that the Seller and the Purchaser shall reprorate the amount of credit for any Payables and pay any

deficiency in the original proration to the other party promptly upon receipt of the actual bill for such goods or services. In addition to the amount to be received by the Seller pursuant to Section 7.1.16, the Seller shall receive a credit for all advance payments or deposits made with respect to FF&E, retail merchandise, Consumables Inventories and Supply Inventories ordered, but not delivered to the Hotel prior to the Closing Date, and the Purchaser shall pay the amounts which become due and payable for such FF&E, retail merchandise, Consumables Inventories and Supply Inventories which were ordered prior to Closing. The reproration obligation in this Section 7.1.1 shall survive the Closing without limitation.

7.1.2    **Cash, Accounts Receivable and Vending Machines**.

(a)    ）Cash. The Seller shall receive a credit for all cash in the cash registers, vaults, safes (other than that belonging to guests) and/or "petty cash boxes." The Seller shall retain all amounts in any operating or reserve accounts of the Hotel in any bank, and there shall be no credit or adjustment hereunder with respect to such cash.

(b)    b）Guest Ledger. All revenues received or to be received from transient guests on account of room rents for the period prior to and including the Adjustment Time shall belong to the Seller, except that the Purchaser shall receive a credit for fifty percent (50%) of the revenues received or to be received on account of such room rents for the day immediately preceding the Adjustment Time. The Purchaser shall promptly remit to the Seller any amounts received by the Purchaser after the Closing Date for which the Seller is entitled hereunder. Revenues collected or to be received from transient guests on account of room rents for the period from and after the Adjustment Time shall belong to the Purchaser. In the event that an amount less than the total amount due from a guest is collected and the guest continues in occupancy after the Adjustment Time, such amount shall be applied pro rata to any amounts owing by such person to the Seller and the Purchaser.

(c)    ）Accounts Receivable (Other than Guest Ledger). This Agreement does not include the purchase or transfer of any Accounts Receivable of the Seller for the period through the Adjustment Time, and the Purchaser shall continue to use commercially reasonable efforts (it being acknowledged that the Purchaser shall not be required to initiate collection proceedings or other substantial collection efforts) for a period of six (6) months after Closing, without incurring any material additional cost or liability, other than its overhead in administering the collection of such Accounts Receivable. During such period, the Purchaser shall not have the right to settle any such receivables without the Seller's consent. For the first six (6) months after the Closing, the Purchaser shall first pay to the Seller all collections received from any party who owed Accounts Receivables to the Seller to pay such Accounts Receivables, (except for any collection expressly designated to pay an invoice for the period after Closing), regardless of whether such party owes sums to the Purchaser. Upon receipt of such payment of Accounts Receivable, the Purchaser shall promptly turn such received amounts over to the Seller. At any time after Closing for any Account Receivable which is ninety (90) days past due and at any time after the foregoing six (6) month period for the remaining Account Receivables, the Seller may pursue any party to enforce payment of its Account Receivable owed to the Seller. The Seller shall provide the Purchaser with its Accounts Receivable detail as of the Adjustment Time. The Accounts Receivable shall not include the room charges for the night of the Adjustment Time. All of the Seller's Accounts Receivable incurred in the Ordinary Course of Business in connection

with the ownership and operation of the Property, including net amounts subject to collection from credit card operations and other trade receivables as of the Adjustment Time, are herein called the "Accounts Receivable".

(d)   d) Vending Machines.  The Seller shall remove all monies from all vending machines, laundry machines, pay telephones and other coin-operated equipment as of the Adjustment Time and shall retain all monies collected therefrom as of the Adjustment Time, and the Purchaser shall be entitled to any monies collected therefrom after the Adjustment Time.

7.1.3   **Advance Reservations and Trade Outs**.  The Purchaser shall cause the Sub-Manager to provide to the Purchaser and Seller a schedule of (a) Advance Reservations, including to the extent available, (i) the party for whose benefit the reservation was made, (ii) any contracts relating thereto, (iii) the amount of prepaid room rent and room rental deposits, and (iv) the amount of any other deposits for advance reservations, banquets and food services to be provided after the Closing Date; and (b) trade out arrangements where the Seller has agreed with third parties to provide free or reduced rate rooms or other services at the Property in return for services or goods to be provided by such third parties, which information shall include, to the extent available:  (i) the number of free or reduced rooms which are still to be made available to such third parties after the Closing, (ii) the dates, if known, of any such scheduled room rights or services, and (iii) a list of the services or goods which the Seller has received or is supposed to receive in the future after the Effective Date.  At the Closing, the Seller shall (x) transfer or credit to the Purchaser the amount of such prepayments and deposits which have been received by the Seller, and (y) credit to the Purchaser the total aggregate value of all free or reduced room rates or services still to be provided by the Property after the Closing under the above trade out arrangements.  The Purchaser shall honor and fulfill all confirmed Advance Reservations and trade out arrangements described in the deliveries made pursuant to this Section 7.1.3.

7.1.4   **Equipment Lease Payments**.  Any and all Equipment Lease payments which are either (a) due to be paid prior to the Adjustment Time for the period prior to the Adjustment Time, or (b) accrue during any period of time prior to the Adjustment Time, shall either be paid by the Seller prior to Closing or, if either such previously due payment has not been paid by the Seller or the payment of any accrued amount is to be paid after the Adjustment Time, the Purchaser shall receive a credit at Closing apportioned as of the Adjustment Time against the Purchase Price for such amounts.  The Purchaser shall credit the Seller for any Equipment Lease payments made by the Seller for the period subsequent to the Adjustment Time.

7.1.5   **Property Taxes**.  All Property Taxes levied against the Property shall be prorated as of the Adjustment Time between the Purchaser and the Seller. Such proration shall be handled on a "cash basis" so that the tax amounts due and payable in the year of Closing (the "Current Tax Year") shall be the amount prorated regardless of the period for which such amounts were assessed. With respect to Property Taxes payable to any Governmental Authority in arrears arising from tax years accruing or payable prior to the Current Tax Year, no proration or adjustment shall be made, and all of such proceeds Any refunds of Property Taxes for periods before the Closing shall be the sole property of the Seller.  Should any such proceeds for prior tax years periods be paid to the Purchaser, they shall be immediately turned over to the Seller.

If the amount of any such Property Taxes for the New York City fiscal tax year in which Closing occurs ("Current Tax Year") is not ascertainable on the Closing Date, the proration for such Property Taxes shall be based on the most recent available bill; provided, however, that after the Closing, the Seller and the Purchaser shall re- prorate the Property Taxes and pay any deficiency in the original proration to the other party promptly upon receipt of the actual bill. The re-proration obligation under this Section 7.1.5 shall survive the Closing without limitation. Notwithstanding the foregoing, in no event shall the Seller be charged with or responsible for any increase in the Property Taxes on the Property resulting from the sale of the Property, or from any improvements made or leases entered into at any time or for any reason after the Closing Date.

With respect to all periods for which the Seller has paid Property Taxes, the Seller hereby reserves the right to institute or continue any proceeding or proceedings for the reduction of the assessed valuation of the Property, and, in its sole discretion, to settle the same. The Seller shall have sole authority to control the progress of, and to make all decisions with respect to, all such proceedings now underway or arising after the date hereof with regard to contesting current taxes or taxes for any other prior calendar years. All net tax refunds and credits attributable to any period prior to the Closing Date which the Seller has paid or for which the Seller has given a credit to the Purchaser shall belong to and be the property of the Seller. All net tax refunds and credits attributable to any period subsequent to the Closing Date shall belong to and be the property of the Purchaser. The Purchaser agrees to cooperate with the Seller, at no out-of-pocket cost to the Purchaser, in connection with the prosecution of any such proceedings and to take all steps, whether before or after the Closing Date, as may be necessary to carry out the intention of this subparagraph, including the delivery to the Seller, upon demand, of any relevant books and records, including receipted tax bills and cancelled checks used in payment of such taxes, the execution of any and all consent or other documents, and the undertaking of any acts necessary for the collection of such refund by the Seller. Purchaser shall in all cases be permitted to commence proceedings for the reduction of the assessed valuation of the Property for all New York City fiscal tax years commencing after the Closing Date, and this sentence shall survive the Closing. In addition, if for any reason the Closing shall not have occurred by February 15, 2016 and this Agreement shall not then be terminated, Seller shall (if Seller shall not already have done so) duly file with the New York City Tax Commission before March 1, 2016 (together with payment of any and all application fees) an application to challenge the assessed valuation of the Property for the 2016-2017 tax year and thereafter reasonably pursue such challenge in compliance with law, in which event, at the Closing, (x) the reasonable out-of-pocket payments made by Seller in connection therewith shall be credited to Seller and shall be paid by Purchaser and (y) Seller shall assign to Purchaser Seller's rights with respect to such application and challenge.

7.1.6     **Lease Rentals**. All Deposits or rentals and other payments received under the Leases shall be adjusted and apportioned as of the Adjustment Time; provided, however, that any rentals and other payments in connection with the Leases received by the Seller as of the Adjustment Time, if any, which are, in whole or in part, allocable to the period after the Adjustment Time, shall be paid by the Seller to the Purchaser at Closing; and provided further, however, that any rents or other payments from any of the Leases not yet billed but ultimately collected related to the period prior to the Adjustment Time shall be paid to the Seller if and when collected.

7.1.7 **Water Charges and Sewer Charges**.

7.1.7.1    Water charges shall be estimated, adjusted and apportioned pursuant to custom or on the basis of the last meter reading.  If there is a water meter at the Property, the Seller shall furnish a reading as close as practicable to the Adjustment Time and the unfixed meter charge, if any, based thereon for the intervening time shall be apportioned on the basis of such last reading.  The Seller and the Purchaser agree to finalize adjustments for these charges after Closing as soon as final bills become available, or, if later, at the next adjustment date referenced in Section 7.1.

7.1.7.2    Sewer charges, if any, shall be estimated, adjusted and apportioned as per custom.  The Seller and the Purchaser agree to finalize adjustments for these charges after Closing as soon as final bills become available, or, if later, at the next adjustment date referenced in Section 7.1.

7.1.7.3    The Seller shall receive a credit for all deposits transferred to the Purchaser or which remain on deposit for the benefit of the Purchaser with respect to such water and sewer utilities.

7.1.8    **Fuel and Utilities**.  Fuel and utilities shall be adjusted and apportioned as of the Adjustment Time.  Deposits, if any, made by or on behalf of the Seller, or any predecessor in title as security under any utility or public service contract shall be credited to the Seller to the extent that the same remains on deposit for the benefit of the Purchaser.  Readings will be secured for all utilities as close as practicable to the Adjustment Time.  The Seller and the Purchaser agree to finalize adjustments for these charges after Closing as soon as final bills become available, or, if later, at the next adjustment date referenced in Section 7.1.  Any pre-paid expenses relating to fuel contracts or cooperative arrangements shall be credited to the Purchaser as of the Adjustment Time.

7.1.9    **Fees for Governmental Permits**.  Fees paid or payable, if any, in the year of Closing for Governmental Permits to the extent such Governmental Permits are transferred to the Purchaser shall be adjusted and apportioned as of the Adjustment Time.

7.1.10    **Prepaid Expenses**.  Prepaid subdivision dues and fees, trade association dues and trade subscriptions, and deposits held by third parties for the benefit of the Property (other than as described in Sections 7.1.7 and 7.1.8), washroom and checkroom income, commissions of credit and referral organizations shall be adjusted and apportioned as of the Adjustment Time.

7.1.11    **Operating Agreements and Equipment Leases**.  In accordance with the provisions of Section 1.2.8, all prepayments made under any Accepted Operating Contracts and/or Accepted Equipment Leases shall be adjusted and apportioned as of the Adjustment Time.  Any Operating Contracts and/or Equipment Leases, other than Accepted Operating Contracts or Accepted Equipment Leases, shall not be apportioned.

7.1.12    **Intent of Proration Provisions**.  The intent of the prorations and adjustments provided for herein is that the Seller shall bear all expenses of ownership and operation of the Property and shall receive all income therefrom accruing through the applicable

Adjustment Time, and the Purchaser shall bear all such expenses and receive all such income accruing thereafter.

7.1.13    **Intentionally Omitted**.

7.1.14    **Miscellaneous**.  All other charges and fees customarily prorated and adjusted in similar transactions shall be prorated at Closing and thereafter be assumed by the Purchaser or the Seller, as applicable and customary.  In the event that accurate prorations and other adjustments cannot be made at Closing because current bills or statements are not obtainable (as, for example, utility bills), the parties shall prorate on the best available information, subject to adjustment upon receipt of the final bill or statement.

7.1.15    **Employee Matters**.

7.1.15.1   7.1.1.1   Immediately prior to the Closing, the Seller shall terminate (or shall cause the Manager to terminate) all Hotel employees employed by the Seller, and the Purchaser or the Sub Manager any manager for the Property retained by Purchaser (the "Purchaser's Agent") shall offer to employ or continue employment of such employees of the Seller on or prior to the Closing Date on such terms and conditions as the Purchaser or the Sub Manager Purchaser's Agent shall determine.

7.1.15.2   7.1.1.2   The Purchaser shall indemnify and defend the Seller, its successors, subsidiaries, and affiliated companies from all liability under the Worker Adjustment and Retraining Act, 29 USC §2101 et seq. or any similar state or local statute or rule of law (the "WARN Act") resulting from (a) the Purchaser's or the Manager Purchaser's Agent's acts or omissions in connection with the hiring, offering to hire, or failure to hire any of the current employees at the Hotel, (b) the Seller's termination of the employees at the Hotel by reason of the sale of the Property to the Purchaser or failure to provide WARN notice to any individual or entity, or (c) the failure of the Purchaser to rehire in accordance with the terms of this Agreement, including all of the Purchaser's obligations contained in Section 7.1.15.3 hereof.

7.1.15.3   7.1.1.3   The Purchaser shall (or shall cause Purchaser's Agent to), on or prior to the Closing Date, offer employment effective on the Closing Date to no fewer of the employees at the Property under terms and conditions of employment so as to not trigger any requirement for notice under the WARN Act.  Such employees shall be hired for the same position, in full or part time status, and at not less than the hourly wage rate or salary currently being paid.

7.1.15.4   7.1.1.4   All employee wages, salaries, bonuses and other forms of remuneration, including all accrued benefits earned by employees which are due and payable as of the Closing Date, such as vacation and sick leave, and other payables with respect to employees shall be paid by the Seller immediately prior to Closing (collectively, the "Employee Benefits").  Seller shall, immediately prior to Closing, (a) deliver with such payment to each such employee an accurate and complete statement of the amounts of any accrued vacation pay, sick days and similar items accrued through the Closing Date by or for such employee (which may be in the form of such information on the pay stub or explanatory portion of the check for such payment), and (b) deliver an accurate record of the actual such payments and such amounts to Purchaser at Closing, together with copies of such checks and statements.  Seller shall indemnify, defend and hold Purchaser

harmless from and against any and all claims, causes of action, losses, damages, liabilities, taxes, sanctions, costs and expenses (including reasonable attorneys' fees and disbursements) arising from or relating to any failure by Seller to pay the foregoing. The Purchaser shall be responsible for any payments or benefits to any employees of the Hotel payable after the Closing Date, and the Purchaser shall indemnify and hold the Seller harmless from and against any and all liability, loss, cost, damage or expenses which may arise by reason of any claim for Employee Benefits assumed by the Purchaser at Closing, or for any post-Closing Employee Benefits. In addition to the other provisions of this Agreement, Seller shall provide Purchaser's representatives access to the Property during the two weeks before the Closing Date to observe all operations at the Property.

      7.1.15.5    ~~7.1.1.5~~ The Purchaser shall remain solely liable for any and all liabilities and claims arising from (a) the Purchaser's (or Purchaser's Agent's) employment or termination or hiring or rehiring or failure to hire or rehire by the Purchaser (or by Purchaser's Agent) of employees at the Property on and after the Closing Date, (b) its obligations under Section 7.1.15.3, 7.1.15.4 and 7.1.15.7, and (c) the termination of employees pursuant to Section 7.1.15.1, and the Purchaser shall indemnify and defend the Seller from any and all such claims and shall reimburse the Seller's reasonable costs of the defense thereof. Nothing in this Agreement shall be inconsistent with the obligation of the Purchaser to indemnify and defend the Seller from any liability under the WARN Act or as provided in this Section 7.1.15.

      7.1.15.6    ~~7.1.1.6~~ For the purposes of determining the reduction of the Seller's liability pursuant to 29 U.S.C. § 2104(a)(2), the Purchaser's (or Purchaser's Agent's) payment of wages, benefits and other compensation to employees at the Hotel during any period of time shall be deemed to have been paid by the Seller also.

      7.1.15.7    ~~7.1.1.7~~ As applicable, the Seller shall retain liability, if any, for "withdrawal liability" ("Withdrawal Liability") as defined under the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), by reason of its discontinuance of contributions to any multi-employer pension plan under any collective bargaining agreement described on **Schedule 2** (the "Multiemployer Pension Plan"). In accordance with the provisions of Section 4204 of ERISA, the Purchaser agrees and covenants: (i) to contribute to the Multiemployer Pension Plan for substantially the same number of contribution base units, as defined in Section 4001(a)(11) of ERISA, for which the Seller was obligated to contribute prior to the Closing Date, and (ii) unless a waiver is in effect pursuant to Section 4204(c) of ERISA, to provide to and for the benefit of the Multiemployer Pension Plan, for the five plan years commencing with the first plan year to begin after the Closing Date (the "Surety Period"), either a bond issued by a corporate surety company that is an acceptable surety for purposes of Section 412 of ERISA or an amount held in escrow by a bank or similar financial institution, in either case in an amount equal to the greater of (A) the average annual contribution that the Seller was required to make with respect to the covered operations for the three plan years preceding the plan year in which the Closing Date occurs, or (B) the annual contribution that the Seller was required to make with respect to the covered operations for the plan year preceding the plan year in which the Closing Date occurs, or any greater amount which may be required under Section 4204 of ERISA, which bond or such amount held in escrow shall be paid to the Multiemployer Pension Plan if, at any time during the Surety Period, the Purchaser or any successor in interest thereto, withdraws from the Multiemployer Pension Plan or fails to make any  contribution to the Multiemployer Pension Plan when due. If a waiver is not in effect pursuant to Section 4204(c) of ERISA, the

Purchaser shall deliver to the Multiemployer Pension Plan at the Closing Date, with copies to the Seller, either the bond or evidence of the establishment of an escrow described in the preceding sentence. If the Purchaser or any successor in interest thereto shall withdraw from the Multiemployer Pension Plan in either a complete or partial withdrawal, as such terms are used in Sections 4203 and 4205 of ERISA, and withdrawal liability is imposed under Section 4201 of ERISA, the Seller agrees that the Seller shall be secondarily liable to the Multiemployer Pension Plan for any Withdrawal Liability that it would have had to the Multiemployer Pension Plan in the absence of section 4204 of ERISA.  To the extent that any obligation is imposed on the Purchaser herein, the Purchaser agrees to require each of its successors in interest and assigns to specifically assume and accept the obligations assumed by it under this Section 7.1.15.7.

      7.1.15.8   7.1.1.8  The Seller shall be responsible for complying with the requirements of Section 4980B of the Internal Revenue Code of 1986, as amended (the "Code") and Part 6 of Subtitle B of Title I of ERISA (such requirements are referred to herein as "COBRA") with respect to all persons who experience a "qualifying event" on or prior to the Closing Date, and the Purchaser shall have no obligation or responsibility whatsoever with respect thereto.

      7.1.15.9   7.1.1.9  No later than ten (10) business days prior to the Closing Date, the Seller shall provide a list of the names of each current or former employee of the Seller who is on a leave of absence (whether or not pursuant to the Family and Medical Leave Act of 1993, as amended ("FAMLA"), and is receiving or entitled to receive health coverage under an employee benefit plan of the Manager or any affiliate, whether pursuant to FAMLA, COBRA or otherwise, if any.  The Purchaser shall, at its own expense, comply (or cause Purchaser's Agent, if applicable, to comply) with the requirements of federal law as may apply to the Purchaser (or Purchaser's Agent, if applicable) with respect to such the Purchaser's Employees for all periods commencing after the Closing Date, including any FAMLA benefits for the Seller's Employees retained for the Purchaser or the Sub-Manager(or Purchaser's Agent, if applicable) which continue for the period after the Closing Date.

this Agreement.

7.1.15.10   7.1.15.10  This Section 7.1.15 shall survive Closing or any termination of this Agreement.

7.1.2  **Consumable Inventories and Supply Inventories**.  The Purchaser shall purchase from the Seller at Closing the Supply Inventories and Consumable Inventories in reserves or in storerooms at a cost equal to the lesser of (a) the actual cost paid by the Seller or (b) the invoiced cost to the Seller.  The Purchaser Seller agrees to maintain and shall direct the Sub-Manager to maintain the level in each of (i) reserves and storerooms and (ii) opened and in service of Consumable Inventories and Supply Inventories at the Property between now and the Closing Date based on normal and customary operating standards and procedures.  The provisions of this Section 7.1.16 with regard to the purchase of liquor shall be subject to the terms of Section 14.1, in the event the parties enter into the interim liquor agreement.

7.1.16   7.1.3  **Operating Equipment**.  The Hotel contains or will contain at Closing, inventories of guest room linen and towels, china and glassware, and silver and flatware, at no lower levels than as retained in the Ordinary Course of Business.

7.1.4  **Survival**.  Except as otherwise expressly provided herein, the provisions of this Article 7 shall survive the Closing for a period of one (1) year after the Closing Date.

**ARTICLE 8**
**OPERATIONS PRIOR TO CLOSING; SPECIAL AGREEMENTS**

8.1   **Maintenance and Construction**.  Subject to the provisions herein concerning repairs and replacements in the event of condemnation or casualty, until Closing, the Seller shall maintain the Property and the Hotel in its present condition, subject to normal wear and tear.

8.2   **Operations**.  Until Closing, subject to any Order of the Bankruptcy Court or the requirements of the applicable UST Guidelines, the Seller and the Manager shall operate the Property and the Hotel in the Ordinary Course of Business.  All of the Seller's insurance policies, including, without limitation, liability, fire and any additional hazard insurance, shall be maintained in effect until Closing and shall be cancelled by the Seller on or after the Closing Date, and any refunded premiums shall be retained by the Seller.  The Purchaser shall be responsible for acquiring and placing its own insurance in force from and after the Closing Date.  The Seller shall continue to, or cause the Manager to, continue to accept reservations for Advance Reservations in accordance with the Hotel's Ordinary Course of Business.

8.3   **Covenants**.  The Seller shall (a) not dispose of or remove any material component or item comprising the Property or any part thereof or interest therein, which is not simultaneously replaced with an unencumbered like or better component or item of a similar and suitable nature, other than Consumable Inventories in the Ordinary Course of Business; and (b) maintain the Consumable Inventories and Supply Inventories and other consumable or depletable assets at the Property in the Ordinary Course of Business; and (c) use reasonable efforts (i) to preserve and enforce all existing Governmental Permits, and (ii) cause all of those expiring prior to the Closing Date to be renewed prior to the time of Closing.

8.4    **Right of Inspection; Cooperation**.

(a)    )The Purchaser, from time to time, may further inspect the Property before the Closing, as long as during regular business hours on business days and upon two (2) days prior Notice or other prior notice to the Seller, which may be oral.

(b)    b) The Seller shall cooperate with respect to the Purchaser's reasonable inquiries or reports requested relative to the Property which are in possession of the Seller or the Manager.  The Seller shall use reasonable efforts to assist and cooperate with the Purchaser in seeking and obtaining licenses, including the Liquor License, needed by the Purchaser or the Managerany Purchaser's Agent in connection with its intended operation of the Property.  It is expressly understood and agreed, however, that neither the Seller nor its agents shall be required to expend any funds in providing such cooperation other than normal overhead and photocopying charges.  This Section 8.4(b) shall survive the Closing for a period of one (1) year.

8.5 Indemnification

## ARTICLE 9ARTICLE 9
## REAL ESTATE COMMISSION

9.1    **Real Estate Broker**.  Each of the Purchaser and the Seller represents and warrants to the other that neither it nor any of its their respective officers, directors, shareholders, partners, agents, or employees, as the case may be, have employed the services of any real estate broker, investment banker, agent or finder (howsoever characterized) in connection with this Agreement or the sale of the Property or any part thereof other than Robert Douglas Real Estate (the "Broker").  Subject to approval of the Bankruptcy Court the Seller agrees to pay any fee or other compensation owed to the Broker with respect to the transactions hereunder pursuant to a separate agreement.

9.2    **Indemnity**.  The Purchaser and the Seller each agrees to indemnify and hold the other harmless from all claims, actual or threatened, of any broker, investment banker, agent or finder (howsoever characterized) arising by reason of the indemnifying party's breach of the representation and warranty set forth in Section 9.1.  The Seller acknowledges that this indemnity of the Purchaser by the Seller includes, without limitation, any claim by the Broker.  The indemnities provided in this Section 9.2 shall survive any termination of this Agreement for any reason whatsoever and the Closing and delivery of the Deed.

## ARTICLE 10
## DEFAULT AND REMEDIES

10.1    **Purchaser's Pre-Closing Default; Liquidated Damages**.  In the event that Closing fails to occur by reason of the Purchaser's failure or refusal to perform its obligations hereunder, which failure or refusal is not cured within five (5) business days after Notice thereof from the Seller, then the Seller may terminate this Agreement and thereto shall receive the Earnest Money from the Escrow Agent as full liquidated damages by giving the Escrow Agent and the Purchaser Notice of the Purchaser's continuing default, in which event the Escrow Agent, subject

to Section 2.5.3, promptly shall pay the Earnest Money to the Seller.  The Earnest Money shall be liquidated damages and not a penalty.  The Purchaser and the Seller each acknowledge that it would be difficult to ascertain the actual damages as to loss of the value of the bargain, certain carrying costs and other indirect costs which would be suffered by the Seller if the Purchaser defaults in consummating the purchase and sale contemplated by this Agreement.  It is agreed by the parties that the Earnest Money represents a reasonable estimate of the probable loss to the Seller resulting from any such default by the Purchaser prior to Closing.  Upon payment of the Earnest Money to the Seller, neither party to this Agreement shall have any further liability to the other and this Agreement shall be and become null and void and of no further force and effect, either at law or in equity, except for the provisions hereof which expressly survive the termination of this Agreement.

10.2   **Seller's Pre-Closing Default**.  In the event the Closing fails to occur by reason of the Seller's failure or refusal to perform its obligations hereunder, or in the event of any other default by the Seller where the Seller either fails to cure such default or to commence such cure, which failure or refusal is not cured within five (5) business days after Notice thereof from the Purchaser, then the Purchaser shall have the right, as the Purchaser's sole remedy, to either:

(a)   receive the Earnest Money, in which event the Purchaser shall give the Escrow Agent and the Seller Notice of the Seller's default, and the Escrow Agent shall (subject to Section 2.5.2) promptly pay the Earnest Money to the Purchaser. In such event, this Agreement shall be terminated and the parties shall be released and relieved of all obligations hereunder except the provisions hereof which expressly survive the termination of this Agreement; or

(b)   b) receive specific performance of the terms of this Agreement, a Motion for which shall be filed with the Bankruptcy Court on no less than 7 days notice and within thirty (30) days of the Seller's alleged default; or

(c)   waive the Seller's default and proceed to consummate the transactions contemplated by this Agreement.

Notwithstanding anything to the contrary contained in this Agreement:

(i)   i) the Purchaser agrees that its failure to timely commence any such action for specific performance within such thirty (30) day period shall be deemed a waiver by it of its right to commence such an action;

(ii)   Except for the remedies as expressly set forth above in this Section 10.2, the Purchaser hereby expressly waives, relinquishes and releases any other right or remedy it has at law, in equity or otherwise by reason of the Seller's default hereunder, including without limitation the Purchaser's right to recover damages from the Seller; and

(iii)   iii) In the event that the Seller shall have willfully or intentionally breached this Agreement in bad faith, then in addition to the Purchaser's remedies under this Section 10.2, the Seller shall be responsible for the Purchaser's

reasonable out-of-pocket costs and expenses incurred by the Purchaser arising out of such breach, not to exceed $100,000 in the aggregate.

10.3   **Post-Closing Default Remedies of the Purchaser**.

(a)   )-The Closing of the transactions contemplated by this Agreement shall be deemed a full satisfaction by the Seller of all of its obligations and covenants under this Agreement other than any post-Closing obligations agreed to in writing by the Seller, and the indemnification provided by the Seller pursuant to Section 10.3(b) (collectively, the "Seller's Post-Closing Matters"), and except for such the Seller's Post-Closing Matters, all obligations of the Seller under this Agreement and the representations and warranties of the Seller shall be deemed to terminate immediately upon Closing.  The Purchaser shall have no right to maintain any action against the Seller for breach of this Agreement after the Closing Date, except for an action in connection with the Seller's Post-Closing Matters.  Notwithstanding the foregoing, in no event shall the Purchaser be entitled to consequential damages for any breach of representation or warranty, or breach of any other obligation of the Seller hereunder.

(b)   b)-From and after the Closing and subject to Section 10.3(a), the Seller shall indemnify and hold the Purchaser, its affiliates, members and partners, and other partners shareholders, officers, directors, employees, representatives and agents of each of the forgoing (collectively, the "Purchaser-Related Entities") harmless from and against any and all costs, fees, expenses, damages, deficiencies, interest and penalties actually suffered or incurred by any such indemnified party solely in connection with any and all losses, liabilities, claims, damages and expenses (collectively, "Losses"), resulting from (i) a material breach of any representation or warranty of the Seller contained in this Agreement or in any Closing Document, and (ii) events, contractual obligations, acts or omissions of the Seller or its agents that occurred in connection with the ownership or operation of the Property for the period prior to Closing.

(c)   )    Any action under this Section 10.3 must be commenced within eighteen (18) months after the Closing Date.

10.4   **Post-Closing Remedies of the Seller**.

(a)   )-The Closing of the transactions contemplated by this Agreement shall be deemed a full satisfaction by the Purchaser of all of its obligations and covenants under this Agreement other than any post-Closing obligations and the indemnification provided by the Purchaser pursuant to Section 10.4(b) (collectively, the "Purchaser's Post-Closing Matters"), and except for such the Purchaser's Post-Closing Matters, all obligations of the Purchaser under this Agreement and the representations and warranties of the Purchaser shall be deemed to terminate immediately upon Closing.  The Seller shall have no right to maintain any action against the Purchaser for breach of this Agreement after the Closing Date, except for an action in connection with the Purchaser's Post Closing Matters.  Notwithstanding the foregoing, in no event shall the Seller be entitled to consequential damages for any breach of representation or warranty, or breach of any other obligation of the Purchaser hereunder.

(b)   b)-From and after the Closing, and subject to Section 10.4(a), the Purchaser shall indemnify and hold the Seller, its affiliates, members and partners, and the partners,

shareholders, officers, directors, employees, representatives and agents of each of the foregoing (collectively, the "Seller-Related Entities") harmless from any and all Losses arising out of, or in any way relating to, (i) any material breach of any representation or warranty by the Purchaser contained in this Agreement or in any Closing Document, and (ii) events, contractual obligations, acts or omissions of the Purchaser or its agents or affiliates that occurred in connection with the ownership or operation or management of the Property for the period after Closing.

10.5    **Attorneys' Fees**.  If either the Purchaser or the Seller shall employ an attorney to enforce its rights pursuant to this Agreement and there is a court proceeding, then, in addition to the other amounts and remedies to which the prevailing party may be entitled pursuant to the other provisions of this Article 10, the prevailing party shall be reimbursed by the non-prevailing party for reasonable attorney's fees and expenses including the costs of any litigation.

10.6    **Break-Up Fee.** In the event that: (1) the Bankruptcy Court approves a higher and better sale offer other than Purchaser; (2) such sale to a Successful Bidder closes; and (3) Purchaser shall have performed all of Purchaser's obligations under this Agreement, all closing conditions have been satisfied by Purchaser, and Purchaser is ready, willing, and able to proceed with Closing, then: (i) the Earnest Deposit shall be returned to Buyer; (ii) Buyer shall be paid, from the proceeds of such sale, a break-up fee equal to One Million One Hundred Forty Thousand Dollars ($1,140,000.00); and (iii) neither the Seller nor Purchaser shall have any further rights or obligations to one another under this Agreement except for obligations that specifically survive the termination of this Agreement. Notwithstanding anything contained in this Agreement to the contrary, in the event that (i) the Bankruptcy Court approves the sale to a Successful Bidder, (ii) such Successful Bidder fails to close on the acquisition of the Property in accordance with the terms of the Sale Order, and (iii) Purchaser shall have made one or more bids during the auction process required by the Sale Procedures Order, then in such event Purchaser shall be obligated to acquire the Property in accordance with the terms of this Agreement as modified by any such bids, provided that Purchaser shall not be so obligated to close such acquisition unless Seller shall have notified Purchaser of such Successful Bidder's failure to close within thirty (30) days after entry of the Sale Order.

## ARTICLE 11
## DAMAGE OR DESTRUCTION/CONDEMNATION

11.1    **Notice of Damage**.  The Seller will promptly notify the Purchaser in writing after (a) any material damage to the Property by fire, windstorm, hurricane, flooding, accident, rioting or other civil disturbance, acts of war, earthquake or other casualty (a "Casualty Loss", and such Notice a "Casualty Notice").

11.2    **Destruction**.

11.2.1    If prior to the Closing a Casualty Loss shall occur and the cost to complete repairs of such Casualty Loss shall equal or exceed Three Million and 00/100 Dollars

($3,000,000.00), then the Purchaser may terminate this Agreement by Notice to the other party (the "Casualty Termination Notice") within ten (10) days after the Purchaser has received the Casualty Notice (provided, however, that if the Closing is scheduled for a date which is less than ten (10) days after the Purchaser's receipt of the Casualty Notice, the Closing shall be adjourned until ten (10) days after the Purchaser's receipt of the Casualty Notice), in which event the Earnest Money shall be returned to the Purchaser, this Agreement shall be null and void and neither party shall have any further liability or obligations to the other.

If the Purchaser does not elect to terminate this Agreement, then the Closing shall take place as provided herein, and at the Closing there shall be (a) assigned to the Purchaser all of the Seller's rights, titles and interest in and to any insurance policies covering such Casualty Loss and all proceeds to be paid thereunder (other then on account of business or rental interruption insurance proceeds payable for the period prior to Closing), (b) delivered to the Purchaser by the Seller written confirmation addressed to the Seller and the Purchaser, in form and substance reasonably satisfactory to the Purchaser, executed by the applicable insurer(s), that (i) such assignment will not impair the Seller's insurance, and (ii) such insurer(s) will pay the amount of claims for such Casualty Loss to the Purchaser in an amount expected to constitute substantial restoration, less any deductible, and (c) a credit against the Purchase Price in favor of the Purchaser at Closing equal to the amount of any deductible to be claimed by such insurer(s).  If the Purchaser does not terminate this Agreement as provided above in this Section 11.2.1 and there is no insurance coverage covering such Casualty Loss or the applicable insurer(s) will not provide such written confirmation provided above, then the Purchaser, at Closing, shall take a credit against the Purchase Price in an amount equal to the lesser of (i) any insurance proceeds which would have been payable on account of such Casualty Loss, or (ii) the amount necessary to repair such Casualty Loss and replace any lost business income during such repair period.

11.2.2    If prior to the Closing, such a Casualty Loss shall occur and the cost to complete repairs of such Casualty Loss shall be less than Three Million and 00/100 Dollars ($3,000,000.00), then, in any such event, the Purchaser shall have no right to terminate its obligations under this Agreement, but at the Closing there shall be a credit against the Purchase Price in favor of the Purchaser at Closing equal to the amount necessary to repair such Casualty Loss and replace any lost business income during such repair period (to the extent not covered by the Purchaser's insurance policies).

11.3    **Condemnation**.  If, prior to Closing, all or a substantial part of the Property with a fair market value of Three Million and 00/100 Dollars ($3,000,000.00) or more (a "Material Portion") is taken by eminent domain, or any proceedings for the taking by eminent domain (a "Taking") of a Material Portion of the Property is commenced, then the Purchaser, at its option, may terminate this Agreement by a Notice to the Seller (a "Condemnation Termination Notice"), in which case the Earnest Money will be returned to the Purchaser.  If the Purchaser elects not to terminate this Agreement notwithstanding a taking by eminent domain or proceeding therefor, or if there is or will be a Taking of only less than a Material Portion, the Seller will deliver to the Purchaser at Closing, through the closing escrow, all condemnation proceeds previously received by the Seller and an assignment of the Seller's rights with respect to all uncollected condemnation proceeds (in either case, net of proceeds allocable to loss of use of the Property for the period through the Closing Date and reasonable costs incurred by the Seller in connection with such

proceedings) and such documents as the Purchaser may reasonably request to substitute itself for the Seller in any pending eminent domain proceedings.

## ~~ARTICLE 12~~
## REPRESENTATIONS WARRANTIES AND COVENANTS OF SELLER

The Seller hereby represents and warrants the following as of the date hereof and on the Closing Date, unless otherwise expressly stated herein:

12.1    **Authority and Non-Contravention**.  The Seller is a limited liability company duly formed, validly existing and in good standing under the laws of the State of Delaware.  As of the date hereof and as of the Closing Date, this Agreement and, as of the Closing Date, all other documents executed and delivered, or to be executed and delivered, by the Seller in connection with the transactions contemplated herein, including, but not limited to the Closing Documents, have been or will be at Closing duly executed and delivered and constitute the legal, valid and binding obligations of the Seller enforceable in accordance with their respective terms and provisions; the Seller has taken all action, corporate, partnership, limited liability company or otherwise, required to authorize its execution, delivery and performance of this Agreement, the Closing Documents and such other documents as are appropriate to convey the Property in accordance with the terms and conditions of this Agreement; and neither the execution nor delivery of this Agreement or the Closing Documents nor the consummation of the transactions contemplated herein will conflict with, or result in a breach of, the terms, conditions or provisions of, or constitute a default under, the Seller Organizational Documents or any other agreement or instrument to which the Seller is a party or any court order, judgment, statute, ordinance, rule, regulation, order or other government requirement.  Except for the approval of any authorities in connection with the Liquor License or other Governmental Permits, no consent or approval of any person, firm, corporation or Governmental Authority is required to be obtained by the Seller in order for the Seller to enter into this Agreement or any of the documents set forth herein, or to perform fully all of the Seller's obligations under this Agreement or under any such other document, and to transfer the Property to the Purchaser.

12.2    **Litigations and Actions**.  To the Seller's Knowledge, listed on  **Schedule 1** annexed to this Agreement and incorporated herein by reference is a schedule of all Litigations and Actions presently pending against either the Seller or all or any portion of the Property and, except as disclosed by the Seller to the Purchaser in **Schedule 1** annexed to this Agreement, to the Seller's Knowledge, the Seller has not received any Notice of any threatened litigations, suits, actions, arbitration proceedings, government investigations, orders, decrees, claims, writs, injunctions, or proceedings (collectively, "Litigations and Actions") with respect to the Seller or affecting all or any part of the Property.

12.3    **Employee Related Matters**.  Except as disclosed to the Purchaser by the Seller in **Schedule 2** annexed to this Agreement, there are no (a) employment contracts for employees of the Seller, (b) union contracts, union disputes, employment contracts, employee disputes or pension, health benefit, profit sharing or other employee benefit plans.

12.4   **Leases**.

12.4.1   **Exhibit "E"** is a true, correct, and complete list of each and every Lease affecting or encumbering all or any portion of the Property together with all amendments thereto, and the Seller has delivered to the Purchaser, or will have delivered to the Purchaser by the DDI Delivery Date, a binder which contains a true, correct and complete copy of every such Lease.

12.4.2   Except as set forth in **Exhibit "E"**:

(a)   ~~)~~ there are no other Leases in force or outstanding (or executed but not yet effective) with respect to the Property; and

(b)   there are no other assignments, amendments, or other agreements outstanding with respect to, or comprising, the Leases.

12.4.3   Unless otherwise specified in **Schedule 3** annexed to this Agreement, to Seller's Knowledge: (a) the Leases are in full force and effect; (b) no tenant is in default under a Lease beyond applicable notice and cure periods; (c) no tenant has (or claims in writing) any setoff, claim or defense to the enforcement of any Lease which has not subsequently been waived or withdrawn; (d) the Seller has completed all work or alterations required of the landlord or lessor under each Lease, if any, has no further obligation to perform decorating, repairs, alterations, or other work for any tenant, and no equipment is required to be furnished to any tenant; (e) no tenant has an option to purchase the Property or any portion thereof, except as expressly set forth in the Leases; and (f) the Seller has not assigned to any Person any of the Leases or any rights thereunder.

12.5   **Compliance with Laws and Ordinances**.   The Seller has not received a written notice from any Governmental Authority or other person that: (a) the present use of the Property is not in conformity with any certificate of occupancy issued for the Property; (b) all required Governmental Permits are not in full force and effect; (c) the Property and the present use and condition thereof violate any applicable deed restrictions, zoning or subdivision regulations, ordinances or laws or urban redevelopment plans applicable to the Property, as modified by any duly issued variances; (d) any action or proceeding relating to the foregoing is pending or threatened with respect to the Property; or (e) any violation of any zoning, building or, other law, ordinance, regulation, requirement or directive of any type presently exists against the Property. To the Seller's Knowledge, **Exhibit "F"** is a true, correct and complete list of all Governmental Permits in the Seller's possession.

12.6   **Operating Statements**.   To the Seller's knowledge, the financial statements delivered to the Purchaser in connection with this Agreement are current, correct and complete, fairly present the financial condition, assets and liabilities of the Seller and the Property in all material respects as of and for their respective dates and the results of operations for such periods, and have been prepared in accordance with generally accepted accounting principles consistently maintained since the beginning of the period covered thereby.   Since the date of the latest monthly financial information, to Seller's Knowledge, there has been no material adverse change in the Seller's financial condition, assets, liabilities or operation of the Property.

12.7    **Agreements in Effect**.  To the Seller's Knowledge, **Exhibit "C"** and **Exhibit "G"** are true, correct and complete lists and summaries of the Equipment Leases and the Operating Contracts, respectively, and all such Equipment Leases and Operating Contracts are in full force and effect.  True, correct and complete copies thereof will be delivered by the Seller to the Purchaser prior to the DDI Delivery Date, to the extent same are in the Seller's possession.  Neither the Seller, nor to the Seller's knowledge, any other party thereto, is in material default under any of the terms of, or any of the agreements, duties or obligations under the Equipment Leases or the Operating Contracts beyond any applicable notice, grace or cure periods.  The Purchaser shall have no liability to assume at Closing, and shall not have any liability of any type regarding, any Operating Contracts or Equipment Leases other than the Accepted Operating Contracts and the Accepted Equipment Leases.

12.8    **Warranties and Guaranties**.  To the Seller's Knowledge, **Schedule 4** sets forth a true, correct and complete list of all Warranties and Guaranties currently covering the Property or any portion thereof or issued and to cover the Property in the future.  The Seller has furnished to the Purchaser, or will have delivered or caused the Manager to deliver to the Purchaser or Sub-Manager, a true, correct and complete copy of each such warranty and guaranty.  To the Seller's Knowledge, there are no such Warranties or Guaranties in effect at this time, other than as set forth in the Operating Contracts.

12.9    **Plans and Studies**.  To the Seller's Knowledge, **Schedule 5** sets forth a true, and correct list of all Plan and Studies in the Seller's possession.  The Seller has furnished to the Purchaser, or will have delivered to the Purchaser by the DDI Delivery Date, a complete set of the Plans and Studies.

12.10   **Hazardous Substances**.   Except as set forth in the environmental reports identified on **Schedule 6** (collectively, the "Environmental Reports") to the Seller's Knowledge, there are no Hazardous Substances on or in the Property, or any portion thereof, other than those used in compliance with applicable law, such as cleaning products, hotel supplies, commercial goods and building materials used or stored on the Property in accordance with applicable law, and to the Seller's Knowledge the Property is in compliance with applicable local, state or federal environmental laws, regulations, ordinances or administrative or judicial orders relating to the generation, recycling, reuse, sale, storage, handling, transport and disposal of any Hazardous Substances with respect to the Property (collectively, "Environmental Laws").  As used herein, "Hazardous Substances" shall mean any substance or material that is regulated, monitored or defined as a hazardous or toxic substance or waste by a governmental authority having jurisdiction over the Property and the environment, including hydrocarbons, petroleum, gasoline, crude oil, or any products, by-products or components thereof and polychlorinated biphenyls.  The Seller has not received any written notice from any Governmental Authority or neighboring, upgradient or downgradient property owner or other third party regarding any non compliance with or violation of any Environmental Laws with respect to the Property or the presence or release of Hazardous Substances in, on, under, or from, the Property, and during the Seller's ownership of the Property, the Seller has not made or been requested in writing to make any report or disclosure to any Governmental Authority relating to a release or a threatened release of hazardous substances to or from the Real Property.

12.11   **FIRPTA**.  The Seller is not a foreign person within the meaning of Section 1445 of the Code.

12.12   **No Landmark Status**.  To the Seller's Knowledge, no part of the Property has been designated or registered as a landmark or historic site by any governmental authority nor is there pending any proceeding to so designate or register any part of the Property.

12.13   **Tax Assessments**.  The Seller will deliver or cause the Manager to deliver to the Purchaser or the Sub-Manager by the DDI Delivery Date true, correct and complete copies of the most recent and the immediately preceding tax year real property tax bills received by the Seller for the Property.

12.14   **Condemnation**.   There is no pending condemnation, expropriation, eminent domain or similar proceeding affecting all or any portion of the Property, and the Seller has not received written notice of any intent of any public authority or other entity to take or use the Property or any part thereof pursuant to any condemnation or eminent domain proceeding.

12.15   **Special Assessments**.  The Seller shall notify the Purchaser of any written notice the Seller receives after the date hereof with respect to any pending or threatened special assessments with respect to the Property which are or may become due and payable with respect thereto.

12.16   **Seller's Knowledge**.  As used in this Agreement, the words "Seller's Knowledge" or "Knowledge of the Seller" or words of similar import shall be deemed to mean, and shall be limited to, the actual (as distinguished from implied or imputed) knowledge of Dante Massaro and Chris La Mack, without such individuals having any obligation to make an independent inquiry or investigation (other than such inquiry or investigation as individuals performing the duties appropriate to such individuals' positions at the Hotel would be expected to make or perform in the proper discharge of such individuals' responsibilities) and without imputation to such individuals of the knowledge of others, whether or not any such others would be deemed agents of the Seller or of the named individuals.   The named individuals are mentioned solely for establishing an objective reference for measuring the Seller's knowledge, and are not making such representations and warranties in their individual capacities.   Accordingly, only the Seller (and not the named individuals) shall be liable in the event any such representations or warranties are breached.

12.17   **Updating of Representations of the Seller; Inaccuracies in Representations and Warranties of the Seller**.  The Seller shall provide the Purchaser, promptly after receipt by the Seller, any material information necessary to update the representations of the Seller in this Agreement to the extent such information materially changes or impacts its representations, including but not limited to this Article 12, together with any written notices of violations of law or regulations received by the Seller.  The Seller shall notify the Purchaser promptly if any of the warranties or representations expressly set forth by the Seller in this Agreement, including but not limited to this Article 12, becomes materially untrue or inaccurate.  Seller shall provide at Closing a certificate updating the warranties and representations of Seller in this Agreement as of the date of Closing and setting forth any material changes or impacts to the extent of Seller's Knowledge (the "Seller Update Certificate").

12.18   **Further Limitation on Representations and Warranties of the Seller**.

(a)      If the representations and warranties relating to the Leases, Warranties, Equipment Leases and the Operating ~~Contacts~~Contracts set forth in Sections 12.4, 12.7 and 12.8 and the status of the tenants, lessees, or contract parties thereunder contained herein were true and correct as of the date of this Agreement, no change in circumstances or status of such vendors, lessees, warrantors or tenants (e.g., defaults, bankruptcies or other adverse matters relating to such tenant or contract party or vendor) occurring after the date hereof, and not caused solely by a default thereunder by the Seller, shall permit the Purchaser to terminate this Agreement or constitute grounds for the Purchaser's failure to close.  Except as set forth in the preceding sentence, if the Seller Update Certificate sets forth material adverse changes or impacts to the warranties and representations of Seller originally made in this Agreement as of the date hereof, then Purchaser may elect to terminate this Agreement by sending Notice thereof to the Seller, and upon delivery of such Notice of termination, this Agreement shall terminate and the Earnest Money shall be returned to the Purchaser, and thereafter neither party to this Agreement shall have any further rights, obligations or liabilities hereunder except to the extent that any right, obligation or liability set forth herein expressly survives termination of this Agreement, provided that, if such materially changed or impacted warranties and representations can be cured and reversed at an aggregate cost (including without limitation legal fees and disbursements) of less than Three Million ($3,000,000.00) Dollars, then this Agreement shall not be so terminated if, within three (3) Business Days after receipt of such Notice of termination, Seller elects (at Seller's option and in Seller's sole discretion) by notice to Purchaser to give a credit to Purchaser against the Purchase Price in the amount reasonably and mutually estimated by both Seller and Purchaser to be the aggregate cost (including without limitation legal fees and disbursements) to cure and reverse any such materially changed or impacted warranties and representations.  The Closing Date shall be adjourned as needed to accommodate the preceding sentence, if applicable.

(b)      Seller shall not be liable for any amounts with respect to the breach of a representation, covenant or warranty unless and until such amounts shall exceed in the aggregate Fifty Thousand and 00/100 Dollars ($50,000.00) (the "Limitation Amount") (in which case Seller shall only be liable with respect to the excess over the Limitation Amount).  Notwithstanding anything to the contrary, in no event shall Seller's liability exceed hereunder twenty-five percent (25%) of the Purchase Price in the aggregate.  Seller shall not be responsible for any indirect, incidental, punitive, special or consequential damages whatsoever, including loss of profits or goodwill.

12.19   **Survival**.  The representations and warranties of the Seller set forth in this Article 12 and anywhere else in this Agreement (unless expressly stated otherwise), as updated pursuant to the Seller Update Certificate, shall survive the Closing of the transaction contemplated in this Agreement and the delivery of the Deed from the Seller to the Purchaser for a period of ninety (90) days from and after the Closing Date.

~~ARTICLE~~
~~13~~

**PURCHASER'S REPRESENTATIONS AND WARRANTIES**

The Purchaser hereby represents and warrants the following as of the date hereof and on the Closing Date:

13.1    **Organization**.  The Purchaser is a limited liability company, duly formed, validly existing and in good standing under the laws of the State of ~~Delaware~~New York.  This Agreement and all other documents executed and delivered, or to be executed and delivered, by the Purchaser in connection with the transactions contemplated herein have been or will be at Closing duly executed and delivered and constitute the legal, valid and binding obligations of the Purchaser enforceable in accordance with their respective terms and provisions; the Purchaser has taken all action, corporate, partnership or otherwise, required to authorize its execution, delivery and performance of this Agreement and such other documents as are appropriate to purchase the Property in accordance with the terms and conditions of this Agreement; and neither the execution nor delivery of this Agreement nor the consummation of the transactions contemplated herein will conflict with, or result in a breach of, the terms, conditions or provisions of, or constitute a default under, the organizational documents of the Purchaser or any agreement or instrument to which the Purchaser is a party or any court order, judgment, statute, ordinance, rule, regulation, order or other government requirement.  No unobtained consent or approval of any person, firm, corporation or governmental authority is required to be obtained by the Purchaser in order for the Purchaser to enter into this Agreement or any of the documents set forth herein, or to perform fully all of the Purchaser's obligations under this Agreement or under any such other document, and to purchase the Property by the Purchaser.

13.2    **No Violation**.  The execution, delivery and performance of this Agreement by the Purchaser will not contravene or result in a violation of or default under (a) any of the provisions of the organizational documents of the Purchaser, or (b) any resolution adopted by the Purchaser, or (c) to the extent not also binding on the Seller, any court order, judgment, statute, ordinance, rule, regulation, orders or other governmental requirement, or (d) under any contract, indenture, agreement or understanding to which the Purchaser is a party.

13.3    **Consents**.  Any authorization, consent or approval of, or registration or filing with, any governmental authority that is required to have been obtained or made by the Purchaser in connection with, the execution, delivery or performance of this Agreement has been (or will be as of the Closing Date) duly obtained or made.

13.4    **Enforceable Agreement**.  This Agreement is a valid and binding Agreement of the Purchaser enforceable against the Purchaser in accordance with its terms, except as limited by applicable bankruptcy, insolvency, moratorium, reorganization and laws affecting the rights of creditors generally, and except as limited by equitable principles of general application.

13.5    **No Intention to Close Business Operations** .  The Purchaser has no present intention to close the business operations at the Hotel on or after the Closing Date.

13.6    **Certain Treasury Department Identifications**.  The Purchaser represents and warrants that as of the date of this Agreement and as of the date of Closing, (a) the Purchaser is not and shall not be named as a "Specially Designated National and Blocked Person" as designated by the United States Department of the Treasury's Office of Foreign Assets Control or as a person, group, entity or nation designated in Presidential Executive Order 13224 as a person who commits,

threatens to commit, or supports terrorism; (b) the Purchaser is not and shall not be owned or controlled, directly or indirectly, by the government of any country that is subject to a United States Embargo; (c) the Purchaser is not acting and shall not act, directly or indirectly, for or on behalf of any person, group, entity or nation named by the United States Treasury Department as a "Specially Designated National and Blocked Person", or for or on behalf of any person, group, entity or nation designated in Presidential Executive Order 13224 as a person who commits, threatens to commit, or supports terrorism; and (d) the Purchaser is not and shall not be engaged in this transaction directly or indirectly on behalf of, or facilitating this transaction directly or indirectly on behalf of, any such person, group, entity or nation.

13.7   **Non Solicitation**.  Notwithstanding anything to the contrary contained in this Agreement, from the date hereof, the Purchaser represents, warrants, and covenants to the Seller and its shareholders and officers, that if the transaction contemplated by this Agreement shall not close for any reason, the Purchaser, the Sub-Manager and theirits shareholders, officers and/or managing members shall neither solicit, nor hire for employment, under any circumstances, any management executives or department heads of the Hotel for a period of not less than fifteen (15) months from the Effective Date without the written consent of the Seller; the provisions of this Section 13.7 shall survive the termination of this Agreement, but shall be without force and effect upon the achievement of the Closing Date.

13.8   **Survival**.  The representations and warranties of the Purchaser set forth in this Article 13 and anywhere else in this Agreement (unless expressly stated otherwise), as updated pursuant to the Purchaser Update Certificate, shall survive the Closing of the transaction contemplated in this Agreement and delivery of the Deed from the Seller to the Purchaser for a period of ninety (90) days from and after the Closing Date.

13.9   **Updating Representations of the Purchaser; Inaccuracies in Representations and Warranties of the Purchaser**.  The Purchaser shall provide the Seller, promptly after receipt by the Purchaser, any material information necessary to update the representations of the Purchaser in this Agreement to the extent such information materially impacts the Purchaser's representations, including, but not limited to this Article 13.  The Purchaser shall notify the Seller promptly if any of the warranties or representations expressly set forth in this Agreement, including, but not limited to this Article 13, becomes materially untrue or inaccurate.  Purchaser shall provide at Closing a certificate updating the warranties and representations of Purchaser originally made in this Agreement as of the date of Closing and setting forth any material changes or impacts to the extent of Purchaser's knowledge (the "Purchaser Update Certificate").  If the Purchaser Update Certificate sets forth material adverse changes or impacts to the warranties and representations of Purchaser in this Agreement as of the date hereof, then Seller may elect to terminate this Agreement by sending Notice thereof to the Purchaser, and upon delivery of such Notice of termination, this Agreement shall terminate and the Earnest Money shall be returned to the Purchaser, and thereafter neither party to this Agreement shall have any further rights, obligations or liabilities hereunder except to the extent that any right, obligation or liability set forth herein expressly survives termination of this Agreement.

**ARTICLE 14Purchase**

**r's Knowledge**.  As used in this Agreement, the words "Purchaser's Knowledge" or "Knowledge of the Purchaser" or words of similar import shall be deemed to mean, and shall be limited to, the actual (as distinguished from implied or imputed) knowledge of Ashish Lall and Jonathan Marrale, without such individuals having any obligation to make an independent inquiry or investigation and without imputation to such individuals of the knowledge of others, whether or not any such others would be deemed agents of the Purchaser or of the named individuals.  The named individuals are mentioned solely for establishing an objective reference for measuring the Purchaser's knowledge, and are not making such representations and warranties in their individual capacities.  Accordingly, only the Purchaser (and not the named individuals) shall be liable in the event any such representations or warranties are breached.

# ARTICLE 14
## SPECIAL HOTEL PROVISIONS

14.1     **Liquor Licenses.**

(a)     )-The Purchaser acknowledges that it is the responsibility of the Purchaser to obtain the approval of the applicable governmental authorities for issuance of such alcoholic beverage licenses as shall be necessary to operate the Hotel and/or its lounges, bar(s) and restaurants (the "Liquor Licenses").  The Purchaser agrees to file the necessary applications and other supporting documents with the appropriate governmental agencies, at the Purchaser's sole cost and expense, within ten (10) days following the Effective Date.  The Purchaser hereby assumes the risk of failing to obtain the Liquor Licenses or any other licenses and permits relating to the Hotel, and the refusal of any governmental authority to grant the Liquor Licenses or any other licenses and permits shall not give the Purchaser any rights, remedies or causes of action against the Seller for damages, for termination of this Agreement or any other relief whatsoever.

(b)     b)-If the permanent Liquor License has not been issued as of the Closing Date, then at Closing:  (i) the parties shall enter into an Interim Liquor Operations Agreement (herein so called) between the Seller and the Purchaser or the Sub ManagerPurchaser's Agent, if any, for the continued operation of the portion of the Hotel constituting the liquor license property (the "Liquor License Property") until the earlier of six (6) months following Closing, or the first business day following the issuance of the Liquor License consistent with the terms described in subsection (c) immediately below, and (ii) if required by applicable laws, this Agreement shall be amended to provide that the Personal Property and related Supply Inventories and Consumables Inventories required for the operation of Liquor Operations shall not be conveyed by the Seller to the Purchaser, or purchased by the Purchaser, until the termination of such Interim Liquor Operations Agreement.  The form of the Interim Liquor Operations Agreement shall be prepared by the Purchaser's counsel in a manner which is permitted under the laws and regulations of the applicable Governmental Authorities with regard to Interim Liquor Operations Agreements, and approved by the Seller and the Purchaser prior to the Closing Date, consistent with the terms described in this Section 14.1.

(c)     )-Subject to any terms required by the applicable Governmental Authorities, the Interim Liquor Operations Agreement shall provide for the following:  upon Closing, (i) the Seller shall lease the Liquor License Property from the Purchaser to continue the operation of liquor sales at the Liquor License Property as such operation had been conducted in the Ordinary

Course of Business; (ii) the Seller shall appoint the Purchaser to actually operate and manage such operations at the Liquor License Property on the Seller's behalf; (iii) the Seller shall have no obligation to maintain, repair or replace any furniture, fixtures or equipment in such property, which responsibility shall be the obligation of the Purchaser, (iv) the Seller shall continue to be named as an additional insured (with primary coverage) under the various liability insurance policies applicable to the property, including but not limited to, commercial general liability and liquor liability insurance and the Purchaser shall be obligated to indemnify, defend and hold the Seller harmless for all liability arising on and after Closing in connection with the Interim Liquor Operations Agreement and the use and operation of the Liquor License Property and the acts of employees in connection therewith after the Closing; (v) the Purchaser or ~~the Sub-Manager~~Purchaser's Agent, if any, shall continue to be responsible for the managing, hiring and supervision of all employees on the Seller's behalf with respect to the service of food and beverages in the Liquor License Property; (vi) the Seller shall pay rent under the Interim Liquor Operations Agreement following Closing until the termination of the Interim Liquor Operations Agreement, in an amount $1.00 per month; (vii) the Purchaser, at the Purchaser's sole cost, shall be responsible for procuring all related Supply Inventories and Consumable Inventories at no cost incurred by the Seller; (viii) the Purchaser shall be entitled to receive any income from the sale of alcoholic beverages under the liquor license from Closing through the termination of the Interim Liquor Operations Agreement, all such income (if any) being the property of the Purchaser, and (ix) the Purchaser shall indemnify the Seller for any damages, losses or actions brought against the Seller by any Governmental Authority or any other entity or individual as a result of the terms of, or operations under, the Interim Liquor Operations Agreement.

14.2     **Safe Deposit Boxes**.  On the Closing Date, the Seller shall deliver to the Purchaser all keys to any unused safe deposit boxes in the Hotel, all receipts and agreements relating to all safe deposit boxes and a complete list of such used deposit boxes which list shall contain the name and room number of each depositor.

14.3     **Baggage Inventory**.  All baggage checked with or left in the possession of the Seller or its agents shall be listed on an inventory to be prepared in duplicate on the Closing Date and signed by representatives of the Seller and of the Purchaser and all books, records and keys concerning such baggage shall be delivered by the Seller to the Purchaser at the Closing.  The Purchaser shall be responsible for all baggage listed in such inventory after the Closing Date.

## ARTICLE 15~~ARTICLE 15~~
## MISCELLANEOUS

15.1     **Purchaser Financing and Equity Commitments**.  The Purchaser acknowledges that there is no contingency under this Agreement for its securing debt and/or equity financing for this transaction, and that the Earnest Money shall be forfeited should the Purchaser not secure its needed debt or equity.

15.2     **Notices**.  Any Notices required or permitted to be given under this Agreement (each a "Notice") shall not be effective unless in writing and (a) delivered by hand, (b) sent by a nationally recognized overnight courier service (e.g., Federal Express) ("Overnight Delivery") or (c) sent in PDF form by email ("Email") with a copy to follow by Overnight Delivery and addressed as follows, and shall be deemed to have been given, if given by hand delivery,

Overnight Delivery or Email, upon the date of actual delivery (or refusal to accept delivery) at the physical address or email address, as applicable, specified below:If to the Seller:

> Gemini 37 West 24th Street MT, LLC
> c/o Gemini Real Estate Advisors
> 16740 Birkdale Commons Parkway, Suite 306
> Huntersville, North Carolina 28078
> Attention:  Dante Massaro
> Telephone:  (704) 895-7845 ~~Email: dmassaro@gemini-re.com~~
> Email: dmassaro@gemini-re.com
>
> with a copy to:
>
> Robins Kaplan LLP
> 800 Boylston Street
> Boston, Massachusetts 02199
> Attention: Mark S. LaConte, Esq.
> Telephone: (617) 859 2785
> email: mlaconte@robinskaplan.com
>
> If to the Purchaser:
>
> ~~Bridgeton Acquisitions LLC 220 Fifth~~FORTUNA 37 WEST 24TH STREET LLC 527 Madison Avenue, ~~19th~~ Floor 20
> New York, New York ~~10001~~ 10022
> Attention: ~~Atit Jariwala~~ Mr. Morris Moinian
> Telephone: (~~212) 235-2780 Email: ajariwala@bridgetonholdings.com~~ 922-1220
> Email:  mmoinian@fortunarealtygroup.com
>
> with a copy to: ~~Bridgeton Holdings, LLC 220 Fifth~~
>
> FORTUNA 37 WEST 24TH STREET LLC
> 527 Madison Avenue, ~~19th Floor~~ Floor 20
> New York, New York ~~10001~~ 10022
> Attention: ~~Jeffrey D. Haroldson~~ Mr. Ashish Lall
> Telephone:   ~~(212)   235-2781   Email:   jharoldson@bridgetonholdings.com~~ 212-922-1220 x310
> Email:  ashish@fortunarealtygroup.com
>
> and with a copy to:

Windels Marx Lane & Mittendorf, LLP
156 West 56th Street, 23rd Floor
New York, New York  10019-3877
Attention:  Wayne S. Cook, Jr., Esq.
Telephone:  212-237-1032
Email:  wcook@windelsmarx.com

If to the Escrow Agent:

Kensington Vanguard National Land Services
39 West 37th Street, 3rd floor
New York, New York 10018
Attention: Ellen Petrillo
Telephone:  (646) 237-0817 ~~Email: epetrillo@kvnational.com~~
Email: epetrillo@kvnational.com

or such other address as either party may from time to time specify in writing to the other in the manner aforesaid.  A Notice may be given by a party or by a party's attorney at law.  Any Notice intended to initiate a response period shall be effective to do so only if such Notice identifies such response period.

15.3    **Successors and Assigns**.

(a)    This Agreement shall be binding upon, and inure to the benefit of, the parties to this Agreement and their respective successors, heirs, administrators and assigns, except that the Purchaser's interest under this Agreement or the beneficial interests in the Purchaser, may not be assigned, encumbered or otherwise transferred whether voluntarily, involuntarily, by operation of law or otherwise, without the prior written consent of the Seller; provided, however, that without limiting the provisions of this Section 15.3, the Seller's consent shall not be required for an assignment of this Agreement to a Purchaser Affiliate.  In the event of any permitted assignment of this Agreement or any interest herein (including, without limitation, any assignment to a Purchaser Affiliate), the assigning party shall remain jointly and severally responsible with the assignee for all of its obligations and liabilities set forth in this Agreement and in any of the documents entered into in connection with the consummation of the transaction contemplated by this Agreement, and such assignment shall not be deemed to release the assigning party, in any respect, from any such obligations and liabilities.  As used in this Section 15.3, the term (i) "Purchaser's Affiliate" shall mean any entity which (a) results from a merger or consolidation with the Purchaser, or (b) acquires all or substantially all of the assets of the Purchaser for a purpose other than to circumvent the provisions of this Section 15.3, or (c) is controlled by, controls or is under common control with the Purchaser, and (ii) "control" shall mean the power, through ownership interests, to directly cause the direction or management or policies of the Purchaser.

(b)    Notwithstanding the preceding Section 15.3(a) or any other provision of this Agreement or the Sale Procedures Order to the contrary, Fortuna 37 West 24th Street LLC may assign all its right, title and interest as Purchaser under this Agreement and as a bidder under the Sale Procedures Order to a corporation, partnership, limited partnership, limited liability company or other entity ("FRG Assignee") in which Fortuna 37 West 24th Street LLC or a

Purchaser's Affiliate of Fortuna 37 West 24th Street LLC (i) is a direct or indirect shareholder, general or limited partner, member, manager or other owner and (ii) either (x) has the authority to manage the day-to-day operations of the FRG Assignee or (y) has the right to consent to or disapprove certain decisions or actions of the FRG Assignee of the type that are commonly defined as "Material Decisions" or similar, on condition that the FRG Assignee assume all the obligations of Purchaser hereunder and under the Sale Procedures Order (if any) by written instrument of assignment and assumption delivered to Seller, upon which Fortuna 37 West 24th Street LLC shall thereupon be automatically (without any agreement or instrument of Seller or any other person or entity being required therefor) and irrevocably released from all liability and obligation under or in connection with this Agreement, the Sale Procedures Order and the Property.  The foregoing release of Fortuna 37 West 24th Street LLC shall be self-operative, but Seller agrees to execute and deliver to Fortuna 37 West 24th Street LLC a written confirmation of such release in such form as Fortuna 37 West 24th Street LLC may reasonably request, within five (5) Business Days after such request.  Without limitation to the foregoing, the initial execution and delivery of this Agreement by Fortuna 37 West 24th Street LLC is subject to this Section 15.3(b).  This Section 15.3(b) shall survive the Closing or any termination of this Agreement.

15.4    **No Third Party Beneficiary**.  Nothing in this Agreement, express or implied, shall give to anyone, other than the parties to this Agreement and their respective permitted successor and assigns, any benefit, or any legal or equitable right, remedy or claim, under or in respect of this Agreement or the escrow contemplated hereby.

15.5    **Waiver; Modification**.  Failure by the Purchaser or the Seller to insist upon or enforce any of their respective rights hereunder shall not constitute a waiver thereof, except as provided for herein.  No waiver of or modification or amendment to any of the provisions of this Agreement shall be valid unless in writing and executed by the parties against whom such waiver, modification or amendment is sought to be enforced.

15.6    **Governing Law**.        This Agreement shall be governed by and construed in accordance with the laws of the State of New York.

Case:

15.7   ~~15.7~~   **Confidentiality**.   Except as may be necessary in connection with the **Bankruptcy** Case:

(a)   ~~)~~ The Purchaser and the Seller each agree that, prior to the Closing, all Property Information and any information provided by the Purchaser, and any third party reports (such as environmental reports) prepared by the Purchaser in connection with the transaction contemplated hereunder, shall be kept strictly confidential and shall not, without the prior written consent of the party providing such information, be disclosed by the Purchaser or the Seller, as applicable or their respective representatives, in any manner whatsoever, in whole or in part, and will not be used by the applicable party or their representatives, directly or indirectly, for any purpose other than evaluating the Property, its suitability for ownership, management, by the Purchaser or third parties, or providing investment or financing by third parties, and the transactions described in this Agreement. Moreover, each party agrees that, prior to the Closing, the Property Information and any information provided by the Purchaser will be transmitted only to their representatives who need to know such Property Information or other information for the purpose of evaluating the Property or the parties to the transaction, and who are informed of the confidential nature of such information.  The Purchaser agrees that the Property Information shall remain the Seller's property and that, upon the termination of this Agreement, the Purchaser shall return all such Property Information to the Seller or furnish the Seller with a letter from a principal of the Purchaser responsible for the Property Information certifying that the Property Information in its possession has been destroyed. Each party further agrees that their representatives and such other parties shall be advised of the confidential nature of the Property Information or the Purchaser information and shall be directed to treat such information with strictest confidence and not to disclose such information except as otherwise provided herein. Each party acknowledges that it will be liable for any breach of the provisions of this section by any of their respective representatives.   The provisions of this Section 15.7 shall in no event apply to Property Information or the Purchaser information which is a matter of public record or is otherwise available generally to the public, or has previously been disclosed by any other person, and shall not prevent such party from complying with Laws, including, without limitation, governmental, regulatory, disclosure, tax and reporting requirements, or with respect to obtaining any required license or permit, including, without limitation, the Liquor License.

(b)   ~~b)~~ The Purchaser and the Seller, for the benefit of each other, hereby agree that, between the date hereof and the Closing Date, they will not release or cause or permit to be released any press notices, publicity (oral or written) or advertising promotion relating to, or otherwise announce or disclose or cause or permit to be announced or disclosed, in any manner whatsoever, the terms, conditions or substance of this Agreement or the transactions contemplated herein, without first obtaining the written consent of the other party to this Agreement which shall not be unreasonably withheld, conditioned or delayed.  It is further agreed that after the Closing Date, any press release issued shall be subject to prior review of the other party, but in no event shall any such press release issued by either party disclose the identity of either party's beneficial owners by name or the consideration paid for the Hotel.  It is understood that nothing contained in this Agreement shall preclude either party from discussing or disclosing the substance or any relevant details of the transactions contemplated in this Agreement or the Property Information with any of its attorneys, accountants, professional consultants or potential investors or lenders, as the case may be, or with any prospective manager or franchisor, or prevent either party to this

Agreement from complying with Laws, including, without limitation, governmental, regulatory, disclosure, tax and reporting requirements.

   (c) )-In the event this Agreement is terminated, the Purchaser agrees to cause the Purchaser's Representatives to deliver to the Seller all originals and copies of the Property Information referred to in this Section 15.7 in the possession of the Purchaser and the Purchaser's Representatives or reasonable evidence of its destruction.

   (d) d)-As used in this Agreement, the term "Property Information" shall mean the Due Diligence Documents and all other information and documents in any way relating to the Property, the operation thereof or the sale thereof (including, without limitation, Hotel Contracts and Permits) which may be furnished to, or otherwise made available for review by, the Purchaser or its directors, officers, employees, affiliates (including Sub-Manager), partners, members, brokers, agents or other representatives, including, without limitation, any prospective manager, attorneys, accountants, contractors, consultants, engineers and financial advisors and investors (collectively, the "Purchaser's Representatives").

   (e) )-If the Purchaser acquires the Property from the Seller, the Purchaser shall have the right, subsequent to the Closing Date, to utilize the information received as part of this transaction.

   (f) )-The provisions of this Section 15.7 shall survive the termination of this Agreement for a period of one (1) year following such termination and the Closing for a period of one (1) year following the Closing Date.

   15.8 15.8 **Partial Invalidity**.  If any provision or provisions in this Agreement is found by a court of law to be in violation of any applicable local, state or federal ordinance, statute, law, administrative or judicial decision, or public policy, and if such court should declare such portion, provision or provisions of this Agreement to be illegal, invalid, unlawful, void or unenforceable as written, then such portion, provision or provisions shall be given force to the fullest possible extent that they are legal, valid and enforceable, that the remainder of this Agreement shall be construed as if such illegal, invalid, unlawful, void or unenforceable portion, provision or provisions were not contained therein, and that the rights, obligations and interest of the Purchaser and the Seller under the remainder of this Agreement shall continue in full force and effect.

   15.9 15.9 **Foreign Investment**.  The Purchaser and the Seller agree to comply with any and all reporting requirements applicable to such party with respect to the transactions contemplated by this Agreement which are set forth in any law, statute, ordinance, rule, regulation, order or determination  of any governmental authority, including but not limited to, The International Investment Security Act of 1976, The Foreign Investment in Property Tax Act of 1980 and the Tax Reform Act of 1984 and further agrees upon request of the other party to furnish it with evidence of such compliance.

   15.10 15.10 **Merger of Prior Agreements**.  This Agreement (including the exhibits and any schedule to this Agreement) constitutes the entire agreement between and understanding of the parties with respect to the purchase and sale of the property specifically described herein and

supersedes all prior and contemporaneous (whether oral or written) agreements and understandings between the parties to this Agreement relating to the specific subject matter hereof.

15.11 ~~15.11~~ **Headings**.  The paragraphs or section headings herein are for convenience of reference only and shall not be deemed to vary the content of this Agreement or terms, provisions, covenants or conditions hereof.

15.12 ~~15.12~~ **Including**.  The word "including" shall be deemed followed by the phrase "without limitation" where the context requires or permits unless already followed by words of similar effect.

15.13 ~~15.13~~ **No Recordation**.  Neither party shall file of record against the Property or otherwise this Agreement or any memorandum thereof.

15.14 ~~15.14~~ **Execution in Counterparts**.  This Agreement and any amendments or modifications to this Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original, and all of such counterparts shall constitute one Agreement or amendment, as applicable.  To facilitate execution of this Agreement or any such amendments or modifications, the parties may execute and exchange by Email PDF counterparts of the signature pages of this Agreement or such amendments or modifications.~~15.15~~

15.15 **Further Assurances**.  In addition to the acts and deeds recited herein and contemplated to be performed, executed and/or delivered by the Seller to the Purchaser at Closing, the Purchaser and the Seller agree to perform, execute and/or deliver or cause to be delivered, executed and/or delivered, but without any obligation to incur any additional liability or expense, on or after the Closing any and all further reasonable acts, deeds and assurances as may be reasonably necessary to consummate the transactions contemplated hereby and/or to further perfect and deliver to the Purchaser the conveyance, transfer and assignment of the Property and all rights related thereto.

15.16 ~~15.16~~ **[Intentionally deleted.]**

15.17 ~~15.17~~ **Construction**.  The parties acknowledge that the parties and their counsel have reviewed and revised this Agreement and that the normal rule of construction to the effect that any ambiguities are to be resolved against the drafting party shall not be employed in the interpretation of this Agreement and any exhibits or amendments thereto.

15.18 ~~15.18~~ **Calculation of Time Periods**.  Unless otherwise specified, in computing any period of time described herein, the day of the act or event after which the designed period of time begins to run is not to be included and the last day of the period so computed is to be included, unless such last day is a Saturday, Sunday or legal holiday in the State of New York, in which event the period shall run until the end of the next day which is neither a Saturday, Sunday, or legal holiday in the State of New York.  The last day of any period of time described herein shall be deemed to end at 5:00 p.m. Eastern Standard/Daylight Savings Time.  A "business day" as used in this Agreement means any day other than a Saturday, Sunday or legal holiday in the State of New York.

15.19    ~~15.19~~ **Effectiveness of Agreement**.  This Agreement shall not become effective until executed and delivered by the Purchaser, the Seller and the Escrow Agent and receipt by the Escrow Agent of the Earnest Money, and approved by the Bankruptcy Court pursuant to the Sale Procedures Order.

15.20    ~~15.20~~ **Access to Books**.  For a period of three (3) years subsequent to the Closing Date, the Seller, the Seller's affiliates and their employees, agents and representatives shall be entitled to access during business hours to all Books, including all documents, books and records given to the Purchaser by the Seller at the Closing for tax and audit purposes, regulatory compliance, and cooperation with governmental investigations upon reasonable prior Notice to the Purchaser, and shall have the right, at the Seller's sole cost and expense, to make copies of such documents, books and records.

15.21    ~~15.21 **Bulk Sales Compliance**. To the full extent required by law, the Seller shall notify the State of New York~~**Bulk Sales Compliance**.  Within five (5) days after the Effective Date, Seller and Purchaser shall complete and file Form AU-196.10 (Notification of Sale, Transfer or Assignment in Bulk) with the New York State Department of Taxation and Finance, ~~and such other governmental entities as are required by law, to obtain either so-called "clearance letters" indicating that no amounts are required to be withheld at Closing or "withholding certificates" indicating such amounts that shall be withheld in escrow pending the Seller's filing of final tax returns with the City, County and State of New York. In the event any withholding certificates are received prior to Closing, the Seller agrees to withhold the specified withholding amounts from the Purchase Price and deposit such amounts in escrow with the Escrow Agent at Closing. Such withheld amounts shall be released to the Seller upon receipt of clearance letters or may be paid at the Seller's direction to the applicable governmental entity in accordance with a withholding certificate to obtain a clearance letter.~~Bulk Sales Unit, Sales Tax Desk Audit ("NYS Tax Department").  In such Form AU-196.10, Seller may assert and attach evidence of exemption from payment of sales or other taxes, if any, provided that (as between Seller and Purchaser) the same shall not be deemed to be a modification of Section 5.3 hereof.  It shall be Purchaser's condition to Closing that, at or prior to Closing, the parties shall have received the issuance of Form AU-197.1 from the NYS Tax Department.  If the NYS Tax Department shall notify either party (via a Form AU-196.2 or otherwise) that Seller owes or may owe any sales or other taxes (or interest or penalties thereon), then Seller shall, at Seller's cost (without adjustment to the Purchase Price), either pay the same or post a bond or other security with and acceptable to the NYS Tax Department so that (a) a Form AU-197.1 is issued before Closing and (b) Purchaser will have no liability for any sales or use taxes (or interest or penalties thereon) accruing before Closing.  Seller or Purchaser may adjourn the Closing as reasonably needed to obtain either the initial Form AU-197.1 or the initial Form AU-196.2 or similar notification from the NYS Tax Department.  In lieu of such bond or other security, Seller may deposit or leave in escrow with Escrow Agent at or before Closing an amount sufficient to pay all sales or other taxes asserted to be owed by the NYS Tax Department (together with interest and penalties thereon through the 95th day after Closing), in amount reasonably determined by Purchaser, until the resolution of such assertion and the issuance of a Form AU-197.1, in which event Closing shall occur and (a) if the Form AU-197.1 is received by the parties hereto by the 90th day after Closing, such escrowed amount shall be released to Seller and (b) if the Form AU-197.1 is not received by the parties hereto by the 90th day after Closing, Purchaser may direct (and the Escrow Agent shall in all events then cause) such escrowed funds to be paid to the NYS Tax Department, in which case Seller shall have no right to

object to such payment but Seller may contest and seek a refund of such payment.  The provisions of this Section 15.21 shall survive the Closing.

[The remainder of this page has been intentionally left blank.]

**IN WITNESS WHEREOF**, the parties to this Agreement have duly executed this Agreement as of the day and year first above written.

**SELLER**:

GEMINI 37 WEST 24TH STREET MT, LLC,
a Delaware limited liability company

By: _____
Name:
Title: _____

**PURCHASER**:

FORTUNA 37 WEST 24TH STREET LLC,
a Delaware limited liability company

By: _____
Name:
Title:

**CONSENT OF ESCROW AGENT**:

The Escrow Agent has joined in the execution of this Agreement in order to (a) acknowledge receipt of the Earnest Money and (b) agree to hold and disburse the Earnest Money in accordance with the terms and provisions of this Agreement.

Dated as of the ____ day of December, 2015.

KENSINGTON VANGUARD NATIONAL
LAND SERVICES OF NY, LLC,
a Delaware limited liability company

By: _____
Name:
Title:

## EXHIBIT "A" LAND

## LEGAL DESCRIPTION

ALL that certain lot, piece or parcel of land, situate, lying and being in the Borough of Manhattan, County of New York, City and State of New York, bounded and described as follows:

BEGINNING at a point on the northerly side of West 24th Street distant 283 feet 4 inches easterly from the corner formed by the intersection of the northerly side of West 24th Street with the easterly side of Avenue of the Americas (6th Avenue);

RUNNING THENCE Northerly and parallel with Avenue of the Americas (6th Avenue) and part of the distance through a party wall, 98 feet 9 inches to the center line of the block;

THENCE Easterly along the center line of the block, 41 feet 8 inches;

THENCE Southerly and again parallel with Avenue of the Americas (6th Avenue), 98 feet 9 inches to the northerly side of West 24th Street;

THENCE Westerly along said northerly side of West 24th Street, 41 feet 8 inches to the place of BEGINNING.

**EXHIBIT "B"**

**INTENTIONALLY**

**OMITTED**

# EXHIBIT "C"

## EQUIPMENT LEASES

~~All Equipment Leases located at the Property or otherwise on file with the Purchaser, in its capacity as Sub Manager.~~1.     Satellite Programming License and Equipment Lease between World Cinema, Inc., and FGC 37 West 24 LLC; dated May 6, 2008.

~~Exhibit C~~
~~{{6135763}}~~ Exhibit C

**EXHIBIT "D"**

**EXCLUDED PERSONAL PROPERTY**

1. 1. Any fixtures, personal property or equipment owned by:  (a) lessor under any Equipment Lease; (b) supplier or vendor under any Operating Contracts; (c) tenants under Leases; (d) (if not paid for by Seller or the Manager or) the Sub-Manager; or (e) employees of the Hotel.

2. 2. Any property of  guests or customers of the Hotel.

3. 3. All cash on hand in any house bank, operating account or reserves maintained by the Seller, the Manager, the Sub-Manager, or the Seller's lender in connection with the ownership or operation of the Hotel.

4. 4. Gift shop inventory.

5.. 5. The other items set forth in this Agreement as excluded Personal Property.

## EXHIBIT "E"

### LEASES AND DEPOSITS

~~All Leases and Deposit located at the Property, or otherwise on file with or held by the Purchaser, in its capacity as Sub-Manager.~~1.     Lease Agreement between Gemini 37 West 24th Street, MY, LLC and JIN Restaurant Management, LLC, dated March 2, 2012.

**EXHIBIT "F"**

**GOVERNMENTAL PERMITS**

1.  ~~All Governmental Permits located at the Property or otherwise on file with the Purchaser, in its capacity as Sub-Manager.~~ Permit from the New York State Department of Taxation and Finance for the collection of sales and use taxes.

# EXHIBIT "G"

## OPERATING CONTRACTS

1.    Planned Maintenance and AADM Inspections between Assa Abloy Entrance Systems US, Inc. and Wyndham Garden Hotel; dated March 23, 2015.

2.    Inspection and maintenance of fire alarms and sprinklers contract between Central Office Alarm Company, LTD., and FGC-37 West 24 LLC; dated July 30, 2008.

3.    High Speed Internet Access contract between Time Warner Cable Business Class and Wyndham Garden Hotel; signed on May 10, 2012.

4.    Basic Elevator Service Agreement between Rotavele Elevator Inc., and Wyndham Garden Hotel Manhattan Chelsea; commencing November 1, 2008.

5.    Contract for Removal of Non-Hazardous Trade Waste between Five Star Carting, Inc., and Wyndham Garden Hotel Manhattan Chelsea; signed on November 11, 2008.

~~All Operating Contracts located at the Property or otherwise on file with the Purchaser, in its capacity as Sub-Manager.~~6.   Franchise Agreement between Wyndham Hotels & Resorts, LLC and FGC 37 West 24th, LLC, dated July 31, 2006, as affected by Assignment, Assumption and Amendment Agreement between FGC 37 West LLC, Gemini 37 West 24th Street MT, LLC and Wyndham Hotels and Resorts, LLC, dated July 31, 2006.

7.    Electricity Supply Agreement between Constellation NewEnergy, Inc., and Gemini Hospitality Management LLC dated June 17, 2014.

8.    Standby Power Maintenance Agreement between GenServe, Inc., and Wyndham Garden Hotel dated October 20, 2014.

9.    Cleaning Contractor Agreement between Imacuclean Cleaning Services, Inc. and Gemini 37 West 24th Street Mt LLC; signed on September 20, 2011.

**EXHIBIT "H"**

**DUE DILIGENCE MATERIALS**

1.    Offering Memorandum
- Robert Douglas – Wyndham Garden Manhattan Chelsea West Operating Memorandum

2.    Property Financials

2009 Monthly P&L Statements
- December 2009 P&L

2010 Monthly P&L Statements
- December 2010 P&L

2011 Monthly P&L Statements
- December 2011 P&L

2012 Monthly P&L Statements
- December 2012 P&L

2013 Monthly P&L Statements
- December 2013 P&L
- Summary Operating Statement 2013

2014 Monthly P&L Statements
- December 2014 P&L
- Summary Operating Statement 2014

2015 Monthly P&L Statements
- August 2015 P&L
- September 2015 P&L

3.    STAR Reports
a)    2009.12 Wyndham Garden Chelsea – 2009 December STAR
b)    2010.12 Wyndham Garden Chelsea – 2010 December STAR
c)    2011.12 Wyndham Garden Chelsea – 2011 December STAR
d)    2012.12 Wyndham Garden Chelsea – 2012 December STAR
e)    2013.12 Wyndham Garden Chelsea – 2013 December STAR
f)    2014.12 Wyndham Garden Chelsea – 2014 December STAR
g)    2015.8 Wyndham Garden Chelsea – 2015 August STAR
h)    2015.9 Wyndham Garden Chelsea – 2015 September STAR

4.      Property Taxes
        a)      November 2013 Tax Bill
        b)      June 2014 Tax Bill
        c)      November 2014 Tax Bill
        d)      February 2015 Tax Bill
        e)      August 2015 Tax Bill

5.      Title Reports
        a)      Wyndham 24th Street – Title Report 2013

**EXHIBIT "I"**

**DEED**

THIS INDENTURE, made as of the ____ day of _____, 2015, by

GEMINI 37 WEST 24TH STREET MT, LLC, a Delaware limited liability company, party of the first part,

in favor of

~~BRIDGETON        ACQUISITIONS        LLC,        a        Delaware        limited        liability~~ ~~company~~ _____, a _____, party of the second part,

WITNESSETH, that the party of the first part, for and in consideration of the sum of One Dollar ($1.00) and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, does hereby grant and release unto the party of the second part, the heirs, successors and assigns of the party of the second part forever,

ALL those certain plots, pieces or parcels of land, with the buildings and improvements thereon erected, situated, lying and being in the

CITY, COUNTY AND STATE OF NEW YORK,
AS MORE PARTICULARLY
DESCRIBED ON <u>EXHIBIT A</u> ATTACHED HERETO
AND MADE A PART HEREOF.

TOGETHER with all right, title and interest, if any, of the party of the first part in and to any streets and roads abutting the above described premises to the center lines thereof;

TOGETHER with the appurtenances and all the estate and rights of the party of the first part in and to said premises;

TO HAVE AND TO HOLD the premises herein granted unto the party of the second part, the heirs or successors and assigns of the party of the second part forever.

The party of the first part, in compliance with Section 13 of the Lien Law of the State of New York, covenants that the party of the first part will receive the consideration for this conveyance and will hold the right to receive such consideration as a trust fund to be applied first for the purpose of paying the cost of the improvements and will apply the same first to the payment of the cost of the improvements before using any part of the total of the same for any other purpose.

The word "party" shall be construed as if it read "parties" whenever the sense of this indenture so requires.

[SIGNATURE PAGE FOLLOWS]

~~Exhibit I~~

IN WITNESS WHEREOF, the party of the first part has duly executed this deed the day and year first above written.

GEMINI 37 WEST 24TH STREET MT, LLC,
a Delaware limited liability company

By: _ _____
Name:
Title:


STATE OF NEW YORK          )
                           ) ss.:
COUNTY OF NEW YORK         )

On                                                                    the

Exhibit I
Exhibit I
{14155763:1}

_____day                                                    of

Exhibit I

{11155763;1}                        Exhibit I

_____ in the year 2015, before me, the undersigned, a Notary Public in and for said State,                    personally                    appeared

Exhibit I
Exhibit I
{{11155763;1}

_____, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he/she executed the same in his/her capacity, and that by his/her signature on instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

_____
Notary Public

Exhibit I
Exhibit I

{11215576;1}

EXHIBIT A

Legal Description

AMENDED
7/14/06:

ALL that certain lot, piece or parcel of land, situate, lying and being in the Borough of Manhattan, County of New York, City and State of New York, bounded and described as follows:

BEGINNING at a point on the northerly side of West 24th Street distant 283 feet 4 inches easterly from the corner formed by the intersection of the northerly side of West 24th Street with the easterly side of Avenue of the Americas (6th Avenue);

RUNNING THENCE Northerly and parallel with Avenue of the Americas (6th Avenue) and part of the distance through a party wall, 98 feet 9 inches to the center line of the block;

THENCE Easterly along the center line of the block, 41 feet 8 inches;

THENCE Southerly and again parallel with Avenue of the Americas (6th Avenue), 98 feet 9 inches to the northerly side of West 24th Street;

THENCE Westerly along said northerly side of West 24th Street, 41 feet 8 inches to the place of BEGINNING.

Exhibit I
Exhibit I
{11155763:1}

DEED

Made by

GEMINI 37 WEST 24TH STREET MT, LLC,
a Delaware limited liability company,

in favor of

~~BRIDGETON ACQUISITIONS~~ _____ LLC, ~~a Delaware limited liability company~~

a _____

| | |
|---|---|
| Property Address: | 37 West 24th Street |
| County: | New York |
| State: | New York |
| Block: | 826 |
| Lot: | 17 |

After recording, please return to:

~~Bridgeton Holdings, LLC 220 Fifth Avenue~~ Windels Marx Lane & Mittendorf, LLP
~~19th~~ 156 West 56th Street, 23rd Floor
New York, ~~NY 10001 Attn: Jeffrey Haroldson~~ New York  10019-3877
Attention:  Wayne S. Cook, Jr., Esq.

~~Exhibit I~~
Exhibit I

## EXHIBIT "J 1"

## BILL OF SALE

KNOW ALL PERSONS BY THESE PRESENTS:

THAT GEMINI 37 WEST 24TH STREET MT, LLC, a Delaware limited liability company (the "Grantor"), whose address is c/o Gemini Real Estate Advisors, 16740 Birkdale Commons Parkway, Suite 306, Huntersville, NC 28078, for and in consideration of the sum of Ten and No/100 Dollars ($10.00) cash and other good and valuable consideration in hand paid, the receipt and legal sufficiency of which are hereby acknowledged, has GRANTED, SOLD, ASSIGNED, TRANSFERRED, CONVEYED and DELIVERED and does by these presents GRANT, SELL, ASSIGN, TRANSFER, CONVEY and DELIVER unto ___, a _____, a _____ (the "Grantee"):

All of the personal property owned by the Grantor or the Manager and located on or in the Property and/or used in the ownership, operation and maintenance of the Improvements, including, without limitation, FF&E, Operating Equipment, Supply Inventories and Consumable Inventories as well as all other personal property presently located on and used in the operation of the Property (but specifically excluding any items of personal property (x) owned by tenants or hotel guests, or (if not paid for by Grantor or the Manager or) the Sub-Manager, or (y) leased under any Equipment Leases, or (z) listed in Exhibit "D" attached to the Purchase Agreement (hereinafter defined)) in "AS IS" condition and without any warranty, representation or recourse whatsoever, except as otherwise provided in the Purchase Agreement (hereinafter defined). All items described above are hereinafter collectively called the "Conveyed Property". Capitalized terms used herein and not otherwise defined herein shall have the meanings set forth in the Hotel Purchase and Sale Agreement dated as of *[___ (the "Purchase Agreement").

_____, 2015], by and between the Grantor and the Grantee (the "Purchase Agreement").

**The Grantor hereby covenants that, from time to time after the delivery of this Bill of Sale, at the Grantee's request and without further consideration or cost or expense to the Grantor, the Grantor will do, execute, acknowledge and deliver, or cause to be done, executed, acknowledged and delivered all further acts, conveyances, transfers, assignments and assurances as may be reasonably required more effectively to convey, transfer to and vest in the Grantee title, as hereinabove provided, to any of the personal property intended to be conveyed hereby.** This Bill of Sale is being entered into pursuant to the ~~Hotel~~ Purchase ~~and Sale~~ Agreement and shall not operate to expand the representations and warranties made by the Grantor therein.

TO HAVE AND TO HOLD the Conveyed Property and all other property as is hereinabove described, together with all and singular the rights and appurtenances thereunto in any wise belonging unto the Grantee, the Grantee's legal representatives, successors and assigns forever.

All of the covenants, terms and conditions set forth herein shall be binding upon and inure to the benefit of the parties to this Agreement, their respective successors, personal and legal representatives, heirs, devises and assigns.

IN WITNESS WHEREOF; the Grantor has executed this Bill of Sale as of the ____ day of _____, 2015.

**GRANTOR**:

GEMINI 37 WEST 24TH STREET MT, LLC,
a Delaware limited liability company

By:____ _____
Name:
Title:

day of

**EXHIBIT A TO BILL OF SALE**

**LEGAL DESCRIPTION OF THE
LAND COMPRISING**

**THE REAL PROPERTY**

**EXHIBIT J 2**

**ASSIGNMENT AND ASSUMPTION**

**ASSIGNMENT AND ASSUMPTION OF PROPERTY**

**THIS ASSIGNMENT AND ASSUMPTION** (the "Assignment") is made as of*[ *[_____, 20-__], by and between GEMINI 37 WEST 24TH STREET MT, LLC, a Delaware limited liability company, whose address is c/o Gemini Real Estate Advisors, 16740 Birkdale Commons Parkway, Suite 306, Huntersville, NC 28078 ("Assignor"), and*[ , a ]. *[_____, a _____("Assignee"), whose mailing address is _____].

W I T N E S S E T H:

**WHEREAS**, Assignor and Assignee are parties to that certain Hotel Purchase and Sale Agreement dated as of *[_____ ___, 2015] (the "Agreement"), which provides, among other things, for the sale by Assignor to Assignee of that certain property commonly known as Wyndham Garden, located at 37 West 24th Street, New York, New York, as more particularly described on **Exhibit "A"** annexed to this Agreement and made part hereof for all purposes, together with other improvements, easements, personal property, governmental permits, operating contracts, intangible property and leases located thereon (the "Property"), and the execution and delivery of this Assignment; and

**WHEREAS**, capitalized terms not defined in this Assignment shall have the meanings given them in the Agreement; and

**WHEREAS**, the improvements attached to the Real Property are being conveyed to the Purchaser, pursuant to a Deed and/or a Bill of Sale, as an ExhibitExhibits to the Agreement; and

**WHEREAS**, the Agreement requires Assignor to assign to Assignee all of Assignor's rights, titles and interests in the Leases, Improvements, Plans and Studies, certain Accepted Operating Contracts, Operating Equipment, Governmental Permits, Accepted Equipment Leases, Warranties and Guaranties, Intangible Property (excluding the Excluded Intangible Property), and Personal Property (excluding the Excluded Personal Property) (as such terms are defined in the Agreement) owned by Assignor and requires Assignee to assume Assignor's obligations thereunder (the "Property");

**THEREFORE**, in consideration of the foregoing and the agreements and covenants herein set forth, together with the sum of Ten Dollars ($10.00) and other good and valuable consideration this day paid and delivered by Assignee to Assignor, the receipt and sufficiency of all of which are hereby acknowledged by Assignor, Assignor does hereby ASSIGN, TRANSFER, SET OVER and DELIVER unto Assignee all of Assignor's right, title and interest in and to the following (collectively, the "Assigned Properties"):

(A) (a) all Leases and Deposits;

(B) (b) all Accepted Operating Contracts identified on **Exhibit "B"** annexed to this AgreementAssignment;

(C) (c) all Governmental Permits;

(D) (d) all Warranties and Guaranties;

(k) (k) all Accepted Equipment Leases identified on **Exhibit "B"** annexed to this AgreementAssignment.

**TO HAVE AND TO HOLD** all and singular the Assigned Properties unto Assignee, and Assignee's successors, and assigns forever, and Assignor does hereby warrant that Assignor is the owner of the Assigned Properties.  This Assignment shall be binding upon and inure to the benefit of the parties to this Assignment, their respective heirs, devisees, legal and personal representatives, successors and assigns.  This Assignment is being entered into pursuant to the Agreement and shall not operate to expand the representations and warranties made by Assignor therein.

Assignee hereby assumes and agrees to perform all of the terms, covenants and conditions of the Assigned Properties on the part of Assignor required to be performed thereunder, from and after the date hereof (but not those required to be performed prior thereto).

**Assignor hereby covenants that, from time to time after the delivery of this Agreement, at Assignee's request and without further consideration or cost or expense to Assignor, Assignor will do, execute, acknowledge and deliver or cause to be done, executed, acknowledged and delivered, all further acts, conveyances, transfers, assignments and assurances as may be reasonably required more effectively to convey transfer to and vest in Assignee title, as herein above provided, to any of the contracts or other property intended to be conveyed hereby, subject to any specific provisions governing such assignments and assumptions set forth in the Agreement.**

All of the covenants, terms and conditions set forth herein shall be binding upon and shall inure to the benefit of the parties to this Assignment and their respective successors and assigns.  This Assignment may only be modified, altered, amended, or terminated by the written agreement of Assignor and Assignee.  If any term, covenant or condition of this Assignment shall be held to be invalid, illegal or unenforceable in any respect, this Assignment shall be construed without such provision.  This Assignment shall be governed by and construed under the laws of the state in which the Property is located without regard to principles of conflicts of law.

[SIGNATURE PAGE FOLLOWS]

**IN WITNESS WHEREOF**, Assignor and Assignee have duly executed and sealed this Assignment as of the day and year first above written.

**ASSIGNOR:**

GEMINI 37 WEST 24TH STREET MT, LLC,
a Delaware limited liability company

By:___ _____
Name:
Title:

**ASSIGNEE:**

BRIDGETON ACQUISITIONS LLC, a Delaware limited
liability company _____,
a _____

By:___ _____
Name:
Title:

**EXHIBIT A**
TO ASSIGNMENT AND ASSUMPTION AGREEMENT OF PROPERTY

LEGAL DESCRIPTION OF THE LAND COMPRISING THE REAL PROPERTY

**EXHIBIT "B"**
**TO**
**ASSIGNMENT**
**AND**
**ASSUMPTION**
**AGREEMENT**
**TO PROPERTY**

**All Accepted Equipment Leases and Accepted Operating ContractContracts**

Exhibit J2, p5

# EXHIBIT "K"

## INTENTIONALLY OMITTED

~~Exhibit K~~

# EXHIBIT "L"

## FIRPTA CERTIFICATE

## FIRPTA CERTIFICATE
## NON-FOREIGN AFFIDAVIT OF ENTITY TRANSFEROR

STATE OF ~~§~~ __§__

COUNTY OF ~~§~~ __§__          §          ss:

BEFORE ME, personally appeared ~~nameof affiant, as of, a~~ _____, as _____ of _____, a _____ ("<u>Affiant</u>"), who having been duly sworn, deposes and says that:

~~1.~~ 1. Affiant is the _____ of Gemini 37 West 24TH Street MT, LLC, a Delaware limited liability company, Owner and the Seller of the Property and has authority to make this affidavit.

~~2.~~ 2. Affiant has actual knowledge of the facts and matters recited herein.

~~3.~~ 3. This Affidavit is made in connection with the sale and purchase of real property located in New York, New York described in **<u>Exhibit "A"</u>** annexed to this Agreement ("<u>Property</u>").

~~4.~~ 4. Affiant makes this Affidavit pursuant to Section 1445 of the Internal Revenue Code that provides that a transferee (purchaser) of a U.S. real property interest must withhold tax if the transferor (seller) is a foreign person. To inform _____, a _____ (the "<u>Purchaser</u>"), and ~~, a~~ _____ (the "<u>Escrow Agent</u>") that withholding of tax is not required upon the disposition of the Property by the Seller, Affiant hereby certifies the following on behalf of the Seller:

~~i.~~ i. The Seller is not a foreign corporation, foreign partnership, foreign trust, or foreign estate (as those terms are defined in the Internal Revenue Code and Income Tax Regulations).

~~ii.~~ ii. The Seller's Tax Identification Number is ~~--~~ _____.

iii.    The Seller has an office address at _____.

iv.    ~~,~~

~~iv.~~    The Seller is not a disregarded entity as defined in Section 1.1445-2(b)(2)(iii) of the U.S. Income Tax Regulations.

~~5.~~ 5. Affiant understands that ~~is~~this Affidavit may be disclosed to the Internal Revenue Service, and any false statement contained herein could be punishable by fine, imprisonment, or both. Affiant further understands that the Purchaser and the Escrow Agent have relied on the statements contained herein.

Under penalties of perjury, I declare I have examined this Affidavit and it is true, correct

and complete.

aBy: _____,

_____
Name:
Title:

SWORN TO AND SUBSCRIBED before me this _____ day of _____, _____. Affiant has produced is _____ is personally known to _____ me or _____ has produced _____ as identification.

_____
Notary Public, State of _____ _____
Qualified in _____ County
My commission expires _____

SWORN TO AND SUBSCRIBED before me this _____ day of _____, _____. Affiant

~~has produced is~~ _____ is personally   known to ~~me~~
~~or~~ me or _____ has produced _____ as identification.

_____

Notary Public, State of _____ _____

Qualified in _____ County

My commission expires _____

Exhibit L, p 2

**EXHIBIT "M"**

**INTENTIONALLY OMITTED**

Exhibit M

EXHIBIT "N-1"

**MANAGEMENT COMPANY TERMINATION LETTER**

_____, 2015

> Re: ~~Re:~~      That certain (a) management arrangement between Gemini 37 West 24th Street MT, LLC (the "Owner") and Gemini Property Management, LLC (the "Manager"), regarding certain aspects of the management of the Wyndham Garden, located at 37 West 24th Street, New York, New York (the "Hotel"), and (b) Hotel Purchase and Sale Agreement (the "Hotel Purchase and Sale Agreement"), dated as of *[–_____, 2015], by and between Owner and ~~Bridgeton Acquisitions LLC~~ FORTUNA 37 WEST 24TH STREET LLC, as assigned to _____ (the "Purchaser"), regarding the purchase and sale of the Hotel.  Capitalized terms not defined herein shall have the meanings given to them in the Hotel Purchase and Sale Agreement.

Ladies and Gentlemen:

The undersigned, by its execution below, hereby acknowledges and affirms that, as of the Closing, (a) the above-described management arrangement and the agreements evidencing the same are terminated, and (b) the Manager agrees that any rights, obligations, or any income or fees it is entitled to or receives from the Owner or the Hotel are and shall be terminated and of no further force and effect.

The Manager agrees to look solely to the Owner for any fees, disbursements, reimbursements and other compensation and obligations under its management arrangements with the Hotel and the Owner accruing prior to the Closing. The Manager hereby releases the Property and the Purchaser from any liability or obligation with respect to its management arrangements with the Owner or the Hotel, and agrees that neither the Purchaser nor the Property shall have any liability to the Manager with respect to such management arrangements or with respect to the Manager's rights or obligations in effect at the Hotel prior to Closing.

Sincerely,

GEMINI PROPERTY MANAGEMENT, LLC,
a Delaware limited liability company

By:_____ _____
        Name:
        Title:

# EXHIBIT "N-2"

## SUB-MANAGEMENT COMPANY TERMINATION LETTER

_____, 2015

    Re: ~~Re:~~    That certain (a) sub-management arrangement between Gemini Property Management, LLC (the "Manager") and Bridgeton Hotel Management LLC (the "Sub-Manager"), regarding certain aspects of the management of the Wyndham Garden, located at 37 West 24th Street, New York, New York (the "Hotel"), and (b) Hotel Purchase and Sale Agreement (the "Hotel Purchase and Sale Agreement"), dated as of *[_____, 2015], by and between ~~52 West 13th~~PGEMINI 37 WEST 24th STREET MT, LLC ("Owner") and ~~Bridgeton Acquisitions LLC~~FORTUNA 37 WEST 24TH STREET LLC, as assigned to _____ (the "Purchaser"), regarding the purchase and sale of the Hotel.  Capitalized terms not defined herein shall have the meanings given to them in the Hotel Purchase and Sale Agreement.

Ladies and Gentlemen:

    The undersigned, by its execution below, hereby acknowledges and affirms that, as of the Closing, (a) the above-described sub-management arrangement and the agreements evidencing the same are terminated, and (b) the Sub-Manager agrees that any rights, obligations, or any income or fees it is entitled to or receives from the Owner, Manager or the Hotel are and shall be terminated and of no further force and effect.

    The Sub-Manager agrees to look solely to the Manager for any fees, disbursements, reimbursements and other compensation and obligations under its sub-management arrangements with the Hotel and the Manager accruing prior to the Closing. The Sub-Manager hereby releases the Owner, the Property and the Purchaser from any liability or obligation with respect to its sub-management arrangements with the Manager or the Hotel, and agrees that neither the Owner, the Purchaser nor the Property shall have any liability to the Sub-Manager with respect to such sub-management arrangements or with respect to the Sub-Manager's rights or obligations in effect at the Hotel prior to Closing.

    Sincerely,

    BRIDGETON HOTEL MANAGEMENT LLC,
    a Delaware limited liability company

    By:___ _____
        Name:
        Title:

## SCHEDULE 1

## LITIGATIONS AND ACTIONS

1.      William T. Obeid, directly and derivatively on behalf of Gemini Real Estate Advisors LLC, Gemini Equity Partners, LLC, et al., Plaintiffs v. Bridgeton Holdings, LLC, Atit Jariwala, The Congress Group, and John Doe Defendants 1 – 10, Defendants, and, Gemini Real Estate Advisors, LLC, Gemini Equity Partners, LLC, et al., Case No. 152596/2015 in the Supreme Court of the State of New York, New York County.

2.      William T. Obeid, directly and Derivatively on behalf of Gemini Real Estate Advisors, LCC, et al., Plaintiff v. Christopher La Mack and Dante Massaro, Defendants, and, Gemini Real Estate Advisors, LLC, et al., nominal defendants, Case No. 14-CV-06498-LTS in the U.S. District Court for the Southern District of New York.

3.      Christopher La Mack, Dante A. Massaro, and Gemini Real Estate Advisors, LLC v. William T. Obeid, Case No. 14-CV-12010 in the General Court of Justice Superior Court Division, Mecklenburg County, North Carolina.

~~All Litigation and Actions of which Purchaser is aware, in its capacity as Sub-Manager.~~

**SCHEDULE 2**

**EMPLOYEE RELATED MATTERS**

~~All plans, agreements, and contracts located at the Property or otherwise on file with the Purchaser, in its capacity as Sub-Manager, and all disputes of which the Purchaser is aware in its capacity of Sub-Manager.~~

None, other than a health insurance plan.

**SCHEDULE 3**

**LEASE INFORMATION**

~~All items of which Purchaser is aware, in its capacity as Sub-Manager.~~None.

## SCHEDULE 4

## WARRANTIES AND GUARANTIES

~~All Warranties and Guaranties located at the Property or otherwise on file with the Purchaser, in its capacity as Sub-Manager.~~ <u>To be delivered at Closing.</u>

## SCHEDULE 5

## PLANS AND STUDIES

1.      ALTA/ACSM Land Title Survey No. 62013-5 of Montrose Surveying Co., LLP for Wyndham Chelsea Hotel, dated August 7, 2008 and last revised November 6, 2013.

All Plans and Studies located at the Property or otherwise on file with the Purchaser, in its capacity as Sub-Manager.2.     Floor Plans drafted by Geme Kaufman Architect PC; dated March 21, 2006.

3.     Property Condition Report prepared by EBI Consulting; dated October 16, 2015.

**SCHEDULE 6**

**ENVIRONMENTAL REPORTS**

1.    Phase I Environmental ~~site assessment report~~Site Assessment prepared by ~~,~~EBI Consulting; dated ~~__, 20__~~October 15, 2015.

Document comparison by Workshare Compare on Tuesday, December 08, 2015 11:57:37 AM

| Input: | |
|---|---|
| Document 1 ID | file://L:/WPDOX/305742/0000018/11154956.DOCX |
| Description | 11154956 |
| Document 2 ID | file://L:/WPDOX/305742/0000018/11154996.DOCX |
| Description | 11154996 |
| Rendering set | Custom rendering set |

| Legend: | |
|---|---|
| Insertion | |
| Deletion | |
| Moved from | |
| Moved to | |
| Style change | |
| Format change | |
| Moved deletion | |
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 514 |
| Deletions | 384 |
| Moved from | 7 |
| Moved to | 7 |
| Style change | 0 |
| Format changed | 0 |
| Total changes | 912 |